UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LITTIECE JONES,

    Plaintiff,

                        Case No. 2:24-CV-11224

v.                           Hon. Susan K. DeClercq

DELTA AIR LINES, INC.,        Magistrate Judge Elizabeth A. Stafford

    Defendant.

| | |
|---|---|
| Littiece Jones | S. Rae Gross |
| (P42514) | |
| Plaintiff, Appearing *Pro Se* | Ogletree, Deakins, |
| Nash,       Smoak | |
| 45014 Trails Ct. | & Stewart, PLLC |
| Canton, MI 48187 | Attorneys for Defendant |
| (313) 515-9797 | 34977 Woodward Ave., Suite 300 |
| lrbj_99@yahoo.com | Birmingham, MI 48009 |
| | (248) 593-640 |
| | rae.gross@ogletree.com |

## Amended Complaint with Jury Trial Demand

Plaintiff Littiece Jones ("Ms. Jones" or "LJ") hereby alleges, as and for her Complaint against Defendant

Delta Air Lines, Inc.("DAL" or "DL") as follows:

### PRELIMINARY STATEMENT

1. Defendant Delta Air Lines, Inc.(DAL) is a major airline and Fortune 500 company that was founded March 2, 1925 and is Headquartered in Atlanta, GA(ATL) in which Detroit Metropolitan Airport(DTW) is one of DAL's Hubs. DAL is ranked second among the world's largest airlines by number of passengers carried, passenger miles flown, and fleet size. It is ranked first

by revenue($58.1 Billion-2023) for commercially owned airline companies as well as in brand value.

2. As of 2023, DAL had 100,000+ employees worldwide. DAL has a standard of being family, safety-first, direct communication with leaders with internal campaign for employees to not vote for a union, see something say something, commitment and partnership to end human trafficking, etc.

3. DAL prides itself on it's people and that its culture is the company's most important competitive advantage and the Delta Difference. DAL has been awarded numerous awards for its Company culture.

4. DAL is a federal contractor that offers support services to various government agencies including Department of Defense.

5. DAL received financial support from the federal government. The financial support received included but not limit to Loans, direct aid, Covid-19 pandemic relief, etc.

6. DAL #1 priority is Safety. DAL employees including leadership are trained to recognize safety hazards, safety threats internal and external, suspicious activity, report directly to management, and when you see something, you say something.

7. Ms. Jones is currently 1 of approximately 100,000 DAL employees in which DAL says it has the "World's Best Employees".

8. Ms. Jones currently has served 12 years as a DAL employee and is in good standing as a DAL employee without any active write ups or disciplinary action.

9. Ms. Jones was selected, out of a rigorous process, to be a DAL DTW Diversity, Equity, and Inclusion(DEI) Advisory Board member where she actively participated by attending meetings, planning events, typing and emailing meeting notes to board members and leadership, contributing to DEI goals and success at DTW station and corporate wide.

10. Ms. Jones applied to be employed by DAL in 2012. On Ms. Jones job application, she shared her religious belief that she is a Seventh-Day Adventist Christian and that she refrains from working  the Sabbath from Friday sunset to Saturday sunset.

11. In 2012, DAL was aware of Ms. Jones religious beliefs, of observing the Sabbath, before she proceeded to the next stage in the hiring process.

12. In 2012, Ms. Jones was invited to move to the next step of qualified applicants and interview with DAL. Ms. Jones told DAL representatives, during the interview, of her religious beliefs and inquired about how scheduling of shifts worked and religious accommodations.

13. DAL representative(s),during the interview, told Ms. Jones that all ACS employees bidded on their schedules by seniority, periodically.

14. Also, during the interview, DAL representative(s) told Ms. Jones that DAL values employee flexibility and offers "shift swapping" to all employees.

15. During the interview in 2012, DAL representative(s) told Ms. Jones that she would be able to shift swap as a religious accommodation.

16.  DAL has historically granted shift swapping as a religious accommodation for ACS employees specifically those who observe the Sabbath from Friday sunset to Saturday sunset.

17. Ms. Jones successfully completed all pre-hiring processes including but not limited to application, computer testing, background check, physical agility testing, hearing and visual test, fingerprinting, drug testing, criminal check, etc.

18. DAL ACS department hired Ms. Jones as a qualified candidate and baggage handler(ramper) on 10/08/2012.

19. Once hired and during training in October 2012, Ms. Jones was told by DAL representative(s) to send an email to officially request religious accommodation now that she was hired.

20. Ms. Jones did, in October 2012, send an email to DAL leadership officially requesting a religious reasonable accommodation.

21. DAL leadership granted Ms. Jones shift swapping as a religious reasonable accommodation.

22. Ms. Jones successfully and without fail, found colleagues, shift swapped her scheduled Sabbath shifts and/or used earned PPT, PO, Holiday, Vacation, or other time to make sure that she had her Sabbath shifts covered.

23. For over 12 years, Ms. Jones successfully and actively contributed to the safety and success of DAL as a company and brand as well as successfully contributing to excellent customer service for customers.

24. DAL does not provide or allow for printed copies of ALL DAL company policies.

25. DAL shares an electronic link for it's employees to click on to view updated policies.

26. When someone clicks on any DAL link as aforementioned, it leads the person to the DAL employee portal where the person has to successfully enter their employee id number and password. Once successfully submitted, the website takes them to the page of the link. Sometimes the link works and the page appears. Sometimes the link does not work and there's an error. Sometimes the link says that the employee has not been granted access to the link

27. DAL does not always notify and/or always give advanced notification to ALL DAL employees of ALL policy changes within their workgroup.

28.  Therefore, sometimes DAL policies, procedures, etc. are often updated/changed/etc without advanced and/or any notice going out to DAL employees of these updates/changes/etc.

29. As of 2012 and up to currently, DAL does not provide  ACS new hire employees with any titled ACS Employee Handbook printed and/or electronically.

30. DAL hired Ms. Jones on or around October 8, 2012, to work as a Seasonal Ready-Reserve(SRR) Agent Below Wing in the ACS/Cargo Department (at DTW).

31. At the time of hire in 2012, SRR agents did not have a policy for working an average of 20 hours per week over a 3 month rolling period.

32. In 2012, SRR had a range of a minimum hour requirement(300 hours) and a maximum hour requirement(800 hours) per year that they were required to meet.

33. Some year after 2012, DAL changed the SRR program to permanent ready reserves(RR) with new minimum and maximum hour requirements.

34. In or around January 2015, DAL  announced RR program enhancements where DAL increased RR minimum hours from 300 hours to 600 hours and increased maximum hours from 800 hours to 1300 hours maximum. This would be effective April 1, 2015.

35. In or around November  2015, DAL changed the ready reserve program again and notified permanent  Ready Reserve Agents that they were bringing back SRR again as an option.

36. The new program hour requirements were SRR minimum of 150 hours and maximum of 1400 hours or RR new hour requirements were minimum of 600 hours and maximum of 1400 hours.

37.  Again, SRR and RR did not have a policy to work an average of  hours per week  over a rolling 3 month period.

38. Also, SRR and RR again were not eligible for DAL medical and health benefits. SRR did not and were not eligible to receive any medical benefits from DAL.

39. As a DAL ACS SRR/RR  employee, Ms. Jones always and each year successfully met the hour requirement guidelines from 2012-2021.

40. From at least 2012 onward, DAL ACS also had a regular benefited position in addition to having SRR and/or RR positions.

41. Regular Benefitted employees were a separate work group from SRR/RR with different policies, hour requirements, medical and health benefit eligibility, etc.

42. From at least 2012-2021, DAL ACS  regular benefited employees had different hour requirements from that of SRR and/or RR in that they did not have minimum and maximum hour requirements.

43. From at least 2012-2021, DAL ACS regular benefitted employees were Full Time or Full Time Equivalent employees.

44. DAL ACS regular benefited full time employees worked and bidded 40 hour per week lines.

45. For a period of time of some years from at least 2012, SRR and/or RR could not even shift swap with regular Benefited employees. SRR and RR shift swapped within their workgroup and Regular Benefited employees shift swapped within their work group.

46. The policy of working an average of 20 hours per week over a rolling 3 month period was a policy for DAL ACS regular benefited FT and FTE employees, not a policy for DAL ACS SRR and RR employees.

47. The aforementioned policy of average of  20 hours per week over a rolling 3 month period was for DAL ACS Regular Benefited FT/FTE employees to maintain for DAL medical and health benefits that ALL DAL ACS Regular Benefitted FT/FTE were eligible to receive.

48. This avg. 20 hour  policy was effective for only DAL ACS Regular Benefitted FT/FTE employees from at least 2018.

49. In 2018, Ms. Jones was a DAL ACS RR agent under the hour requirements of minimum 600 hours to a maximum of 1400 hours.

50. In at least 2018, ALL DAL ACS SRR and RR were under minimum and maximum hour requirements and not under the Regular benefitted FT/FTE requirements.

51. Being so, SRR and RR agents were not notified of any average of 20 hours policy, any employee handbook, DPM, etc because this average 20 hour policy over a rolling 3 month period did not apply to SRR and RR agents who had a minimum and maximum hours requirement.

52. Therefore, Ms. Jones and most if not ALL SRR and RR agents did not know such average of 20 hours per week over a rolling 3 month policy existed because it did not apply to Ms. Jones and all SRR and RR agents.

53. In and or around 2020, unfortunately, the Covid-19 Pandemic hit Worldwide.

54. Due to the devastating effects of the Covid 19 Pandemic, DAL profits, flight schedule, employees, customers, company, etc took a MAJOR hit.

55. The 2020 Covid-19 Pandemic caused DAL as well as other companies and businesses to receive government relief.

56. From at least 2020, DAL received approximately $11.9 billion USD in government Covid 19 pandemic assistance.

57. The over $11.9 Billion USD tax- payer support came to DAL in the form of direct aid, grants, and loans.

58. This tax payer support enabled DAL as an airline carrier to stay afloat during and after the 2020 pandemic.

59. According to aviation week Contributing Editor Aaron Karp, "Delta CFO Paul Jacobson said the airline was burning through $100 million per day at the end of March, a staggering cash-burn rate that is expected to moderate to $50 million per day by the end of June as the company takes action to slash capacity. Delta plans year-over-year system capacity reductions for the June quarter of 85%, including a domestic cut of 80% and an international cut of 90%. Delta has parked more than 650 aircraft."

60. With this over $11.9 Billion USD tax payer government relief came certain government requirements that DAL has to uphold through at least the Payroll Support Program(PSP) under the U.S. Department of the Treasury.

61. Also, With this over $11.9 Billion USD tax payer government relief came certain government requirements that DAL has to uphold through at least the Coronavirus Aid, Relief and Economic Security(CARES) Act.

62. DAL restructured the company and shared that DAL would be a much smaller company.

63. As a result, In or around 2021, the company sunset the current Ready Reserve and Seasonal Ready Reserve program.

64. In or around 2021, introduced a new Seasonal and Benefited CSA group for the ACS/Cargo Department. Employees would have to electronically opt into one of the two groups: a) a new seasonal program with 150 hours minimum and 800 hours maximum between October 16 and October 15 of the following year without medical benefits, or b) a new CSA benefitted program. The new benefitted program would offer CSA full time and full time equivalent lines(schedule) ranging from 20 hours up to 40 hours per week instead of the normal FT 40 hours per week..

65. Per company guidelines, terms, and conditions, benefitted agents who worked less than 1000 hours between Oct. 16 and Oct. 15 of the following year would have to pay 100% of their benefit premiums. Benefitted agents that worked at least 1000 hours between Oct. 16 and Oct. 15 of the following year would maintain the active employer/employee shared premium benefit rate. CSA agents who opted out of benefits would not be affected and had no minimum/maximum hour requirement.

66. Ms. Jones chose to opt into the new CSA benefitted program as a part time agent with 20 hr./week schedule.

67. During this time nor prior to, did the company ever notified nor introduce a policy of 20 hour weekly average over a rolling 3 month period to RR agents as well as new hires who began after the 2021 sunset/new seasonal or benefitted roles/program.

68. Ms. Jones disclosed disabilities of herself and her dependents to leadership from at least 2021 onward.

69. Due to the serious nature involving Ms. Jones and her dependents, DAL DTW leadership were aware of and encouraged Ms. Jones to "take all the time you need".

70. Ms. Jones did so by shift swapping and using all time gained via Vacation, PPT, etc

71. DAL DTW leadership was supportive at first.

72. Ms. Jones was seriously ill with Covid in 2021 and 2022 and let her manager Rob O'Leary know.

73. In 2021 and ongoing Ms. Jones did keep her manager Rob O'Leary informed about her disabilities and he was aware that she had been diagnosed with Long Covid which is a debilitating illness and disability.

74. Ms. Jones also shared with OSMs and Leadership Nikko Vinuya, Rob O'Leary, Bruce Swanson, Mehdi, Hussein Berry, Tenia Russ other disabilities related to her ability to safely do her job duties;

75. Ms. Jones inquired with these leaders regarding accommodations, leaves, etc due to Ms. Jones disabilities and those disabilities associated with her dependents.

76. Ms. Jones noticed that due to her illness and other disabilities,she would not be reach the new 1,000 hour requirement and reached out to HR Tenia Russ to see what the 100% premium costs would be that she would have to pay as part of the new 2021 Benefitted program.

77. Tenia Russ gave an estimation that it would be about 8-10 times as much monthly but shared that she did not know for sur because the rates constantly changed.

78. The 100% premium costs were never billed to me possibly because it would be a violation of the Affordable Health Care ACt.

79. Instead, DTW leadership grew tired of accommodating me and my disabilities.

80. In addition, DTW leadership grew weary of me bringing safety matters to their attention from the wrorkgroup.

81. The Bagroom Pier garage style doors would malfunction in which employees would be injured.

82. Instead of spending money to fix the garage sty doors, DAL DTW Leadership instead blamed employees for walking under the doors.

83. In or around 2022/2023, DTW Leadership painted in red for employees to not walk under the door ways.

84. However, DTW employees need to be able to walk in that area to d their jobs safely, ergonomically, and efficiently.

85. Ms. Jones heard the concerns of many employees and some asked her to take those concerns to leadership as they knew of Ms. Jones active involvement with the company.

86. Ms. Jones truly thought that DAL DTW leaders really wanted to hear from employees as they encouraged… but DTW leaders put profits and number goals over safety.

87. Ms. Jones attended speak your mind sessions and reported workplace violence, safety, and other concerns.

88. Rob O'Leary began to text and call Ms. Jones when she was not at work demanding for her to complete work tasks at home or that same day saying that it was due that same day.

89. Ms. Jones would call Employee support center to see about the due date and as told that those tasks were actually not due for several months.

90. rob O'Leary harassment continued in which in July 2023, he told Ms. Jones that her shift swaps would be stopped because of a policy.

91. Ms. Jones reported this and other workplace concerns to Tenia Russ.

92. ROb O'Leary told Ms Jones that Tenia Russ told him to write things in her work place journal.

93. Leadership grew weary of accommodating Ms. Jones and discriminatorily ended both her religious and disability accommodations.

94. In addition, they threatened, intimidated, and created a hostile work environment in attempts for her to stop reporting safety incidents, for her OSHA  whistleblowing, participating in FAA investigation, etc.

95. Leadership even would call Ms. Jones into the office and interrogate her about her minor dependent being a witness and victim in multiple Federal Human Trafficking/Child Exploitation cases as well as her other dependent's military service.

96. In November 2023, Hussein Berry met with LJ and asked her to give him a timeline for when her and her dependents disabilities would be back to normal.

97. Robert O'Leary and other leaders also began to intensely scrutinize Ms. Jones and threaten to write her up. This would happen in close proximity to Ms. Jones reporting safety incidents.

98. Other employees would approach Ms. Jones or make comments, falsely accusing Ms. Jones of poor work performance.

99. Leadership began to imply that Ms. Jones was not telling the truth about her and her dependents disabilities, implying that Ms. Jones was lying so that she could have time off from work to use her flight benefits to travel and questioning Ms. Jones on the validity of her and her dependents disabilities.

100. Ms.  Jones went from 2012-2023 without much work incidents.

101. From late 2023-2024, Ms. Jones was repeatedly called into the office almost every time she worked in which leadership used intimidation, threats, gaslighting, and exploitation of her disabilities to retaliate and discriminate against Ms. Jones  including threatening to stop her shift swaps which was never a policy that was told to former RR employees who became benefitted.

102. While they threatened Ms. Jones with this policy in July 2023 that would end her religious and disability accommodations, Ms. Jones shared on October 31, 2023 and in meetings with leadership in November and December 2023 that they were singling her out and discriminating.

103. It was then after she told leaders of their discrimination and retaliation that leadership sent a "reminder" memo out to all DTW ACS employees.

104. This policy is not uniformed as currently and previously, there are many agents who do not meet the requirement and their shift swaps are not revoked.

105. Also, airlines are under the Railway Act. This policy is not uniformed amongst ACS in DTW nor is it uniformed companywide. There are other stations companywide where employees have not heard of this policy and/or it is not enforced at all.

106. Disappointingly, DAL DTW chose to discriminate and retaliate against Ms. Jones and then try to cover their illegal practices by trying to enforce a policy that was not even enforceable due to the new 2021 benefitted program.

107. **<u>Safety Concern</u>**

108. DAL DTW ramp equipment are mostly 30+ years old and continuously break down, making it unsafe for agents to use. Ms. Jones brought these concerns of the employee workgroup to DTW leadership as DAL encourages direct communication with leaders.

109. Leadership often times would give agents flight assignments in which the aircraft had already landed prior to the agent starting their shift. Agents would not be able to complete required safety checks of equipment or would not adequately complete safety checks of equipment(EPOIs)

110. **Events of August 1, 2023**

111. On August 1, 2023, online(OL)CSA started at 7:30am, but our assigned flight landed on the ground 10 -15 minutes prior to our shift start time. As a result, we were rushed to the flight by leads/management and not able to complete the EPOI(saftey check) of equipment. By the time we(OL runners/employees) got to the gate, there were numerous bags on the ground which was a safety and safety zone hazard. Typically, runners and ramp crew are set up at the gate before your flight arrives. On this day, however, due to the aforementioned, the ramp crew had already started piling bags in and out of the safety diamond zone, around the belt loader, and aircraft.

112. Ms. Jones called a safety time out at that time as it was unsafe to continue as bags were everywhere on the ground resulting in tripping and injuries risk.

113. Ms. Jones did this to stop the ramp crew from unloading any more bags so that we could safely load the bags that were on the ground and proceed with our job duties.

114. She followed safety time out protocol as trained in previous years. The company has since upgraded safety time protocol and procedures that include different and additional steps yet she was not privy nor assigned and completed that training of new safety time out until months after August 1, 2023.

115. Ms. Jones reported this over the radio to leadership including OSM Rob O'Leary and to Jeff Simonin (Rob's Manager) on 08/01/23.

116. Ms. Jones also later reported this in a "Speak Your Mind Session" with leadership including VP Hussein Berry on 08/09/23 and to HR manager Tenia Russ.

117.    In another incident that day, Rob wanted LJ to do some of on-going training and FBI/Homeland Security fingerprinting that day.  I shared with him that I was watching my assignments line for when he would assign that task/puck to my line (put a reservation for the job security and training in my schedule for the day).  Rob refused to assign me a task for my line instead berating me. I inquired with the radio as to when it may be a good time for me to complete tasks and as a result they put a puck on my line for job training/tasks per normal process.  This was not the first time Rob had refused to put a puck in my schedule and without this puck reservation of time, I have experienced schedule conflicts.  For instance, I might be assigned another flight when Rob wanted me to perform another duty and then he would accuse me of not doing or being at one or the other double booked job tasks.

118.    After being assigned tasks, Rob came by my area to check on my whereabouts and to report me to Jeff Simonin. About 15 minutes later, Rob emailed me to ask if I was done yet and this was a pattern of extreme criticism, false accusations of work performance/training completion, etc. I saw Jeff Simonin, Rob's supervisor, and shared my concerns about the morning's safety incident and my concerns with Rob's harassment and inappropriate conduct. I also showed Jeff Rob's numerous and demanding text messages to me while I was off the clock. I told Jeff that I felt Rob's texts, refusal to task my line yet demand job duties including while not at work were inappropriate and retaliatory. During my meeting with Jeff, he shared that Rob should not have been sending me the texts yet gave a managerial perspective as to perhaps why Rob may have.

119.    **January 17, 2024**

120.    On 1/17/24, my tug vehicle/equipment broke down and I notified leadership immediately. A lead pushed me while in the tug across an active taxi-way. This is a safety and FAA violation yet common practice at DTW. I was on the radio, and someone asked me why the tug stopped. At first, we thought it was out of gas, but it turns out the gas gauge was broken and it was another unknown issue. The lead was able to get it to start and followed me back to the break room where I was criticized for responding when asked over the radio that I had been pushed in the tug as this

was a safety violation in which I did not know as pushing broken down equipment is a common practice at DTW. There were no other tugs available for me to use and as a result, I followed up with Rob who approved me to continue using the tug but to drive it to the shop in which I did. While at the shop, I was assigned another flight/task in which leads incuding Rob ultimately had me leave the shop, continue with assigned tasks for remainder of shift, and to await their further direction with tug TBD.

121. When my shift was completed, I was retaliated against by Rob O'Leary who publicly berated, humiliated, intimidated, threatened with disciplinary action, falsely accused, refused to allow me to leave although I was off the clock, harassed, provoked, and aggressively abused his managerial authority and power. He falsely accused me of not being in safety PPE compliance with not wearing my bump cap although I shared with him that I had just taken it off and put it in my locker at the end of my shift and I was now off the clock. His abuse of authority was in retaliation for my reporting of safety concerns earlier in the day as he was provoking in an attempt to get me to admit to something that I did not do so that he could have disciplinary action against me for my reporting that day. Rob would keep me past my end time at work being very aggressive and demanding that I answer his questions even while I was off the clock. I shared with Rob that I was off the clock and if we could follow up at another time to which Rob stated that I was still on company property and I was refusing to answer his questions, which was not true, as I had answered his questions numerous times but he wanted me to admit to his false accusations which were not true. He did this publicly for over 30 minutes in which other employees heard him berating me. His supervisor Ron Cook, also heard him and came in the area but allowed Rob to continue to publicly humiliate, criticize, falsely accuse, intimidate, threaten discipline, and keep me hostage as I requested to be allowed to finish what I was doing as I was off the clock.

122.

123. **Events of August 9, 2023**

124.

125. For August 9, I had been selected to attend a discussion concerning a new uniform design. Rob saw me at the meeting and criticized me for not having my hair up. When I am working as a Customer Service Agent (CSA), I always follow the safety requirement to have my hair up. However, in a meeting where there is no safety concern, Rob's criticism of my hair was unwarranted. Furthermore, I have seen another CSA wear her hair long and loose during her work hours, and to the best of my knowledge, Rob did not criticize her.

126.

127. Around August 9, 2023, I was invited to a "speak your mind" session with higher level executives. During that session I voiced safety concerns about equipment, EPOIs, work areas, management had given us flights before our start times (such as on August 1), and other concerns that employee workgroup had conveyed.There were about 35 employees and leadership there including Hussein Berry, Tenia Russ, Darrin Parker, Eric Pricco.

128.

129. Also on August 9, I met with Human Resources representative Tenia Russ. I reported the events of August 1, including the safety issue, as well as Rob's inappropriate behavior, including texting me while I was off the clock, refusal to task my line, and concerns about the average 20-hour per week policy, etc. During the meeting, Tenia constantly interrupted me and didn't take my concerns seriously. She shared that she did not see anything wrong with Rob's conduct, etc. Tenia explained the policy but was unclear about the rolling three month aspect of it and could not provide more details as to notification to employees, new benefitted program 2021, etc. She also explained how me not coming to work effected the full time equivalency or numbers for the company"s count?? She told me she would get back to me about the policy but never did.

130.    .

131.

132.

133. My supervisor Robert O'Leary (Rob) began to harass me and seemed to be looking for any reason to criticize and single me out. I believe he did this in retaliation for my bringing up safety issues, reporting his harassment, and also because I had been absent with Long Covid, which is considered a disability. I had also been absent supporting my daughter, who was a victim of a crime which resulted in disabilities related to being victim of crime. In addition to harassment, he also inquired in a way I found inappropriate into my personal life. Rob continued to make disparaging comments and falsely accusing me which created a hostile work environment. Rob also made it difficult for me to receive Personal Protection Equipment(PPE), he frequently complained to me about the hours I spent in DEI-related activities and claimed that he never saw me other than in DEI meetings. He texted me repeatedly while I was off the clock to hound me to complete my training (going so far as to suggest I complete it at home while off the clock) even though I had made arrangements with the training department, completed the training, and it was only because of an IT issue, which he had been informed of, that my completion was not showing up in Delta's system. Rob also would ostracize me by calling the training department to have them make sure that I was in the training department, text, and email me as if I was not where I was supposed to be. Rob also demanded that I complete work related things while off the clock and on the same day that he would text me, falsely stating that I had to do them that day when in reality, the item was not due for over another month to several months later. Due to the frequency and harassing nature of his texts, I requested that he not send me text messages but send work related items to my work email instead. Rob continued to text me.

134. Examples: In July 2023, while I was off the clock, Rob texted me to say I had to take care of an incomplete fingerprinting issue that same day. I called the Employee support Center, and they told me that I had up until January 2024 to complete the fingerprinting and I did NOT have to come in that day. It was at this point that I let Rob know that I would appreciate it if he could communicate via work email rather than text–unless an emergency–while I was off the clock.

135. **Events of October 31, 2023 and November 1, 2023**

136. On October 31, 2023, Rob pulled me into a mandatory one-on-one meeting, which was also attended by Niko Vinuya, an OSM (manager supervisor). During this meeting, Rob asked me about my family life, specifically about my daughter while other employees were in the office. He proceeded to ask about details of the crime where my daughter was victimized. Rob complimented me for "staying busy" and working with DEandI and FIT and asked me if I planned to switch roles within the company. He then told me I wasn't working enough hours and that he had sent me an E-mail explaining a 20 hour/week (average over a rolling 3 month period) requirement. I questioned the fact that this policy was never shared with employees when we became benefitted in 2021. There was also no forum for employee education on this policy as Delta has offered in the past. I brought up that no one else's schedule was critiqued, just mine. This made me feel singled out, which I verbalized. I clarified that I requested a leave of absence due to my daughter's victimization (which was approved). Later, I got Covid, took vacation days, and the other days were either traded or swapped and Jeff Simonin(Rob's supervisor) advised me I was not in trouble or at risk of discipline in any way. This entire meeting was held with the office door open for the first half hour with other employees walking by. Once the office door was closed, I explained the seriousness of the issue involving my daughter and that our lives were altered, forcing an ongoing legal situation as well as ongoing medical care. On this date, I filed a claim with Sedgewick to file a retroactive leave of absence as Niko suggested.

137. Earlier in this meeting, Rob noted that Delta offers a 2500 mile/$25 bonus if a bag doesn't get delivered to the baggage claim within 20 minutes. Later on this same date, I was called to meet with Nick Cook. Nick told me about this 20 minute rule and told me to be "conscious of the routes I'm taking". I explained that on the flight in question (A25) the employee I was working with did not show up, leaving me on my own to unload the bags. The absence of the employee also left me with insufficient time to perform the required safety check (EPOI). While he said it "wasn't on me", I felt as if I was being singled out again since I was called to the office in the first place and he was writing it up in my employee record/journal.

138.    November 1, 2023 Sedgwick returned my call and I let Rob know that I had contacted them as requested. I explained that I didn't qualify for FMLA but they were looking into a caregiver leave of absence. Additionally, I told him Jeff told me my shift trades were safe and that we had a conversation about it back in August. The conversation with Jeff occurred when I advised him of Rob texting me on my days off and also the safety issue (See August 1st). He noted he didn't know about this conversation because I didn't use the proper chain of command. The reason I went to Jeff in the first place is to report Rob texting my personal phone on my days off and the fact that his refusal to "puck my line" when he assigned a different work related task. He chastised me for talking to other managers.

139.     He told me that he had been using my employee journal as a "tracking" and had put a note in there listing "personal issues" because they are affecting my work with Delta. I asked Rob why he was putting personal information about me and my family into my employee record as any manager can see what you enter in there. Rob responded that other people would be assured he is doing his job. Rob said "You need to call and talk to Tenia, she is the one who told me to put [the information] in your record." He said, "That is protocol". I brought up that I didn't know why personal issues (even though he said it was not specific) needed to be in my file at all, potentially jeopardizing future career growth with Delta. I have an e-mail from Rob documenting my employee record/journal entry that states I have been utilizing EAP, receiving counseling, and therapy for my personal life issues. This should all be confidential and protected information. He suggested that I go speak to Tenia to clarify as she was the one who told him to put it in my employee record. I asked when Tenia had told him this and he informed me that she told him to add these things to my record. Rob noted he tracks my attendance because he gets an e-mail when I call off. I corrected him by saying I never call off.

140.     Later in the day, I looked for Rob and he wasn't there so I spoke to Jeff (Rob's manager). He immediately brought up my hours and the fact that Rob was texting me on my days off. Jeff asked

me when I would be able to work my full shift and I explained that the situation with my daughter is ongoing and unpredictable.

141.    In addition, Rob informed me that because I was not averaging 20 work hours per week my shift trading privileges could be taken away. I told Rob and Niko that I felt I was being singled out for scrutiny of my hours and possible revocation of trading benefits.  I knew many fellow employees who I did not think averaged 20 work hours a week and to the best of my knowledge they had not been subject to criticism or potential shift trading privilege revocation.

142.    It is my opinion that I was being treated differently than other employees because I had raised safety concerns, had reported Rob to HR and various leaders, and I raised concerns regarding my employer violating the ACA. Also, As it relates to the Affordable Care Act, Human Resources still has not given me the tax forms 1095-C for the years 2021 to 2022 to file. My concern with ACA is that due to my disabilities and that of my daughter's, I worked less than 1000 hours in the company guideline policy and my company is retaliating by creating new policies after the fact so that I have to work more hours so that I pass the 1000 hour threshold requirement so that I will have to pay the insurance and ACA premium and not qualify for the ACA tax subsidy. In addition, I believe that not only myself but the company is violating ACA with employes systemwide. The company often times creates new policies after the fact without legally notifying employees in order to fit their narratives and cover/protect the company with safety issues, ACA, and other issues. The company will then mandate and target employees to "Read and Signs" and acknowledgement of other newly created policies without employees knowledge and to be able to manipulate situations in which the company may be in violation of.

143.

144.    After that I contacted/called Hussain Berry, Regional Vice President, and asked if we could meet and shared my concerns. I met with him in person. During my meeting with Hussain, I shared with him that I had these concerns about Rob and basically how after I met with Taneia, Rob pulled me in on the one to one and put these things in my employee record/journal. For

example, Rob had told me that I had received help and counseling and therapy EAP, employee assistance program.  I also asked Hussain about the hourly schedule issues. I have been asked to work more than my scheduled hours (I was asked to work over recently) and Rob also threatened me with taking away my hours. More details with Hussein Berry

145.

146.    In 2021 they introduced the benefit to opt in or opt out the minimum and maximum hours we would have to work in order to have the employer/employee shared cost. If we worked under that 1000 hours, we would have to pay 100% of that cost. But now Rob is saying that I have to work a min of 20 hours which will put me over the 1000 hours. Tania told me through email that she didn't know what the 100% cost would be. But I am concerned as to how I would pay the employee shared cost – nothing ever came of my emails with Tania.

147.

148.    I believe that Delta management/leadership is retaliating and they contacted Corporate HR(Antonio Bush) not to resolve my concerns but as retaliatory measures to protect the company and use the information that they mandate me to provide against me to terminate me for raising safety, retaliation, and ACA concerns . I think the employee premium cost under the ACA is higher than what they have told us and I know there's a formula. Now that Delta is implementing this new employer/employee shared cost, it's my belief they are violating that act by making me come in to work my full shift at a full time rate.

149.

150.    Right now, I'm at $26.54 per hour. So if I work 20 hours, that will put me over my formula for the lower shared rate. To my knowledge, 1,040 hours puts you in the employer/employee shared responsibility under the ACA then Delta would have to pay the 100% premium rate. But when I emailed HR to confirm this, I was told, "The market rate changes daily."

151.

152.    I believe that I was discriminated, harassed, and retaliated against with respect to "compensation, terms, conditions, or other privileges of employment" (i.e. requirement to increase/decrease work hours,  violation of Delta's flexible worker hours agreement and new 2021 benefitted CSA employee role terms, conditions, and agreement, because of my reporting for myself and employee workgroup 1) Safety concerns, 2) Harassment and Retaliation, 3) Violation of ACA including but not limited to Title I, refusal to participate in an activity the employee reasonably believes violates ACA including but not limited to Title I, and/or receives a tax credit or cost-sharing reduction under ACA. eduction of hours and then requirement to increase my hours is a form of harassment that violates Delta's flexible worker hours agreement, new benefitted employee program terms and conditions for opt-in, and is related to my speaking up about safety issues, retaliation/harassment, and for notifying the company of concerns about aspects of premiums, Affordable Care Act. I believe that  I want OSHA to expunge my employee record of all disciplinary action that relates to my speaking up about safety incidents and/or all inquiries about my enrollment in the Affordable Care Act. I would also like for OSHA to reinstate me to positions that leadership demoted me from. Employee workgroup would benefit from OSHA reviewing Delta's Safety/etc reporting processes and protocols and provide training and/or recommendations so employees feel safe to report concerns without fear. I would also like OSHA to require Delta to post signage that informs other employees about their rights to raise safety, Affordable Care Act, and other concerns with statues under the scope of OSHA without discrimination. It will benefit the company and employee workgroup to do an inspection of DTW equipment and operational areas for safety compliance.

153.    Nicole Smith by the Employee Engagement Team. Nicole Smith was asking approval from Leader, why did she inlude Jeff Simonin? She sent it on 12/6/23 at 2:12pm EST. I responded 12/6/23 at 3:02pm confirming that I'm available to attend, the Nicole Smith responded on 12/7/23 at 11:17 am EST that we appreciate your interest,  however the spot is no longer available, was her (Nicole Smith) response in the email.

154. 12/7/23 at 11;17am EST-A follow up email was sent from Nicole Smith the following day 12/7/23 indicating that she hope I will consider attending a future Velvet event in the upcoming Spring 2024 EOI for Velvet which can be found on their divisional page (Velvet DeltaNet.page

155. 1/18/24- I emailed Shane Bowman, R.O., and 8 other Delta  Leaders regarding the incident about not having my bump hat and steel shoe boots on

156. DEI event- Gleaners July 12, 2023 I organized Gleaners event. OSM Rob O'Leary gave me a hard time.

157.

158. October 31, 2023: 1st shift AM- (Retaliatory) OSM Robert O'Leary (R.O.),OSM Nikko Vinuya- Called me into office for employment record/journal entry- Notified me of new local bags policy/requirement, interrogated me about personal/life "family life" situations with my daughter,

159.

160. October 31, 2023: 2nd shift PM- (Retaliatory) OSM Nick Cook called me in office for employment record/journal entry for local bags incident

161.

162. November 1, 2023- (Retaliatory)R.O- called in office

163.

164. November 3, 2023- (Retaliatory) Ben from ESC denying your trades in schedule, had to advocate for shift/trade policy to be followed

165.

166. November 9, 2023- Met with Vice President Hussein Berry

167.

168. November 10, 2023- (Retaliatory) ramp-in task, job out of my area/role of online/transfers. Ramp-In is a different job role which requires different safety procedures, and safety PPE including safety wands, knee pads, headset, belt loader,

safety check EPOI of equipment, etc which was either not provided and/or not included or done.

169.

170. November 29, 2023- Tenia Russ (HR), Jeff Simonin (GM), Hussein Berry (VP),Hussein Berry requested meeting with him as follow up to November 9, Tenia Russ included herself and Jeff Simonin in meeting.

171.

172. December 1, 2023- Called EAP at 1:15a due to on-going harassment, to talk to someone

173.

174. December 6, 2023- Delta lead said they had been calling for over an hour, looking for me. It had not been that long, maybe 10-15 minutes and falsely accused me of not taking local bags to the belt which would result in write up but it was not true.

175.

176. December 9, 2023: (6:00p)- Tried to write me up for a safety check (EPOI) not done, though it can only be done once a day. I showed that I tried to submit via spring shot device. No write up

177.

178. December 13, 2023- R.O. Sent me an email at 9:46am telling me to complete my EPOI (Safety Check of Equipment)

179. ** (Find out what shift hours and Flight assignments and refer to pictures on phone)-regarding above …part of R.O. Harassment is that falsely accusing me that I did not complete my EPOI.

180.

181.   December 16, 2023:(Midnight Reroute shift)Was made aware by coworker that their was a DEI event email that was sent out and I did not receive invite to see "The Color Purple".

182.

183.   December 17, 2023- Completed Safety Time-Out Training

184.

185.   December 17, 2023: (6:00a)- reported equipment being stored in zipper row, in rainy conditions

186.

187.   January 17, 2024- This morning tug broke down, had to still drive it for the rest of the day, I reported this as a safety concern. A Lead pushed the tug vehicle and myself in an active runway zone. I was criticized for sharing this over the radio and I reported this to my manager.  Robert O'Leary, kept me for 35 minutes, harassed after shift for taking PPE stuff off after I completed my work shift. I was completing paperwork at this time, off company time. (Had just came back from two week vacation)

188.

189.   January 17, 2024: (12:08p)- Corporate Office called Antoino Bush (HR), reported what happened earlier to Antonio

190.

191.   January 24, 2024- Robert O'Leary, asked me "are you with us today." He told me about a 20-hour rule, he hadn't showed me how to find it in the portal. I made him aware that the new benefited transition program did not state this policy. *Highlighted to go back and fill in more.*

192.

193.

194.   January 26, 2024-

195.

196.    January 31, 2024- 6:42am I emailed RO

197.

198.    January 31, 2024: (Retaliatory) (10:10a)- Called to a coaching meeting with Robert O'Leary, he stated they are doing one to one meetings with everybody. Employee Record/journal entry

199.

200.    February 2, 2024- RO

201.

202.    February 2, 2024- Phone call with Antonio Bush (Corporate HR)-wants timeline of history of Rob O'Leary text messages, emails, etc that shows examples of harassment within chronological order.

203.

204.    February 2, 2024- Phone call with Exec. Eric Snell shared that head HR took a look and their was nothing personal in my journal that would suggest that they are watching and/or tracking me. I shared that my main concern is with my OSM Robert O'Leary, HR Tenia Russ, and VP Hussein Berry. Felt that this could have been resolved with a conversation earlier when I first reported my OSM to HR on August 9, 2024. When I met with Rob on November 1, 2024, he shared that HR Tenia Russ directed him to do so. I do have something that I want to share with you all but have hesitation. Antonio Bush is a neutral party to take all of the facts and take the best course of action. I shared that their were concerns with Antonio Bush. Eric Snell will work with HR that Antonio Bush will share with HR. Want to hear feedback. Retaliation concerns.

205.

206.    February 2, 2024- Phone call with Antonio Bush (Corporate HR)

207.

208.   February 3, 2024- 1st shift (OL) Did not have a safe assigned tug(running hot) or springshot(ran out), was not able to complete safety EPOI of equipment at beginning of shift and shared with LCO. An 1.5 hr after shift start, tug previously used was assigned to me and was shared that someone had completed a safety EPOI on it earlier.

209.

210.   February 3, 2024- 2nd shift(Re-route) Did some leg work for statement

211.

212.   February 5, 2024- Antonio Bush call- Shared for me to take my time in writing a statement of what we had previously discussed as he did not have any further questions although we did not go over my concerns. Discussed safety concerns for shift on Feb 3 and it was ok for me to share those concerns with leadership. Antonio also brought up his concerns that I had spoken with and contacted Erick Snell and I had not shared that information with him. I shared that Erick reached out to me on behalf of Ed Bastian. I shared concerns of conflict of interest amongst leadership and concerns that the process is not a neutral process concerns with Leadership communicating with each other regarding the process, etc. Antonio at the time was not interested in all of my concerns and only select things that were shared with him from leadership. Also, shared concerns that company refused to provide company policy and procedures when requested and would only share after the investigative process which raises concerns for additional retaliatory discipline for raising safety and other concerns. This raises additional concern of fair, neutral process and the integrity and resolve. Also, Antonio was unclear in Company policy and processes and that was no adverse action to me but the company was not sure how they had rolled out the company policy of average hours and that payroll does an audit and it is a heads up as no one's shift swaps have been revoked. How did this all start and when were employees told of this company policy? Employee workgroup  are concerned about unknown, unclear company policies. Antonio let me

know that his conclusion was that this was not because of my reporting of safety concerns. He was not finding my concerns regarding retaliation of sharing safety concerns to be valid. He shared that he is only able to make recommendations to station leadership and station leadership decides what further action, if any, they will take.

213.

214. There has been more incidents past the date of this filing on or around February 8, 2024 and it is ongoing so much so were it has negatively affected my health and

215.

216. I believe that I was discriminated, harassed, and retaliated against with respect to "compensation, terms, conditions, or other privileges of employment" (i.e. requirement to increase/decrease work hours, violation of Delta's flexible worker hours agreement and new 2021 benefitted CSA employee role terms, conditions, and agreement, because of my reporting for myself and employee workgroup 1) Safety concerns, 2) Harassment and Retaliation, 3) Violation of ACA including but not limited to Title I, refusal to participate in an activity the employee reasonably believes violates ACA including but not limited to Title I, and/or receives a tax credit or cost-sharing reduction under ACA.

217. Reduction of hours and then requirement to increase my hours is a form of harassment that violates Delta's flexible worker hours agreement, new benefitted employee program terms and conditions for opt-in, and is related to my speaking up about safety issues, retaliation/harassment, and for notifying the company of concerns about aspects of premiums, Affordable Care Act. I believe that I want EEOC to expunge my employee record of all disciplinary action that relates to my speaking up about safety incidents and/or all inquiries about my enrollment in the Affordable Care Act. I would also like for EEOC to Ms. reinstate me to positions that leadership demoted and blacklisted me from. I would like EEOC to award any monetary damages and any unpaid wages. I would like EEOC to

218.

219. There are some incidents and details that I left out due to time constraints and ability to complete due to DAL workplace anguish **FIRST CAUSE OF ACTION**

**Violation of Title VII of the Civil Rights Act of 1964 based on**

**religion**

220. Ms. Jones requested a religious accommodation in 2012

221. Ms. Jones utilized shift swapping, historically a DAL religious accommodation, successfully for almost 12 years, Delta stopped the religious accommodation for discriminatory and retaliatory illegal reasons.

222. **SECOND CAUSE OF**

**ACTION** **Violation of Title VII of the Civil Rights Act of 1964**

**based on disability** **THIRD CAUSE OF**

**ACTION** **Violation of Title VII of the Civil Rights Act**

**of 1964 And the Elliott-Larsen Civil Rights Act**

**FOURTH CAUSE OF ACTION**

223. **Violation of Title VII based on Hostile Environmemt Harassment**

224. **FIFTH CAUSE OF ACTION** Violation of Title VII

Severe or Pervasive Requirement

225. **SIXTH CAUSE OF ACTION** FOR Retaliatory

harassment

226. **SEVENTH CAUSE OF ACTION** Violation of Michigan's

Whistleblower's Protection ACT

227. **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays judgment be entered in her favor against the defendant as follows:

1. For shift swap restrictions to be lifted and held as a reasonable accommodation to uphold status quo and henceforth since Ms. Jones began employment in 2012 in which historically shift swaps are granted as a religious accommodation;

2. For Ms. Jones to be restored to DTW DEI advisor for a full term;

3. For Ms. Jones to be allowed to attend a near future DAL Company Velvet event in SLC as previously afforded to her;

4. For disability accommodations requests to be granted in terms of written and printed copies given to Ms. Jones of all policies within her workgroup;

5. For any work related record be cleared of any false allegations of improper or wrongful doing of Ms. Jones that is unsubstantiated;

6. For safety check of DTW ACS work area, procedures, policies, guidelines.

7. For a money judgment representing compensatory damages including consequential damages, lost wages, earnings, earning potentials for self-employment, and all other sums of money, together with interest on these amounts;

8. For a money judgement for mental pain and anguish and severe emotional distress;

9. For punitive and exemplary damages;

10. For any attorney fees and costs;

11. For any ProSe fees and costs;

12. For prejudgment and post-judgment interest;

13. For a money judgment for mental pain and anguish and severe emotional distress of pass riders and dependents of familial status to Ms. Jones

14. For such other and further relief as the Court may deem just and proper.   Dated: October 21, 2024                                                  Detroit, MI


     Respectfully submitted,                                                  /s/ Littiece Jones

                                     Ms. Littiece Jones

45014 Trails Ct.                                                                    Canton, MI 48187

LRBJ_99@yahoo.com