# Exhibit A

.

1

```
 1              ***UNCERTIFIED ROUGH DRAFT***

 2        This unedited rough transcript draft is uncertified

 3    and may contain incorrect punctuation, misspelled proper

 4    names and/or terminology, an occasional reporter's note,

 5    and/or inaccurate/nonsensical word combinations. There

 6    WILL BE discrepancies between this form and the final

 7    form.

 8

 9        Please keep in mind that the final certified

10    transcript's page and line numbers WILL NOT match the

11    rough draft due to the addition and/or editing of title

12    pages, indices, appearances of counsel, paragraphing,

13    formatting, and other changes.

14

15        Due to the need to correct entries prior to

16    certification, parties agree to use this transcript

17    draft only for the purpose of augmenting counsel's notes

18    and may not be cited or used in any way or at any time

19    to rebut or contradict the certified transcription of

20    the proceedings and should not be distributed in any

21    form to anyone who has no connection to this case.

22
```

23

24

25
↟

2

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF MICHIGAN

3                      SOUTHERN DIVISION

4     _____

5     LITTIECE JONES,

6              Plaintiff,

7        v.                              Case No.

8     DELTA AIR LINES INC.,              2:24-CV-11224

9              Defendant.

10    _____

11                DEPOSITION OF LITTIECE JONES

12    DATE:         Thursday, January 8, 2026

13    TIME:         10:20 a.m.

14    LOCATION:     Avalon Healing Center

15                  601 Bagley Street

```
16                    Detroit, MI 48226

17   REPORTED BY:   Melanie Malinowski

18   JOB NO.:       7781741

19

20   PAGES 73-76 ARE CONFIDENTIAL

21

22

23

24

25
```

3

```
1              A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFF LITTIECE JONES:

3       LITTIECE JONES, ESQUIRE (by videoconference)

4       Pro Se

5       45014 Trails Court

6       Canton, MI 48187

7       lrbj_99@yahoo.com

8       NA
```

```
9

10   ON BEHALF OF DEFENDANT DELTA AIR LINES INC.:

11        ANTHONY J. SIMONTON, ESQUIRE (by videoconference)

12        Ogletree Deakins Nash Smoak & Stewart, PC

13        191 Peachtree Street Northeast

14        Atlanta, GA 30303

15        anthony.simonton@ogletree.com

16        (404) 881-1300

17

18   ON BEHALF OF DEFENDANT DELTA AIR LINES INC.:

19        LAUREN H. ZELDIN, ESQUIRE (by videoconference)

20        Ogletree Deakins Nash Smoak & Stewart, PC

21        191 Peachtree Street Northeast

22        Atlanta, GA 30303

23        lauren.zeldin@ogletreedeakins.com

24        (404) 881-1300

25
```

4

```
1             A P P E A R A N C E S (Cont'd)
```

2    ON BEHALF OF DEFENDANT DELTA AIR LINES INC.:

3        ERIN HARRIS, ESQUIRE (by videoconference)

4        Delta Airlines Senior Corporate Counsel

5        1030 Delta Boulevard, Department 981

6        Atlanta, GA 30354

7        erin.harris@delta.com

8        (404) 715-6061

9

10   ALSO PRESENT:

11       Robert Casey , IT for Ogletree Deakins (by

12       videoconference)

13       Alice Johnson, Emotional Support Person (by

14       videoconference)

15       Melissa Coleman, Emotional Support Person (by

16       videoconference)

17       Milan, Emotional Support Person (by

18       videoconference)

19       Justin Dloski, Videographer (by videoconference)

20

21

22

23

24

25

5

```
 1                    I N D E X

 2  EXAMINATION:                        PAGE

 3      By Ms. Zeldin                   8

 4

 5                  E X H I B I T S

 6  NO.            DESCRIPTION          PAGE

 7  Exhibit 1     Littiece Jones Notice of

 8                Deposition            39

 9  Exhibit 2     Original Complaint    40

10  Exhibit 3     Amended Complaint     41

11  Exhibit 4     Littiece Jones Training Record   107

12  Exhibit 5     Delta Internal Memorandum        132

13

14            QUESTIONS REFUSED TO ANSWER

15                 PAGE          LINE

16                  17            7

17

18        D O C U M E N T S   R E Q U E S T E D

19  NO.            DESCRIPTION                    PAGE
```

20  1              Records from Hairt Salon              84

21

22

23

24

25
↟

6

1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are on the record

3   at 10:20 on January 8, 2026.  This is the

4   videorecorded deposition of Littiece Jones, taken by

5   defendant in the matter of Jones vs. Delta Air Lines

6   Inc., filed in the U.S. District Court for the Eastern

7   District of Michigan, Case 2:24-CV-11224.

8                    My name is Justin Dloski, representing

9   Veritext.  Counsel may now introduce themselves for

10  the record, then the reporter will swear in the

11  witness.

12                    MS. ZELDIN:  This is Lauren Zeldin, for

13   Delta Air Lines.

14                  MR. SIMONTON:  Anthony Simonton, also

15   for Delta Air Lines.

16                  MS. HARRIS:  Good morning.  And Erin

17   Harris, in-house counsel for Delta Air Lines.

18                  THE REPORTER:  Ms. Jones, if you'd

19   like, you can state your name on the record.

20                  MS. JONES:  Littiece Jones, pro se

21   litigant.

22                  THE REPORTER:  Perfect.  Thank you.

23                  And hello, everyone.  My name is

24   Melanie Malinowski.  I am the reporter that was

25   assigned by Veritext to take record of this

                                                    7

1    proceeding.

2                   I'm just going to read a small speech

3    here and then I will swear you in Ms. Jones, so please

4    bear with me.

5                   I am a notary authorized to take

6   acknowledgements and administer oaths in Michigan.

7   Parties agree that I will swear in the witness

8   remotely.

9              Additionally, absent an objection on

10   the record before the witness is sworn, all parties

11   and the witness understand and agree that any

12   certified transcript produced in the recording of this

13   proceeding:

14              - is intended for all uses permitted

15                 under applicable procedural and

16                 evidentiary rules and laws in the

17                 same manner as a deposition recorded

18                 by stenographic means; and

19              - shall constitute a written

20                 stipulation of such.

21              Does anyone have any objections to this

22   legal stipulation, before I swear in the witness?

23   Everyone is quiet --

24              MS. JONES:  No.

25              THE REPORTER:  -- so hearing no

8

1   objection --

2                   MS. ZELDIN:  No, no objection.

3                   THE REPORTER:  -- I will now swear in

4   -- thank -- thank you.

5                   Ms. Jones, please raise your right

6   hand.  Thank you.

7   WHEREUPON,

8                       LITTIECE JONES,

9   called as a witness and having been first duly sworn

10  to tell the truth, the whole truth, and nothing but

11  the truth, was examined and testified as follows:

12                  THE REPORTER:  Okay, great.

13                  I am going to go on mute.  Attorneys,

14  you may take over.

15                      EXAMINATION

16  BY MS. ZELDIN:

17      Q   Good morning, Ms. Jones.  My name is --

18      A   Good morning.

19      Q   -- Lauren Zeldin.  We've met before; we

20  actually have met in person.  Do you recall that?

21      A   Yes.  I can't really see your face and I

22  know it's a few Laurens, but I'm assuming you're the

23  same Lauren from when we met.  So yes, good morning.

```
24       Q    Yes, good morning.  And as you know, I

25   represent Delta Air Lines in this lawsuit that you've
```

9

```
 1   brought against the company.  Ms. Jones, you stated

 2   that you are at Avalon Healing Center; is that

 3   correct?

 4       A    Yes.

 5       Q    And is that a medical provider of yours?

 6       A    Avalon Healing Center is not -- I don't

 7   think they're -- they're -- I'm -- I'm not sure if

 8   that's -- if they're qualified as a medical provider

 9   or not.

10       Q    Have you sought services from them in the

11   past?

12       A    Yes.  And currently.

13       Q    And why are you at their location for your

14   deposition?

15       A    To -- I had an emotional support person who

16   canceled on me last minute, so Avalon was the
```

17    secondary to assist in that manner.

18        Q    Okay.  Who was the emotional support person

19    that canceled?

20        A    I would have to look up their name --

21    they're -- one second.  Could I provide that to you

22    later?

23        Q    Just look it up now, please.

24        A    May I -- may I ask the reason why?

25        Q    Ms. Jones -- so we're going to go over

⋀

                                                    10

1     ground rules in a minute, and I'm going to ask the

2     questions and you need to provide answers and that's

3     how a deposition works.  And so I need you to answer

4     my question, please.

5         A    I understand, Counsel.  I am also pro se and

6     I'm representing myself, so as my own representation,

7     I just want to make sure that I'm not waiving or

8     answering.  So I'm -- I'm here as -- under deposition

9     and representing myself.  So as the representation

10    part, I would like to interject and ask the reason why

11    you need the name of the person, please, Counsel?

12        Q    Ms. Jones, you need to answer my question,

13    please.  Otherwise we're going to -- you need to

14    answer my question.  If you don't, we're going to note

15    this as something to take up with the Court.

16        A    So I do not have the name of the person

17    fully; I -- I have to make sure that I have their full

18    name and they canceled.  So I do not have the full

19    name with me right now, so I would have to provide

20    that at another time.

21        Q    What part of the name do you have with you

22    now?

23        A    Gina.  And I'm not sure if that's her full

24    name or an abbreviation.

25        Q    Okay.  And who or what -- how do you know

11

 ,  1    her?  What organization is she affiliated with?

    2        A    She was an emotional support person.

 3      Q     Where does she work?

 4      A     I do not know.

 5      Q     Okay.  Ms. Jones, is someone else in the

 6  room with you at present?

 7      A     No.

 8      Q     Okay.  Is someone else listening into this

 9  proceeding through video or phone?

10      A     No.

11      Q     Are you recording this proceeding?

12      A     Yes.

13      Q     Okay.  We're going to ask that you stop

14  doing that immediately, because there's an official

15  videographer and court reporter that's taking down the

16  proceeding and those are the official ways that it's

17  going to be recorded --

18      A     I'm going to --

19      Q     Do you agree to --

20      A     I'm going to request that, as a reasonable

21  accommodation for my disabilities, that I'd be able to

22  take notes through recording.  I don't have any paper

23  with me and I want to be able to take notes and I'm

24  requesting a -- a disability accommodation for that.

25      Q     Okay.  The answer is no, we're not going to

12

1    have unauthorized recordings, so you need to agree to

2    stop the unauthorized recording.  Do you agree to

3    stop?

4         A    Let me think about it for a second, please.

5    Let me see what my --

6         Q    All right.

7         A    -- what would be --

8         Q    All right.  We're going to go off the record

9    for a second.

10        A    Okay.

11        Q    And then we'll come back on in a minute.

12        A    Yes.  I -- yes, ma'am.

13             THE VIDEOGRAPHER:  Off the record,

14   10:27.

15             (Off the record.)

16             THE VIDEOGRAPHER:  Back on the record,

17   10:33.

18   BY MS. ZELDIN:

19        Q    Okay.  Ms. Jones, let's go over a few ground

20   rules right now, and then I'm going to come back and

21    ask you about the recording issue.

22            And what I want tell you is that if we take

23    breaks from time to time today, throughout the break

24    and when you come back on the record, you're still

25    going to be under oath and the deposition continues

                                                              13

1     through the breaks, if that makes sense.

2             So, you know, anything that you discuss or

3     do during the break, we can ask about, and those are

4     things that you'll need to disclose to us.

5             So we are recording the deposition with a

6     certified videographer, and it's being recorded by a

7     stenographer as well, and you'll have the opportunity

8     to get copies of those recordings, as will we.

9             Let me go over a couple of other ground

10    rules about -- first of all, you understand you're

11    under oath?  Even though we're not in a courtroom and

12    we're actually on in this remote proceeding, you

13    understand that your testimony is the same effect as

14    if you were sitting in a courtroom?  Do you understand

15    that?

16        A    Yes.

17        Q    Okay.  And then, clarifying questions.  If

18    today you don't understand a question that I ask you,

19    please ask me to clarify it, otherwise I'm going to

20    assume that you understood it and your answer is

21    responsive.  Is that agreeable?

22        A    Yes.

23        Q    You need to give verbal responses today

24    instead of saying "uh-huh" and "uh-uh," and you're

25    doing fine with that so far, so just please keep doing

                                              14

1    that.  Do you understand?

2        A    Yes.

3        Q    Okay.  We both need to avoid interruptions.

4    Please try not to interrupt my questions and do not

5    let me interrupt your answers.  If I do interrupt you,

6    stop me and complete your answer.  Agreed?

 7        A    There's only one concern with that.  If I

 8   need to object -- because I am representing myself as

 9   well, I may need to interrupt to object.

10        Q    Okay.  So, Ms. Jones, if you believe that

11   you need to object to something, you'll need to wait

12   till the question has been fully asked and then you

13   can respond in whatever way you believe is

14   appropriate.  Understood?

15        A    Yes.

16        Q    Okay.  So before the ground rules, we were

17   discussing the fact that you are recording the

18   deposition and I asked that you stop doing that.  And

19   can you confirm to us that you have agreed to stop

20   recording?

21        A    Thank you for the question.  Before

22   answering, you mentioned in the ground rules that both

23   parties would be able to obtain copies.  Could you

24   explain a little bit more on how that would take

25   place?

15

1      Q    Ms. Jones, you need to answer the questions

2  that I'm asking you.  So there's a process for

3  obtaining copies and that's something that you need to

4  look into and figure out.  But what I need you to

5  answer my question is, are you agreeing to stop

6  recording the deposition?

7      A    I have a concern with that and I need

8  clarification.  You mentioned in the ground rules --

9  we're establishing the ground rules -- and I

10 appreciate you bringing up in the ground rules that I

11 would be able to obtain copies, and likewise the other

12 parties.

13          I need to know how that would take place

14 before I answer, and I need clarification on that,

15 please.

16     Q    That's not something that I can provide to

17 you during your deposition.  Again, my question is,

18 are you going to stop recording the deposition?

19     A    One moment, please.  Because I am pro se and

20 have medical conditions affecting memory and

21 processing, I'm asking whether counsel would consent

22 to my making a personal audio recording for accuracy

23 and notetaking only.

24     Q    Ms. Jones, how are you recording the

25    deposition right now?

16

1        A    Through videorecording.

2        Q    Because I also note that you appear to be

3    reading something on a screen.  Can you share with us

4    what you're reading?

5        A    That's for my attorney privilege.  This --

6    this is what I use to help me.

7        Q    Okay.  Are you represented by an attorney in

8    this case?

9        A    I believe not in the -- I'm pro se in this

10    case.

11        Q    Okay.  So what is it that you're referring

12    to as attorney-client privilege?

13        A    I'm my own attorney, so there's some

14    privilege with that.

15        Q    Okay.  And whatever you said that you're

16    reading is something that you're using to help you

17    with your testimony in this case; is that correct?

18      A    No, I never said that I was reading

19   anything.  You shared that I -- you -- it seemed as

20   though I was reading and I said that that was

21   attorney-client privilege.  I never said that I was

22   reading anything.

23      Q    Ms. Jones, are you reading something on your

24   screen?

25      A    No.  That's attorney-client privilege.

17

1       Q    You're refusing to answer my question?

2       A    I answered.

3       Q    Okay.  Well, are you reading something on

4    your screen, yes or no?

5       A    I'm -- I'm answering your questions and

6    that's what I can -- the best way I can say it.

7       Q    Okay.  I'm going to note this down as a

8    question that you're refusing to answer, and I think

9    we're getting to the point that we might need to go

10   ahead and get on a call with the Court because we

11    can't keep doing this for hours all day.

12            So we've got to be able to have clear

13    questions and answers and a clear record, and we also

14    need confirmation that you are no longer making an

15    unauthorized recording of the deposition.  So I think

16    that we probably should just go ahead and contact the

17    Court at this point and see if we can get on the phone

18    with the judge.

19        A    I asked -- you said in the ground rules --

20    you asked me if I had clarity or needed clarification

21    with the questions to say so.  I'm doing my due

22    diligence based on what you have shared, as well as me

23    representing myself.

24        Q    Ms. Jones, can you show us who -- like, use

25    your camera to show us the room that you're in,

                                                            18

1     please?

2         A    Yes.

3         Q    It seems extremely blurry.  Can you take off

4    that blurred feature please?

5         A    I'll do my best.  I'm not sure --

6         Q    Okay.

7         A    -- let -- I -- I -- yes, I will, however,

8    I'm not -- I've never taken it off before in this, so

9    I need time to figure out how to do that.  But yes, I

10   will take off the blur feature.  Let's see.  Do you

11   happen to know how I could do that, 'cause I think it

12   asked you in the beginning.

13        Q    I think there might be something that says

14   "Blur my background" that you could click off, but.

15        A    Okay, I see it here.  One moment.  Now I

16   have to try to start the video again.  Is that better?

17        Q    [No audible response.]

18        A    You're -- you're muted.

19        Q    Okay, sorry.  We're back on.  Okay.  Could

20   you -- I think blur went off.  Can you show us the

21   room, please, now?  Thank you.

22        A    You're welcome.

23        Q    Ms. Jones, do you -- thank you.

24        A    You're welcome.

25        Q    Do you have any programs open on your

19

1   computer or phone at this time, such as an AI program?

2       A    I do have a AI open.

3       Q    Okay.  And what is that called?

4       A    ChatGPT.

5       Q    Okay.  And are you feeding in information to

6   ChatGPT as this deposition is proceeding?

7       A    That's -- it's -- may I ask why you're

8   asking that?

9       Q    Ms. Jones --

10      A    Objection.

11      Q    Okay.  You've objected, now answer my

12  question, please.

13      A    Objection, relevancy, please.

14           MS. ZELDIN:  We need to call the Court.

15  BY MS. ZELDIN:

16      Q    Okay.  So we're going to call the Court --

17           MS. ZELDIN:  And I guess we'll go off

18  the record?

19           MS. HARRIS:  Yeah, we'll go off record.

20           MS. ZELDIN:  Okay.  We'll go off the

21  record for now, and --

22          THE WITNESS:  Before going off the

23   record, will -- in the court call, will I be a

24   participant in that call?

25   //

                                                    20

1   BY MS. ZELDIN:

2        Q    Of course.

3        A    Okay.

4        Q    Yes.  We're going to contact them, figure

5   out the -- I don't know if we'll do it by email, or

6   how we'll do it, but yes, you will be copied.

7        A    So I'm -- when you say I'm to be copied,

8   that I should be expecting --

9        Q    Okay.  Yeah, let's --

10       A    -- I should be -- I'm asking -- please don't

11   interrupt me.  You -- you said -- I'm asking for

12   clarification, 'cause we're just still going over the

13   ground rules.  You said that I would be copied in, so

14   I'm asking will I be -- is that mean -- 'cause you

15   said it may be a phone call or email, so should I be

16   expecting an email?

17        Q    So let's try to call the Court now and we'll

18   remain connected.

19        A    Okay.

20                 THE VIDEOGRAPHER:  Okay.  Are we going

21   off?

22                 THE WITNESS:  May -- may I ask what --

23   what phone number we'll be using to call?

24   BY MS. ZELDIN:

25        Q    The phone number of the Court.

                                                        21

1         A    Which they have different numbers.  Which

2    number would that be?

3         Q    Ms. Jones, we have to look it up.  We don't

4    know right this second; okay?

5         A    Okay.  Okay.  You all are on mute.  I'm

6    sorry, you all were -- you all were on mute.

7         Q    Okay.  We're going to go off the record for

8    right now.

9         A     Okay.

10        Q     But we can -- we'll remain connected on this

11   Zoom.

12        A     Okay.

13        Q     Okay.  All right.

14                  THE VIDEOGRAPHER:   Off the -- off the

15   record, 10:45.

16                  (Off the record.)

17                  THE VIDEOGRAPHER:   Back on the record,

18   10:53.

19   BY MS. ZELDIN:

20        Q     Okay, we're back on the record.   Ms. Jones,

21   you stated a moment ago off the record that you have

22   an emotional support person with you.   Can you please

23   provide that information for us on the record?

24        A     Yes, I do.   I am at Avalon Healing Center in

25   Detroit, Michigan, and I have a staff member as an

1    emotional support person.

2        Q    Okay.  Can you please identify your

3    emotional support person by name?

4                MS. JOHNSON:  Hi, I'm Alice, Alice

5    Johnson, human trafficking specialist for Avalon.

6                MS. ZELDIN:  And Ms. Johnson, was that

7    --

8                MS. JOHNSON:  Yes.

9                MS. ZELDIN:  Was that right?

10               MS. JOHNSON:  Yes.

11               MS. ZELDIN:  Okay.  Ms. Johnson, what

12   is your -- you said you're a human trafficking

13   specialist.  Are you a licensed counselor, or what is

14   your certification there?

15               MS. JOHNSON:  I'm a human trafficking

16   specialist by trade.

17               MS. ZELDIN:  Okay.  Do you have any --

18               MS. JOHNSON:  I have -- I have worked

19   as a case -- as a -- as a counselor, a legal advocate

20   over 10, 12 years.  I also work with the 36th District

21   Court, with the Human Trafficking Specialty Court,

22   with Shannon Holmes.  And I serve on the Board of

23   Commissions for the State of Michigan and the Human

24   Trafficking Task Force for Detroit.

25               MS. ZELDIN:  Are you an attorney?

23

1              MS. JOHNSON:  No.  No, I've done legal

2   advocacy with neighborhood legal services and the

3   court.

4              MS. ZELDIN:  Okay.  So -- and let me

5   ask one more question before we take a break to call

6   the Court.  Have you, Ms. Johnson, worked -- have you

7   provided services to Ms. Jones?

8              MS. JOHNSON:  No.  Ms. Jones is not one

9   of my clients.

10             MS. ZELDIN:  Okay, thank you.

11             MS. JOHNSON:  Okay.

12             MS. ZELDIN:  All right.  Let's attempt

13  to contact the Court now.

14             THE VIDEOGRAPHER:  I'm sorry, did you

15  want to go off the record, or are we staying on the

16  record?

17             MS. ZELDIN:  We'll go off.

18             MS. HARRIS:  Let's go off the record.

19              MS. ZELDIN:  We'll go off.  Thank you.

20              THE VIDEOGRAPHER:  Okay.  Off the

21   record, 10:55.

22              (Off the record.)

23              THE VIDEOGRAPHER:  Back on the record,

24   11:05.

25              MS. ZELDIN:  Off the record the parties

                                                    24

1    made a call to the Court to ask for guidance and

2    intervention from the judge, we were advised that we

3    expect to receive a call of some nature back within

4    the hour.

5    BY MS. ZELDIN:

6        Q    So the proposal is to go off the record but

7    remain connected, so that when the court calls, Ms.

8    Jones, we can do the same thing, put it on speaker,

9    have both parties present.  Is that acceptable?

10       A    Yes.

11              MS. ZELDIN:  Okay.  Let's go off the

12   record but remain connected on the Zoom.  Thank you.

13                   THE WITNESS:  Okay, thank you.

14                   THE VIDEOGRAPHER:  Off the record,

15   11:06.

16                   (Off the record.)

17                   THE VIDEOGRAPHER:  Back on the record,

18   12:23.

19                   MS. ZELDIN:  We are back on the record

20   after a break during which the parties contacted the

21   Court, and our meeting with the Court ended around

22   12:10, and we want to put on the record that we are

23   now waiting for Ms. Jones' support person to come back

24   so that we can restart the deposition, and we'll go

25   off the record and remain on mute until that time.

                                                            25

1    Thank you.

2                    THE VIDEOGRAPHER:  Off the record,

3    12:24.

4                    (Off the record.)

```
5                    THE VIDEOGRAPHER:   Back on the record,

6    12:30.

7                    MS. ZELDIN:   Okay.   We're back on the

8    record, and Ms. Jones stated off the record that she

9    has brought a different support person into the

10   deposition at this point.

11   BY MS. ZELDIN:

12        Q    Is that correct, Ms. Jones?

13        A    Yes, that's correct.

14        Q    What happened to Ms. Johnson?

15        A    I don't know.

16        Q    She just left the deposition?

17        A    We went on a break from the call and she

18   came in, asked me a couple of questions, then she left

19   back out, then the new support person came in.

20        Q    Okay.   Do you anticipate Ms. Johnson

21   returning to the deposition?

22        A    I don't know.

23        Q    Okay.   So currently you have a new support

24   person, and could you please identify her for the

25   record?
```

26

1          MS. COLEMAN:  Hi, I'm Melissa Coleman.

2          MS. ZELDIN:  Oh, I'm sorry, was that --

3  could you spell that first name, please?

4          MS. COLEMAN:  M-E-L-I-S-S-A.

5          MS. ZELDIN:  Oh, okay.  Melissa

6  Coleman?

7          MS. COLEMAN:  Yes.

8          MS. ZELDIN:  Okay.  And Melissa, what

9  is your title or position?

10          MS. COLEMAN:  Title, as far as my

11  degrees, or --

12          MS. ZELDIN:  Could you kind of identify

13  yourself --

14          MS. COLEMAN:  -- employment?

15          MS. ZELDIN:  Yes, let's start with your

16  employer, please.

17          MS. COLEMAN:  Okay.  So I work for

18  Avalon Healing Center.

19          MS. ZELDIN:  Okay.  And what is your

20  title there?

21          MS. COLEMAN:  So I'm a sexual assault

22  counselor.

23              MS. ZELDIN:  And have you previously

24  provided services to Ms. Jones?

25              MS. COLEMAN:  Services in the sense, as

27

1  far as working with her, or?

2              MS. ZELDIN:  Yes.  Have you met Ms.

3  Jones before today?

4              MS. COLEMAN:  Yes, yes, yes.

5              MS. ZELDIN:  And have you provided

6  counseling services to her?

7              MS. COLEMAN:  Yes.  Yes.

8              MS. ZELDIN:  Okay.  When?

9              MS. COLEMAN:  I don't know the exact

10  date, so I apologize.  It's been over a year, I

11  believe, though.

12              MS. ZELDIN:  Okay.

13  BY MS. ZELDIN:

14      Q    Ms. Jones, are you ready to proceed with

15  your testimony?

16      A     Yes.

17      Q     Okay.  So to pick up where we left off from

18  earlier, you understand that you're still under oath;

19  correct?

20      A     Yes.

21      Q     Okay.  And can you think of any reason why

22  you cannot answer the questions I'm going to ask you

23  today, completely, accurately, and truthfully?

24      A     I am a person under medical treatment, as

25  previously discussed with the judge and with counsel,

28

1   and counsel has my medical records.  So I'm not sure

2   what questions you all will ask me, but I -- due to

3   workplace injuries at Delta, there may be a time where

4   the -- the medical -- my medical condition due to

5   those on-the-job injuries may interfere with me being

6   able to answer the question.

7       Q     Okay.  Ms. Jones, can you list the medical

8   issues that you're currently suffering from, please?

9       A    Medical issues?

10      Q    Yes.  You referenced medical issues?

11      A    Yes.  So my daughter is a victim, and I'm a

12   victim as well, to human trafficking, child

13   exploitation.  Delta and management pulled me into the

14   office and harassed and interrogated me about my

15   daughter's involvement.  That was unwanted conduct.

16           And they -- that's what led us to this

17   lawsuit, because they allegedly revoked accommodations

18   that I previously had and is my belief they did so in

19   discrimination and retaliation for --

20      Q    Okay.

21      A    -- not just those disabilities, but previous

22   disabilities and religious accommodations as well.

23      Q    Ms. Jones, what my question was is asking

24   you about your current medical conditions.

25      A    So --

                                                    29

1       Q    So can you please list those for me?

2       A    Yes.  So to the best of my knowledge,

3   without any reference in front of me, I've been

4   diagnosed with long COVID.  I've been diagnosed with

5   irritable bowel syndrome.  I've been diagnosed with

6   GAD, which is generalized anxiety disorder.

7           I've been diagnosed with PTSD, by one

8   provider, due to workplace trauma at Delta.  However,

9   another provider has said that I do not have PTSD, but

10  I have -- they haven't seen signs of it, but they say

11  I have stressor -- stressor disorder, I believe it's

12  called.

13          I also have RBBB.  I have sleep apnea.  I

14  have morbid obesity.  I have hip -- I have -- from a

15  workplace injury at Delta, physical disability,

16  muscular disorder -- musculoskeletal and hip pelvic

17  disorder.

18          I may not be saying them exactly correct,

19  I'm just going based off of memory again.  What else?

20  So those -- I -- I believe that I've covered

21  musculoskeletal -- yes.  I believe that's -- those are

22  the lists.  I may be not recalling exactly everything.

23      Q    And are you taking any medication that might

24  affect your testimony today?

25      A    I'm not on any -- I -- I -- I'm not a

30

1    medical provider, so I don't know how things may

2    affect my testimony, but I'm not on any mental health

3    medications, no.  But I -- I have had injections and

4    -- for the physical injury that happened at Delta.

5    They've given me an injection, more recently, and also

6    patches for that.

7        Q    And when you say -- are you talking about

8    the musculoskeletal injury?

9        A    Hip, yes.  Hip, musculoskeletal.  Yes.

10       Q    And when was that injury?

11       A    That injury is -- it didn't happen one time,

12   it was over a period of time.  I -- so I've worked

13   with Delta since 2012.  So it's -- it's been -- it's

14   -- it's not one instance that --

15       Q    Do you know what year -- oh, go ahead.

16       A    That -- that I know of.  I'm not a -- again,

17   I'm not a medical provider, so that would probably be

18   best answered by them and my medical records.

19       Q    Do you know what year you were diagnosed

20   with that?

21      A    It is in my medical records.  I can't recall

22   right now, I -- what year exactly.

23      Q    Have you had any recent alcohol usage?

24      A    No.

25      Q    Have you ever had your deposition taken
♠

31

1    before?

2       A    No.

3       Q    Have have you ever testified as a witness in

4    a lawsuit?

5       A    No.

6       Q    And I'm talking about any lawsuit, not just

7    one that you have brought, but have you testified as a

8    witness in any lawsuit?

9       A    Testified as a witness in any lawsuit?

10   Could you clarify the question?

11      Q    Yes.  Have you -- you said you had never had

12   your deposition taken before.  Have you been to a

13    court proceeding where you gave testimony of any kind?

14        A    No, not -- not -- I'm a little unsure of how

15    to answer that because I have been to court -- to

16    court proceedings regarding my daughter's situation,

17    and I had to take her where she was a -- a -- not in

18    court, but they're -- they have different avenues for

19    minors.  But I don't think that would be considered as

20    me being a witness, so I would say no.

21        Q    Ms. Jones, can you provide the names of

22    those lawsuits that you took your daughter to testify

23    regarding?

24        A    No, I can't provide them right now.  I don't

25    have that information in front of me.

32

1         Q    Do you recall what court they were pending

2    in?

3         A    I did provide the Court some of the VNS

4    documents to Delta.  One -- one court proceeding is

5    the actual court that we are -- we have our lawsuit

```
 6    proceeding in now.  Is -- what is -- what court is

 7    that?  Is that -- it's not 36 --

 8         Q    Are you referring to the Federal Court --

 9         A    Federal court --

10         Q    -- in the Eastern District of Michigan?

11         A    Yes, these were federal crimes.  And then we

12    had another court, federal court.  It was out of

13    state.

14         Q    What state was it in?

15         A    I don't remember.  It -- it -- I want to say

16    Missouri.  There was a lot that was going on, but then

17    there's Missouri City, there's Kansas, Missouri, so

18    I'm -- I'm not sure, but I want to say Missouri.

19         Q    And how long ago were those lawsuits?

20         A    They weren't lawsuits.  They were -- I -- I

21    -- they were criminal -- they were crimes, federal

22    crimes of human trafficking, child exploitation, so --

23         Q    And how -- go ahead.

24         A    I -- I don't know if you would consider that

25    a lawsuit, just -- you know, I'm not sure.  But they
```

33

1   were -- they were federally prosecuted crimes.

2       Q    When were those crimes being prosecuted?

3   What year?

4       A    I'm not an attorney, so I don't know.  The

5   prosecution takes place, I'm sure, over time.  But I

6   know we had hearings and court proceedings in 2023.

7   We had them in, I want to say two thousand -- 'cause

8   we had -- we had things going on, but then COVID hit,

9   so that the courts were paused or whatnot.

10          So I can't be for certain, 'cause I -- I'm

11  -- I was just the victim and -- and trying to, you

12  know, take care of my daughter, so I'm not entirely

13  sure of the start and stop.

14      Q    Are those criminal proceedings still

15  ongoing?

16      A    Investigations, yes, but my -- when these

17  things were happening, my daughter was a minor, so as

18  her parent I was actively involved.  She is an adult

19  now, so I don't know -- she's primarily taking over

20  that.  I'm not sure.

21      Q    And how old is she now?

22      A    She is 22.  She just had a birthday.

23      Q    Ms. Jones, have you ever sued anyone --

```
24      A    Yes.

25      Q    -- before?  Okay.  Could you please list the
↑
```

34

```
1   lawsuits that you have brought?

2        A    I currently have a lawsuit before the same

3   judge, Judge DeClercq, against First Hospitality.

4   That is ongoing.  I'm litigating both cases

5   simultaneously.

6        Q    And what are your allegations in the First

7   Hospitality case?

8        A    My allegations are discrimination,

9   retaliation.

10        Q    And discrimination based on what?

11        A    I don't have it in front of me, but from my

12   recollection, if I'm -- if I'm correct, it's

13   disability and religion.

14        Q    And what's the status of that lawsuit?

15        A    It's --

16        Q    Is it settled?
```

17     A     No, it's open.

18     Q     Any other lawsuits that you filed?

19     A     So I'm not sure with the clarification --

20     when you say "lawsuit," could you clarify, please?

21     Q     Well, let's broaden it a bit.  So why don't

22     you list for us any type of legal action that you've

23     taken against any person or entity, and just list all

24     of those, please.

25     A     Okay.  So there was a small claims case that
^

                                                        35

1      I took -- I don't recall the actual year, and the name

2      of the person, I can't recall.  I think it was -- you

3      didn't ask me that, but.  I also have OSHA

4      whistleblower statutes against Delta for safety.

5      AIR21 and -- AIR21 and ACA, Affordable Healthcare Act.

6      That's before the Department of Labor.

7              I also have FAA legal -- legal proceedings,

8      or a legal appeal, for the FAA.  I also have MIOSHA,

9      'cause OSHA -- there's federal OSHA and then there's

```
10    state-level OSHA.

11              And OSHA is Occupational -- well, I -- I

12    don't -- let me not say that, 'cause I don't -- I may

13    mess up on what OSHA stands for.  But those cases are

14    related to Delta safety and me being a -- a OSHA

15    whistleblower at Delta.

16         Q    Okay.

17         A    And let me think, is there anything else.

18    Within the OSHA, the Department of Labor, because I

19    have to file these lawsuits -- every court has

20    different jurisdiction, so it is surrounding some of

21    the same facts, but because it's under different

22    jurisdiction I had to file in the separate courts.

23         Q    Okay.  So how many legal proceedings -- and

24    I'm going to include lawsuits, charges, administrative

25    complaints -- do you currently have pending against
```

36

```
 1    Delta?

 2      ,    A    So I have this, that will be one.  I'm going
```

```
 3   to write it down, if that's okay, so I can refer back

 4   to my notes.  So I have this case, which is

 5   2:24-11224.  I have EEOC charges against Delta, in

 6   which one of the charges I'm represented by an

 7   attorney.

 8          So that's in the legal -- their -- process

 9   -- or -- I don't know if I'm saying the right word.  I

10   don't know if legal process is the correct way --

11   word, but is -- with the EEOC charges have been

12   brought against Delta.

13          Because Delta -- there were -- I'm a OSHA

14   whistleblower, so that falls under the Department of

15   Labor; that's their jurisdiction.  So that's one case

16   with the Department of Labor.  And I believe that may

17   be it, but it -- it's gone on to different phases.  So

18   I believe just those two plus the EEOC charges, but

19   again, I don't have anything in front of me to, you

20   know.

21      Q    Ms. Jones, do you recall filing another EEOC

22   charge, here in the past couple months, against Delta?

23   I believe it was filed in November 2025.

24      A    November of 2025?  Are you -- could you give

25   me the case number, or the --
```

37

1     Q     Yeah.

2                 MS. ZELDIN:   A.J., can you find that

3     charge, please?

4     BY MS. ZELDIN:

5     Q     Yes, we'll get it in one second.

6     A     Okay.

7     Q     Also, do you recall filing a lawsuit in

8     state court that got removed to federal court and is

9     also pending before Judge DeClercq now?

10    A     Oh, yes.  That was a -- yes.  That -- that

11    had to deal with, I believe Michigan Department of

12    Civil Rights, or -- yes.  That's -- that's another

13    one.  Yes.

14    Q     Do you dispute that you have no fewer than

15    eight separate legal proceedings currently going on

16    against Delta, including all the charges,

17    administrative filings, and lawsuits?

18    A     Could you clarify the question?  When you

19    say -- could you clarify what you said, please?

20    Q     Okay.  So Ms. Jones, these are the lawsuits

21   that I understand that you filed that are currently

22   pending.  You have this lawsuit that we're here to

23   talk about today, the one that is the subject of your

24   deposition.  You have an EEOC charge that you filed on

25   February 7, 2024, and that's the one that we

                                                          38

1    understand is underlying this current lawsuit that you

2    brought.

3              You have a Department of Labor OSHA case.

4    You have an EEOC charge that you filed in July of

5    2024.  You have a second DOL OSHA case, which you

6    filed February 19, 2025, AIR21.  You have OALJ, Case

7    Number 2025AIR00008.

8              You have a MIOSHA complaint that you filed

9    April 23rd, '25.  And you have a lawsuit that we just

10   talked about that was filed in state court that got

11   removed to federal court, you filed on August 18,

12   2025.

13             And you also have an EEOC charge that was

14   filed this fall, and the number of that one is

15   471202502221.  Did I accurately capture your current

16   proceedings against Delta?

17        A    It sounds right.  I don't have the

18   information in front of me.

19        Q    So today, Ms. Jones, we're here to have your

20   deposition in this lawsuit, and as you know, this

21   lawsuit is 2:24-CV-11224.  And do you understand that

22   today we're here to take your deposition in that

23   lawsuit, not in connection with all the other legal

24   proceedings that you have against Delta?  Do you

25   understand that?

                                                    39

1         A    Yes.

2                   MS. ZELDIN:  And A.J., can you put Ms.

3    Jones' notice of deposition into the record, please,

4    as Exhibit 1?

5                   (Exhibit 1 was marked for

6                    identification.)

```
 7   BY MS. ZELDIN:

 8       Q    Ms. Jones, we're putting your notice of

 9   deposition as an exhibit, and that's confirming, as

10   you've just agreed with, that you're here today to be

11   deposed in this lawsuit.

12              MS. ZELDIN:  And so, we'd like to enter

13   that as Exhibit 1, please.  Okay, so let's remove it

14   -- if the court reporter --

15              Court Reporter, do you guys need us to

16   do anything else with this, or can we remove it from

17   the screen?

18              THE REPORTER:  Nope, I am good as long

19   as you state what it is and mark it as an exhibit.

20   I'm all set.

21              MS. ZELDIN:  Thank you.

22   BY MS. ZELDIN:

23       Q    So Ms. Jones, you filed your lawsuit in this

24   case, and -- on May 8, 2024.

25              MS. ZELDIN:  And A.J., can we please
```

40

1   mark her original complaint as Exhibit 2?  Can you put

2   it on the screen, please?

3                (Exhibit 2 was marked for

4                identification.)

5   BY MS. ZELDIN:

6       Q    Ms. Jones, do you recognize Exhibit 2?

7                MS. ZELDIN:  Can we give her the

8   ability to scroll through the document?

9   BY MS. ZELDIN:

10      Q    Yeah.  Ms. Jones, are you now able to scroll

11  through this document?

12      A    No.

13               MR. SIMONTON:  I can scroll manually.

14               MS. ZELDIN:  Okay.  All right.  So

15  let's scroll --

16  BY MS. ZELDIN:

17      Q    Did you recognize this document so far?

18      A    Yes.

19      Q    Okay.  And what is Exhibit 2, please?

20      A    The document you're scrolling is Exhibit 2?

21      Q    Yes.  What I'm asking you -- what is it?

22      A    It is the ECF Number 1 for this case.

23      Q    Okay.  So this is the original complaint

24  that you filed in this lawsuit; correct?

25      A    Yes.

41

1       Q    Okay.  And at the time that you filed it,

2  was everything in it true and correct to the best of

3  your knowledge?

4       A    To the best of my knowledge, yes.

5       Q    Okay.  So now we're going to show you --

6  let's take that off -- what we'd like to mark as

7  Exhibit 3.

8                 MS. ZELDIN:  And this is the amended

9  complaint in this lawsuit, please.

10                (Exhibit 3 was marked for

11                identification.)

12  BY MS. ZELDIN:

13      Q    And while we're doing that, Ms. Jones, do

14  you recall that you amended your complaint in this

15  lawsuit?

16      A    Yes.

17      Q    Okay.  And at the time that you filed the

18    amended complaint, was everything in it true and

19    correct to the best of your knowledge?

20        A    Yes.  Well, there -- with this amended

21    complaint, there were some statements that were made.

22    Like for example, what you're showing now, Number 2,

23    "As of 2023, DAL had a hundred thousand-plus employees

24    worldwide."

25            So there were things with me being pro se

42

1    representing myself.  I'm not sure if everything I --

2    I got those from sources about Delta, and I was still

3    in the process of understanding the process of -- with

4    me being pro se.

5        Q    So the allegations that you've included in

6    this amended complaint about your own claims, those,

7    to the best of your knowledge, were true and correct;

8    is that right?

9        A    Could you clarify when you say

10    "allegations"?

11        Q    Yes.  The things that you're asserting, Ms.

12    Jones, as your claims in this case.  I understand

13    you're saying maybe you found a fact about Delta Air

14    Lines on a website, that you're not sure about, but

15    what you've written in here about your own claims and

16    why you're suing, that was true and correct, to the

17    best of your knowledge; is that right?

18        A    So I'm not -- I didn't say what you just

19    shared, just for clarification.  I didn't say that I

20    got it off of -- I don't think I just said that -- a

21    website or anything like that.  And if I did, my

22    mistake.  Let me clarify.

23             In the process of proceeding pro se -- I'm

24    not sure if you're stating that Number 2, the -- what

25    you have on the screen now, are my actual allegations

43

1    or not.  I -- some of it was background information or

2    different facts.  So I -- as pro se, I was putting

3    information in the document the best as I knew how at

4    the time, so --

5         Q    Ms. Jones?

6         A    Yes.

7         Q    When you filed the amended complaint, did

8    you believe everything in it was true and correct, at

9    the time?

10        A    I -- I didn't -- like for Number 2, I was --

11   I was given background information that I wasn't -- I

12   didn't know I had gotten that from different sources,

13   so I'm not sure as to those things.

14        Q    Did you include information in your filing

15   with the Court that you believed to be untrue?

16        A    Not to my knowledge.  I was, again, given

17   some -- trying to figure out pro se representing

18   myself, so I was doing the best I could with the

19   process as a pro se representing myself.

20        Q    So if you look at the end of this document,

21   you can see -- and you can also see on the top line --

22   that it was filed on October 21, 2024.  Do you see

23   that?

24        A    Filed October 23rd, yes.  You point the

25   arrow -- yes, I see that.

44

1       Q    Okay.  So this amended complaint, this

2   includes the claims that you're bringing in this

3   lawsuit that we're here today to talk about; correct?

4       A    Yes.

5       Q    And you agree with me that everything that's

6   part of your lawsuit, that we're here to talk about

7   today, occurred prior to this date, such that it's

8   included in this complaint; correct?

9       A    Yes.

10               MS. ZELDIN:  Okay.  We can put that

11   down.

12               THE WITNESS:  That it -- I'm -- I'm

13   saying yes, for clarification, that things occurred

14   prior to today's date.  Yes.

15   BY MS. ZELDIN:

16       Q    Well, I'm talking about prior to the date

17   that you filed your amended complaint.

18       A    The question -- the question you answered,

19   in which I said yes to, just for clarification, you

20   asked me was I -- something along the lines of was I

21   -- did those things occur before today's date,

22    meaning, like, January 8, 2026.  So I was answering

23    yes to that.

24         Q    Okay, let's go back.

25         A    Okay.

↑

                                                      45

1          Q    So as we talked about, you have multiple

2     lawsuits pending against Delta; correct?

3          A    Legal proceedings, lawsuits.  Yes.

4          Q    Okay.  Yes.  And those legal proceedings

5     cover different claims and different time periods; am

6     I right?

7          A    I'm not sure.  I know that I had to file

8     them under different jurisdictions, because -- that's

9     why there are multiple.  Because my claim for

10    disability and religious accommodations has to be

11    filed under -- through the EEOC process and

12    retaliation.  The same claims, it was intermingled.

13               So for the OSHA whistleblower, that could

14    not be filed in -- under the federal court EEOC

15    process.  I -- I may not be saying it correctly, so

16    please forgive me; okay?  So I had to file another

17    claim under the court that held that jurisdiction, or

18    go through that process.

19              That's why there are multiple process, but

20    they -- the multiple process, the claims are generally

21    the same.  I just had to file in different -- under

22    different jurisdictions for what -- what it pertained

23    to, even though they're basically the same.  I hope

24    that --

25        Q    So what you're saying is that it's your

46

1    belief that you're seeking relief for the same claims

2    in multiple different legal proceedings that you've

3    brought?

4        A    No.  What I'm saying is that, with me

5    representing myself as pro se, there are different

6    processes that federal, and the legal systems, set up.

7    And with me representing myself in these cases, except

8    for where I have the attorney for the one EEOC charge,

9    I was navigating those court processes on my own.

10          And to do so, I could not file religious --

11   alleged religious accommodation discrimination,

12   alleged disability accommodation, and disability

13   discrimination and retaliation, in the Department of

14   Labor.  That had to -- according to the way the law

15   system is set up in United States, I have to do that

16   under -- through the EEOC and then in federal court.

17          And then the Department of Labor, with me

18   being an OSHA whistleblower, for raising safety

19   concerns and things of that nature, that had to go

20   under another court process.  That's why there are

21   multiple legal proceedings or lawsuits.

22      Q    So tell us in your understanding, what is

23   the basis of your claims that we're here to talk about

24   today?  What claims are you bringing that are part of

25   this lawsuit that we're here talking about today?

47

```
 1        A     Discrimination based on disability,

 2    religion, also retaliation.  And I don't have the

 3    information right in front of me, but that's the

 4    basis.  There may have been some other things umbrella

 5    -- umbrella -- that's not even a word.  There may have

 6    been some things under that umbrella, but I don't have

 7    that information right in front of me.  But those were

 8    the -- the main claims.

 9        Q     So Ms. Jones, today is your day to tell us

10    about this lawsuit that you're bringing.  And so what

11    I want you to do is tell me specifically what are your

12    claims that you're asserting in this lawsuit against

13    Delta?

14        A     So, I -- I'm a little not understanding,

15    'cause when we just had court, the judge said that --

16    you saying it's my day to tell you, but the judge said

17    you all would ask me questions, so.

18        Q     Yes, and I am.

19        A     Okay.

20        Q     The question is, tell me what are the claims

21    that you're bringing against Delta Air Lines in this

22    lawsuit?

23        A     Could you go back to the document, if

24    possible?

25        Q     Are you referring to the amended complaint?
```

48

1      A      Yes, which I think you shared was Exhibit 3.

2      Q      Okay.

3             MS. ZELDIN:  A.J., do you mind putting

4    that back up, please?

5             THE WITNESS:  Okay.  So I'm not able to

6    scroll.  I'm trying to -- let me see.  I'm not able to

7    scroll, but if you could go to the first page, if

8    possible?  Okay, thank you.  So if you could go to --

9    if you could scroll down a little more, please.

10            Okay.  If you could -- yes.  If you

11   could go up just a little bit?  I'm trying to see what

12   the title of that, right before Number 1, if possible.

13   "Preliminary statement."  Okay.  Is -- are -- could

14   you scroll down to where it doesn't say -- where it's

15   not under preliminary statement anymore?

16   BY MS. ZELDIN:

17      Q      Let me just stop for one second.  So, Ms.

18   Jones, before we look at this document any further,

19    please tell me from your own understanding, without

20    getting into the details of this document, what are

21    the claims that you're bringing against Delta Air

22    Lines in this lawsuit?

23        A    So, without me having anything in front of

24    me, other than what's in front -- what you have on the

25    screen right now, my claims are that Delta

                                                          49

1    discriminated against me based on my disabilities,

2    based on religious -- my religion, and also

3    retaliation.  And there may have been more claims.

4    And then I go -- I think I have detailed incidents of

5    what took place for those claims.

6        Q    Okay.  So first talking about your claim

7    that you just stated that Delta discriminated against

8    you based on your disabilities.  What's the basis of

9    that claim?

10        A    Could you scroll down on the paperwork for

11    me?

12      Q    Let's -- I'd first like you to tell me, just

13    from your own memory, your own understanding, what's

14    the -- like, why are we here?  What -- why are you

15    suing Delta for disability discrimination?  What is

16    that based on?

17      A    They discriminated -- there -- there's

18    different things, but I believe you said that I would

19    have had the ability to scroll on my own, but I don't.

20    So I'm -- I'm asking if you could scroll so that I can

21    answer the question, since the document is right in

22    front of us, if possible.

23      Q    So I would like you first to answer the

24    question without reference to the document.  I just

25    want to understand in your own words -- I'll give you

                                                          50

1     the opportunity to look at it, but I just want you to

2     answer in your own words, what is the basis for your

3     claim against Delta Air Lines that you were

4     discriminated against due to a disability?  Just,

5    what's the basis of that claim?

6         A    The basis is that Delta discriminated on me

7    based on my disabilities, based on religious

8    accommodations, and retaliation.

9         Q    Okay.  And how --

10        A    That's the basis.

11        Q    -- were you -- oh, excuse me.  Did you

12   complete your answer?

13        A    No.  I was saying that's the basis, but of

14   course I've shared that there were things -- that's

15   the umbrella, and there are things underneath that I

16   can recall right now, as you shared, I have -- I'm --

17   I'm proceeding pro se and I think you shared that I

18   have eight cases against Delta.

19             So I'm doing the best I can, representing to

20   make sure justice is done against these alleged

21   claims.  So at first --

22        Q    Okay.

23        A    -- you gave me the -- I'm not finished,

24   please.

25        Q    Oh, excuse me.

51

1      A    At first you gave me -- it's okay.  You -- I

2   know we said in the preliminaries that you wanted me

3   to stop you --

4      Q    No.  You're right.

5      A    -- interrupted.  Okay.  So --

6      Q    Please continue.

7      A    Thank you.  So I know you shared in the

8   beginning that I would be able to scroll the document

9   and I wasn't able to do that, so now you're saying you

10  don't want me to scroll.  So I -- you know, I'm under

11  oath, so I want to make sure that my testament is

12  exact as precise as possible.

13          With what you shared with me, having eight

14  cases of alleged misconduct and illegal conduct from

15  Delta -- I apologize.  I -- I want to be as clear and

16  concise as possible, but without you being able to let

17  me look at the document that you said was filed in May

18  8th of 2024 -- it is now January 8, 2026 -- along with

19  my ongoing treatment and other things, I hope you can

20  understand why I would want to make sure to look at

21  the document we have right in front of us just to make

22  sure.

23     Q    Ms. Jones, we can take a break in a few

24   minutes and we will look and see if we can resolve the

25   issue with scrolling.

                                                    52

1      A    Okay.

2      Q    And we will let you look at the document.

3    But what I'm asking you to do, right now, is just tell

4    me from the best of your ability, without looking at

5    any documents, what is the basis of your claim that

6    Delta Air Lines discriminated against you due to a

7    disability?

8      A    Due to disability, I had disability

9    accommodations, also -- that were revoked.  I also --

10   the process, with my daughter going through and we

11   being victims of human trafficking, child

12   exploitation, they -- the -- some of the items that

13   I'm sure I have listed there was discrimination

14   regarding those disabilities that I had shared with

15   Delta, regarding my daughter and myself and family.

16          Am I answering your question?  'Cause you

17   said we're just doing disability right now, not

18   religious, or just disability?

19      Q    Let's talk about disability right now.

20      A    Okay.

21      Q    And what I want to understand is, how were

22   you discriminated against due to disability?

23      A    Due to disability, there was -- I'm not sure

24   -- you're an attorney, but I'm not sure if harassment

25   and disability can go into the same -- under the same

↟

53

1   umbrella.  But I was brought into the office at Delta

2   -- first, I'll say this.  When there comes to

3   disability accommodations, Delta has a culture of one-

4   to-one -- they don't believe in us being unionized on

5   the ramp.

6          And I believe the only people that are

7   unionized are other groups, maybe two groups.  So they

8   -- because they say we did not unionize, they say that

9    that's because -- I'm sorry, I thought I had this on

10   silent.  My apology.  My apology.

11            So to answer your question, how do I think I

12   was the claims -- or how do you think I was

13   discriminated against for disabilities.  The processes

14   that Delta have when you have a disability, they don't

15   accommodate you.

16            There's no set -- at the time, that I was

17   aware of at the time.  They want you to have a one-to-

18   one relationship with management.  They want you to --

19   the culture is that you're to talk to -- there's a

20   open-door policy.

21            So when I had these disabilities, that Delta

22   was aware of, long COVID, the disabilities associated

23   with human trafficking and child exploitation, as I

24   was going through it in real time, my physical

25   disability with -- with the injury at work, Delta

♠

54

1   discriminated by trying to harass me, intimidate me,

2    bring me into the office to embarrass me, or whatever

3    their intent was.

4           It was not -- revoke accommodations that I

5    had held previously, and created a policy that was not

6    -- anyone that I know of was aware of.  And that was

7    part of the discrimination.  I hope I'm answering that

8    to the best of my ability.  That's part of it.

9       Q    Anything else?

10      A    I'm sure there is.

11      Q    Related to disability?

12      A    Yes.  But that's -- that's what I have for

13   right now.

14      Q    Well, Ms. Jones, we're here to get all of

15   your testimony today regarding this lawsuit.  So what

16   else do you have regarding disability?

17      A    So there were different incidents, and

18   that's where I have a hard time.  And I sent you all

19   one of the incidents, October 31st, where I was called

20   into the office for a one-on-one meeting where -- you

21   know, when you come to work you shouldn't be asked

22   personal questions about --

23      Q    Do you need a break, Ms. Jones?

24      A    No, I'm okay.

25      Q    Okay.

55

1      A      I appreciate it.  You all are in receipt of

2   -- 'cause I -- I sent it to you all, and -- and to

3   Delta as part of their investigation.  So Delta --

4   because I was speaking up on safety concerns, is my

5   belief, and I had an injury, and also I was a D --

6   Delta selected me to be a DE&I advisor, as they have

7   selected me to do other things.

8           I'm a good employee, but because I hit on

9   something -- I'm not sure exactly what, that's what

10  this is for -- to figure all those things out.  Delta,

11  in my belief, discriminated and harassed and

12  retaliated against me based on those disabilities.

13          And there are incidents, like the October

14  31st incident, where I was called into the office

15  where I was questioned about my daughter's involvement

16  and my family and personal matters, which never should

17  take place, I believe, at work, and Delta did that.

18     Q      Okay.  Anything else about disability for

19  now?  Or, I mean, I'm -- let me strike that.

20      A     Okay.

21      Q     Anything else about disability?

22      A     Yes.  But I -- right now I'm -- I'm trying

23  to get -- I -- yes, there are other things, I'm sure.

24  Right now I -- that's all I can say at this moment.

25  But there -- there are other things.

56

1            I had long COVID; that was a disability that

2   Delta was aware of.  Delta has -- they have, along

3   with the one-to-one -- I'm sorry, hold on one second.

4   We don't have to take a break.  Just give me a second

5   to, like, get myself together; okay?

6            Just, we don't -- we -- I don't need a

7   break, I just need, like, maybe one minute if

8   possible.  Okay.

9            THE WITNESS:  There -- just for the

10  record, my support person said I'm doing good, 'cause

11  I don't want -- she was -- I know the judge said she's

12  not to -- she just was giving -- providing support.

13  She just said, "You're doing good."  That was all.

14              Could you re-ask the question, please?

15              MS. ZELDIN:  Can the court reporter

16  read it back, please?

17              THE REPORTER:  Give me one moment.

18              MS. ZELDIN:  Thank you.

19              (The reporter repeated the record as

20              requested.)

21              MS. ZELDIN:  **Okay.  And what is that?

22              THE WITNESS:  Could you -- what is it

23  else regarding disability?  The disabilities that I

24  listed.  Long COVID, that Delta was aware of me having

25  long COVID.  So they were accommodating me through the
↑

57

1  one-to-one open-door policy, because they -- they

2  didn't share that there was an accommodations

3  department at the time; that came on later.

4              They were accommodating me for my

5  different disabilities for my workplace injury, which

6    I believe I shared was musculoskeletal disorder and

7    hip, which was an injury that occurred at Delta.  So

8    they were accommodating me through that.

9              For just disabilities, they were

10   accommodating me with disabilities with my daughter

11   and with us being victims of human -- multiple human

12   trafficking, child exploitation cases and

13   investigations.  So they were accommodating me through

14   that.

15             And where the -- the -- did I say it

16   all?  I said long COVID, musculoskeletal disorder,

17   daughter's human trafficking and child exploitation,

18   victimization, just for the disability aspect.  I

19   think that was the main three things.

20             So could you ask the question again?  I

21   want to make sure I'm staying on topic.

22   BY MS. ZELDIN:

23        Q    So Ms. Jones, asked you to describe the

24   basis for your claim that Delta discriminated against

25   you due to your disabilities.

58

1     A    When you say the basis, you mean like the

2   legal basis?

3     Q    Just your own understanding and what that

4   claim is based on.  Have you described that to us?

5     A    Not -- not in full.

6     Q    Okay.  What else do you have to share?

7     A    What -- what -- if we could refer back to

8   what I wrote.  I know that I'm not able to use, like,

9   other things, so if we could refer back --

10     Q    Do you have any -- sorry.

11     A    Oh, that's fine.

12     Q    Do you have anything else to share at this

13   point?

14     A    Yes, I would -- I would like to, but it -- I

15   would need to refer back to what I wrote in the

16   amended complaint, 'cause the incidents that occurred

17   that were discriminatory is very triggering,

18   especially --

19     Q    So what you're telling us is --

20     A    I was just pausing for a second, I

21   apologize.  Especially with it being around the

22   questioning that Delta did for me on -- that I -- that

23   was mandatory, that you all are -- that I've sent to

24   you regarding my daughter's human trafficking and

25   child exploitation.

                                                    59

1              So I may not be able to recall everything

2    right now, because it is triggering when I think back

3    to what the basis is and the -- the discrimination,

4    retaliation, harassment, that I encountered at Delta,

5    especially surrounding that.

6         Q    Please tell us the basis for your claim that

7    Delta discriminated against you based on your

8    religion.

9         A    Okay, so let me -- so, could you repeat the

10   question, please?

11             MS. ZELDIN:  Can you please read it

12   back, Madam Court Reporter?

13             THE REPORTER:  Sure.  One moment.

14             (The reporter repeated the record as

15             requested.)

16             THE WITNESS:  **-- is the basis.  The

17   best way I can answer your question, based on what I

18   believe you're asking me to answer, is what took

19   place; is that correct?  I don't want to --

20   BY MS. ZELDIN:

21        Q    Ms. Jones --

22        A    Yes.

23        Q    You're bringing a claim in this case that

24   Delta discriminated against you based on your

25   religion; is that right?

                                                    60

1        A    Yes.

2        Q    Why are you doing that?

3        A    Okay.  So I'm doing that because Delta gave

4   me an accommodation.  I'm a seventh Adventist

5   Christian.  I observe the Sabbath from Friday sunset

6   to Saturday sunset.  In doing so, I refrain from

7   working.

8             However, there are times when you can work

9   if it's -- if you're doing good, like medical work,

```
10   certain other things, there's some exceptions or

11   exemptions to that.  But overall we try to refrain

12   from working on the Sabbath, Friday sunset to Saturday

13   sunset.

14          I shared that with Delta in my hiring

15   process, in the interview process.  I put that also on

16   my application.  I inquired with Delta, during the

17   interview process, about how the scheduling will work,

18   and I asked for accommodations at that point.  I told

19   them I'm not able to work Friday sunset to Saturday

20   sunset.

21          The interviewer shared with me that Delta

22   has scheduling where you can shift swap your schedule,

23   because we bid it on a schedule based on seniority,

24   and based on -- not just -- we bid it in order of

25   seniority, but people bid based on whatever needs they
```

61

```
 1   have and whatever area they want to work in and things

 2   of that nature.
```

3          So the interviewer told me -- and I'm not

4    saying this is verbatim -- but in a roundabout way, he

5    told me that the shift swapping would be an

6    accommodation for my religious beliefs.  We proceeded,

7    thankfully I was hired by Delta, 2012, and I brought

8    this up again during the training.

9          I told them, when we got to the point -- I

10   believe training was maybe the first two weeks.  It

11   was, like, during day hours, like Monday through

12   Friday, let's say seven to -- I don't know.  So I

13   brought it to Delta's attention at that point and they

14   asked me to write a letter or send an email.

15         So I did do that, asking for religious

16   accommodations.  Due to the one-to-one -- there was no

17   accommodations department, there was no -- that they

18   told me of.

19         They talked to me and discussed, based on

20   the one-to-one relationship and Delta's culture of

21   open door policy -- and they told me that you would be

22   able to shift trade.  As long as you can find a person

23   to work your shift, you can give away those days.

24   They allow that to employees, and that was an

25   accommodation for me.

62

```
 1              Also, it was -- there was a previous lawsuit

 2      where there was an employee of Delta who was also

 3      Seventh-day Adventists, and in that lawsuit they

 4      offered this employee shift swapping as an

 5      accommodation for the same thing that I am.  So that

 6      falls in line with my testimony.

 7              That's what was granted, and I did that for

 8      -- that was 2012.  I successfully shift traded my days

 9      without any problems, just like other employees are

10      allowed to do for their own different personal needs

11      or accommodations.  And I was able to do that

12      successfully until Delta revoked my accommodations

13      based on my disabilities.

14              So that's the basis.  And they did that --

15      or they threatened to do it -- there was a threat in

16      the beginning, there was some different variants of

17      that, but that's the basis for my religious

18      accommodation.  I hope that answered the question.

19         Q    So to clarify, Ms. Jones, you're saying that

20      Delta revoked your religious accommodations because of
```

21   your disabilities?  Is that your testimony?

22        A    That was one thing.  And because -- and

23   because I -- it was retaliation.  I'm alleging

24   retaliation because I spoke up on safety concerns.  I

25   had reported my manager for harassment.  And -- and

63

1   what other -- what other -- and other illegal

2   allegations that, you know, may have taken place.

3        Q    Any other basis for your religious

4   discrimination claim?

5        A    Let's see.  That's the main basis.  There

6   may be -- I -- I'm not sure if you're saying legal

7   basis, 'cause I am representing myself, so I'm trying

8   not to -- I'm -- I know I'm a witness, but I am also

9   representing myself, so trying not to get the two

10   interlined, but -- or I may be saying the wrong word,

11   my apology.

12             That's the -- there may be more that I would

13   -- I would say in follow-up questions, but I would say

14    that would be the -- the gist for now.

15         Q    Are there any other claims?  We've talked

16    about disability, we've talked about religious

17    discrimination.  Any other claims that you're bringing

18    against Delta in this case?

19         A    Yes.  Retaliation and I -- I -- I'm -- I --

20    I think you said that in a few minutes we would -- you

21    would allow me to look at the document and as you see

22    --

23         Q    We're going to take a break --

24         A    I do -- I do have eight cases as you shared,

25    so me trying to separate each case is -- it would be

                                                          64

1    really helpful as -- if as you shared before, I would

2    have the ability to scroll.  I just want to make that

3    clear that everything is going off the top of my head

4    without anything in front of me, so.

5         Q    Ms. Jones, we're going to take a break in

6    just a few minutes --

```
 7        A    Okay.  No worries.

 8        Q    -- and we'll look into the scrolling issue.

 9   But right now I just want you to tell me your

10   understanding, what is your retaliation claim based on

11   in this lawsuit?

12        A     There were lists of incidents that occurred

13   that I was retaliated and harassed.  When you file a

14   lawsuit, it only has certain things I believe that you

15   can file under, so retaliation was one.  And just the

16   -- the harm that I was caused by Delta to me, the

17   different incidents that occurred.

18        Q    Any other claims that you're bringing in

19   this case?

20        A    I believe there -- it was amended, so I

21   believe there was another claim under Michigan Elliot,

22   or -- but I -- again, I'm not an attorney.  I'm doing

23   my best representing myself in these eight cases, so I

24   don't have that information right in front of me.  I

25   don't want to intermingle them.
```

65

1     MS. ZELDIN:  So I think that we could

2 take, like, a 30-minute break --

3     MS. HARRIS:  Sure.

4     MS. ZELDIN:  -- if that's okay with

5 everyone.

6 BY MS. ZELDIN:

7  Q A 30-minute break, Ms. Jones?

8  A Yes, that's fine.  Thank you.

9     MS. ZELDIN:  Does anyone need longer to

10 get lunch, or is that sufficient time?

11     THE WITNESS:  Could -- will we -- it's

12 1:33 now, so will we come back at, like -- I want to

13 -- what would be the time that we would come back?

14     MR. SIMONTON:  2:03.

15 BY MS. ZELDIN:

16  Q Do you want to say, like, 2:05 or 2:10?

17  A Yeah, 2:10 would be great, or 2:05.

18  Q Okay.

19  A I just want to make sure, 'cause 30 minutes

20 it would be, like, 2:03, so.

21  Q Okay, we'll do -- we'll all come back on the

22 record at 2:10.

23  A 2:10?  Okay, sounds good.  Thank you so

24 much.

25              THE WITNESS:  You all have a great

                                                      66

1   break.

2               MS. ZELDIN:  Off the record.  Thank

3   you.

4               THE VIDEOGRAPHER:  Off the record,

5   1:33.

6               (Off the record.)

7               THE VIDEOGRAPHER:  Back on the record,

8   2:26.

9   BY MS. ZELDIN:

10      Q    Ms. Jones, we're back on the record after a

11   break.  You understand you're still under oath;

12   correct?

13      A    Yes.  Yes, ma'am.

14      Q    Okay.  And you were telling us off the

15   record that your support person has currently left and

16   there's no one else in the room with you; is that

17   right?

18      A    Yes, currently.   However, there will be

19   someone that will be coming in and out, checking on

20   me, and there are people, staff in the building on

21   this floor that I can go and get if need be.

22      Q    Okay.  So in accordance with the Court's

23   prior order and instructions is if someone else is

24   coming to the room, you need to identify that person.

25      A    Okay.

67

1      Q    If they're coming into the room to check on

2   you and have them visible in the camera frame, just so

3   that it's clear on the record who is in this

4   deposition and when.

5      A    Okay.  Just also about that -- I -- I should

6   have mentioned it before, but I'm glad you brought it

7   up, Counsel -- I had my support person in the camera

8   frame, but the -- whoever's in charge of the camera

9   did it where it was more centered on me, and the -- so

10   that wasn't of my doing, just to -- but I will make

11    sure if someone comes in that I have them identify

12    themself -- that's --

13         Q    That's fine, thank you.  And --

14         A    You're welcome.

15         Q    -- are you presently in a place where other

16    people can hear this deposition proceeding?

17         A    Well, I'm at Avalon Healing Center; I'm in

18    one of the offices.  There are adjacent offices.  I'm

19    not sure whether the walls, how thin they are, but I

20    am here alone.

21         Q    Okay.  And is the door closed?  The room

22    that you're in?

23         A    Yes, it's closed.

24         Q    Ms. Jones, what did you do to prepare to

25    give your deposition today?

                                                    68

1          A    I prayed.  I did a lot of prayer.  I think

2    you all sent me some materials over the -- some

3    discovery materials.  I received a big -- two -- one

4    big box, and another box.  I tried to review -- I

5    think one of the boxes is over 3,000 pages, or -- a

6    lot of pages.  I reviewed that information from

7    Monday, that I received on Monday -- or -- or I

8    reviewed it as best I could.

9            I -- this is my first deposition, so that I

10   didn't have -- I don't know how to prepare.  I -- the

11   -- the one other thing I did was I made sure prior

12   when we first made the arrangements, that I went

13   around asking for support people to participate.  And

14   that was part of the preparation.  Unfortunately, my

15   support person canceled yesterday.  Other than that,

16   I'm here.  That was it.

17       Q    And did you bring any documents with you

18   today to the deposition?

19       A    Yes.  Uh-huh -- we want to see -- uh-oh,

20   something happened.  Hold on.  Can you all see me

21   okay?

22       Q    Yes.

23       A    So I have a little heart here and it -- it

24   just has the Delta lunch bag.  It just has the box --

25   oh, that you all sent me on Monday, I believe this big

69

1    old box.

2         Q    Okay.

3         A    And here's another box, and then a third

4    box.  So I didn't -- I didn't know how the depositions

5    work -- uh-oh -- of the third box.  I don't know how

6    depositions work, so I know this was what you all

7    sent.  So that's it.

8         Q    And you brought documents that we sent to

9    you; is that right?

10        A    Correct.

11        Q    Okay.  Did you bring any other documents of

12   your own with you?

13        A    No.  Just what you all sent to me.

14        Q    Have you discussed this lawsuit with any

15   other -- with any former or current Delta Air Lines

16   employees?

17        A    Discussed the lawsuit?

18        Q    Yes.

19        A    I mean, you -- I've discussed -- have I

20   discussed this lawsuit?  When I was -- when you all

21   were -- Delta was allowing me to work, there were

22    incidents when management met with me and harassment

23    continued -- alleged harassment or retaliation,

24    discrimination continued.

25            So I've sent emails for investigations.

70

1    I've talked to Delta employees that were of -- not --

2    not coworkers, but I've talked to Delta employee

3    management or people who were taking care of the

4    investigations when they would ask me questions, and

5    they were aware that I did have a lawsuit out and OSHA

6    legal proceedings for OSHA whistleblower and things of

7    that nature.

8        Q    Have you asked any former or current Delta

9    Air Lines employees to be a witness for you in this

10   lawsuit?

11       A    No, not to my knowledge.  No.

12       Q    Ms. Jones, where were you born?

13       A    Where was I born?  I was born in Pinehurst,

14   North Carolina.

15      Q    And how long have you lived in Michigan?

16      A    Oh, child, let's see.  I've got to tell my

17  age now.  So I've lived here for approximately 30, 31,

18  32 years.

19      Q    What is your current address?

20      A    My current address is 45014 Trails Court,

21  Canton, Michigan, 48187.

22      Q    Are you married?

23      A    No.

24      Q    Have you ever been married?

25      A    No.

 

 

 

 

 

71

1       Q    Do you have children?

2       A    Yes.

3       Q    Could you please tell us their names and

4   ages?

5       A    My son, his name is Jayshon Jones.  He's a

6   Delta employee as well at another station, as --

7   that's not what you asked me though.  I apologize.

8        Q    What is his age?

9        A    Yeah, yeah, I was -- I was thinking of his

10   date of birth.  Oh, did you ask me for a date of birth

11   or just age?

12       Q    Yes.  What -- well, what is his date of

13   birth?

14       A    Did -- did you ask me for that originally --

15       Q    Ms. Jones --

16       A    -- I'm just trying to recall.  It's fine --

17       Q    What is his date of birth?

18       A    Okay.  His date of birth is November 3rd,

19   '99, so that will make him 26.  I -- you know, I --

20   I'm going to -- okay.  My second daughter -- the

21   reason why I say this, 'cause I've talked about human

22   trafficking and stuff, and I don't want my daughter --

23   I don't want her name out there.  I don't want to -- I

24   don't want to expose her, because she was a minor.  Is

25   that okay, or?

72

```
 1      Q    Yeah.  Do you want this portion of that --

 2   do you want this part of your testimony to be marked

 3   confidential under the protective order --

 4      A    Yes.

 5      Q    -- in the lawsuit?

 6      A    Please.  Yes.

 7      Q    Okay.  Yes.  We have that entered, as you

 8   know, so we can do that.

 9                (Nonconfidential portion of transcript

10                ends.)

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //
```

73



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

Redacted – Subject to Protective Order

19
20
21
22
23
24
25



74

1
2
3
4
5
6
7
8
9
10
11

Redacted – Subject to Protective Order






Redacted – Subject to Protective Order

76

1    Redacted – Subject to Protective Order

2                  (Confidential portion of transcript

3                  ends.)

4    //

5    //

6    //

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

77

1                    (Nonconfidential portion of transcript

2                    begins.)

3    BY MS. ZELDIN:

4        Q    Do you have -- other than Jayshon, do you

5    have any other relatives who currently work for Delta?

6        A    My cousin, Carmen Johnson.

7        Q    Is Carmen the person that referred you to

8    Delta back in 2012?

9        A    Yes.

10       Q    And what is her role there currently?

11       A    I don't know currently.  I haven't talked to

12   her and so I -- I don't know what her current role is.

13   I know when I was actively working, when I would see

14   her at work, she seemed to be, I believe, above wing,

15   and a red coat in a managerial or lead position.  And

16    she's been there for a lot of years, like 30, I

17    believe -- 25, 30 years.

18         Q    Did you graduate from high school?

19         A    Yes.

20         Q    And do you have any education post high

21    school?

22         A    Yes.

23         Q    Tell me about that, please.

24         A    So I don't have any -- could you ask me a

25    question that might be -- or could you rephrase that,

᠕

78

1    please?

2         Q    Did you graduate from college?

3         A    No.

4         Q    Did you attend college?

5         A    Yes.

6         Q    Did you obtain any type of -- so you didn't

7    graduate from college, did you obtain any other type

8    of, like, license or degree of any kind?

```
 9      A    Yes.

10      Q    What is that?

11      A    Cosmetology license.

12      Q    Is that still active?

13      A    Yes.

14      Q    Were you ever in the military, Ms. Jones?

15      A    No.

16      Q    Do you have any immediate relatives in the

17  military?

18      A    Veterans, or?  I'm not sure.  My son was in

19  the military.  I'm not sure if -- if he's still

20  considered active military or not.  And my dad was --

21  is a Vietnam vet.

22      Q    Could you please just tell us where you were

23  employed before Delta Air Lines?

24      A    For, like, what timeframe?  Because I've had

25  --
```

79

```
 1      Q    Well, let's go -- start it -- go back right
```

2   before Delta.  Where were you employed immediately

3   before Delta?

4        A    Immediately before Delta, so that was in

5   2012.  So before that I was a ramp agent for a

6   subsidiary of Delta Regional Elite.

7        Q    And how did your employment with Regional

8   Elite end?

9        A    I got employment with Delta mainline.

10       Q    So you voluntarily left?

11       A    I -- yeah.  I -- I had already gotten

12  employment with Delta and so you couldn't be employed

13  with two, as far as I'm aware, so I separated from

14  them and I was with Delta mainline.  So I was with

15  them in 2011 and I started with Delta 2012, so there

16  was a little bit of overlap.

17       Q    Is that the only other airline that you've

18  worked at?

19       A    Yes.

20       Q    What type of other jobs have you had, like

21  in your career?

22       A    Types of other jobs?  I worked in childcare.

23  I've worked in -- in educational institutes, K through

24  12 and college.  I've worked in retail.  I've worked

25  in hospitality and customer service agency roles.

80

1    I've worked as a math tutor.

2            I've worked as a -- math tutor, in the

3    education system -- I worked as, like, a substitute --

4    well, I said in the education system.  I think that

5    might -- I might have covered everything.

6        Q    Have you ever had your --

7        A    Oh, I'm sorry, I apologize.

8        Q    No, go ahead.

9        A    I had a -- I had a -- a salon.  I worked in

10   cosmetology -- cosmetology field.

11       Q    And you said "I had a salon," was that one

12   that you owned?

13       A    I don't think I said that, but yes.

14       Q    And what was the name of that salon?

15       A    Hairt Salon Spa.

16       Q    Do you still own this business?

17       A    I'm not sure because I'm not sure if it's

18   still registered, so I'm not currently working in it.

19       Q    When were you working in it?

20      A    From 2022 to -- I closed it in, I believe

21  October of last year, or -- yeah.  I think it was

22  2024, 2025.  I'm not sure.

23      Q    When you say last year, do you mean a few

24  months ago, or a year and a few months ago?

25      A    I believe it was a year and a few months.

81

1   It wasn't -- it wasn't October 2025.  I think it was

2   the previous year, but I'm not sure.  I'm not sure.

3       Q    Why did you close it?  Why did you close it,

4   Ms. Jones?

5       A    Well, I wasn't really there often, and I was

6   using my Delta income to offset the expenses and Delta

7   wasn't allowing me to work anymore to get income, and

8   so I was unfortunately unable to keep up with my

9   payments.  That's part -- partial reason.

10      Q    When you were running Hairt Salon, were you

11  the only person that worked there, or did you employ

12  other people?

13      A    I had people -- sometimes I had assistants

14   and -- not a lot.  Maybe when it got really busy.

15      Q    What were the hours and days of the week

16   that that business was open?

17      A    Twenty-four hours.  Well, let me

18   distinguish.  So it's a salon suite.  The salon suite

19   -- the building was available 24 hours, seven days a

20   week, holidays, weekend, everything, but each person

21   in the building was a different business so we

22   operated on our own schedule.  So I didn't have any

23   set -- I didn't have a set schedule.

24      Q    Would customers contact you and arrange for

25   an appointment and then you would meet them at the

82

1   appointment time?  Is that what you're describing?

2      A    Sometimes.  Sometimes you would get walk-ins

3   if I was already there, or they had a system where

4   people would call and you would get alerted to what

5   they may need.  Everybody in the building who signed

6    up -- who signed up would get alerted.

7        Q    How many hours a week roughly did you work

8    at Hairt Salon, when it was in operation?

9        A    It -- it varied greatly.  I don't know.  I

10   don't have an -- I don't know.  It was -- it varied

11   greatly.  Pardon me?

12       Q    What do you think would be -- oh.  What do

13   you think would be the maximum number of hours that

14   you ever worked?

15       A    In a day?  A week?  A month?

16       Q    A week?

17       A    The maximum?  And are we saying -- when you

18   say hours worked, would that be paid -- like, hours

19   that I was just in the building?  'Cause sometimes I

20   may be in the building, but I didn't have any clients.

21       Q    Sure.  How how many hours do you think you

22   spent at the Hairt Salon location per week?

23       A    It varied.  It could vary anywhere between

24   one hour -- altogether servicing clients, I -- I could

25   be -- just, so for clarification, 'cause I want to

83

1      make sure I'm answering this accurately.

2              Sometimes as a hairstylist you may just be

3      in your suite waiting.  It may be -- I may have had

4      one client in the morning and they had another client

5      who canceled, so I'm just sitting there.  So it's hard

6      for me to really give you a number amount, if that

7      makes sense.

8          Q    Okay.  All right.  Well, to the best of your

9      ability -- let's just talk about how much time you

10     physically spent at that location per week, whether

11     you were sitting there or servicing a client.

12         A    It varied from zero hours a week to --

13     you're saying an average, or?  I -- I need

14     clarification, please.

15         Q    Okay.  An average, please?

16         A    I don't know.  I can't tell you.

17         Q    How about a maximum?

18         A    I couldn't tell you.

19         Q    Were you ever there more than 40 hours a

20     week?

21         A    More than 40 hours a week, probably not, but

22     I -- I don't know.  There were times --

23         Q    Were you ever there more --

24      A    Go ahead, I'm sorry.

25      Q    Go ahead.

84

1       A    Go ahead.  I'm listening.

2       Q    Were you ever there more than 20 hours per

3   week?

4       A    At times I have been.

5       Q    Do you have -- did you file taxes as an

6   owner of that business?

7       A    No.

8       Q    How did you report that income?

9       A    I'm still dealing with that now.

10      Q    Do you have records showing appointments or

11  clients that you serviced, time that you spent working

12  there, and money that you made?

13      A    Some record, yes.  Or some indication, yes.

14      Q    Okay.  Ms. Jones, I'm going to add that to

15  the list of things that you need to provide us in

16  connection with discovery in this case, that time

17    period that you're there overlaps your employment with

18    Delta.  And so, can you please supplement your

19    discovery to provide that information to us?

20         A    Okay.  Could you -- yes, for the record.

21    Could you send that to me what you need -- like, in

22    writing, so I'm aware?

23         Q    We can provide a communication of all of the

24    information that you need to supplement.

25         A    I appreciate it.

85

1          Q    Are you currently employed, Ms. Jones?

2          A    No.

3          Q    Are you looking for work?

4          A    I'm trying to -- first the -- when you asked

5     me am I currently employed, I believe I've been

6     terminated from Delta, but there -- that Delta has

7     given me multiple termination dates, so I'm not very

8     clear on what my employment status is there.  And

9     they've -- they've recalled things.

```
10              I've called in after I was -- it was stated

11   I was terminated and they said, "No, we have you on

12   the record as still being an active employee."  So I'm

13   not sure whether -- what my status is.  That's why

14   I've asked -- given a motion, asking for

15   clarification, and I've also asked Delta attorneys,

16   and I've also --

17              MR. SIMONTON:  Ms. Jones?  Sorry.  Can

18   you please answer the question?

19              THE WITNESS:  What -- what -- can you

20   -- can you ask --

21              MR. SIMONTON:  Sorry.

22              THE WITNESS:  Yeah, I -- you cut me

23   off.  We shared that -- you all told me to let you

24   know.  I don't -- how would you all -- if you cut me

25   off, how would you all like for me to proceed?  Like,
```

86

```
1   should I say, "Please don't cut me off," like you've

2   said, or how -- how should I do that?
```

3    BY MS. ZELDIN:

4        Q    No.  You can complete your answer.

5        A    Okay.  I've -- so he just said that he

6    wanted me to answer the question.  I believe the

7    question was -- you had asked about whether I was

8    still employed, and I'm saying --

9        Q    Yes.

10       A    -- I'm -- I'm unsure.  I said no at first,

11   but then I wanted to -- I don't know the right

12   terminology.  If I say we can strike that, or I wanted

13   to change that answer, because I believe that I've

14   been terminated from Delta, but they've provided

15   different dates.

16            They told the Detroit Airport Police that I

17   was no longer an employee on August 22nd through --

18   and I submitted that recording to the Court.  But then

19   when we had court for a status conference, you all

20   said I was still employed.

21            Then on other dates, September -- I believe

22   24th, 25th -- they sent me an email, then they

23   recalled that email saying I was terminated.  Then

24   they sent me -- so.  And when I called in to

25   1-800-mydelta, they -- I believe it was September

87

1    28th, they said I was still employed.

2              So that's -- I have a motion currently to

3    try to clear whether I'm employed or not, that -- I

4    hope that answered the question.

5         Q    Ms. Jones, are you working anywhere

6    currently?

7         A    So secondly, to answer your question -- the

8    second question was am I working anywhere currently,

9    and the answer would be I'm -- I'm not receiving any

10   income of -- for employment.  So no, I'm not working

11   anywhere that -- yes.

12        Q    During your employment with Delta, you told

13   us that you had the Hairt Salon for a time period.

14   Were you also employed at some place called First

15   Hospitality?

16        A    Yes.  Hairt -- it's Hairt Salon.  Like --

17   like your heart, but it's spelled H-A-I-R-T.

18        Q    Oh, okay.

19        A    Yeah, I know.

20        Q    Okay.  Thank you.

21      A    No worries.

22      Q    Okay.  So were you currently employed at

23  some place called First Hospitality during your

24  employment with Delta?

25      A    You said currently employed.  Could you
↑

                                                        88

1   repeat the question, or rephrase it, or clarify it?

2       Q    During your employment with Delta, was there

3   a period of time that you were also employed at a

4   place called First Hospitality?

5       A    First Hospitality was the managing

6   corporation.  I was not employed with First

7   Hospitality.  I was employed with Marriott Residence

8   Inn in Ann Arbor, but I believe First Hospitality is

9   the umbrella.

10      Q    And what were your dates of employment at

11  First Hospitality/Marriott Residence Inn?

12      A    I don't have that information in front of

13  me, the exact date.

14      Q    So is it true that you sought employment at

15   Marriott while you were employed with Delta?

16      A    Yes.

17      Q    And why did you do that?

18      A    That -- well, one reason I was -- had a

19   workplace injury at Delta and I had reported that to

20   management.  I was in physical therapy and in a lot of

21   pain, so I wanted to -- I needed to get income.  And I

22   guess now as years have gone by, Delta never reported

23   my injury where I could have probably gotten workman's

24   comp.  I don't know.  And so that was one reason for

25   disabilities.

                                                        89

1           Secondly, I wanted to have -- my -- my uncle

2    had previously worked at Marriott and he had passed

3    away, so we -- my family and I benefited from his

4    hotel discount.  So I inquired, because I had

5    traveling, and I also had different things in and out

6    of state for my daughter's cases, as well as her --

7    she -- I had to relocate her for her safety out of

8    state, and it was costly.  So I worked there to seek

9    the benefit of the hotel.  And they only -- I -- I'm

10   -- I'm talking too much.  I'm sorry.

11       Q    Ms. Jones, did you also use your Delta

12   flight benefits to assist with that process that

13   you've just described?

14       A    With my daughter?  Yes, I did.

15       Q    When you worked at Marriott, how many hours

16   a week did you work there?

17       A    So they started me -- I'm -- I'm talking too

18   much, I feel.  I'm trying to -- let me see if -- to

19   answer your question, I may have to give more

20   information, if that's okay, or -- could you repeat

21   the question?  Let me just answer what you asked.

22       Q    Yes.  How many hours a week did you work at

23   First Hospitality/Marriott?

24       A    So okay, it averaged from zero to -- oh, I

25   shouldn't say average, 'cause the average is like a

90

1    culmination divided by whatever, so it wasn't an

2    average.  But I've worked there at times between zero

3    per week -- between zero hours a week to maybe 21 --

4    21, 22 hours a week.

5         Q    How did you work out scheduling your shifts

6    there and your shifts at Delta?

7         A    Well, Delta didn't place me on a leave, they

8    were accommodating me with the one-to-one

9    relationship.  So for my physical disability and for

10   the situation with my daughter, I -- I think it's

11   important to note that my -- as a baggage handler for

12   any airline is a very dangerous position to work in.

13        You have -- they -- they say safety first.

14   You have to make sure you're focused, you have to make

15   sure you're aware, you have to make sure that engines

16   are not running so you don't go behind it, because

17   people have injuries and sometimes fatalities.

18        So I had a physical injury that I sustained

19   at Delta with a musculoskeletal disorder, hip pain.

20   Then I had the situation with my daughter, which she

21   had disabilities and I had disabilities, plus I had

22   long COVID and other things going on.  So Delta --

23   your question was, why did I work there?  Why did I

24   work there?

25    Q    So my question was, since you had two jobs,

91

1    you had Delta and you had First Hospitality/Marriott,

2    how'd you go about working out your schedule so that

3    you could work at both places in the same week?

4        A    Well, Delta's a 24/7 operation, so you can

5    -- you can work at the airport, literally any -- they

6    have shifts around the clock.  I was able to alternate

7    days and fix my schedule accordingly.  Also, with

8    Marriott, I said that I worked there, not an average,

9    but any time between zero to 21, 22 hours a week, so

10   that was -- the higher level only took place maybe

11   just a few weeks, sometimes I didn't work there at all

12   during the week, so.

13           And -- and the hotel is 24/7 too.  So I was

14   able to manage both jobs -- like, and I'm not the only

15   employee who does that.  There are other employees who

16   work for hotels, other jobs, so it's not uncommon to

17   be able to do both -- one or more jobs.

18      Q    Did you ever use your Delta shift swapping

19   to allow you to be available for shifts at Marriott?

20      A    I -- I used the accommodation that Delta

21   gave me for my physical disability, which was shift

22   swapping, and for my physical and mental disabilities

23   and religious accommodations.

24      Q    Okay.  So --

25      A    Delta -- Delta even has a policy, or I'm not

                                                          92

1    sure -- that's the thing with Delta, we're --

2    employees, we're not sure what policies are, because

3    they don't have -- I guess with the discrimination

4    piece, Delta doesn't necessarily -- employees are

5    often concerned that policies change and we don't --

6    we're not aware of what policies are because they rely

7    so heavily on the one-to-one relationship between an

8    employee and management.

9           So what the discrimination may be -- what

10   they may do for me, they may not do for someone else

11    or they may do something different for someone else is

12    based on that one-on-one relationship.  So other --

13    other employees have other jobs that they allow shift

14    swapping to -- for flexibility.  And I'm sure that it

15    is been in some of the Delta manuals, they even talk

16    about it when they hire you.  So this was not an

17    uncommon thing.

18        Q    So you agree, Ms. Jones, that shift swapping

19    is something that is afforded to Delta employees in

20    general; correct?

21        A    And -- and for -- for -- in general and for

22    accommodations.

23        Q    And so the answer to my question is yes;

24    correct?  Shift swapping is a benefit that's afforded

25    to all employees, provided the requirements for shift

                                                        93

1    swapping are met; correct?

2        A    I can't say correct, 'cause all employees, I

3    think is a hundred thousand-plus employees, so I don't

4    know about all employees.  I just -- and I think

5    everybody has a different department.  Like in-flight

6    has different rules -- I guess, so no, I would say

7    that would be incorrect.

8        Q    So as far as you're aware, employees that

9    were in your job category, shift swapping was a

10   benefit that was afforded to all employees in your

11   category as long as the requirements for shift

12   swapping were met; correct?

13       A    No, that's not correct.  I -- it was -- it

14   was used as accommodations and for flexibility.  So it

15   was used for people's disability accommodations.  It

16   was used for flexibility.  It -- the policy, I think

17   you said based on if you had the hours or something --

18   could -- could you repeat what you just said,

19       Q    Ms. Jones, is it your testimony under oath

20   that shift swapping was only available to employees as

21   an accommodation?  Is that what you're trying to

22   testify to?

23       A    No, I'm answering your question.  And I

24   believe your question was, is it my -- if the recorder

25   -- if they could reread what you just asked -- what

94

1    was the question?

2                    THE REPORTER:  Sorry, one moment.

3                    THE WITNESS:  Sorry.

4                    THE REPORTER:  Let me go back to it.

5    It's okay.

6                    THE WITNESS:  Thank you.

7                    THE REPORTER:  Let me find her last

8    question.

9                    (The reporter repeated the record as

10                   requested.)

11                   THE WITNESS:  **A question before that,

12   but for this question, as long as requirements for

13   shift swapping was met, that's untrue.  Because there

14   are different -- that's the discriminatory piece.  The

15   -- the -- as long as requirements for shift swapping

16   was met, that's the discrimination piece right there.

17   BY MS. ZELDIN:

18       Q    So you agree that shift swapping was

19   available to all employees in your job category?

20       A    Not all --

21       Q    Do you agree with that?

22      A      No.  Because when people -- they've changed

23   things over the years, and I think more recently when

24   Delta did allow me to work, they -- they did not allow

25   shift swapping for different instances.  Like, if

                                                              95

1   somebody was a new employee when I first started, they

2   allowed shift swapping if you were a new employee; I

3   believe now they don't.  So I would disagree with that

4   statement that you made.

5      Q      So Ms. Jones, let's talk about your position

6   at Delta.  Is it correct that you worked in airport

7   customer service throughout your entire employment?

8      A      Airport customer service.  Yes.

9      Q      ACS.

10      A      ACS.  Yes.  Thank you.

11      Q      And you worked below the wing; correct?

12      A      Yes.

13      Q      And what was your job title?

14      A      So when I first started in 2012 -- and I

15    don't have everything in front of me -- but I was

16    hired as a seasonal ready reserve.  The position

17    changed where we had to become permanent ready

18    reserves, they -- they let go of seasonal.  Then from

19    that it switched to -- in 2021 we become benefited, or

20    they brought back a -- a different type of seasonal

21    program and we had to choose whether we were going to

22    become benefited or seasonal.

23        Q    And you chose to become a benefited customer

24    service agent; correct?

25        A    Yeah.  With -- but shift swapping was not a

96

1    part of that.  Yes --

2        Q    Ms. Jones, that was not part of my question.

3    I need you to focus on what I'm asking.  So my

4    question was, you chose to become a benefited customer

5    service agent and that was in June 2021; correct?

6        A    I'm not sure about that, because in my

7    personnel record it still has me as ready reserve.

8        Q    Is it your understanding that in 2021 you

9    chose to become a benefited customer service agent?

10       A    I'm not sure about that.  With -- with the

11   circumstances of how things played out, I don't know

12   for -- honestly.  All I can go is by what my record

13   states and my record, it doesn't have any information

14   about that transition.  It just says -- my records

15   that HR forwarded to me more recently, the most recent

16   one, it had me as ready reserve.

17       Q    So your duties as a customer service agent,

18   you typically worked a four hour shift; is that

19   correct?

20       A    When you say work, no, I've worked more than

21   four hour shifts.  I've -- they've -- Delta, because

22   I'm a good employee, they selected me at one point to

23   go down to Raleigh Durham to assist them with the

24   transition there, and I worked there for a month.

25   Delta had me there for about a month.  So during that

⬆

1   time I worked almost a 40-hour shift a week.  There

2   have been other times I've worked a lot of different

3   hours.

4       Q    On an average week, were you a full-time 40

5   hour employee, or a part-time 20 hour per week

6   employee?

7       A    It varied.  On an average, throughout my

8   whole career, it started in 2012, I was seasonal.  And

9   the way Delta has the system set up, seasonals, you

10  had to work a minimum, at the time, of 300 hours a

11  year, and I think the maximum was 900 hours.

12          So I always stayed within my -- when I first

13  started at seasonal, I always reached my minimum and

14  everything.  Then they moved to permanent, where they

15  changed it, we had to work 600 hours minimum a year.

16  So the way -- the way -- to answer your question

17  accurately, I think that you have to understand how

18  Delta has the operation running.

19          It wasn't necessarily an average, per se,

20  for -- depending on what group you were in.  Everyone

21  was responsible as ready reserves to meet our minimums

22  and that's what -- that's what I did.

23      Q    And Ms. Jones, that was your responsibility

24  to keep track of those hours and make sure that you

25  met those minimums; is that right?

98

1        A      As a ready reserve, yes --

2        Q      And you did that?

3        A      And they -- and they also -- I'm sorry?

4        Q      And you told us you did that; correct?

5        A      Correct.  Also they had tracking.  They

6    would give us reports where they had every -- Delta

7    had everyone listed to -- so that -- and they -- I

8    think they sent them out monthly.

9              **And I would ask that you all -- I did not

10   see that in the discovery.  I would ask that you all

11   please submit that to me -- and I can submit that to

12   you in writing -- the -- the tracking mechanism that

13   they used to help people keep on track with their

14   hours when we were -- as ready reserves.

15             So they would send out something, I'm going

16   to say monthly or so, that you -- it had your employee

17   number and it was transparent.  It showed everyone's

18   to let you know where you were at with the hours.

19      Q      Is it true that regardless of whether you

20   were in the ready reserve or benefited, you were

21   working as a customer service agent below the wing

22   during your entire employment with Delta?

23      A      That's true.

24      Q      That's the only job that you had; correct?

25      A      I mean I was a DE&I advisor.  Delta selected

↟

99

1   me as a DE&I advisor.  So that was -- I had other, I

2   don't know if you want to call it jobs, but

3   opportunities that Delta selected me for.

4      Q      So other than those, you were always

5   employed as a customer service agent below the wing;

6   correct?

7      A      Yes.

8      Q      And Ms. Jones, what were your job duties in

9   that role?

10      A      Safety first.  So you have to make sure that

11   you -- we dealt with bags, so we had to follow FAA

12   guidelines.  Sometimes with dealing with baggage, you

13   transport or transfer baggage from different areas

14   from the aircraft.  You push back -- you -- you have

15   to be able to do all the job requirements, but

16   sometimes there were specialty job functions that you

17   would get extra training on, like pushing the plane

18   back.

19          We would wing walk, bring the plane in, wing

20   walk the plane out, took ramp -- bag -- bagroom

21   transfers, which is online.  Sometimes we would get

22   the pink tag bags, which you would go to the -- meet,

23   like, face-to-face with the passenger, and if they

24   have pink tag bags, you would take it.

25          You'll be responsible at times for handling

♠

                                                        100

1    human remains.  You'll be responsible for handling

2    wheelchairs and accessibility things for passengers,

3    following FAA guidelines to make sure that the ramp

4    operation was safe, making sure that you were alerted

5   to any threats, whether that be someone being on the

6   ramp that was unauthorized or if there was baggage.

7           If you felt that the bag had a vibration,

8   you would have to report it just in case it may be a

9   bomb or something like that.  Making sure that if

10  there were any threats with -- within the

11  organization, for example, another coworker, if they

12  were suspicious or doing things they weren't supposed

13  to do, it was your duty to report it.  See something,

14  say something.

15          Making sure that we came to work fit and

16  able to do our jobs since it's such a dangerous

17  environment.  Making sure that we discuss with Delta

18  employees or management -- when I say Delta employees,

19  you all use Delta employees in one of the litigation

20  motions, so typically I'm saying management, the

21  leadership, to make sure that the -- if there were any

22  concerns, safety wise or anything, that you report

23  that so that Delta could resolve it.  Other FAA

24  guidelines that -- and operational guidelines to -- to

25  do, as a baggage --

101

1    Q   So Ms. -- so Ms. Jones, is it fair to say

2  that in that role you were on your feet pretty much

3  the whole shift; is that correct?

4    A   No, that's not correct.

5    Q   How much of your time do you think that you

6  were on your feet, as opposed to sitting at a desk?

7    A   There was no sitting at a desk per se.  When

8  you say sitting at a desk -- could you repeat the

9  question, or -- or clarify the question?

10    Q   I think you answered the question.  Let me

11  move on and ask you this.

12    A   I -- I don't -- I don't think I did.  I -- I

13  want to strike what I -- what I said, because I -- I

14  wanted to -- I don't think I answered the question, so

15  if you could please repeat it.  I want to make sure

16  that this testimony is accurate, 'cause I'm not sure

17  --

18    Q   Ms. Jones --

19    A   -- at a desk.

20    Q   I'm going to ask the questions, and you

21  answer them and the record will reflect what it

22  reflects.

23      A     Okay.

24      Q     You testified to dealing with baggage, and

25   when you talk about that you're talking about actually

102

1   lifting luggage; is that correct?

2       A     When you say I testified to speaking about

3   baggage, could you clarify?

4       Q     Yes.  I'll ask a different question.   In

5   your role as a customer service agent, you had to pick

6   up luggage; correct?

7       A     At times, yes.

8       Q     And the average weight of that luggage could

9   be up to 50 pounds; is that correct?

10      A     It could be more.

11      Q     Fifty pounds might be an average?

12      A     No, it could be more.  It could be -- like I

13   shared, we had to deal with electronic wheelchairs.

14   And also in my role as a baggage handler, I didn't

15   always pick up bags.  I had other roles involved as

16    well where I may not have picked up bags.

17         Q    But in that role -- in those other roles,

18    you could have been lifting a wheelchair, dealing with

19    human remains, some of these other things that you

20    described to us; correct?

21         A    In -- in the other roles, sometimes, for

22    example, if I was working at -- excuse me, it's been a

23    minute, so let me think of the department, please.  If

24    I was working in reroute.  Okay, reroute is more

25    computerized, where you sit at a desk and bags may --

                                                     103

1     it is a team of you.  And -- and they may -- I don't

2     know, sometimes it may be 8 to 15 people work in that

3     department.

4              And if a bag was rerouted, you have to

5     figure out where -- where that bag is going to go,

6     where -- match it with the passenger, so in those

7     moments -- and it could vary.  I may not lift bags, I

8     may just be at the computer, get -- scanning the bag

9    tag and things of that nature.  It just varied.  It

10   was -- my -- it wasn't always lifting bags.

11        Q    But you agree that was a part of your role

12   as a customer service agent; correct?

13        A    Correct.

14        Q    Throughout your time at Delta, Ms. Jones,

15   you received training; correct?

16        A    Yes.  Sometimes, sometimes not.

17        Q    You received training on job duties, as well

18   as company policies?

19        A    Oh no, definitely not company policies, as I

20   shared.  And I think that's part of the discrimination

21   piece.  Delta did -- and you can ask -- if -- if I get

22   witnesses who's willing to testify, 'cause they're not

23   too afraid of repercussions from Delta, you can ask --

24   if they answer honestly.

25        One of the things in my role as a DEI
↟

104

1   advisor that Delta selected me to be in, and in my

2   role of whatever Delta selected me to do, when I was

3   in that role, as I talked to different employees, one

4   of the biggest concerns is Delta's policies, how they

5   didn't have one.

6            For example, there's no attendance policy.

7   Delta -- and that's the discrimination piece, because

8   Delta worked more -- has a culture of one-to-one, open

9   door.  So I go to management -- they wanted you to

10  come to them to resolve how they're going to work

11  things out with you.

12           And that's discriminatory in the fact that

13  they may do something -- one thing for me and do

14  something different for another person in the same

15  category, or do some -- it was -- there was no

16  training completely on policies.  It was more -- I

17  mean, they -- they may have had -- I'm trying to think

18  back.

19           Or -- or they -- one of the things that they

20  discriminated against me was because my doctor asked

21  for policies and -- that they printed out or presented

22  in a PDF form, just so that I would be able to have

23  that paper -- like how you all sent me all these

24  documents -- I could have it readily available, and

25  Delta denied those accommodations, which is

105

1   discriminatory, I -- I believe --

2       Q    Ms. Jones, I just want to stop you there,

3   because I just want to make sure that I clearly heard

4   your testimony.  Your testimony, under oath, is you

5   received no training on Delta policies?  I just want

6   to make sure that that is your testimony under oath?

7       A    Could she repeat -- well, I don't think

8   that's the question you asked.  Could the -- could the

9   question be -- I -- I apologize.  What was the name of

10  the -- the recorder, I believe?  Could she possibly

11  read --

12      Q    Okay.  No, just answer this question.  Did

13  you receive training on Delta policies?

14      A    When you say training, I'm -- I'm not sure

15  what you mean.  Could you clarify?

16      Q    Okay, let's --

17              MS. ZELDIN:  A.J., can you get her

18  training records, please?  December 25, if that's

19  helpful.

20          MR. SIMONTON:  Yeah, I've got --

21          MS. ZELDIN:  Okay.

22   BY MS. ZELDIN:

23      Q    Okay.  So Ms. Jones, the way that you can

24   get access to scroll through a document is there's a

25   button that you can click that says "Ask" --
↟

106

1          MS. ZELDIN:  What does it say, A.J.?

2    "Ask" --

3          MR. SIMONTON:  It will say "View

4    options."  It says you are viewing Anthony Simonton

5    screen, and then to the right there's a black dropdown

6    that says "View options."  If you click view options,

7    at the bottom it says "Request remote control."  And

8    if you request remote control, I can give you the

9    ability to scroll.

10          THE WITNESS:  So you said that on the

11   screen there would be something stating "View

12   options."  I don't, on my screen -- and I can take a

13    picture if -- if you would like for me to, for maybe

14    better further instruction.  I only see "View."  When

15    I click on view, it -- it does not say what you just

16    shared.

17              It just says "Standard, side by side

18    speaker, side by side gallery, side by side multi,

19    sort gallery by, change theme, hide self view, hide

20    non-video participants, swap video and share screen,

21    show meeting timers, and full screen."

22              I'm not sure -- with you all being the

23    host, it may -- our screens perhaps may look

24    different.  I'm not sure.

25    //

                                                    107

1    BY MS. ZELDIN:

2         Q    Okay.  Well, we'll check on that.

3         A    Okay.

4              MS. ZELDIN:  A.J., why don't you just

5    kind of scroll through this document and then go get

6    Rob, please, see if we can get this resolved.

7                    THE WITNESS:  If -- if possible, can

8    you all like zoom -- make it bigger, 'cause it's very

9    blurry and I can't see the writing?

10                    MS. ZELDIN:  And so, we're marking this

11   as the next exhibit, please.

12                    THE WITNESS:  This will be Exhibit 4?

13                    THE REPORTER:  Exhibit 4 is what I have

14   as well.

15                    (Exhibit 4 was marked for

16                    identification.)

17                    THE WITNESS:  Okay.  And what is this

18   --

19   BY MS. ZELDIN:

20        Q    Ms. Jones, do you recognize Exhibit 4?

21        A    I don't -- I -- oh, now you scrolled it back

22   up.  Okay.  So it says my name, completed training

23   --could you go back over, I couldn't see the other

24   part?  All types.  Do I recognize it?  Not

25   necessarily, but it -- it has my name.  I -- I don't

108

1    know if this is an internal document or whatnot.

2        Q    So I'll represent to you that this is a

3    record of all of the training classes that you took

4    during your employment at Delta Air Lines.  Do you

5    have any reason to dispute this document?

6        A    I -- I'm -- I can't answer that right as of

7    now, but if there's any disputes if possible I can

8    bring it at that time.

9               MS. ZELDIN:  Okay.  Let's go off the

10   record for a short second, please.

11   BY MS. ZELDIN:

12       Q    Well, we're going to take, like, a five to

13   ten-minute break, Ms. Jones.

14       A    Oh, okay.

15              THE VIDEOGRAPHER:  Off the record,

16   3:27.

17              (Off the record.)

18              THE VIDEOGRAPHER:  Back on the record,

19   3:36.

20              MS. ZELDIN:  Okay.  Do you guys want to

21   see if Ms. Jones can find the ability to scroll?

22              THE WITNESS:  So something just --

23   something just came on saying "Click to start" -- oh,

24   it went away.

25             MR. SIMONTON:  Ms. Jones, you should be

↑

109

1    able to move the document.

2             THE WITNESS:  Yes, I am able to do so.

3    Thank you so much.  Is there a particular page you all

4    would like for me to go to?

5    BY MS. ZELDIN:

6        Q    No, we can put that exhibit away.

7        A    Oh -- oh, okay.  Did I fully answer the

8    question about the policies?

9        Q    Ms. Jones, I'll address what I want you to

10   answer.  So when you -- in your role as a customer

11   service agent, your schedule was set through a bidding

12   process; is that correct?

13       A    Could you repeat the question?

14       Q    As a customer service agent, your schedule

15   was set through a bidding process; is that correct?

16       A    Could you -- I'm sorry, 'cause I was in the

17    mindset of the training and we just did away with

18    that, so I was in that mode.  Could you please

19    rephrase the question and clarify?  I apologize.

20         Q    Yeah.  We're talking about how you knew when

21    to go to work, which would be, what was your schedule?

22    That's what we're talking about.  And my question is,

23    you bid on a schedule; correct?

24         A    Not at all times.

25         Q    So focusing on the time period 2021 forward,

                                                          110

1     you received your schedule through a bidding process;

2     correct?

3          A    No, not at all times.

4          Q    How else did you ever receive a schedule?

5          A    During training, they sometimes would tell

6     you what days you would -- you would work it out with

7     the training department when you wanted to come in for

8     training.  It may not be the same schedule that you

9     had.

10          Also, when you return to work, sometimes

11    they would give you a schedule.  When I returned to

12    work, they gave me a schedule, I didn't bid on one.

13    And there may be other instances.

14          May -- may I answer that -- the question

15    about the policies, 'cause I just want to make sure

16    that I'm accurate.  That they -- policies, that -- in

17    the training that you just had there, they -- Delta

18    does not, in my recollection, go over policies with

19    you in training.

20          What we just saw was work related, for like

21    FAA, but not policies per se for Delta.  They create

22    them -- you can ask almost any Delta employee, if they

23    don't feel like they'll be retaliated and telling the

24    truth.

25          Delta's policies changed so drastically that

111

1    many times we were unaware of what policies were, and

2    they heavily relied on one-to-one management to --

3   leadership to employees, so they work with each

4   individual a lot of times based on whatever

5   circumstances.  That's what they were accommodating me

6   with my circumstances.  So that's one of the

7   discriminatory basis, the policies that Delta are

8   discriminatory, if they are policies.

9                MR. SIMONTON:  Can you hear us?

10               THE WITNESS:  There's someone coming in

11  to check on me.

12               Hi, how are you?  Could you -- could

13  you come in and state your name for the record?

14               MS. MILAN:  **It's Milan.

15               THE WITNESS:  You have to be in the

16  camera.  I apologize.

17               There's an a person checking in on me

18  now, a support person.

19               MS. MILAN:  Hello.  My name is Milan.

20               MS. ZELDIN:  Can you please state your

21  -- name as well?  We need -- please.

22               THE WITNESS:  We -- we -- it's a --

23  it's a big -- what would you call it?  Bounce back --

24               MS. ZELDIN:  Feedback.

25               THE WITNESS:  Feedback is very bad.

112

1                     Thank you for checking on me.

2                     MS. MILAN:   Yeah, I just want to make

3     sure you're doing okay.

4                     THE WITNESS:   So far so good.   I'm

5     trying my best.

6                     MS. MILAN:   Did you have your

7     transportation scheduled for when you are ready to go?

8                     THE WITNESS:   Everything is all set,

9     but what -- how -- how --

10                    MS. ZELDIN:   We got a message on the

11    screen that says --

12                    MR. SIMONTON:   Hello there.   Can you

13    hear us?

14                    THE WITNESS:   Yes.

15                    MS. ZELDIN:   Well there was a message

16    that said microphone is out and there was a red alert

17    down there -- and then we turned it to try to figure

18    out what was going on --

19                    MS. HARRIS:   Are we off the record, by

20    the way?

21           THE REPORTER:  I was going to say, Ms.

22    Zeldin, do you want me to take us off the record for a

23    moment?

24           MS. ZELDIN:  Yes.  Thank you.

25           THE REPORTER:  Or have Justin take us

---

113

1    off the record.

2           Go ahead, Justin.

3           MS. ZELDIN:  Thank you.

4           THE VIDEOGRAPHER:  Okay.  Off the

5    record, 3:43.

6           (Off the record.)

7           MS. ZELDIN:  **So before we went off

8    the record, I had asked a question and I don't think

9    anyone heard it because our audio had gone out.

10           Madam Court reporter, could you please

11    read us the last thing that's on the record from me,

12    please?

13           (The reporter repeated the record as

14            requested.)

15            MS. ZELDIN:  What I had stated there

16   that I'll state again is, I'm moving to strike Ms.

17   Jones' answer to that question as nonresponsive.

18            And I had asked that you please read my

19   last pending question back to the witness.

20            THE WITNESS:  May -- may I ask what

21   nonresponsive means, 'cause I -- she said -- she

22   shared that I did respond?

23   BY MS. ZELDIN:

24       Q    Ms. Jones, no.  You need to answer questions

25   that I'm asking you, so there's no question pending.
＾

                                            114

1            MS. ZELDIN:  Could the court reporter

2   please read back the last question?

3            THE REPORTER:  One moment.

4            (The reporter repeated the record as

5            requested.)

6            MS. ZELDIN:  Okay, thank you for

```
 7    reading my question back.  I think I had actually

 8    asked another question that was cut off by the audio,

 9    but let's just move on.

10    BY MS. ZELDIN:

11         Q    Ms. Jones, aside from training or when you

12    came back from leave, the typical way that you would

13    receive your schedule is through the bidding process;

14    correct?

15         A    I'm confused, because -- I -- I need you to

16    clarify, please.  'Cause you -- that seemed like maybe

17    two questions within a question, perhaps.  I'm not

18    sure.

19         Q    At Delta Air Lines, when you were employed

20    there as a customer service agent, was there a process

21    called bidding through which you received your work

22    schedule?

23         A    Yes.

24         Q    And how often did you bid on a work

25    schedule?
```

115

1          A     It varied.

2          Q     Was it typically every six months?

3          A     I'm not sure, because in the beginning as

4    seasonal we bid it one time, and sometimes they would

5    make mistake on the bid and you would have to rebid if

6    they hadn't covered the operation appropriately.  And

7    then, sometimes you could do bid-ups.  So there were

8    different times that you would bid, but it -- it was

9    never consistent.  It -- it would just all depend.

10         Q     And bid-ups, that was a process through

11   which maybe a line or lines would become available

12   before the next official bid and employees could

13   select those based on seniority; is that correct?

14         A     I don't know if it was based on seniority or

15   not.  They had another process for that that was

16   different from the typical bidding, which I'm not

17   privy to 'cause I was just a regular employee.

18         Q     So focusing on the time period, once you

19   became a benefited customer service agent 2021

20   forward, was bidding for you based on seniority?

21         A     As previously explained, my personnel files

22   indicates that I was still ready reserve.  So when you

23   say --

24         Q     Ms. Jones --

25      A      -- when you -- may I -- may I finish

116

1    answering?

2         Q      Yes.

3         A      You -- for me to -- if you interrupted, for

4    me to say that.  So my records stated that I was a --

5    a ready reserve agent, and there was a different type

6    of policy that took place.  Now that's what my -- my

7    personnel file, and I've requested clarification on

8    that, so I wouldn't be able to -- and I have not

9    received that from Delta.

10             So I would need to -- in order to answer

11   those questions, would need to be able to know those

12   answers from Delta.

13        Q      Your understanding is that you were a

14   benefited customer service agent, regardless of what

15   your personnel file says; correct?

16        A      To some degree.

17        Q      So answer to my question is yes; correct?

18      A    No, it's not yes, completely, it's to some

19   degree.   Not -- not fully, because that was -- that's

20   a part of the unclarity with the -- with the lawsuit,

21   so that's a part of the discrimination aspect.

22      Q    Okay.

23             MS. ZELDIN:   Let's go to back to Ms.

24   Jones' amended complaint, just so we can get this

25   issue cleared up, please.   A.J., can you pull that

117

1   exhibit back up?

2             MR. SIMONTON:   Yes.

3   BY MS. ZELDIN:

4      Q    Okay.  Ms. Jones, we previously looked at

5   this exhibit, which is your amended complaint, and

6   this is a document that you signed and filed in this

7   court; correct?

8      A    Yes.

9      Q    Okay.  So I just want to direct your

10   attention to paragraph 66.   Either you can scroll

11    there or A.J. can scroll there for you.  And can you

12    please read what paragraph 66 says?

13         A    "Ms. Jones chose to opt into the new CS --

14    CSA benefited program as a part-time agent with 20

15    hour per week schedule."

16         Q    Okay.  So does that refresh your

17    recollection that you were, at that time, a benefited

18    CSA employee?

19         A    No.

20         Q    Okay.  So is your testimony that what you've

21    written here in your amended complaint is not correct?

22         A    No, that's not my testimony.

23         Q    Is it your testimony that your understanding

24    is that you were a benefited customer service agent,

25    that's what you put in the complaint, but you believe

118

1    your personnel file says something different; is that

2    correct?

3         A    Yes.

4       Q       So Ms. Jones, when you would bid for your

5  schedule, you were allowed to choose lines that were

6  open that your seniority could hold; correct?

7       A       Yes.

8       Q       And if you did not choose a line, the --

9  well, strike that.  The lines that you didn't choose,

10  those could then become available to employees with

11  lower seniority; is that how it would work?

12       A       Could you repeat that, or clarify, please?

13       Q       Yes.  So when you were able to bid, you

14  could see lines open to you that your seniority could

15  hold; correct?

16       A       I could see all the lines, yes.

17       Q       And you could see ones that you could choose

18  with your seniority; correct?

19       A       Yes.  And -- and what people had previously

20  bidded.

21       Q       And once you made your choice, then

22  employees with less seniority could pick up lines that

23  you didn't choose; is that right?

24       A       Yes.

25       Q       Can you describe to us the process that you

119

1    followed when you would go to bid your schedule?  And

2    what I mean by that is, what shifts did you typically

3    work?  What hours?  What days of the week?

4         A    So when I first got hired in, they gave me

5    shift training as a religious accommodation.  So

6    oftentimes you partner with other shift -- what we

7    call shift trading partners, and you all can create

8    how you want to work out your schedule.

9              Maybe there's some times when people double

10   up, I'll take this day -- your two days, you take my

11   two day -- they -- we work it out amongst ourselves.

12   So with that accommodation in place, I would

13   oftentimes work -- also with bidding, you may want to

14   bid a area -- there are different areas that you want

15   to bid, based on whatever -- each individual's

16   preferences were, and seniority gave you that ability.

17             There also may be areas you want to work

18   based on your disabilities, or based on -- like, Tenia

19   Russ told me, the HR, that I should have followed

20   --instead of -- with my situation, I should have

21   followed a manager around.  Some people -- that --

22    that's what Tenia Russ told me, which I don't

23    necessarily agree with.

24            But that's one of the things -- if you like

25    a particular manager, 'cause attached to each bid line

                                                    120

1     is a manager.  I'm not sure if they've changed things

2     recently, but that's how it's been.  So there were

3     different variables into bidding a line.  One of those

4     was the accommodation aspect for religious

5     accommodations.

6             So to answer your question, describe the

7     process I followed to bid my schedule, I would look at

8     what the bid line stated, what areas they were in,

9     what time of day, and if I had a shift training

10    partner, what they may want for our agreement amongst

11    ourselves to shift trade and to work out our

12    schedules, and then I would bid it accordingly.

13        Q    Did you always bid on morning shifts?

14        A    That's a good question.  Let me think,

15    'cause it's been what, 13, 14 years.  Yes, I always

16    bidded to my -- the best of my recollection, yes, I've

17    always bidded mornings.

18         Q    And did you always choose the same -- let me

19    ask this.  We're going to look at some bid sheets in a

20    bit, and there's a abbreviation, RDO, that I

21    understand stands for regular days off.  Does that

22    comport with your memory?

23         A    Yes.

24         Q    And did you always pick the same regular

25    days off when you bid?

                                                        121

1          A    I -- I don't know.  I'm -- I'm going to

2    assume that I did not, but I don't know.  It's been --

3    if you say we bidded every six months, and sometimes

4    more than that, that would be at least 24 or more bids

5    over a period of 12 years-plus, so I could not tell

6    you.

7          Q    Let's focus on the last couple years, 2021

8    forward.  Do you recall if you always chose the same

9    regular days off?

10        A    I cannot recall.

11        Q    How would you go about deciding which

12   regular days off to choose?

13        A    Based on shift trade partners, the

14   relationship with other coworkers.  What will work for

15   my religion and able to shift trade?  'cause I may

16   have somebody who say, "Hey, I'm -- I work another job

17   during the day and I need to give away that."  Or I --

18   you know, so "I can pick up your Saturdays if you can

19   pick up my afternoon," or my days or whatever the case

20   may be.  We worked it out amongst each other.

21             So that's how I bid it partially, based on

22   those reasons.  And that was the accommodation Delta

23   gave me from the beginning, for religion.

24        Q    So Ms. Jones, we've been talking about this

25   concept of shift swapping -- and for the record,

122

1    that's where you're scheduled to work a certain shift

2    and you either give that away to another employee to

3    work, or you trade a shift with another employee and

4    they work yours and you work theirs?  Is that a fair

5    statement of what shift swapping is?

6         A    No, that's not a fair statement.

7         Q    Okay.  Can you -- what is shift swapping?

8         A    Well, to correct what you shared, the part

9    that's not correct, based on my recollection of what

10   you just said, is that employees shift swap where they

11   would work -- someone would work for them and you

12   would work the same exact -- the -- the shift for

13   them.  That's not how it went.

14             Again, just to -- thank you for allowing me

15   to answer this, to give you some clarification on how

16   Delta policies and culture is, they offer flexibility.

17   Detroit airport, where I am stationed, is a 24/7

18   operation, nonstop.  We don't close for anything.

19             So to give employees, as Delta tells us and

20   they mention in hiring, they give you the flexibility,

21   and in my case, and maybe others, accommodations, they

22   allow you to shift trade.  So what that means is you

23   can -- it is just actually trading the shift.  There

24   was no, you have to pick up for another person.

25             They -- they gave -- you just are able to

123

1    give your shift away or pick up shifts.  It was no, if

2    I give my shift away, I have to pick up this shift for

3    this person.  The -- that could be the case, but it

4    didn't have to be.  And as I said, when I first got --

5    when I first got hired, seasonal ready reserves, we

6    only had to work -- if I recall correctly, we only had

7    to work a minimum of 300 hours in a whole calendar

8    year, so that's about -- 12 divided by 300 -- that's

9    what, less than 20 hours a week?  So people shift

10   swapped all the time based on their needs, based on

11   their agreement.

12        Q    So Ms. Jones, I think that you're describing

13   -- so there's different ways that you can swap shifts;

14   is that fair?  There could be a one-way swap, and

15   that's an example where you just give away your shift

16   and somebody else works it and that's it; correct?

17        A    That's correct.  I'm not sure if the one way

18   is the exact terminology, but where you could give

19    away your shift.  Yes.

20          Q    And then sometimes there can be what's

21    called -- or whether this is exact term or not, is

22    more of a two-way swap -- where I give you -- I trade

23    my shift to you, you give me your shift, or maybe more

24    employees are involved.  So is that fair?  That could

25    happen as well?

                                                    124

1           A    I'm not sure, because honestly Delta never

2     -- as you saw in the training that you had as an

3     exhibit, they never trained us on what shift swaps

4     were.  So the -- as far as the terminology one way

5     versus, I think you said two way.

6               All I khow is that you could pick up a shift

7     or you could give a shift away and then you had to

8     meet based on -- for example, right now seasonal

9     employees at Delta, in my category, I believe they

10    only have to work 150 hours a year.  It's dropped down

11    from 300 to 150.

12            So those people you have -- sometimes people

13   hurry up and work, get their 150 hours in, and they

14   give away the rest of their days.  So it -- it --

15   that's Delta's culture.  That's their -- that's their,

16   quote-unquote, "policy."  So that -- that in itself is

17   possibly discriminatory.

18       Q    Do you recall there being an issue with

19   employees in general, like you just described, maybe

20   giving away the vast majority of their shifts, working

21   very little hours for Delta so that they could

22   maintain their flight benefits?  Do you recall hearing

23   about that problem?

24       A    I don't think it was a problem.  It was

25   discriminatory.  It wasn't a problem.

                                                      125

1        Q    Okay.  You recall hearing about employees

2   that may have given away the majority of their shifts,

3   worked very few through swapping?  Worked very few

4   shifts and still maintain their flight benefits?

5       A    I recall being discriminated against in

6   which Delta employees, in the terms of leaders and

7   management, would harass me about my hours when it

8   wasn't company policy.

9            And the discriminating factor was that they

10  tried to create a policy that was never enforced, or

11  -- or employees never knew about, to try to cover

12  because I told them that they were discriminating

13  against me.

14           And so, they tried to cover it up by

15  creating a policy that would make it seem as though

16  they were not being -- having illegal actions for my

17  protected activity.

18      Q    Ms. Jones, are you referring to the policy

19  that came into place that benefited CSAs had to work a

20  certain number of hours to maintain their swap

21  privileges?  Is that what you're talking about?

22      A    Well, I believe so, yes.  And it said

23  regular benefited.  So again, what -- who was regular

24  benefited?  Yes.  That's the -- that's the

25  discriminatory policy.

126

1     Q    So at some point -- and we're going to talk

2    about the details of when -- at some point you learned

3    that there was a policy that you needed to work 20

4    hours per week over a rolling three-month period in

5    order to maintain your swap privileges; correct?

6    A    That's the discriminatory policy that's in

7    -- that's -- that this lawsuit has one of the claims.

8    The -- the policy -- there -- there's nothing in my

9    training records, that you just had as Exhibit 4, that

10    stated that I was aware or trained on that policy.

11         It doesn't even reflect in my -- it doesn't

12    even reflect in my personnel file that -- that I was

13    -- when that happened.  It just showed me as still as

14    ready reserve, for policies that I actually signed

15    regarding my hours.

16    Q    So Ms. Jones, is it your testimony that you

17    -- are you saying that you believe that this policy,

18    that I've just articulated about having to work 20

19    hours per week over a rolling three-month period in

20    order to maintain swap privileges, are you saying that

21    that policy only applied to you and no one else?

22    A    What I'm saying is that it was

23    discriminatory because no -- the policy did not exist.

24    It was not -- we were not trained on it -- or I can

25    say I was not trained on it.   It was brought up after

127

1    I spoke up on safety concerns, reported my manager for

2    harassment, and other things, and I spoke up on some

3    other things internally, that Delta -- you tried to

4    create a policy.   I don't know where this policy came

5    from.

6             HR, Tenia Russ, sent me an email, that you

7    all did not include in your discovery, stating that

8    this policy had been around since 2018.   And the -- in

9    which time I was ready reserve and under a whole new

10   different set of policies.   So this policy -- to

11   answer your question, in conclusion, this policy was

12   discriminatory.   It -- if it -- if it was a real

13   policy, it was a tool to be used to discriminate

14   against me.

15        Q    Is it your testimony that this policy only

16    applied to you?  Is that what you're claiming?

17        A    It's my testimony that this policy is not

18    company-wide enforced, and I have evidence of that,

19    where Tenia Russ shared that this was a policy they

20    were starting to implement in Detroit only.  And

21    that's discriminatory.

22            If this is all the -- ACS is just not at

23    Detroit Station, it's at companywide in the United

24    States.  So this so-called policy was not enforced

25    companywide, and I still don't think it's enforced

128

1    companywide as of today, where every person in this

2    same category is upheld to this policy.

3            And there -- in conclusion, there are

4    discrepancies within the policy based on what we were

5    told when we were made -- when we -- the amendment

6    that you said, about 2021 the benefited, we -- they

7    did not make us aware that this was a policy or -- or

8    whatnot.  So I'm -- what I'm stating is this policy is

9    discriminatory.

10       Q    So your testimony is that this policy

11   applied to customer service agents in Detroit, but

12   your testimony is that you don't believe it applied to

13   customer service agents in other airports?  Is that

14   your testimony?

15       A    No, that was not my testimony.  My testimony

16   was that this policy was -- is not companywide.  And

17   this policy -- HR, Tenia Russ, told me that this

18   policy, they were starting it -- something along those

19   lines; I'm not saying verbatim, but she told me that

20   this policy, they were starting in Detroit.

21           Also when I reported the discrimination and

22   the harassment, Delta did not take the appropriate

23   measures to make sure that it ceased.  It was

24   workplace violence -- according to their policy for

25   workplace violence.

129

1           And when Anthony -- oh, I forget his last

2    name.  He was a part -- one of -- one of the Delta

3    employees in charge of the investigation.  He even

4    shared at one point, "Ms. -- Ms. Jones, I don't know

5    what they're doing with this policy.  I think that

6    they may be trying to start it" -- and I'm just -- I'm

7    not speaking verbatim, but this was -- they -- they --

8    this was not a policy that employees, as of 2021 and

9    before, when ready reserves were -- were aware of.

10   And I have -- I can back that up with evidence.

11        Q    Let's --

12             MS. ZELDIN:  Do you want to go off the

13   record for a minute?

14             Yeah, we can go off the record for just

15   one five-minute break.

16             THE WITNESS:  Okay.

17             THE VIDEOGRAPHER:  Off the record,

18   4:14.

19             (Off the record.)

20   BY MS. ZELDIN:

21        Q    **Ms. Jones, while we were off the record,

22   you stated that on Monday you scheduled a doctor's

23   appointment for tomorrow morning and we just want to

24   let you know that this deposition was previously

25   noticed for tomorrow morning starting at 9:30 and that

130

```
 1    was the date that you gave us.

 2              Also, we never heard anything about this

 3    medical appointment until right now.  And so, the

 4    deposition, you knew it was noticed when you may have

 5    made this appointment and we're going to need you to

 6    come tomorrow as noticed.  And so --

 7       A    So for -- I'm sorry for interrupting.

 8       Q    Yeah.  We're just going to expect you to

 9    appear at 9:30 a.m., as noticed, so that your

10    deposition can continue.

11       A    So for the record, I did not say that -- I

12    don't think I said I scheduled an appointment on

13    Monday.  I said I had a -- a medical emergency, and I

14    could -- and I may have said it, I don't know.

15              But I -- just for clarification, as you are

16    aware, I'm under medical treatment for injuries

17    sustained at Delta, and there was a medical emergency

18    -- or, if not an emergency, something that occurred

19    that I needed to take care of.
```

20          And I -- I appreciate you, just us as

21   humans, knowing that things can occur and I asked them

22   for the most available day for me to be seen, and they

23   only had tomorrow at 9:10 available, and they just --

24   we just confirmed that very recently.  So I will be in

25   -- logged in.

                                                       131

1          It may be from the medical office though,

2    because I have to take care of my health.  And I know

3    Delta, they say, put your -- we put each other first

4    so we can best take care of our customers.  So I can

5    understand how Delta and the attorneys will understand

6    me making sure my health is in order first, especially

7    since Delta caused significant injuries to my health.

8          Q    So Ms. Jones, we'll all be here at 9:30 --

9          A    Okay.

10         Q    -- and what you do is what you do, but we

11   expect you to be available at 9:30.

12              MS. ZELDIN:  A.J., can you please pull

13    up Document 13 as an exhibit?

14                    THE WITNESS:  Also, off the record I

15    also said how I had a group therapy appointment today

16    at ten o'clock due to injuries sustained at Delta, and

17    I did cancel that to be here.  And we were scheduled

18    for 9:30 today, however counsel had to move it back to

19    ten o'clock, and -- because of us unforeseen

20    circumstances, so I appreciate that the -- you know,

21    us helping each other out.

22                    MS. ZELDIN:  What is this document

23    going to be marked as, Exhibit --

24                    MR. SIMONTON:  Five.

25                    MS. ZELDIN:  This is Exhibit 5.

                                                             132

1                    (Exhibit 5 was marked for

2                     identification.)

3    BY MS. ZELDIN:

4         Q    Ms. Jones, do you recognize Exhibit 5?

5         A    Exhibit 5.

6        Q    And if you can scroll, or A.J. can scroll,

7    through this document.  If you look at it, it purports

8    to be an internal memo dated December 14, 2023, and it

9    says "To all DTW ACS employees"; do you see that?

10       A    I need you to zoom -- I'm not sure if you

11   say zoom in or zoom out.  Make it smaller to see the

12   full document, if possible.

13             MS. ZELDIN:  Go back to the top,

14   please.

15             THE WITNESS:  December 14, 2023.  Yes.

16   BY MS. ZELDIN:

17       Q    Okay.  And --

18       A    E -- ESC reminders.  Regarding ESC

19   reminders.  Yes.

20       Q    And Ms. Jones, you see where it says "To all

21   DTW ACS employees"; correct?

22       A    Yes.

23       Q    And that, at the time, included you;

24   correct?

25       A    Yes.

133

1     Q     And if you look down, do you see that

2   heading that says "Swap reminders"?

3     A     Swap reminders?  Yes.

4     Q     Do you see that heading?

5     A     Yes.

6     Q     Okay.  And do you see that in the second

7   paragraph -- I'll read this and you tell me if I read

8   it correctly.  "Regular benefited employees must

9   maintain an average of 20 hours of paid time per week

10  over a rolling three-month period, and are responsible

11  for monitoring their own hours to ensure this average

12  is always met or exceeded."  And then it says, the

13  last sentence there, "When this requirement is not

14  met, swap privileges may be suspended."  Do you see

15  that?

16    A     There -- you -- you missed a part where it

17  says "Employees can determine this by reviewing their

18  last six paychecks biweekly and ensuring the" -- it's

19  cut off for me.  I don't know what the word is --

20  "been paid 240 hours or greater."  So yes, I see that.

21    Q     So as of December 14, 2023, when this memo

22  came out, you understood that you had to work an

23  average of 20 hours of pay time per week over a ruling

24    three-month period in order to maintain your swap

25    privileges; correct?

134

1        A    No, that is incorrect.

2        Q    Well, this is a policy that's going out to

3    all ACS and DTW; correct?

4        A    I don't know, but I'll -- I'll answer the

5    question.  I -- I met with, in the one-to-one

6    relationship -- and this is part of the discovery, we

7    just -- one of my people who are working with me, and

8    I'll -- I'll submit that to you all for discovery.

9            One of the recordings that I took at work,

10    the manager, Jeff Simonin, confirmed that they were

11    working with me where I did not have to do the 20 hour

12    average over a rolling period, and they told me to do

13    the best that I could do.

14            So there -- what -- what I'm sharing with

15    you is that Delta has discriminatory processes and

16    policies where they -- first of all, where they work

17   with people one-to-one to do different accommodations.

18   And so they were -- different people -- different

19   Delta employees, leadership, were telling me different

20   things.

21          And because of the situation where they

22   harassed me about my daughter's situation, things of

23   that nature, and continued to retaliate, is very

24   triggering for me.  And so, I'm in therapy now and

25   under medical treatment to be able to provide that

135

1   discovery to you all as -- as needed.

2          But this -- if you go -- if we could go to

3   the front of this, this was, I believe December 14,

4   2023.

5              THE WITNESS:  Hi.

6              She's coming in to check in on me

7   again.

8              I'm sorry.  You -- can you state your

9   name?

10                Could you all turn my camera back on,

11   if possible?

12                MS. HARRIS:   -- don't need to --

13   BY MS. ZELDIN:

14      Q    Yeah, let's just keep going.   I think --

15      A    -- a support -- a support --

16      Q    -- she's already been identified for the

17   record.

18      A    Okay.

19      Q    So --

20      A    So -- so I would -- I'd like to finish --

21   I'd would like to finish answering, please.   Thank you

22   so much.

23                THE WITNESS:   Did you want me for --

24                They said that I have to wrap this up,

25   'cause I -- we have to be -- it's 4:30.   How much more
▲

                                                            136

1    minutes?   I told them like to 4:50; is that okay?

2                So I'm getting all my stuff so I could

3       just walk out.  Is that fine?

4                       MS. MILAN:  Just -- yeah, just

5       technically you -- be in here by yourself, there

6       should be somebody with you, and --

7                       THE WITNESS:  Okay.

8                       MS. MILAN:  I'll make sure that you're

9       --

10                      THE WITNESS:  That I'm okay.

11                      MS. MILAN:  Yeah, okay.  And that you

12      have your ride all -- all set --

13                      THE WITNESS:  Oh no, it's all set.

14      That's all set.

15                      MS. MILAN:  Did you drive here, or --

16                      THE WITNESS:  Yeah.

17                      MS. MILAN:  -- drove yourself?

18                      THE WITNESS:  Yeah.  Is that okay?

19                      MS. MILAN:  Yeah.  I'll give you until

20      4:45.  I'll come back up --

21                      THE WITNESS:  Okay.

22                      MS. MILAN:  -- and walk out together.

23                      THE WITNESS:  Okay.  Sounds good.

24      Thank you.

25                      So my -- my -- what we had said about

137

1    this memo, this is a part of the discrimination.  This

2    memo was sent -- we are not on it right now, but it

3    was sent December 14th.  This was after I had

4    submitted complaints about my manager, Rob O'Leary,

5    after he had brought me into the office asking me

6    questions about my family, personal questions that

7    should not be asked, and could be considered workplace

8    violence.  That's a sensitive subject.

9              He asked me with another manager, Nikko

10   Vinuya, with people in the room, people coming in and

11   out the room.  And -- and then, he proceeded to say

12   this was after I had met with -- well they met with me

13   -- Tenia Russ, and I shared with them -- you all have

14   that one video where I told them they were singling me

15   out and discriminating against me.

16             And so, because I had brought up how

17   they were discriminating against me and retaliating,

18   then they, after the fact, sent this memo out to

19   everyone.  And if -- I was still working -- Delta was

20   still allowing me to work at the time, and there was a

21    huge shock sent through employees.   'Cause they're

22    like, "What?   Delta always changing policy.   What's

23    this policy?"   Because people were not aware.

24              There were people who said that this

25    was something from benefited from -- for our insurance

138

1    purposes, medical insurance.   So this was a

2    retaliatory discriminatory memo, 'cause it -- memo,

3    because it says that -- December 14th, it says a

4    reminder, but when were we reminded?   When is it --

5    where does it say in my training records that I was

6    ever told of this?

7    BY MS. ZELDIN:

8        Q    So Ms. Jones, you just stated other

9    employees were upset when this memo came out; is that

10    correct?

11        A    Not upset.   People -- I said that -- those

12    were your words.   I said it was a shock.   I believe I

13    used the word shock, because they're saying -- I

14    didn't say upset, I said shock.  Because they're

15    saying, "Man, Delta, what are they talking about?

16    They're always changing policies."

17          And mind you, Delta -- because I'm a great

18    employee, Delta has selected me as an advisor, DE&I.

19    They selected me to help operations in Raleigh Durham

20    for over -- for about a month.  Other things as well.

21    I volunteered for the company.

22          But so, when I say that it was part of my

23    duty as a DE&I advisor to go out and talk to the

24    people to see what they wanted to be done at Delta,

25    improvements.  And so people would come to me.  They

139

1    knew I was in this role, and oftentimes they would

2    come to me to tell me Delta-related things and

3    sometimes personal things of nature.

4          They would ask for me to pray for them and

5    things of that nature.  I had established, over the

6    12-plus years of being a good employee there.  And so

7    you -- you stating they were upset.  I didn't say

8    upset.  I said they were shocked because this was

9    another discriminatory practice that Delta has to

10   cover their illegal wrongdoings.

11        Q    They were shocked because they didn't

12   understand, in your testimony, that this policy was in

13   effect and applied to them?

14        A    They were shocked because they had some --

15   some employees were shocked because they had never

16   heard of this policy before.

17        Q    But as of this point, they understood that

18   it did apply to them; correct?

19        A    No, they -- some didn't.  It was a -- it was

20   a lot of people talking about it, 'cause they're like,

21   "What do they mean?"  'Cause it was the first time

22   that they had heard of this.

23             So if this the first time that you've heard

24   of this, and Delta has a history of changing policies

25   to fit their narrative, which is discriminatory, then

140

1   you are wondering what does this mean for my

2   livelihood?  What does this mean for my flexibility

3   and scheduling?  What does this mean for my ability to

4   pick my son or daughter up?

5          People have lives outside of Delta and --

6   and Delta needs to have policies that are uniformly

7   enforced, companywide and not on a one-to-one basis,

8   which is discriminatory.  So people were shocked

9   because they had never heard of this policy before.

10  And it was --

11      Q    So, Ms. --

12      A    Go ahead.  I'm sorry.

13      Q    What you're saying is that -- what you're

14  claiming is this policy was issued to all DTW ACS

15  employees in retaliation for complaints that you made?

16  Is that what you're claiming?

17      A    No, that's not my claim.  My claim is that

18  when you -- the memo that you just had, it says ESC

19  reminders.  For it to be a reminder, that means people

20  had to have known initially.  There was no knowledge

21  initially.

22          This was a policy, because I had made

23  reports of discrimination, harassment, workplace

24  violence, safety concerns, and so forth, and Delta was

25    targeting me to -- because they -- I don't know, maybe

                                                                141

1    they knew that I had the religious accommodation.  So

2    they were targeting me to try to create a narrative to

3    probably have constructive discharge.

4            And so, when I told them that they -- they

5    -- this policy was first told to me, I believe months

6    prior to this.  So when Delta met with me and told me

7    that, "Lettiece, you have to work these hours," or

8    "We're going to work with you, you don't have to work

9    the hour."  Different managers were telling me

10   different things.

11           You -- I think the Rob O'Leary told me at

12   one point that -- in the video that I sent to you all,

13   that he understands and -- he -- he disagrees with the

14   policy, and that maybe I should just work 10 to 12

15   hours.  Everybody was saying different things.

16           So what I'm saying is this policy, because

17   they were -- I was targeted because of my -- my

18   formally showing -- telling complaints and voicing

19   concerns, that I previously mentioned, they tried to

20   have a policy that would target me.  And then, when I

21   shared with them that this was discriminatory, they

22   tried to cover it by saying it's for all employees

23   when it wasn't.  And that's discrimination.

24        Q    Is it your testimony that Delta concocted

25   this policy to target you?

142

1        A    It is my testimony that I had no knowledge

2   of this policy, is my testimony --

3        Q    Right.  Let's --

4        A    It is my testimony that I made -- I made

5   official complaints of harassment, discrimination,

6   workplace violence, safety concerns, workplace

7   injuries.  And in the -- in the 12-plus years of me

8   being a great Delta employee, I never had any issue

9   ongoing with this until I made those complaints.

10            And they targeted me by trying -- because

11    they know I'm such a good employee, they didn't -- I

12    didn't have bad attendance.  I -- they selected me as

13    a leader in different areas.  They had me going out of

14    town for over a month, or about a month.  So they

15    couldn't get anything else on me.

16          But they knew I was a committed Christian

17    with my Sabbath.  They knew that I was -- as a mother,

18    I was serious about my children as a single mother,

19    and they knew that I had disabilities.  So how could

20    they get me to get in a line and have the fear culture

21    that they do, by creating or trying to bring out from

22    2018 a policy that was not -- who knew about it, and

23    that way they could -- they knew that they could

24    target me in that way.

25          Yes, that's what I'm telling you.  Delta

                                                        143

1     discriminated.  And not -- when I brought -- when I

2     brought that to Delta's attention, they did not cease

3     the retaliation and harassment.  They kept it going.

4              Hence me having to continue to report at a

5      federal level, and why I have eight suits because the

6      harassment kept going on.  And to them, terminating me

7      and giving me possibly three or more termination dates

8      at different weeks and days apart from each other.

9              MS. ZELDIN:  Can we please read back

10     the question that I actually asked?

11             THE REPORTER:  One moment.  Let me go

12     back.

13             MS. ZELDIN:  Thank you.

14             (The reporter repeated the record as

15             requested.)

16             THE WITNESS:  Was it your testimony --

17     BY MS. ZELDIN:

18     Q     Ms. Jones?

19     A     Yes.

20     Q     Please provide a yes or no answer.

21     A     Was it my testimony that Delta concocted --

22     could you repeat that, please?

23     Q     What -- okay, let's -- we're about to run

24     out of time.  Let me ask a question.  Are you writing

25     or reading something off your computer?

144

1      A     No.  The judge -- I wouldn't do that.  The

2    judge told me not to -- she clarified that.  So I'm --

3    this is my notes, 'cause I do have disabilities.  So

4    I'm writing down the question that you shared so I can

5    read it and process it due to my disabilities.

6      Q     We're going to need to see those notes,

7    because that's going to be part of your deposition, so

8    do not destroy them.  You can scan them or take

9    pictures of them, but they're going to need to be

10   marked as an exhibit to your deposition.

11     A     Okay.

12     Q     Ms. Jones, Exhibit 5.  Are you claiming that

13   this policy was concocted by Delta to target you?

14     A     I'm saying that the -- this policy was not

15   companywide enforced.  If it was a accurate policy, it

16   was not companywide enforced.  I did have -- I had no

17   knowledge of the policy at any time prior to its first

18   -- when Delta first brought it to my attention when

19   the -- when I believe it was discrimination and

20   retaliation.

21           And not only did I not have any

22    acknowledgement, it doesn't show up in my training

23    records that -- that this policy was something I

24    signed off on.  And not only did I not have any

25    knowledge of it, other Delta employees did not as
^

145

1    well.  And it's still not companywide enforced --

2         Q    Ms. Jones --

3         A    -- to this day.

4         Q    -- you referenced a complaint that you made

5    about Rob O'Leary, and that's the complaint that you

6    said that you felt like this memo came out in

7    retaliation for; correct?

8         A    No.  I said that I filed complaints with Rob

9    O'Leary.  I filed workplace violence.  I filed safety

10   concerns.  They had me in a role as DE&I.  I was

11   selected, so for Delta to select me as that advisory

12   role, that says something about me as an employee.

13        So I was selected, and one of the parts of

14   that role was to go and talk to my colleagues.  And in

15    doing so, colleagues oftentimes didn't want to talk

16    about DE&I, they wanted to talk about how we were

17    unsafe on the ramp and how Delta seemingly was not

18    doing anything about it.

19           How people were getting injured.  How

20    equipment was failing, and other things.  And amongst

21    that was the policy that you just claimed that was --

22    you know, by law things -- when you have policies, it

23    -- it has to be companywide, uniformly enforced, and

24    it was not.

25           And so, those were the concerns that I've

                                                                    146

1     shared with leadership because they have this open

2     door policy, one-to-one for us to come.  But when I

3     came to leadership and those employees, they

4     discriminated and retaliated against me.

5        Q    And what were the dates of those complaints

6     that you made?  So when did you make those complaints?

7        A    They were prior to this memo, so I know they

 8   were --

 9        Q    What dates?

10        A    Let me -- let me answer the question, if

11   possible.  They were prior to this memo, and I don't

12   -- I don't have -- like you just shared, I have to

13   have my notes, but I don't have anything in front of

14   me, so as far as like listing the dates.

15             So I'm -- I'm talking, as part of my

16   processing for my disabilities, I may talk out loud,

17   so please forgive me.  That's just a part of me trying

18   to process everything.

19             So some of the complaints were prior to the

20   December 14, 2023, date.  One of the complaints I

21   spoke out, I was selected -- again selected, out of a

22   hundred thousand-plus employees -- to be an advisor.

23   And they selected me again to speak at a Speak Your

24   Mind session.

25             I was one of -- I think I was maybe one of a

1    few from the ramp, and there were -- I'm not sure if

2    they were cargo, but there were above wing members

3    there, all a part of ACS.

4           And I spoke those concerns of safety and

5    equipment, and all of those things at that meeting in

6    public.  That was, I believe August of that same year,

7    2023, if -- or 2024.  I -- I don't remember right now,

8    but it was right before that memo came out.

9           And then, I met with Tenia Russ, HR, and

10   which there are emails that you all did not supply for

11   discovery, in which it talks about us meeting and for

12   me to voice concerns.  And I told her about how Rob

13   O'Leary was texting me, making inappropriate calls

14   while I was dealing with the daughter, with my --

15   dealing with the situation with my daughter, while I

16   was not at work.

17          How he would make different comments.  I

18   showed her the text messages.  How he was like being

19   aggressive and on me, dot, dot, dot, dot, dot, when he

20   was not doing that with other employees.  Different

21   things he had shared that I felt would be in that

22   umbrella of workplace violence.

23          That was done in August as well.  As a

24   matter of fact, while trying to get discovery

25   together, there is a video of me that I can recall

148

1  where Rob O'Leary talked about how Tenia Russ told him

2  to put stuff in my file after.

3          I mean, he didn't -- and this took place

4  after the fact.  So while I'm under medical treatment

5  and able to organize that discovery to send to you

6  all, that was just something that I've just recently,

7  I think this week, discovered.

8          So they were trying to, in my opinion,

9  discriminate against me, to silence me, to stop

10  speaking out on safety concerns, concerns that Delta

11  should have taken seriously, including workplace

12  violence.

13          I had a person who told me that they were

14  going to slap me and I have a witness for that.  They

15  were on the phone.  You know, I -- the -- these types

16  of things that Delta needs to stop, and Delta needs to

17  take them seriously and not retaliate against

18  employees for doing what we are called to do and

19   speaking up to make it safe.

20        Q    Ms. Jones, when are you planning to

21   supplement the rest of your discovery that you owe us?

22        A    I'm under medical treatment, and I -- the

23   discovery, there's a ongoing process.  I would have to

24   talk to my medical providers to do that -- to do so.

25        Q    Well, you realize discovery -- so what is
♠

149

1    your best estimate of when you're planning to provide

2    this?

3         A    I have to --

4         Q    The rest of your discovery?

5         A    I have to talk -- so from two -- the -- the

6    young lady is here for me to leave the room; it's

7    4:49.  But in conclusion, for -- to that answer.  When

8    you have been a good employee at Delta, they selected

9    you for to do different things.  People at Delta know

10   I was a joy.  I was optimistic.  I loved my job.  I

11   still love Delta.

12          But you know, the -- when you go into work,

13   you go from that -- for a period of 12 years, to them

14   coming in, targeting you, asking you personal

15   questions about your daughter's human trafficking,

16   child exploitation situation.

17          And from that point on, once you filed

18   complaints, they continuously harass you and

19   intimidate you and gaslight and all -- tell you

20   different types of things.   It causes person to have

21   disabilities, in my case.   General anxiety disorder,

22   PTSD -- which there's some question as to whether I

23   really had it or not -- and trauma stressors.

24          So to answer your question, when do I think

25   I would be able to provide that in full?   I'm under

150

1   medical treatment and we're doing it as best as we

2   can.

3        Q   So -- and I'll just ask this last question;

4   I understand that we have to end for the day.   But are

5   you planning to provide this discovery before the

6   discovery period ends next Friday?

7       A    Next Friday?  I'm -- I'm doing my best to

8   collect it.  That's all I can say.  When a -- when a

9   person -- when you -- when you're a person who's been

10  trained -- you know, for Olympic training, sometimes

11  that takes place over time.

12           The harm that Delta has inflicted on me from

13  the harassment, from talking to me -- and which you

14  all have the video -- where they called me in -- in a

15  mandatory meeting and asked me personal questions

16  about my daughter's human trafficking.  And Delta,

17  they've been trained on human trafficking, so they

18  understand how that impacts victims.

19           And it -- instead of Delta ceasing that, it

20  continued and it continues to now.  So I'm doing my

21  best under medical treatment to provide that.

22      Q    And so the answer to my question is that you

23  cannot commit to getting us the rest of the discovery

24  you owe us by next Friday; is that correct?

25      A    What I'm stating is, is not about my

151

1    commitment.  I'm under medical treatment for the

2    ongoing harm Delta has caused.  And that would be up

3    to my medical providers to see what is safe for me in

4    this treatment process.  Is -- the treatment is not

5    linear, it's up and down.

6            So Delta caused this harm and -- or

7    exacerbated it, so I'm doing my best to keep safety

8    first and that will be provided with the determination

9    of my treatment plan under my medical providers.

10                   MS. ZELDIN:  We'll go off the record

11    for the day.

12                   THE VIDEOGRAPHER:  Off the record,

13    4:52.

14                   (Whereupon, at 4:52 p.m., the

15                   proceeding was concluded.)

16

17

18

19

20

21

22

23

24

25

1

```
1                         DRAFT

2

3              UNITED STATES DISTRICT COURT

4          FOR THE EASTERN DISTRICT OF MICHIGAN

5                    SOUTHERN DIVISION

6

7

8   LITTIECE JONES,

9

10          Plaintiff,

11

12   -vs-                    Case No:  2"22=CV=11224

13

14   DELTA AIR LINES, INC.,

15

16          Defendant.

17

18   _____/

19

20   CONTINUED ZOOM VIDEO CONFERENCE VIDEOTAPED DEPOSITION

21                   OF LITTIECE JONES
```

22

23      Taken by the Defendant, by Zoom Video Conference,

24      on the 9th day of January, 2026, at 10:

25

2

1

2  APPEARANCES:

3

4  For the Plaintiff:        LITTIECE JONES

5  In Pro Per                45014 Trails Court

6  (Appearing by Zoom)       Canton, Michigan   48187

7

8

9

10

11  For the Defendant:       LAUREN H. ZELDIN

12  (Appearing by Zoom)      GA Bar No. 36899

13                           ANTHONY J. SIMONTON

14                           GA Bar No. 196758

15                           Ogletree Deakins Nash Smoak

16                           & Stewart, P.C.

17                           One Ninety One Peachtree Tower

18                           191 Peachtree Street, N.E.

```
19                    Suite 4800

20                    Atlanta, Georgia   30303

21                    (404) 881-1300

22

23

24

25
```

3

```
 1   APPEARANCES (Continued):

 2

 3                    ERIN H. HARRIS

 4                    In-house Counsel

 5                    Department 981

 6                    1030 Delta Boulevard

 7                    Atlanta, Georgia   30354

 8                    (404) 715-6061

 9

10

11   Video Technician:     Justin Dloski

12

13

14

15
```

16

17

18

19

20

21

22  Reported By:          Kimberly A. Matro, CER-6215

23                       Certified Electronic Reporter

24                       (586) 468-2411

25

                                                    4

1                    TABLE OF CONTENTS

2

3  WITNESS                                  PAGE

4

5  LITTIECE JONES

6

7     Examination by Ms. Zeldin

8

9

10  EXHIBITS

11

12  Exhibit 6       ACS/CGO/Clean DPM Manual

13

14   Exhibit 7        Performance Journal

15

16   Exhibit 8

17

18   Exhibit 9

19

20   Exhibit 10

21

22   Exhibit 11

23

24   Exhibit 12

25

5

1   Exhibit 13

2

3   Exhibit 14

4

5   Exhibit 15

6

7   Exhibit 16

8

9   Exhibit 17

10

11  Exhibit 18

12

13  Exhibit 19

14

15  Exhibit 20

16

17  Exhibit 21

18

19  Exhibit 22

20

21  Exhibit 23

22

23  Exhibit 24

24

25  Exhibit 25

6

1      Remote Zoom Video Conference

2      Friday, January 9, 2025

3      10:15 a.m.

4

5          MS. ZELDIN:  Good morning.  This is Lauren

6      Zeldin, Counsel for Delta Air Lines.  We are going

7      on the record to note the status of Day 2 of

8      Plaintiff, Littiece Jones' deposition.  This

9      deposition was noticed for 9:30 this morning.

10     Ms. Jones sent an email around 9:25 and stated that

11     she would be available at ten a.m. and was running

12     late due to a medical appointment and it's now

13     approximately 10:15 a.m., we've had no further

14     communications from her.

15

16           So we'll go off the record at this time.

17     Thank you.

18

19           (Whereupon a short break was taken)

20

21        VIDEO TECHNICIAN:  We are on the record at

22     10:45 on January 9th, 2026.  This is he continued

23     video-recorded deposition of Littiece Jones, taken

24     by Defendant in the matter of Jones versus Delta

25     Air Lines, Inc., filed in the U.S. District Court⬆

                                                    7

1      for the Eastern District of Michigan, Case Number

2      2:24-CV-11224.

3

```
 4              My name is Justin Dloski representing

 5      Veritext.  Counsel may now introduce themselves for

 6      the record and then the reporter will swear in the

 7      witness.

 8

 9          MS. ZELDIN:  This is Lauren Zeldin, Counsel

10      for Delta Air Lines.

11

12          MR. SIMONTON:  Anthony Simonton, Counsel for

13      Delta Air Lines.

14

15          MS. JONES:  Littiece Jones, Pro Se.

16

17          MS. HARRIS:  And Erin Harris, In-house Counsel

18      for Delta Air Lines.

19

20          MS. ZELDIN:  Ms. Jones, do you have someone

21      with you today?

22

23          THE WITNESS:  Not in the room currently.

24

25                    LITTIECE JONES
```

8

```
 1      was thereupon called as a witness herein, and after

 2      having first been duly sworn to tell the truth, the

 3      whole truth and nothing but the truth, was examined

 4      and testified as follows:

 5

 6                    EXAMINATION (Continued)

 7

 8  BY MS. ZELDIN:

 9

10  Q   Ms. Jones, well just formally good morning again.

11      You understand this is the continuation of your

12      deposition that we started yesterday, correct?

13  A   Yes.

14  Q   And you were stating to me that you do not have

15      anyone else in the room with you at this time, is

16      that right?

17  A   Yes.

18  Q   Do you have someone present by phone or through

19      some other means?

20  A   No.

21  Q   So you do not have a support person with you at

22      present, is that right?

23  A   Not in the room with me, but I'm in a place where

24      there's support people who can come in if need be

25      to support.
```

9

```
1   Q   And where are you located today.

2   A   I'm at University of Michigan, Livonia Clinic.  I'm

3       -- I'm reading a doctor's note that was given just

4       so -- is that okay?  Because I don't want to be in

5       any trouble to give you the address.  Is that okay

6       for me to do that?

7   Q   That's fine.  Thank you.

8   A   You're welcome.  So according to this letterhead

9       that I'm reading from, this is the University of

10       Michigan Health Family Medicine Clinic, Livonia

11       Health Center.  The address is 20321 Farmington

12       Road, Livonia, Michigan  48152-1411.

13   Q   Thank you.  And Ms. Jones is this the medical

14       provider that you had an appointment with this

15       morning?

16   A   Yes.

17   Q   And you've actually been a patient of that medical

18       provider for a number of years, is that right?

19   A   Yes.

20   Q   And we have asked you to sign a release of records

21       for that provider int his lawsuit.  Do you recall

22       that?
```

23   A   Yes.

24   Q   And do you recall that this release that we asked

25       you to sign, this is the provider where you marked

                                                        10

1        out the word voluntary when you signed the release.

2        Do you recall that?

3    A   It was for University of Michigan records, not just

4        this provider.

5    Q   Ms. Jones, do you recall marking out the word

6        voluntary when you signed the release that we're

7        talking about?

8    A   Yes.

9    Q   Okay.  And you recall that we've asked you a number

10       of times since then, as ordered by the Court, to

11       sign a release that's unaltered, do you recall

12       that?

13   A   I don't know that it -- to my knowledge, there was

14       no Order from the Court.  Did the Court order that

15       I sign -- I did sign it and submit it, but I don't

16       recall it being a Court Order that I had to sign it

17       unmarked.

18   Q   Ms. Jones, are you prepared to execute a release of

19       records for Michigan Medicine that is unaltered?

20  A    I would think that that would be going through the

21       court system with the legal process, so --

22  Q    Ms. Jones --

23  A    With answering that, it is my religious belief, as

24       I believe I've shared in the proceedings that what

25       I sign has to be truthful for my religious⌃

11

1    Christian beliefs, so I would like to ask for an

2    accommodation for religious beliefs if you -- that

3    you all present a form or some other type of other

4    alternate that could -- I could honestly sign.  It

5    says that I was voluntarily doing this and I

6    crossed it out and put legal because you all

7    subpoenaed the records.  That's a legal process,

8    it's not voluntary.

9  Q    Let's go to the DPM Manual.  We're going to bring

10      an Exhibit up to the screen.

11  A    What's DPM.

12  Q    We're going to introduce an Exhibit, Ms. Jones.

13      One second, please.

14  A    May I share something?  We went on the record

15      because I did have a preliminary question in which

16      you all said should we go to the record, but we

17      didn't address the question because I want to -- my

18      question --

19  Q   Go ahead.

20  A   I had requested that I be able to take notes

21      because I need to get a pen and paper and then you

22      all said well let's go on the record, but we didn't

23      address that. That's what we were going on the

24      record for.

25  Q   So if you take notes, those need to be preserved by⌃

                                                        12

1       you and we're going to make them an Exhibit to

2       your deposition.  The same as the ones from

3       yesterday.

4   A   Well the notes -- I'm not going to be looking at

5       the notes as a refresher or anything, so I would

6       need that to be -- I believe that you have to -- if

7       I'm using it -- just like yesterday, I didn't use

8       it for a refresher.  The Judge I know said that I

9       can't do the Chat GPT or things like that, but

10      there was no mention of notes.  So I want to know

11      if that's okay for me to take notes, but I will not

12      be using it as a refresher for me to answer

13      questions.

14  Q    Ms. Jones, if you take notes you need to preserve

15       them and take a picture of them or scan them and

16       transmit them to us that can be marked as an

17       Exhibit to your deposition.  That's the answer.  If

18       you want to go off the record for a moment to get a

19       pen and paper, that's fine, but that's the answer.

20       If you take notes, you have to save them and

21       they'll will be an Exhibit to your deposition.

22  A    I will need the Court to share that with me through

23       some type of order because I've done my research.

24       As long as I'm not using it as a refresher, I'm

25       able to take notes.  So however you all want to➤

                                                      13

1        proceed.

2   Q    So do you want to go off the record to get a pen

3        and paper?

4   A    And I know that the Judge has previously said that

5        you all would be advising me, so is this your legal

6        advice to me?  Are you legally guiding me that this

7        is a legal thing that -- that needs to be done?

8   Q    No.  Ms. Jones, we cannot provide --

9   A    You're providing -- I believe you're providing

10       legal guidance that the Judge had previously given

11      you all legal guidance to provide me.

12   Q   We are not providing you with legal guidance.  We

13      -- we represent Delta Air Lines, we do not

14      represent you.  What I'm telling you is that if you

15      take notes during the deposition, do not destroy

16      them because they're going to need to be marked as

17      an Exhibit to your deposition.  That's all I'm

18      saying.  So if you want to get pen and paper and

19      take notes, that's fine, but that's how we're going

20      to handle it and we need to -- we don't need to

21      waste any more time on this.  So do you want to get

22      the pen and paper and go off the record or not.

23   A   Yes, I would like to get the pen and paper.

24

25          MS. ZELDIN:  Okay.  Off the record, please.

14

1

2           THE WITNESS:  Okay.

3

4           VIDEO TECHNICIAN:  Off the record 10:54.

5

6           (Whereupon a short break was taken)

7

```
 8              VIDEO TECHNICIAN:  Back on the record 10:55.

 9

10              MS. ZELDIN:  We'd like to mark this as the

11         next Exhibit, please.  Exhibit 6, please.

12

13                   (Document Marked for Identification as

14                   Deposition Exhibit Number 6)

15

16  BY MS. ZELDIN:

17

18  Q    And Ms. Jones, do you recognize Exhibit 6?

19  A    ACS Cargo DPM -- I'm sorry, Clean DPM.  Yes.  Could

20       you scroll through -- it says Revised, August,

21       2023.  I recognize -- this is the only page that I

22       recognize.  I don't see anything else.

23  Q    And you were part of ACS, correct?  We talked about

24       that yesterday.

25  A    I am a part.  Because I'm unsure of my employment
```

```
                                                        15

 1       status because Delta has not verified that.

 2  Q    Your job as a Customer Service Agent fell under

 3       ACS, correct?

 4  A    Yes.
```

```
 5   Q    We talked about that yesterday.

 6   A    I'm not sure if we talked about it yesterday, but

 7        I'm just saying yes, that's what my job is.

 8   Q    And this is a manual that applied to that position,

 9        correct?

10   A    Not -- no.  I don't know that to be true.

11   Q    Ms. Jones, Delta has an Internet referred to as

12        Delta Net.  You're familiar with that?

13   A    Yes.

14   Q    And that's where you can go to find policies and

15        other things.  Like an Internet, correct?

16   A    No, not necessarily.  It's an employee portal, but

17        not necessarily where you can find policies

18        exclusively.

19   Q    But it's a place you could find policies, correct?

20   A    No.  I can't -- I can't verify that as being true.

21   Q    You don't dispute it either, correct?

22   A    Yes, I do dispute it.

23   Q    Let's go look on Page 19, please.  Do you see that

24        in the middle of the screen, Ms. Jones, it says

25        Swap Guidelines.♠
```

                                                        16

```
 1   A    Yes.
```

2  Q   Okay.  And under that do you see where it says

3      regular benefitted employees must maintain an

4      average of twenty hours of pay time per week over a

5      rolling three-month period?

6  A   Yes.

7  Q   Do you see that?

8  A   Yes.

9  Q   And do you see where it says that if that amount of

10     time -- when this requirement is not met, swap

11     privileges may be suspended.  Do you see that?

12 A   Yes.

13

14         MS. ZELDIN:  So let's move on A.J., please.

15     We can take this Exhibit down.  Ms. Jones, we're

16     going to put Exhibit 7 on the screen.  That's going

17     to be the Performance Journal.

18

19             (Document Marked for Identification as

20             Deposition Exhibit Number 7)

21

22 BY MS. ZELDIN:

23

24 Q   Do you recognize Exhibit 7?

25 A   Yes.

17

1   Q   What is Exhibit 7.

2   A   From what you're showing me, the one page it says

3       Littiece Jones -- you're scrolling, so I'm not able

4       to see the first one.  Thank you for taking it back

5       -- scrolling back.  So it says Littiece Jones and

6       it has my employee number and it has manager

7       information, Tod Cabanaw, the company name, Delta

8       Air Lines, Incorporated.  It has Ramp Agent,

9       1200ACS OPS & Services Airport.  It has Detroit,

10      Michigan, Detroit 1045 and then it has my Delta

11      email.

12  Q   Okay.  Thank you, Ms. Jones.  Do you agree with me

13      that this is your Performance -- Performance

14      Journal?

15  A   No, I do not agree.

16  Q   Okay.  See where it says Performance Profile Team

17      Journal?

18  A   Yes.

19  Q   And there's entries under this.  Do you see those

20      where there's dates and then there's conversations

21      that are listed under there?

22  A   Yes.

23  Q   Okay.  So I would like to please go to the entry

24      for October 31st, 2023.  Do you see this entry

25      here, Ms. Jones?♠

18

1   A    Yes.

2   Q    Okay.  And you see there's notes.  And it says

3        today I met with Littiece and OSM Nikko Vinuya.

4        And OSM, that was a title that was a supervisory

5        role to yourself, is that correct?

6   A    OSM stands for Operational Service Manager.

7   Q    And that was a position that you reported into,

8        right?

9   A    One of the positions.  But you could report to any

10       manager/leader at Delta because of their one-to-one

11       and open door policy.

12  Q    So under this entry do you see where it says

13       currently you, Ms. Jones, were shown to have worked

14       sixty point two hours for the last three months and

15       there had been two hundred and sixty-eight hours

16       scheduled.  And it says in the notes Corporate

17       policy requires twenty hours average a week over a

18       rolling three-month period and if not met, that

19       you, Littiece, would risk losing your trade day

20       privileges.  Do you see that there?

21  A   Yes, I do.

22  Q   Okay.  And it looks like this entry was created by

23      O'Leary.  And is that referring to Rob O'Leary?

24  A   I don't see where you're saying it.  Oh, there --

25      there's something blocking the name.⌃

                                                    19

1  Q   Yeah.  See right there at the end it says O'Leary?

2  A   Yes.

3  Q   Okay.  And that's Rob O'Leary who is another OSM,

4      is that right?

5  A   Yes.

6  Q   Okay.  So in here Ms. Rob O'Leary was letting you

7      know about the Corporate policy and letting you

8      know that you were not meeting the hours

9      requirement and were at risk of having your swaps

10     suspended, correct?

11  A  He was stating -- it says in addition that we have

12     asked that she increase her hours worked to at

13     least ten to twelve a week going forward.  She has

14     also mentioned -- I'm sorry.  She had also

15     mentioned that she has a religious accommodation

16     that provides her off from Friday to Saturday.

17     O'Leary.  And before that it says Littiece has had

```
18        some very personal issues in her past and present

19        that we have been helping her get through, EAP,

20        Sedgwick and local counseling have been made

21        available to her.

22   Q    And you agree that that's true, correct, that Delta

23        had made those resources available to you.

24   A    No, I do not agree.

25   Q    But you agree with the other things in this --
```

                                                          20

```
1         these notes?

2    A    No, I do not agree.

3    Q    You agree that you were under the twenty-hour a

4         week requirement at this time, right, Ms. Jones?

5    A    I -- the policy is discriminatory.  The policy was

6         made up and not uniformly enforced and they

7         implemented or tried to enforce a policy that no

8         one knew about and to discriminate against me and

9         to cover up and present a legal reason to cover for

10        the illegal action.

11   Q    So let's go to the next entry in the Journal, A.J.,

12        please, January 24, 2024.  So Ms. Jones, this is

13        roughly three months later.  We've moved from

14        October into January of 2024.  Do you see this
```

15        entry?

16   A    Yes.

17   Q    Okay.  And it looks like Rob O'Leary is meeting

18        with you again and discussing the ASC Divisional

19        Swap Guidelines.  And here again you see that it

20        says the Guidelines state that you must maintain an

21        average of twenty hours of paid time per week over

22        a rolling three-month period.  Did these notes also

23        say that you were shown where to find this policy

24        within the DPM, which is the document we just

25        looked at, and the last sentence says after ninety⌃

                                                           21

1         days from today, their swap privileges will be

2         reviewed for non-compliance and swaps may be

3         suspended if compliance is not met.  Did I read

4         that correctly?

5    A    No, you didn't read it in its entirety.

6    Q    Okay.  So Ms. Jones, regardless of whether you

7         agree or disagree, this -- these notes state that

8         you were told on this date by Mr. O'Leary that you

9         were under the hours requirement and you had ninety

10        days to raise your hours or your swaps might be

11        suspended.  You were aware of that as of this date,

12    correct?

13  A   That is an incorrect entry into the journal and I

14    have a recording that will show that --

15  Q   Okay.

16  A   -- that he did not show me where the DPM was and

17    I'm in the process now due to my medical and

18    disabilities due to on-the-job injuries and

19    harassment and trauma incurred at Delta, I'm under

20    medical treatment to be able -- that the Judge is

21    accommodating me to be able to produce that

22    discovery.  And in that discovery it will show that

23    this journal entry is incorrect.  He did not show

24    me where to find the policy in that meeting of

25    within the DPM.

                                                    22

1   Q   So is this a video that you have on your phone?

2   A   No.  Not to -- I'm not sure.  I may have it on my

3    phone, but I'm not sure.

4   Q   Where is it right now.

5   A   I'm not sure.  And I'm under medical treatment to

6    be able to provide that to you all.

7   Q   Is it still in your possession or have you lost or

8    destroyed it.

9  A    I've not destroyed it, I've not lost it, but I'm

10      trying to work through my medical accommodations to

11      provide that to you all.  But from my recollection

12      and from the evidence, it will show that this is

13      not correct.

14  Q    Okay.  And to clarify for the record, this video

15      has not been provided to us as of today, correct?

16  A    Correct.  This is being my medical treatment to be

17      able to provide it to you all while I undergo

18      treatment to do so under the doctor's medical plan.

19  Q    And so this video, as you're stating, Ms. Jones,

20      you claim that it will show that Mr. O'Leary did

21      not show you where to find this manual, however,

22      you agree that on this date he did warn you that

23      you had ninety days to increase your hours or you

24      lose your privileges, correct?

25  A    All I'm confirming is that he did not show me the ⌃

23

1      -- where to find the policy within the DPM as it

2      states there.  At this time I can't recall, but

3      that's part of the discovery and accommodation for

4      my disabilities for.

5  Q    Okay.  Ms. Jones, let's go to the next

```
 6        conversation, please.  June 16, 2024.  Here on this
 7        date it says the HR manager and I met with Littiece
 8        to review her hours worked and swap privileges.  It
 9        was discussed with you that you had not met the
10        minimum hours.  And you don't dispute that, right?
11        You don't dispute that you were under twenty hours
12        a week.
13   A    I do dispute the policy.  I believe the policy, and
14        that's part of the alleged discrimination.  The
15        policy and as far as in my HR file, I was under
16        different policies as rate of reserve and I had no
17        awareness of this policy until it was presented to
18        me as a form of discrimination by Delta Air Lines.
19   Q    I understand that you're stating that you dispute
20        the policy, but you do agree that you were working
21        less than twenty hours per week on average,
22        correct?
23   A    No.  I do not -- I dispute that.  Because per
24        average of what, my entire twelve, thirteen-year
25        career there?  No, I dispute that.
```

24

```
 1           MS. ZELDIN:  All right.  We're going to go off
 2        the record for one second.  Thank you.
```

```
 3

 4           THE WITNESS:  You're welcome.

 5

 6           VIDEO TECHNICIAN:  Off the record 11:09.

 7

 8              (Whereupon a short break was taken)

 9

10           VIDEO TECHNICIAN:  Back on the record 11:12.

11

12  BY MS. ZELDIN:

13

14  Q    We're back on the record.  Ms. Jones, if Delta's

15       pay records show that you worked less than twenty

16       hours per week on average during a rolling three-

17       month period, do you have any basis to dispute

18       that?

19  A    I would have to see those records and we would have

20       to establish when they were stating that at what

21       time frame because as I've shared in the deposition

22       yesterday, one time Delta selected me to handle the

23       transfer of operations in Raleigh, Durham Airport

24       and that work week started -- I believe I was

25       supposed to be there for a week and that was a
```

25

```
 1        forty-hour work week and they extended me to be
 2        there for almost a month.  So that's what is at
 3        dispute, you know, as far as when they say an
 4        average.  Because there had been times when I've
 5        qualified for FMLA and in order to qualify for
 6        FMLA, I believe you had to have worked twelve
 7        hundred and fifty hours in the previous year and
 8        that would average to about twenty hours a week, so
 9        I would need to see those records to be able to
10        answer sufficiently.
11   Q    Well, Ms. Jones, you're aware that in fall,
12        November, fall of 2023 you applied for FMLA and
13        were informed that you weren't eligible for it
14        because you hadn't worked enough hours.  Do you
15        recall that?
16   A    No because there were times when management forced
17        me on a leave and they put in for the leave and I
18        didn't.  Or they handled that process, so I'm
19        unaware of what you're -- when you say fall, you
20        don't give me any dates or any records.  So
21        management does things often that hey do not
22        provide immediate records for, they backtrack
23        things and do other things to cover for a legal --
24        what I'm claiming and alleging to be a legal and
```

25    discriminatory fact.  I'm not able to answer that. ⬆

26

1         For example when you shared that the

2    conversation, October 31st is not in this journal

3    entry, that there was another conversation had with

4    Jeff Simonen on November 1st where he said -- I

5    believe he's two times over Rob O'Leary where he

6    told me that he told previously told me that I

7    could just do the best that I could do dealing with

8    the situation with my daughter's human trafficking

9    child exploitation, but that's not in the journal.

10    So I can't affirm to these things because Delta has

11    a tendency to not do things correctly

12    unfortunately.

13

14  Q  And the reason -- the reason that was important to

15    you, Ms. Jones, that Jeff allegedly said that is

16    because you were under your hours, correct?  Under

17    the twenty hours a week, otherwise you wouldn't

18    have cared.

19  A  No.  The reason why he said that was because Delta

20    was harassing me and sharing that I needed to come

21    to work and I believe he also mentioned something

22      about medical insurance or benefits.  So you can't

23      illegally coerce or harass or intimidate or try to

24      enforce policies that are not uniform to one

25      individual just because you're trying to reach↑

27

1       certain legal quotas or whatnot.

2   Q   Ms. Jones --

3   A   So I would -- I would disagree with the statement

4       you shared.

5   Q   Do you have evidence of that conversation with Jeff

6       Simonen?

7   A   Yes.

8   Q   Have you produced that to us?

9   A   No.  That evidence was -- that was part of the

10      evidence I was sharing yesterday.  That was just

11      discovered when I had an appointment this week with

12      -- under my medical treatment.  So that will --

13      that discovery will be produced soon.

14  Q   Do you have evidence of the number of hours that

15      you claim that you worked during 2001, 2002, 2003,

16      2004 for Delta Air Lines?

17  A   What have I claimed.

18  Q   I'm asking you do you have -- are you -- do you

19      have evidence showing the number of hours that you

20      think you've worked?

21  A   That I -- I haven't presented that I thought I've

22      worked hours.   You've asked me questions that I've

23      just disagreed with what has been presented.   Can

24      you clarify the question, please.

25  Q   Yes.

28

1  A   I don't understand the question.   My apologies.

2  Q   Here's the question.   Do you have evidence of the

3      number of hours that you have worked for Delta Air

4      Lines?

5  A   I believe that it was -- my hours were given to me,

6      yes I believe you all have sent that to me, so I

7      would say yes.

8  Q   So you agree that our records that we sent to you

9      are accurate?

10  A   Well, I'm not -- between discovery and what HR sent

11      me, I'm not sure because I haven't been able to

12      fully review it because I have been with Delta for

13      thirteen plus years now, so I haven't been able to

14      break down what the numbers are and whether they're

15      correct and accurate or not.

16  Q   At this time you have no basis to dispute Delta's

17      records.

18  A   I do have a basis based on me being witness to

19      things -- me being a witness and being an employee

20      and knowing that things that were presented in this

21      journal are untrue because I was present and I have

22      recordings of most or if not all of the events.

23  Q   And have you produced any of that evidence to us?

24  A   I have.  I produced the October 31st recording and

25      -- that you have in this journal, but you all --

                                                    29

1   Q   You just said that you didn't.

2   A   No, you asked me did I produce the June 20 -- the

3       evidence from -- can we read it back to clarify

4       what was said?  Could we read it back, please.

5       Because you didn't ask me about October 31st, you

6       asked me about the conversation with Jeff Simonen.

7       I said that that was the next day, November 1st.

8       You didn't ask me about October 31st and I

9       presented that to you all in discovery, but you all

10      said that I never presented discovery, so that's

11      why I asked the Judge for you all to outline what I

12      have presented because I wanted to make sure that I

13     was doing things correctly and I didn't want to be

14     in any trouble with the Judge or with you all.

15  Q  Okay.  So Ms. Jones, if you produced -- if you

16     claim that you produced a video to us of

17     October 31st, do you have that with you on your

18     phone?

19  A  I'm not sure.

20  Q  Okay.  Well, we'll ask you to check during a break

21     because we have no record of having received that

22     video.

23  A  I can look up the email and resend it to you, but I

24     did submit that to you all and you all said that I

25     was harassing Delta employees.  That was part of↑

30

1      the -- that I brought up to the Judge and you all

2      didn't produce any evidence that I was harassing

3      Delta employees and the Judge ruled in your favor

4      and banded me from speaking as I was currently

5      employed, speaking to any Delta employee with

6      you --

7

8          MS. ZELDIN:  Let's go off the record and give

9      you a chance to look for that because if you have

10    it, whether you've sent it to us already or not, we

11    can look at it while we're here.  So let's go off

12    and you look for that video.

13

14         THE WITNESS:  That would require -- that would

15    require me to seek the medical provider because I'm

16    under a treatment plan and accommodating with the

17    discovery process.  And the person -- my medical

18    plan is for me to meet with a social worker and

19    we're going through the discovery together.  So I

20    have gone through that with the social worker so

21    she's helping me and accommodating me under the

22    medical plan for that.  So the social worker is not

23    here right now so I wouldn't be able to do that.

24

25         MS. ZELDIN:  Ms. Jones, but if you've already↖

                                                          31

1     produced it to us, you can just reforward the

2     email.

3

4          THE WITNESS:  That's what I just -- that's

5     what I just said I could do.  You're saying what I

6     just said I would do.

7

8          MS. ZELDIN:  Well, we'll go off the record and

9     let you find the email and forward it to us.

10

11         THE WITNESS:  Okay.  I'll reforward it to you.

12

13         MS. ZELDIN:  Okay.  Off the record.

14

15         THE WITNESS:  Thank you.

16

17         VIDEO TECHNICIAN:  Off the record 11:21.

18

19             (Whereupon a short break was taken)

20

21         VIDEO TECHNICIAN:  Back on the record 11:36.

22

23         MS. ZELDIN:  Ms. Jones, we're back on the

24     record.  While we were off you forwarded us an

25     email that had an iCloud link and I believe that⌃

32

1     you represented that that was a video that you

2     think is responsive to our discovery request and I

3     wanted to let you know that we were not able to

4       access the link.  It says something about we don't

5       have permission or that the owner stopped sharing

6       or something like that, so we were not able to

7       receive that discovery.

8

9              THE WITNESS:  That discovery was sent on

10      August 5th, 2025 and with iCloud they have an

11      expiration date.  So you all never shared with me

12      or had any communications that you all never

13      received it so now with it being January 9th of

14      2026, I'm sure the iCloud link was expired, but I

15      did send the October 31st video to you all for

16      discovery.

17

18             MS. ZELDIN:  So we're going to ask you to

19      supplement you're your discovery to provide that

20      because we don't have it.

21

22  BY MS. ZELDIN:

23

24  Q   Ms. Jones, how many videos just in general do you

25      think that you have that are responsive to our

33

1    discovery requests that you have not provided.

2  A  I don't know at this time.

3  Q  Can you give us an estimate?

4  A  I'm unable to.  I'm unable to suspect or -- I just

5     don't know.  That's part of my medical treatment

6     because Delta was retaliating at me every time --

7     almost every time I came into work and I reported

8     internally and there will be nothing done about it.

9     The retaliation continued.  So I -- and that's part

10    of my medical treatment because of the trauma that

11    I endured while at Delta during -- while I was

12    working.

13  Q  And so, Ms. Jones, I understand what you said.

14     Just to clarify further, did you at the point that

15     you described that you felt you were being

16     retaliated against, did you then start recording

17     meetings and other things in the workplace?

18  A  Could you clarify the question, please.

19  Q  Yes.  I'm just trying to understand how many videos

20     potentially you have that you haven't provided to

21     us and so it sounds like you don't know the answer,

22     is that fair?

23  A  Yes.

24  Q  And is that because you actually need to, through

25     your medical treatment, figure out all the videos

34

1      that you have and then be able to provide them to

2      us.  Is that what you're saying?

3  A   It's because of my medical treatment.  I'm not an

4      attorney, I don't have separate business accounts

5      verse personal.  My daughter and I were victims of

6      human trafficking, child exploitation, along with

7      other personal matters that are all intermingled

8      and so part of my medical treatment I have

9      disabilities due to that and t's hard for me to go

10     through to organize and sort because I have so many

11     things that are intermingled and so that's a part

12     of my treatment and then the further harm is when I

13     send things like this, like I sent it August 5th,

14     2025 at 5:39 p.m., Delta then tells me, their

15     attorneys that they never received it when I sent

16     it to over forty people, thirty-five to forty

17     people, including the many attorneys that Delta

18     have representing them.  So that adds to the trauma

19     and the ongoing impact of my disabilities.

20  Q   And so, Ms. Jones, just to clarify, you believe

21     that you have video evidence that supports your

22     case, but you've not been able to identify all of

23    it or provide all of it because of your medical

24    conditions, is that correct?

25  A   Yes.⌃

                                                    35

1   Q   Let's look at -- let's go back to your Performance

2       Journal, we're still on it.  The June 16th

3       conversation.  Do you see under the notes the

4       sentence that says you were not under

5       investigation?

6   A   Yes.

7   Q   And this is not any type of formal performance

8       discipline or anything like that, correct?

9   A   I can't say that to be correct because Delta, they

10      changed things around, so I can't say that to be

11      true.

12  Q   Okay.  So you can't say one way or another,

13      correct?

14  A   I believe that it was disciplinary and it came --

15      and I believe that it was done intentionally to

16      harass, intimidate me and coerce me and all the

17      things.  If you notice, June 16th was the date HR

18      -- that was Father's Day, Sunday, Father's Day and

19      HR took it upon themselves, they normally work I

20    guess Monday through Friday to come to just to see

21    me on this day.  Because right after they came in,

22    they departed by car right from the ramp site and

23    people were -- like there were coworkers who were

24    coming to me, oh, what you do, HR just came in and

25    see you, what you do.  So it was a pattern of↑

                                                          36

1     workplace violence according to Delta policy and

2     illegal activity for my protected activity.

3  Q  So your testimony is that this entry, June 16th,

4     this reflects workplace violence, is that your

5     testimony?

6  A  I believe it reflects intimidation, harassment.  I

7     don't have the workplace violence policy right in

8     front of me, but the professional conduct that

9     Delta is to have with their leaders, especially

10    with HR and I believe this was with Rob Cook that

11    they did not display what Delta strives for and

12    what they say they strive for for leadership.

13 Q  Ms. Jones, do you personally know if other

14    employees had their swaps suspended as well for not

15    working the twenty hours a week over a rolling

16    three-month period?

17  A    I believe you all may have provided that in

18       discovery, but I can't say for certain.  I'm not

19       sure.

20  Q    You don't have any personal knowledge of that,

21       correct?

22  A    I'm not -- I can't speak.  I'm not sure.

23  Q    A.J., can you please pull up Exhibit 33 document.

24       Is this going to be Exhibit 8?

25

                                                        37

1            MR. SIMONTON:  Yes.

2

3            THE WITNESS:  In addition to that question, I

4       do know that the policy was not uniformly enforced.

5       That I do know.

6

7  BY MS. ZELDIN:

8

9  Q    Have you produced all evidence that you have that

10       supports that, Ms. Jones?

11  A    I'm trying to.  It would be helpful when I produce

12       things to you all that you not say that I haven't

13       because that increases the harm to my disabilities

```
14      as we just shared that I produced this August 5th,

15      which was what, six months ago or so, five or six

16      months ago and the link that I produced it has

17      expired by now.  You all said I never produced

18      anything, so that -- that's --

19   Q  That's a separate video.  What we're talking about

20      now is something else.

21   A  Could you repeat the question.

22

23          MS. ZELDIN:  Madam Court Reporter, could you

24      please repeat it.

25▲
```

                                                              38

```
1              (Whereupon the record was read back by

2              the reporter)

3

4          THE WITNESS:  All evidence, no.  I'm under

5      medical treatment to do so.

6

7          MS. ZELDIN:  Okay.  Let's look at what I'm

8      marking as Exhibit 8, please.

9

10          THE WITNESS:  Exhibit 8 as in the number 8?
```

11

12          MS. ZELDIN:  Yes, ma'am.  That's going to

13      appear on the screen in just one second.

14

15          THE WITNESS:  Okay.

16

17              (Document Marked for Identification as

18              Deposition Exhibit Number 8)

19

20  BY MS. ZELDIN:

21

22  Q    And, Ms. Jones, I'm going to ask you if you

23       recognize Exhibit 8.

24  A    Exhibit 8 says Lovely Lady and it has my personal

25       email, lrbj_99@yahoo.com.  It's sent March 11th,


                                              39

1       2024, 11:46 a.m. to Tenia Russ and it has her Delta

2       email and also my Delta email.  Subject regarding

3       Employment File Request.  Good morning, Tenia,

4       thank you for your email.

5   Q    Okay.  Ms. Jones.

6   A    Yes.

7   Q    Ms. Jones, I don't need you to read the entire

8          thing.  I just asked you if you recognized it.

9     A    For me to recognize it I need to be able to read it

10         because all I recognize is that it says an email.

11         I'm sorry.

12    Q    Let me ask you some additional questions then.

13    A    Yes.

14    Q    So as you stated, this is an email from your

15         personal email address and it's to Tenia Russ at

16         Delta, is that correct?

17    A    Yes.

18    Q    And Tenia Russ was your HR manager, is that right?

19    A    She is my HR manager, yes.

20    Q    And she was an HR manager at the Detroit

21         Station, correct?

22    A    I'm not sure if she's still there currently, but

23         when I was there currently actively working, yes.

24    Q    She was the HR manager that you worked with, yes?

25    A    For -- not in the beginning, but more towards the

                                                          40

1          end.

2     Q    At this time.

3     Q    When you say this time, could you clarify.

4     Q    Yes.  When you sent this email --

5  A    Yes.

6  Q    -- you were sending this email to her as your HR

7       manager, okay.

8  A    Yes.

9  Q    So what I want you to look at is in the first

10      paragraph do you see where it says within ACS

11      department we have been coming together as agents

12      to continue the success and bettering the company

13      and employees.  There are different discussions and

14      meetings occurring amongst employees who are either

15      unaware of or have concerns regarding company

16      policies, including but not limited to the recent

17      company email sent December, '23 regarding working

18      an average of twenty hours weekly over a rolling

19      three-month period for benefitted agents.  We

20      really need clear company policies and guidelines

21      collectively as employees.  Here are some common

22      questions and concerns from agents.  Do you see

23      that?

24  A   Yes.

25  Q   And so have other agents come to you and said that

41

1       they had concerns or questions about this policy?

```
 2   A   Yes.

 3   Q   And that's why you write this email, correct?

 4   A   Not entirely.  Part -- one of the reasons.

 5   Q   A.J., can you scroll down, please.  And Ms. Jones

 6       as you look down through here, it looks like

 7       there's questions that you're asking.  Do you see

 8       those?

 9   A   Yes.

10   Q   And just to confirm, these are questions that

11       you're asking on behalf of yourself and other

12       employees impacted by this policy, correct?

13   A   Not just the policy, but as it refers -- it says

14       unaware or have concerns regarding company

15       policies, including but not limited to.  So it

16       wasn't just limited to this one alleged policy.

17   Q   That was part of it, correct?

18   A   Yes.

19   Q   And then can you scroll down in here to the

20       February 5th email.  This is a chain, am I right?

21       There's a number of emails that are in this chain

22       over time?

23   A   I can't -- I'm not sure because she responded -- I

24       think this is the discovery I was talking about

25       yesterday that you all sent, but you all left out
```

42

1    an email where she gave the answers to those

2    questions that you first showed, so I can't --

3    Delta has a way of changing things around, so I

4    can't say for sure that this is a chain or what

5    this is.

6  Q   All right.  We'll look at that in a second.  I've

7    got email as well.

8  A   Okay.

9  Q   So if you go to February 5th from Ms. Jones, scroll

10    on down.  It starts with good afternoon, I'm

11    seeking help and guidance.  Okay.  So Ms. Jones,

12    this is also from you.  This is from your Delta

13    email.  Do you see that?

14  A   Yes.

15  Q   Littiecejones@Delta.com.

16  A   Yes.

17  Q   On February 5th you send it to Antonia Bush and who

18    is that.

19  A   Antonio Bush is a Delta employee that contacted me

20    when I filed internal concerns with the company.

21  Q   And he was the person that investigated that,

22    correct?

23  A   Well, he was one of the people.  There were others.

24  Q    And who is Erik Snell that you copied here.

25  A    Erik Snell, I'm not sure what his title is now, but⌃

                                                    43

1        he was one of the executives at Delta.

2   Q    And, Ms. Jones, did you often copy executives on

3        your emails raising concerns?

4   A    I was told that we -- there was a chain of command

5        and that I was to talk through the chain of

6        command.  So when you say my emails for concerns, I

7        can't say without them being present who I copied

8        and who I didn't.

9   Q    So if you look at this email -- I'm sorry.  Do you

10       see where it says good afternoon.  I'm seeking help

11       and guidance regarding company policies regarding

12       swap guidelines since July, 2023 when it was first

13       brought to my attention by OSM Rob O'Leary.  Do you

14       see that?

15  A    Yes.

16  Q    So you agree that this policy about the number of

17       hours you had to work to maintain your swap

18       privileges, Rob O'Leary raised that with you in

19       July of 2023, correct?

20  A    He said that there -- he told me why was I not

21      coming in to work my scheduled hours and I think I

22      said what do you mean by that.  That was part of

23      the harassment complaint because he was texting me

24      and calling me and contacting me outside of work

25      hours, as well as work hours that I felt was⋀

                                                          44

1       inappropriate.

2    Q  Ms. Jones,  do you have those text messages from

3       Rob O'Leary?

4    A  Yes.

5    Q  And have you provided those to us?

6    A  No.

7    Q  And is that because of your medical conditions?

8    A  Yeah.  I'm trying to gather all of that together as

9       we speak.  That's part of the medical plan.

10   Q  So Ms. Jones, throughout this time period when

11      leaders were telling you that you weren't meeting

12      the hours requirement, you were at risk of losing

13      your swap privileges, you know, as of January, 2024

14      you had ninety days to bring up your hours, how did

15      you resolve to handle that or what did you do.

16   A  So I went -- first of all, different leadership was

17      saying different things, so that's part of the

18    discrimination aspect because there was no clear

19    policy.  The alleged policy that they brought to my

20    attention it was not clear amongst leaders and

21    Delta has a one-to-one open door policy, so what I

22    did when things weren't clear and sometimes leaders

23    told me to go talk to someone else and they would

24    inquire because they weren't sure.  So leadership

25    told me different things and I was going by what▲

                                                    45

1    the highest leader said and at one point I believe

2    it was Jeff Simonen told me that we are going to

3    continue to work with you, just do the best that

4    you can do while trying to figure out what was

5    actually the correct -- in order to --

6  Q   Go ahead.

7  A   Okay.  Thank you.  In order to actually know what

8        the policy and if it was a true policy for my -- my

9        employment role.

10  Q   And that's the conversation that you told us you

11       have a recording of that you have not yet provided,

12       correct?

13  A   Yes.

14  Q   And --

```
15  A    It was just -- it was just discovered this week

16       when meeting with the medical provider that we just

17       discovered that video.

18  Q    Ms. Jones, did you resolve or did you try to

19       increase your hours?  Like why would you just not

20       work twenty hours a week so that there just

21       wouldn't be an issue.

22  A    Number one, I was going with direct communication

23       from upper leadership.  They told me that they

24       understand, you know with Delta -- well, let me not

25       say they told me this.  They told me that just do⬆
```

                                                              46

```
 1       the best that you can do and they were going to

 2       figure out how they were going to continue to

 3       accommodate me.  I'm not sure Delta is partnered or

 4       they advocate for human trafficking, child

 5       exploitation and things like that, so I'm not sure

 6       if you all are aware of what victims go through in

 7       those circumstances.

 8

 9            First thing you have to be believed, you

10       know, so -- and then you go through a process that

11       can be ongoing, you know.  So while we were trying
```

12      to navigate and figure out how they were going to

13      continue to accommodate me for those disabilities.

14      And that was what they brought to the forefront,

15      but keep in mind I had an on-the-job injury that

16      they had been accommodating me for, as well as my

17      religious accommodations.

18

19  Q   Ms. Jones, do you have evidence that shows that you

20      were given accommodations by Delta for these

21      reasons that you just articulated?

22  A   I have evidence that I asked for accommodations

23      back in 2012 when I was hired and it's also on my

24      application.  I'm not a -- I have evidence that I

25      asked.  The way that Delta decides to uphold the

                                                              47

1       law or not uphold the law, that's above my pay

2       grade.  I know that I asked for accommodations and

3       the record will show that I was allowed shift

4       trading for my Sabbaths and they never said

5       anything until after my protected activity.

6   Q   Do you have evidence that you asked for and

7       received accommodations to help with the human

8       trafficking situation?

```
 9   A    I'm not sure.  I'm not sure if it was asked because

10        you have to understand, Delta didn't have an

11        accommodations department.  They brought this up

12        after the fact.  So the way they handled

13        accommodations in which they do so now at times is

14        still not uniform.  The way they handle

15        accommodations is through one-to-one meeting with

16        your manager.  If they can give you the time off,

17        they can.  You work it out one-to-one or any

18        leadership.  They have an open door policy.  That's

19        how they deal with accommodations.  So some of my

20        -- as I go through my treatment plan and am able to

21        provide more evidence, it may show that, but again,

22        that's under my medical treatment plan, so I'm

23        doing that now.

24   Q    Ms. Jones --

25   A    Yes.
```

                                                        48

```
 1   Q    Do you have a medical treatment plan that -- well,

 2        let me ask you this.  What medical provider is that

 3        plan under.

 4   A    What plan.

 5   Q    Who's coordinating that plan.
```

```
 6  A   Could you clarify.

 7  Q   Yes.  You keep referencing a medical plan that's

 8      enabling you to -- going to enable you to search

 9      for discovery and other things that might be

10      related to this lawsuit.  What provider is

11      coordinating that medical plan.

12  A   The medical treatment plan?

13  Q   Yes.

14  A   University of Michigan is the main provider, but

15      with the human trafficking I've also had services

16      at Avalon Healing Center and it's under different

17      providers or organizations that assist with matters

18      such as this.  I actually have a letter here that

19      the doctor wrote that I was in the process last

20      night I was trying to file another motion or

21      supplemental motion, but I wasn't able to do so.

22      I'll try to submit it after the fact, but they

23      wrote me a letter regarding or that talks about

24      that more.

25  Q   You're saying this morning you got a letter that
```

```
 1      talks about your medical treatment plan?

 2  A   Yes.
```

3   Q    Okay.  Could you read to us what it says, please.

4   A    This actually -- it needs to be -- is this going to

5        be redacted or whatnot?

6   Q    **We can put it under the Protective Order.

7   A    Protective Order?

8   Q    Yes.



Redacted – Subject to Protective Order

50

Redacted – Subject to Protective Order

16  Q    Thank you, Ms. Jones.  And do you have a follow-up

17         appointment scheduled?

18  A    I have a lot of different appointments.  You'll

19         have to clarify when you say do I have a follow-up.

20         Follow-up for what.

21  Q    With this provider.  Following up the letter that

22         you just read.  They said that you're working to

23         establish with a new provider there.  Do you have a

24         follow-up appointment with someone there?

25  A    I'm not sure of your question.  Could you clarify.⤴

51

1   Q    So, Ms. Jones, you just read a letter and that's

2        from University of Michigan, is that correct?

3   A    Yes.

4   Q    And they said that your provider is leaving the

5        practice, correct?  You just read that.

6   A    She completed her last visit with her psychiatrist

7        due to provider leaving the practice.

8   Q    Okay.  So that's what I just said.  So yes.  So do

9        you have another appointment there with a different

10       provider at that practice?

11  A    At U of M?

12  Q    Yes, Ms. Jones.

13  A    I have a lot of different appointments at U of M,

14       yes.

15  Q    With the Psychiatry Department.  Do you have a

16       follow-up appointment with that department that

17       issued that letter that you just read?

18  A    You're saying different things, so I need you to

19       clarify because the department that issued this

20       letter is different.  They have different

21       departments at U of M.  So there is a collaborated

22     effort in my medical treatment that involves

23     multiple departments, multiple medical providers,

24     multiple people who assist, it's a team effort.

25     And so there are various appointments that I have

52

1     had under this team and other associations such as

2     Avalon Healing Center who deals with human

3     trafficking and sexual abuse and things of that,

4     victims of that.  So it -- and also I'm still in

5     the clinic now, so as far as I don't know -- I

6     haven't left out of the office.  Thank you all so

7     much for changing your mind and allowing me to

8     attend to my medical needs and delaying the

9     deposition, but I don't know what they scheduled

10    for me.  So I can't answer your question the way

11    you've asked.

12  Q   So, Ms. Jones, it sounds like the best way to get

13    this information is for you just to go ahead and

14    execute that release that we're still waiting on

15    for this provider and we'll be able to gather all

16    that information.

17  A   Again, if you all -- due to my religious beliefs,

18    if you can -- I've signed what you send me numerous

19      times or at least one time.  So if you can provide

20      an alternate way for me to be able to give an

21      accurate, truthful reflection, then I will sign

22      whatever you send me that is an accurate

23      attestament to my faith.  I could not -- I had to

24      cross that out where it said voluntarily because

25      that is not truthful.  And as a Christian I believe⌃

                                                          53

1       in being as truthful as I can.  So if you can

2       provide that to me, I'll continue to sign, like I

3       signed the other things you sent me.

4    Q  And just for the record, the same release was

5       provided for all the medical providers and you were

6       able to sign every single one except for the

7       University of Michigan.  So I just want that to be

8       clear on the record.

9    A  And on the record, the other ones did not say

10      voluntarily, if I remember correctly.  They didn't

11      say voluntarily.

12   Q  They were all the same.

13   A  No, they were different providers.  You just said

14      all the different providers.  They couldn't have

15      been the same.  The U of M has their own form and

16    I've contacted U of M and they said that they did

17    not receive anything from you all and they said

18    that they -- you all are to send it to them

19    whatever way I signed it and that there are

20    processes for that, but you all never sent it in

21    according to the last time I checked with U of M

22    Records.

23

24  Q    And do you have documentation of those

25    communications with U of M, Ms. Jones?

54

1   A    I'm not sure.

2   Q    Okay.  Those are things that you need to provide to

3    us.  So if you have them, preserve them and you

4    need to provide them.  Let's look at please what

5    we're going to mark as the next --

6   A    Could I ask that you please provide -- due to my

7    disabilities, could you please provide that in

8    writing whatever it is that you need me to provide

9    so I can have it in writing.

10  Q    We're going to follow up with all of the things

11    that are outstanding.

12  A    Okay.

13

14          MS. ZELDIN:  A.J., can you please bring up

15      Document --

16

17          THE WITNESS:  When you say outstanding, I just

18      want for the record, this is a new request that you

19      just asking me today, so it's not outstanding.

20      You're asking it as a new request as of today.

21      That was never asked before.  So it's not

22      outstanding.

23

24  BY MS. ZELDIN:

25↑

                                                    55

1  Q    Ms. Jones, all the things that we're asking for are

2       things that are responsive to our existing

3       discovery request.  We don't know everything that

4       you have, which is -- but all of these things are

5       responsive to our existing discovery request.  So

6       we'll follow up with you --

7  A    For the record, you all have never, to my

8       knowledge, asked me for conversations that I might

9       have had with University of Michigan Record

10      Department.  You've never asked for that in

11      discovery.  This is the first time that you've

12      asked of that.

13

14          MS. ZELDIN:  Let's pull up the next Exhibit,

15      please.

16

17          MR. SIMONTON:  This is 23?

18

19          MS. ZELDIN:  Yes, please.

20

21   BY MS. ZELDIN:

22

23   Q   So, Ms. Jones, while we're getting this Exhibit

24       pulled up and let me get -- tell you the exact

25       date.  On June 16, 2024 your swapping privileges⬆

                                                          56

1       were suspended as of that date, is that correct?

2   A   June -- what day?

3   Q   16, 2024.

4   A   Could you repeat the question please.  I'm sorry.

5   A   Your Performance Journal, which has bene marked as

6       an Exhibit, it reflects that on June 16, 2024 your

```
 7      swap privileges were suspended.

 8  A   I don't have that in front of me.  I think you

 9      moved it off the page.

10  Q   If your journal shows that, you don't have any

11      reason to dispute that, correct?

12  A   Oh, no.  I have plenty of reason to dispute it.  As

13      I said in the email I sent to you all on August

14      5th, they were -- that's part of the

15      discrimination.  They were entering things in my

16      journal that were not true.  That's the email that

17      I sent you on August 5th, so I -- that's part of

18      the case.  They were making up things that were not

19      true.

20  Q   Okay.  So, Ms. Jones, are you saying that your swap

21      privileges were never suspended?  You got to keep

22      them the whole time?

23  A   That's not what I said.  That's what you said.  But

24      could you clarify the question.  I didn't say that.

25      That's what you said.
```

                                                          57

```
 1  Q   Were your swap privileges suspended at some point

 2      in time?

 3  A   Yes.
```

```
 4   Q    Yes or -- okay.  And other employees also had their

 5        swap privileges suspended as well, corer?

 6   A    I don't know.  But I know there were a lot who did

 7        not -- who didn't meet the swap -- who talked about

 8        it.

 9   Q    Okay.  Tell us the names of those people, please.

10   A    I don't have that information with me.  Sometimes

11        at work people went by -- you may not have known

12        the person's name, but you heard them talking about

13        it.  Or they may go by a nickname.  We weren't

14        friends, we were coworkers.  But I can testify that

15        after my shift swaps were suspended and there were

16        conversations that I heard or were a part of where

17        people were talking about that they themselves did

18        not have their shift swaps suspended and they had

19        worked under twenty hours.  There were different

20        conversations had, but I'm not able to identify the

21        government names or even nicknames at this point of

22        those people because there was so many people

23        talking about it.

24   Q    Okay.  Well, I'll take any information you have.

25        So nicknames, description of the person, whatever ⌃
```

```
 1        -- all the information that you have about the

 2        people whose swaps were not suspended and you claim

 3        they worked less than twenty hours a week over a

 4        rolling three-month period, please tell me all the

 5        information that you have that supports that.

 6    A   Could you repeat that, please.

 7

 8            MS. ZELDIN:   The Court Reporter can read it

 9        back, please.

10

11               (Whereupon the record was read back by

12               the reporter)

13

14            THE WITNESS:   So they were Customer Service

15        Agents that worked on the ramp.   There were some

16        Customer Service Agents that worked above wing and

17        I believe in meetings there was some who worked in

18        Cargo because ACS is cargo, below wing and above

19        wing.   Furthermore Tenia Russ herself said that

20        this was only being implemented in Detroit.   So for

21        it to be -- and I'm not an attorney, but you all

22        are, but this is what I'm alleging discrimination

23        for a policy not to be discriminatory it has to be

24        informed uniformly company-wide as this is a

25        company-wide policy.   And Tenia Russ said that it
```

59

1       was only being enforced -- they were only doing it

2       in Detroit, and I'm not saying verbatim, but she

3       shared that with me and also Anthony Bush, he -- in

4       one of our conversations he talked about Ms. Jones,

5       I don't know what they're doing with this policy,

6       and I'm not saying verbatim.  He said I don't know

7       if they're going to start it, I don't know if

8       they're going to -- and this was after they had

9       first introduced this policy I think you shared

10      July, 2023.

11

12              So the other description, there were

13      African Americans, Caucasian, Arabic or I'm not

14      sure if they're a particular denomination, but

15      Muslim or Arabic, Middle Eastern men, women, other

16      descriptions.  ACS Delta employees.

17

18   Q  Any other information that you have to support

19      that?

20   A  To support what again?  I'm sorry.  And this is

21      part of my -- this is part of my disability too.

22      To process -- this is triggering for me when I

23    think back.  So this is part of my disability.  I

24    don't mean to -- I'm in a doctor's appointment.  I

25    had different medical procedures, but I'm answering⬆

60

1     your questions, but this is part of my disability

2     when we talk about these incidents, so could you

3     clarify the question and repeat when you say you

4     refer to that, what do you mean by that.

5  Q  Let me ask you this.

6  A  Okay.

7  Q  Do you have recordings of those conversations that

8     you just described with Tenia Russ and/or Antonio

9     Bush?

10 A  I know for Tenia I believe I do have that

11    recording.  For Antonio Bush I may, but again I

12    have a lot of videos and recordings and emails and

13    texts that are intermingled personal and situate --

14    things with my daughter, human trafficking and

15    other stuff all intermingled because I don't have a

16    separate business account.  And so and they're not

17    labeled, so I have to go through all of that and

18    it's triggering.  That's part of the accommodation

19    pieces.  So I believe I do have the Tenia Russ

20    conversation where she stated that.  Antonio Bush I

21    believe so too, but I can't -- I'm not sure.  If I

22    do, it will be -- it will be produced in the

23    discovery under the treatment I'm undergoing now.

24

25         MS. ZELDIN:  Ms. Jones, let's look at this

                                                          61

1     email and what is our next Exhibit Number.  We'd

2     like to mark this Exhibit 9, please.

3

4              (Document Marked for Identification as

5              Deposition Exhibit Number 9)

6

7         THE WITNESS:  Can I get clarification?  I'm

8     sorry.  May I ask a question if possible please.

9

10        MS. ZELDIN:  Unless it's something like you

11    need an urgent break or something like that, then

12    no.

13

14        THE WITNESS:  Okay.

15

16  BY MS. ZELDIN:

17

18  Q    Please turn your attention to this document.  It's

19       Exhibit 9.  And this document is an email and it's

20       from you correct, Ms. Jones, Littiece Jones.

21  A    I don't see an email on there, so I can't say that

22       it's from me.  It just says Littiece Jones, but it

23       does not have an email address.  It says --

24  Q    Does it say that it -- sorry.  Go ahead.

25  A    It just says from and it has the letters --↑


                                                        62

1        somebody's scrolling down so I can't see it.  If

2        you can scroll back up.  Thank you.  It says from

3        and it says Jones, comma, Littiece, R., then it has

4        a bracket, forward slash O equals --

5   Q    Okay, Ms. Jones.

6   A    Yes.

7   Q    You don't need to read all that into the record,

8        thank you.

9   A    Okay.

10  Q    I don't mean to interrupt you, but we just don't

11       need you to do that, but thank you.  What I want to

12       direct your attention to is an email further down

13       in this chain.  So A.J., if you could go down to

14      Wednesday, July 24th, 2024.  And, Ms. Jones, when

15      we get there you're going to see that -- do you see

16      this email is from Littiece.jones@Delta.com?

17   A   Yes.

18   Q   Okay.  And this is an email that you're sending to

19      someone named Dominic Brackett and Tenia Russ,

20      correct?

21   A   And it's cc'd to others as well, yes.

22   Q   Okay.  And among the ccs that I see is Ed Bastain

23      and who is that.

24   A   Ed Bastain is the CEO of Delta.

25   Q   So you chose to copy him on this communication,

63

1       correct?

2    A   I was told at one point by his assistant to email

3       him, yes.  I'm not sure if this was the point or

4       not, but at some time they -- I was -- because the

5       retaliation and concerns were ongoing and they

6       weren't being remedied and due to Delta's one-to-

7       one and open door policy where we can contact all

8       leaders and to try to work it internally at one

9       point his assistant did tell me to email him.

10   Q   And any communications that you had with Ed

11      Bastian's assistant will need that to be produced

12      by you in the case, so I'll add that to our list.

13      A.J., can you scroll down, please.

14

15              Ms. Jones, I want you to look at this

16      email the paragraph that starts with in keeping

17      with Delta's goal.  Do you see that there?

18

19  A   Yes.

20  Q   Okay.  Let me -- this is an email from you and let

21      me know if I'm reading this correctly.  In keeping

22      with Delta's goal of taking care of our customers

23      and each other, we respectfully ask that Delta

24      consider waiving the twenty hour per week policy

25      average and lift the restrictions for the several

                                        64

1       employees who have had their trades restricted.

2       Did I read that correctly?

3  A    Yes.  I just want t say that -- I'm not saying that

4       I knew of several employees, but Tenia Russ and

5       them have -- when I told them that they were

6       singling me out and that they were doing this in

7       discrimination, that's when they sent out the memo

```
 8        saying that this was a reminder, the one that you

 9        showed yesterday, and they said Littiece, we're not

10        singling you out, we suspended other employees as

11        well.  So that email I'm not stating that I know of

12        people.  That is what was told to me from

13        leadership and what you all call Delta employees

14        and my belief in an attempt for them to cover up

15        that they were not targeting just me.

16   Q    Yeah.  Ms. Jones, we read what you wrote in your

17        email and you confirmed that you wrote it.  So we

18        can take that Exhibit down.

19   A    Did I confirm that I wrote it though?  I said that

20        I see it on the screen.  That's all I was saying.

21   Q    Do you dispute that this email came from you?

22   A    You don't have it on the screen.  I would need you

23        to put it back up, please.  What I can tell you is

24        that I'm a person who experienced trauma and I was

25        doing my best as Delta has told us, to work
```

65

```
 1        internally.  They say we're a family, you can come

 2        to us.  So I was doing my due diligence based on my

 3        knowledge of things from my experienced based on

 4        what leadership was telling me, Delta employees and
```

5       so forth.

6

7           MS. ZELDIN:  All right.  Let's go off the

8       record briefly, five-minute break and we'll come

9       back on.

10

11          THE WITNESS:  Five minutes?  Okay.

12

13          MS. ZELDIN:  Okay.  Before we do that, hold on

14      one second.  All right, Ms. Jones, let's do this.

15      Let me go back to this Exhibit briefly and then

16      we'll just take an hour break for our lunch at this

17      point because it's almost 12:30, forty-five

18      minutes.  Is that better?

19

20          THE WITNESS:  Are you asking me?  Because I

21      didn't say anything.

22

23          MS. ZELDIN:  Yes.

24

25          THE WITNESS:  Is that better for who because⌃

                                                    66

1       an hour --

```
 2

 3          MS. ZELDIN:  For you.

 4

 5          THE WITNESS:  Listen.  I'm here to take

 6     deposition.  Whatever you all decide, I'm under

 7     whatever you all say, so you all make the decision.

 8     How much time do we have left in the deposition.  I

 9     did make you all aware that I would not be able to

10     take this deposition when sun sets due to my

11     religious disabil -- I mean my religious beliefs.

12     So you all are in charge.  Whatever you want to do,

13     but I do have that -- the religious aspect.

14

15          MS. ZELDIN:  We'll do forty minutes and to

16     start in just a second.

17

18 BY MS. ZELDIN:

19

20  Q   But let's just go back to this email here on

21      Wednesday, July 24 from Littiece.jones@Delta.com.

22      This is an email that you wrote and sent to Dominic

23      and Tania, correct?

24  A   To be honest, I'm confused and this may be a part

25      of my disability and I need to process it because
```

67

1    we went from talking about -- are we talking a

2    break, forty-minute -- I need to just give me a

3    second to process what you're just saying.

4

5            You are saying that we are going to take

6    a forty-minute break, but just not now and you want

7    me to go back to the previously asked question for

8    clarification?

9

10        MS. ZELDIN:   Yes.   And then after that we will

11   take our break.

12

13        THE WITNESS:   Okay.   Thank you.   Could you

14   repeat the ques -- could you clarify or repeat the

15   question, please.

16

17 BY MS. ZELDIN:

18

19 Q   Yes.   I'm asking you to confirm that this is an

20   email that you wrote, Wednesday, July 24, 2024 from

21   littiece.jones@Delta.com to Dominic and Tania and

22   there's a number of people cc'd on this email.

23   This is an email that you wrote, correct?

24   A      I'm not sure if I used AI or used other assistance

25          to write this, but the record shows that it was⬆

                                                              68

1           sent from my email -- my work email.

2

3               MS. ZELDIN:  All right.  We'll go off the

4           record and we're coming back on -- what is forty

5           minutes from now.

6

7               THE WITNESS:  Before we go off the record,

8           could we clarify please for disability reasons and

9           religious how much more time we have for the

10          deposition?  I think we can only do seven hours and

11          yesterday was a very long day.

12

13              MS. ZELDIN:  Ms. Jones, we'll confirm that

14          when we come back.  We'll confirm that later, okay?

15

16              THE WITNESS:  Okay.

17

18              MS. ZELDIN:  Yeah.  We can ask the

19          videographer to confirm how much time we've already

20          used.  Mr. Videographer, could you please confirm

21    that?

22

23        VIDEO TECHNICIAN:  Yeah.  I have to do a

24    little math, so if we go off the record I can tell

25    you.  Is that okay?♠

                                                    69

1        MS. ZELDIN:  Okay, yeah.  We'll get that when

2    we come back on, okay?

3

4        THE WITNESS:  For the record what time are we

5    coming back?  It's 12:25.

6

7        MS. ZELDIN:  One oh five.

8

9        THE WITNESS:  One oh five.  Thank you so much.

10    You all enjoy your lunch.

11

12        MS. ZELDIN:  Thank you.  You too.

13

14        THE WITNESS:  Thank you.  Bye-bye.

15

16        VIDEO TECHNICIAN:  Off the record 12:25.

17

18              (Whereupon a luncheon recess was taken)

19

20          VIDEO TECHNICIAN:  Back on the record 1:15.

21

22  BY MS. ZELDIN:

23

24  Q    Ms. Jones, we're back on the record from the lunch

25       break.  You understand you're still under oath,♠


                                                      70

1        correct?

2   A    Yes.

3        And, Ms. Jones, you described your religion as a

4        Seventh Day Adventist, is that correct?

5   A    Seventh Day Adventist Christian, yes.

6   Q    And are you currently a member of a church?

7   A    Yes.

8   Q    Which one.

9   A    Ypsilanti Seventh Day Adventist Church.

10  Q    And how long have you been a member of that church.

11  A    Of Ypsilanti or Seventh Day Adventist Christian.

12  Q    Ypsilanti.

13  A    I don't know for sure.

14  Q    Roughly how many years.

15  A   I couldn't tell you at this time.

16  Q   How often do you attend.

17  A   In person or virtual.

18  Q   Either and both.

19  A   Every Sabbath.  But not necessarily watch -- or

20      attend in person or -- let me rephrase that.  I

21      keep the Sabbath eery Sabbath.  Sometimes I may

22      attend other churches sometimes in person,

23      sometimes I may watch it virtually, sometimes I may

24      not watch it virtually, but I may stay at home if

25      I'm not feeling well.  But I keep the Sabbath.

71

1   Q   And your Sabbath, as you described, requires that

2       you not work from sunup Friday to sun -- excuse me.

3       Let me start over.

4

5               As you described, your Sabbath requires

6       that you not work from sundown Friday through

7       sundown Saturday, is that correct?

8

9   A   Could you repeat the question.

10  Q   Yes.  Your Sabbath, as you've explained, requires

11      that you not work from sundown Friday through

```
12        sundown Saturday, is that correct?

13   A    No.

14   Q    Okay.  Could you pleas explain what your Sabbath

15        requires.

16   A    There's -- first there's no requirement.  The

17        Sabbath is based from the bible where it says

18        remember the seventh day to keep it holy.  Six days

19        shall though labor and do all they work, but the

20        seventh day is the Sabbath of the Lord they God. In

21        it though shall not do any work, though nor they

22        man servant, nor thy maid servant, nor they cattle,

23        nor thy stranger that is within thy gates.  For six

24        days the Lord blessed the Sabbath day and hollowed

25        it.  I'm sorry, I might have messed up on that last
```

72

```
1         part.

2

3                 But it's not a requirement.  Anything,

4         first I'm a Seventh Day Adventist Christian, so

5         being a Christian believes -- is that I believe in

6         Jesus Christ and having a personal relationship and

7         I thank you all for this opportunity to share my

8         faith with you as I've done with different Delta
```

```
 9        employees previously.  So when you say what is the

10        requirement, that's where I -- you know, why I said

11        no.

12

13   Q    Ms. Jones, did you seek a religious accommodation

14        at Delta?

15   A    Let me answer that I didn't seek -- because we're

16        talking about over thirteen years of employment, so

17        could you clarify more that question please when

18        you say did I seek a religious accommodation.

19   Q    Yeah, I think it's pretty clear.  At any time

20        during your employment with Delta, did you seek a

21        religious accommodation?

22   A    I think when you say it's pretty clear, that's kind

23        of mis -- that's leading because it's not really

24        clear.  And I'm asking you to clarify, please.

25        That threw me off a little bit.  Could you clarify
```

73

```
 1        because it's not really clear.  That's why I'm

 2        asking for you to clarify, please.

 3   Q    Did you seek a religious accommodation during your

 4        employment at Delta Airlines?

 5   A    In the beginning the way I can best answer this is
```

```
 6       that I -- I didn't seek a religious accommodation.

 7       I told Delta that I was unable to work from Friday

 8       sunset to Saturday sunset.  And with that there are

 9       some exceptions.  Delta then told me in the

10       interview process and it's on my application as

11       well, they told me that Delta would accommodate me

12       through shift swapping.  That if I had a shift that

13       required the Sabbath, as long as I found someone

14       else to work it, then I could do that as an

15       accommodation.  That's what Delta said, okay.  I

16       didn't request it.  I told them my beliefs.

17

18              Then Delta decided to hire me with that

19       information and I successfully did that

20       accommodation for thirteen or twelve plus years

21       until Delta alleged retaliation.  When Delta

22       employees said that I believe in 2023, 2024 that

23       they were going to revoke my accommodations through

24       shift swapping, my pastor at the time sent in a

25       letter not requesting an accommodation, but trying
```

                                                              74

```
 1       to encourage Delta to uphold what had been going on

 2       for the past twelve years how they had accommodated
```

```
 3      me.  That was not -- that was not a request from

 4      me.  Tenia Russ then from what I understand and

 5      from what you alls records, she then sent that

 6      letter to the -- to someone, I'm not sure who and

 7      she requested an accommodation.

 8

 9           MS. ZELDIN:  Okay, Ms. Jones.  Let's look at

10      this document that's being marked as Exhibit 10.

11

12              (Document Marked for Identification as

13              Deposition Exhibit Number 10)

14

15 BY MS. ZELDIN:

16

17 Q  And I'll direct your attention to the middle of it.

18      Do you see where it says from Littiece R. Jones and

19      it's dated October 16, 2012?

20 A  No.  I'm sorry.  Could you repeat that.  I don't

21      see.

22

23           MS. ZELDIN:  Is there a way to highlight,

24      A.J.?

25
```

75

```
 1   BY MS. ZELDIN:

 2

 3   Q    Do you see right there where it says from Littiece

 4        R. Jones, Littiece R.?

 5   A    Yes.

 6   Q    Okay.  And this is an email that you sent on

 7        October 16, 2012.  Do you see that?

 8   A    All I see -- it doesn't have an email associated

 9        with it.  All it says is Littiece Jones.  There's

10        no email address.

11   Q    And do you see that this says Good morning, Bill.

12   A    Yes.

13   Q    Okay.  And then look at the second paragraph.  Do

14        you see where it says as discussed, I'm requesting

15        a religious accommodation.

16   A    Right, as discussed.  Because they told me to send

17        an email stating that I'm requesting a religious

18        accommodation, so that's what I did at the time.

19   Q    You did that in 2012, correct?

20   A    I'm pertaining to what this email says.  That's

21        what the email says.  If it is as it's coming from

22        Littiece Jones.

23   Q    And isn't it true that in response to this request

24        Delta offered to allow you to have Friday evenings
```

25      and Saturdays as your regular days off.  Do you⌃

76

1       recall that?

2   A   No.

3   Q   And that you actually declined that option and just

4       said that you would accommodate yourself through

5       shift swapping.  Do you recall that?

6   A   Is that in my journal that they wrote up?  It

7       should be in my journal.  I reflected if that's the

8       case.

9   Q   Ms. Jones, just answer the question, please.

10  A   I'm asking if we can go back to the journal --

11  Q   No.

12  A   -- because that was -- that was in 2012, so you're

13      asking me for something fourteen years ago

14      approximately.  Was it reflected in my -- it was

15      not reflected in my journal, so I cannot attest --

16      and the journal is inaccurate anyway, but that was

17      not anything mentioned in my journal.

18  Q   So, again, what I'm asking, isn't it true that

19      Delta offered to give you Friday evening and

20      Saturdays as your regular days off every week and

21      you declined that and said I'll just --

22   A   I --

23   Q   Wait.  Let me finish.  I'll accommodate myself

24       through shift swapping.  That's what happened,

25       right?♠

77

1    A   Absolutely not.  That would be false.  I think

2        there's a lawsuit in addition.  There is a lawsuit

3        where a Seventh Day Adventist filed against Delta

4        for -- he was a Seventh Day Adventist, same

5        religion as I, and he filed a lawsuit against Delta

6        and in the record the attorney stated that Delta

7        gave him an accommodation through shift swapping

8        and I believe that was circa maybe 2008, 2009, so

9        it's relatively within the same time period me

10       getting the interview process for me might have

11       started in 2011, 2012 so roughly within a few

12       years.  That's an accommodation on the record that

13       you all are aware of in which how Delta dealt with

14       somebody in my same class.  He was a --

15   Q   Ms. Jones.

16   A   He was in the same work category as I.

17   Q   Ms. Jones.

18   A   Yes.

19   Q   I'm just going to stop you.  What you're saying is

20       not responsive to any questions that I've asked, so

21       I'm moving to strike all of it.

22   A   Okay.

23   Q   I need you to focus on the questions that I'm

24       asking so we can try to complete your deposition as

25       much as we possibly can.  We're allowed to ask the

78

1        court for more time and we're obviously goingxx to

2        do that for a number of reasons, but how much is

3        going to depend on your ability to cooperate and

4        just answer the questions that I'm asking, please.

5    A   This was what first time that you've shared that

6        with me.  You've allowed me to freely answer.

7        You've never struck anything that I said, but I

8        understand now if that's what you all want to

9        happen.  Thank you for clarifying.

10   Q   So the record will reflect what it will.

11       Ms. Jones, do you have any documentation or other

12       evidence showing that you were given shift swapping

13       as an accommodation by Delta for your religious

14       beliefs?

15   A   Yes.  My -- the records of my work history, yes.

16  Q    And have you provided those to us?

17  A    I don't -- I don't have -- you all provided that to

18       me.  Employees don't have those.  That's HR.  I

19       don't have access to that.  You all provided that

20       to me.

21  Q    So you don't have any documentation that you can

22       show that says I was given shift swapping as a

23       religious accommodation, is that correct?

24  A    I do have documentation that will show that.  My

25       hours that show the shift swaps.  That is⌃

79

1        documentation of an accommodation.  If I couldn't

2        work Friday -- let me stop with that.  Well, you'll

3        tell me if you striking it.  The accommodations

4        that you all allow, Delta allow, it is shown in my

5        history, my work history of swaps for over thirteen

6        years from 2012 that you all gave to me.

7   Q    Any other evidence that you have that shows that,

8        that shows that -- that supports your claim that

9        you were given shift swapping as a religious

10       accommodation?

11  A    I believe in a journal entry that you shared which

12       I dispute as factual everything.  There's certain

13     parts that are factual, but Robert O'Leary put that

14     as well in my journal entry.

15  Q   Okay.  His entry --

16  A   On October -- on October 31st, 2023, 2024.  That

17     you all just showed.  He put that in my journal

18     entry.

19  Q   His entry will reflect in the document what it

20     says.  Ms. Jones, did you at some point after 2012

21     -- so we talked about 2012 your request then.  Did

22     you at some point later request a religious

23     accommodation at Delta?

24  A   Not on my own doing, no.  Because I had already

25     been accommodated.  I think they took -- they took⌃

80

1     away my accommodations and told me -- Delta told me

2     they revoked my accommodations and told me that I

3     would have to reapply, so I was just -- I'm just an

4     employee doing what my employer tells me to do.

5  Q   And when you say that your accommodations were

6     revoked, you're referring to the fact that your

7     shift swapping was suspended, correct?

8  A   It was -- no.  I'm referring to the fact that they

9     took away I believe -- revoked means to take away

10      my ability to shift swap at all.  I'm not sure if

11      that answers the question.

12

13          MS. ZELDIN:  So let's look at Document I think

14      it's 52, yes.  This is Exhibit 11?

15

16          MR. SIMONTON:  Yes.

17

18          MS. ZELDIN:  This is going to be marked

19      Exhibit 11.

20

21          MR. SIMONTON:  Is it 52?

22

23          MS. ZELDIN:  I've got 2-16-24 email from Ron

24      Cook.

25↑

                                                    81

1           MR. SIMONTON:  Yeah, that's what I have.

2       That's what this is.  I think it just started --

3

4           MS. ZELDIN:  Okay.  Sorry.  Go on down.  I'm

5       sorry.

6

```
 7              MR. SIMONTON:  No worries.

 8

 9         MS. ZELDIN:  All right.  Let's -- hold on.

10    Let's go to 36.  We were trying to pick up that

11    attachment.  Sorry.  One second, Ms. Jones.  Let's

12    go to Number 36.

13

14         MR. SIMONTON:  Okay.  Do we need to renumber?

15

16         MS. ZELDIN:  Just take that off and open up 36

17    and we're going to make that Exhibit 11.

18

19              (Document Marked for Identification as

20              Deposition Exhibit Number 11)

21

22 BY MS. ZELDIN:

23

24 Q    Okay, Ms. Jones.  I'm showing you what's been

25    marked as Exhibit 11.  And if you can scroll down. ▲
```

82

```
 1    Do you see that this is -- this is -- A.J. if you

 2    can scroll down please.  This is from your email

 3    address, home email to Tenia Russ and Rob O'Leary
```

4       and do you see the subject is Sabbath

5       Letter/Religious Reasonable Accommodation Made.  Do

6       you see this email?

7   A   Yes.

8   Q   Okay.  And you say hello.  Please see letter

9       attached regarding Sabbath Religious Reasonable

10      Accommodation Made and add to my employee record

11      journal.  Thank you.  And if we scroll on down to

12      see the document that's attached, this looks like

13      it purports to be a letter from Ypsilanti Seventh

14      Day Adventist Church, is that correct?

15  A   It's on Ypsilanti Seventh Day Adventist Church

16      letterhead, yes.

17  Q   And if we scroll on down, it looks like it is

18      signed Dr. Aaron Chancy.

19  A   Yes.

20  Q   And who is that.

21  A   He was the pastor of Ypsilanti at the time.

22  Q   And did you request that this letter be written?

23  A   I don't remember.

24  Q   Well, did Dr. Chancy just send it to Delta without

25      -- I mean did he just create this without your

83

```
 1      knowledge or request?

 2   A  You would have to ask Dr. -- respectfully, you

 3      would have to ask him.  I don't know.  I don't -- I

 4      think my first answer was I don't remember and in

 5      terms of what he did, I can't speak for him

 6      respectfully.

 7   Q  Well regardless of how he happened to write this,

 8      you emailed it to Tenia Ross and Rob O'Leary,

 9      correct?

10   A  Could you go back up further?  Yes.

11   Q  Do you recall, Ms. Jones, if you yourself may have

12      written this letter and asked Dr. Chancy to sign

13      it?

14   A  I never did that.  I wouldn't do that.

15   Q  Do you think you might have used AI to write it for

16      him and asked him to sign it?

17   A  I wouldn't do that.

18   Q  Why did you decide to submit this letter to Tenia

19      and Rob O'Leary in February of 2024.

20   A  I also want to supplement my answer.  That letter

21      is on church letterhead.  I'm a member of the

22      church.  I'm not a pastor.  I don't have access to

23      church letterhead, so that's an official letter on

24      stationary church letterhead, so I would not have

25      access to write that or have AI do that.
```

84

1  Q   Okay.  Let's look at the letter for just a second.

2      Three paragraphs before the bottom.  Do you see

3      where it says it's my understanding that

4      accommodations have been made through shift

5      swapping for the last twelve years.  Therefore

6      please continue to permit this in accordance with

7      the Sabbath observance for Littiece Jones.  Do you

8      see that?

9  A   I would like to state for the record that you asked

10     me a previous question and I'm afraid that that may

11     be used against me because I didn't get a -- I was

12     just supplementing my answer, so if possible, and

13     I'm not trying to run anything, I'm just really

14     afraid that the Judge or Delta or the attorneys

15     will use that against me.  But I will answer this

16     question.  I'm just requesting I be able to ask the

17     previous question you answered so I wouldn't be

18     penalized.

19

20         But it is the -- what you just read, it

21     is my understanding that accommodations have been

22     made through shift swapping for the last twelve

23    years, therefore please continue to permit this in

24    accordance with the Sabbath observance for Littiece

25    Jones.  Yes, that's what's in the letter.⬆

85

1  Q    And, Ms. Jones, help me understand why you had to

2       have shift swapping as your religious

3       accommodation.  And what I mean by that is wouldn't

4       it have been just as good or better if you were

5       allowed to have every Friday night and all day

6       Saturday off every week?

7  A    Respectfully, I'm just an employee and I go to

8       work, I'm told what to do and I do what my employer

9       tells me, as long as it aligns with my moral

10      Christian values and the law.

11 Q    Okay.  But why were you asking specifically for

12      shift swapping.  Why didn't you ask for Friday

13      night and Saturday off.

14 A    I wasn't asking for shift swapping.  Could you

15      share in the record where it shows me asking for

16      shift swapping?

17 Q    It's right here in the letter from your minister.

18      He's saying --

19 A    What part of that says that I asked for it.  It

20      says it is my understanding that accommodations

21      past tense, have been made.  That's past tense.

22      Through shift swapping.  It doesn't say Littiece

23      Jones asked for it.  It said that the

24      accommodations.  Who's responsible for giving

25      accommodations for religion and disability⌃

                                                    86

1       according to federal law.  The employer.  That's

2       what they told me.  I don't -- and if I had -- if I

3       had defied what my employer told me to do, it would

4       be in my journal.  But the record shows that this

5       pastor, he was speaking in past tense.  He said

6       it's my understanding that accommodations have,

7       emphasis on have been made through shift swapping.

8       Meaning Delta -- that's what I read it to say.

9       Delta already made those accommodations for the

10      last twelve years.  Please -- therefore -- it goes

11      on to say therefore please continue to permit this

12      in accordance with the Sabbath observance for

13      Littiece Jones because Delta was threatening and

14      going against federal law to take away those

15      previously had accommodations.

16   Q  I just want to make sure that your testimony is

17      clear.  You're not claiming that you asked for

18      shift swapping as a religious accommodation.  Is

19      that what you're saying?

20  A   What I'm saying is that I made delta aware that I

21      was a Seventh Day Adventist Christian before I was

22      hired.  With that knowledge, Delta hired me.

23      During the first week of training I wanted to know

24      how the scheduling -- how they were going to do

25      things and I told them, hey, I talked to the

                                                        87

1       interviewer, what is this about shift swapping

2       because I'm new.  It's the first day.  I know

3       nothing about Delta.  I'm not an administrator, so

4       I was happy to be there and I'm like excited, so

5       hey, how does this work with shift swapping.  He

6       mentioned something that that would be accommodated

7       with my Sabbath and they said oh, we need you to

8       send us an email with that requesting an

9       accommodation.  So I did what my employer told me

10      to do.  I was following direction.  I had no idea

11      what accommodations process, none of that.  I'm

12      just -- they told me to do it, I did it.

13  Q   So in 2024 as of the time of this letter,

14    February 16, 2024 you didn't care what

15    accommodation you were given, is that correct?  It

16    could have been shift swapping, it could have been

17    Saturday and Friday night off.  It didn't matter to

18    you, is that your testimony?

19  A    I'm thinking, Counsel, that you're being very

20    aggressive with your line of questioning.  I'm

21    going to -- I've made my -- I'm not sure if your

22    intent is to harass me because that is clearly not

23    what I said.  And I'm a person with disabilities.

24    I'm not sure whether you have disabilities or not,

25    but I've stated on the record and I feel as though^

88

1    you're being aggressive and hostile in an attempt

2    to intimidate me just like your Defendant, Delta

3    Air Lines.  Your client, I'm sorry.  Not Defendant,

4    but client.  So I'm going to reserve on that

5    because it's disturbing -- you're clearly saying

6    something that I did not say and if the reporter

7    could read back what I said to your answer because

8    you're being very aggressive and hostile.

9  Q    No.  Ms. Jones, I'm in charge of the deposition.

10  A    Okay.

11   Q   So we're not reading anything back right now.   But

12       I'm going to put my questions into smaller pieces

13       if that would be more palatable to understand them.

14   A   If -- if I may, I would like for you to, if

15       possible for clarity, when you state -- if you

16       heard what I said, that if you could repeat what

17       I've shared, because it's very hostile and

18       aggressive.

19   Q   Ms. Jones --

20   A   And untrue.

21   Q   I'll re-ask my question.

22   A   Okay.

23   Q   What's already on the record is already there, so

24       here's my question.   In February, 2024, when you

25       sent this letter form your pastor to Tenia and Rob

89

1    O'Leary, were you asking to be accommodated through

2    shift swapping?

3   A   I'm not sure.   I can't see where it was sent to Rob

4       O'Leary and I apologize.   I know that these --

5       these things are factual and I don't want to be in

6       any trouble with Delta with my employer, with the

7       court with the Judge, so could you please verify

8      that it was sent to O'Leary as well.  Okay.  Thank

9      you.

10  Q  Ms. Jones, the pending question is when you sent

11     this email, were you asking to be accommodated

12     through shift swapping for your religious beliefs?

13  A  I didn't send the email.  I was -- I said hello,

14     please see letter attached regarding Sabbath,

15     religious reasonable accommodations made and please

16     add to my employer record and journal.  Thank you.

17     So I was asking them to add the letter from my

18     pastor to my employee record and journal as it

19     states in the email.

20  Q  If you look at the tp of this document.  A.J., can

21     you scroll up please.  Do you see that Tenia Russ

22     there on March 28, 2024, do you see that she

23     forwards this to an Accommodations email.  Do you

24     see that?

25  A  Well, it says from Tenia Russ, it doesn't have an

                                                        90

1      email next to it.  It says to Accommodations.

2      There's no email next to that and it says Kruit,

3      Daniel S. and there's no email to that.  But it

4      says Hello Accommodations.  Please accept this

```
 5          letter as a request for a religious accommodation

 6          for Littiece Jones.  So and it has my date of hire,

 7          my name.  So Tenia Russ made the religious

 8          accommodation request according to this, not I.  I

 9          said to put it in my journal because that's what

10          the letter -- they didn't have any record of my

11          accommodations at this time.  They didn't have any

12          record in my -- in my HR journal, not to my

13          knowledge.

14   Q      And Ms. Jones, you yourself never forwarded your

15          request to the Accommodations Department, is that

16          correct?

17   A      When you say never, again, I'm not sure what time

18          frame you're saying.  Could you clarify, please.

19   Q      Ever.  Did you ever forward a request for an

20          accommodation to the Accommodations Department at

21          any point.

22   A      I'm not sure because Delta has changed things.

23          That's the form of discrimination.  So they said

24          that there was an email, then they might have

25          changed it and said there's a portal, then they may↑
```

91

```
 1          have changed it and said this.  They may have --
```

```
 2       Delta continues to change things, which is part of

 3       the discrimination.  So I'm not sure.

 4   Q   So now I want to look at a bid sheet and this is

 5       A.J., 67.

 6

 7                  (Document Marked for Identification as

 8                  Deposition Exhibit Number 12)

 9

10   BY MS. ZELDIN:

11

12   Q   And what I want to talk about now is when you --

13       when you forwarded that email that we just looked

14       at to Tenia and Rob, that was in February of 2024.

15       What I want to ask you is do you recall what your

16       schedule was in February of 2024?  Like what shift

17       were you working, what regular days did you have

18       off in February, 2024.

19   A   I do not recall.

20   Q   So we're going to look at your bid sheet and -- so,

21       Ms. Jones we talked yesterday about how you would

22       bid on a schedule.  Do you recall that testimony?

23   A   Not -- not in the way that you have described it.

24       I would be -- that's broad.

25   Q   So if we look at -- so this is a bid for Winter,
```

92

1       2023.  Do you see that at the top of the

2       spreadsheet?

3    A  Yes.

4    Q  Okay.  And if we go under the Benefitted Seniority

5       tab and we find your name, do you see yourself

6       there on Line 175?

7    A  Yes.

8    Q  Okay.  Do you see, Ms. Jones, that it looks like

9       you -- there's your hire date, 10-8-12.  Do you see

10      that?

11   A  Yes.

12   Q  And that's how your seniority is determined,

13      is that correct?

14   A  Could you repeat the question.

15   Q  Yes.  Is seniority is determined by date of hire,

16      correct?

17   A  Seniority is determined by date of hire.  Not in

18      its entirety because when you are hired, you're not

19      the only person hired typically on that date.  So

20      in my instance it was, I don't know, maybe twenty

21      of us hired on the same date.  So they have --

22   Q  Okay.  That goes into calculating seniority is your

23      hire date, correct?

24   A    I don't know.  I'm just an employee.  So I'm not

25        aware.↖

                                                          93

1    Q    So there you are on Line 175 with your hire date

2         and do you see in the Column J where it says Bid

3         Date.  Do you see it says 9-19-23?

4    A    Yes.

5    Q    Okay.  So that would reflect the date that you bid

6         on this schedule, is that right?

7    A    I have no knowledge of that as of then.

8    Q    A.J., can you go to the CSA Bid tab please.  Okay.

9         So, Ms. Jones, this is the CSA Bid tab and this --

10        let's find your name and we can see what you bid

11        for this time period.

12   A    It shows RDO Saturday, Sunday off.

13   Q    Okay.

14   A    It shows area BX80Lxx but I don't see the manager

15        assigned to this line.

16   Q    Okay.  So it looks like you chose a shift that's in

17        Column E that is 6:30 to is that 10:30 a.m., is

18        that correct?

19   A    Yes.  It's in military time I believe, so yes.

20   Q    Okay.  So under this schedule you would have Friday

21      evening off, correct?

22   A   Not -- based on this schedule?

23   Q   Yes.

24   A   Yes.

25   Q   Because you would get off at 10:30 a.m. on Friday,⬆


                                                    94

1       right?

2    A   Unless I decided to pick up another shift or they

3        kept us to mandatory overtime or they needed people

4        to stay over, so --

5    Q   That's right.  But your normal schedule is

6        reflected in this document shows you getting off at

7        10:30 a.m. Friday, correct?

8    A   Is in reflection -- just for accuracy, it says that

9        I have 6:30 to 10:30 with RDO Saturday, Sunday.  Or

10       it says SS.

11   Q   And RDO, just to clarify for the record, is regular

12       days off and that was Saturday and Sunday that you

13       chose, correct?

14   A   Yes.

15   Q   So under this schedule you were off for your

16       Sabbath, correct?

17   A   Yes.

18 Q   So this schedule went through a six-month bid,

19     correct?

20 A   I don't know.

21 Q   So we'll show you in a minute that the next

22     bid was --

23 A   It doesn't show here when -- it doesn't -- I'm

24     sorry for interrupting.

25 Q   Okay.  So to the best of your knowledge was this↖

95

1     the schedule that you were working in February,

2     2024?

3 A   I don't remember.  So much was going on at work

4     with them harassing me, I honestly don't recall.  I

5     can't -- I can't affirm because I really -- because

6     it says Winter, 2023 and then you asked was this

7     the schedule I worked in 2024.  So I don't know

8     what that means.  Could you clarify.

9 Q   So let's pull up the next bid, please, that's

10    reflected in Delta's records which is Exhibit 68.

11    And just for the record, the spreadsheet that we

12    just had up, that was marked as an Exhibit --

13

14        MS. ZELDIN:  Madam Court Reporter, can you

```
15        confirm that the spreadsheet we just had up was

16        marked as an Exhibit.

17

18             COURT REPORTER:  Exhibit 12.

19

20        MS. ZELDIN:  This next document we're marking

21        as Exhibit 13, please.

22

23             (Document Marked for Identification as

24             Deposition Exhibit Number 13)

25
```

                                                    96

```
1  BY MS. ZELDIN:

2

3  Q    And, Ms. Jones, this is another Bid Sheet and if we

4       go under the Benefitted -- the Benefitted Seniority

5       tab.

6  A    Oh, for the record, it's saying that you have to

7       sign in for Microsoft.

8

9             MR. SIMONTON:  It's not supposed to make me do

10       that.

11
```

12          THE WITNESS:  This is just an example of how

13   Delta blocked me from accessing the bids recently.

14   It wouldn't allow me to be able to bid just what

15   we're showing here how you have to put in your

16   email for access.

17

18          MS. ZELDIN:  There's no question pending,

19   Ms. Jones.

20

21          THE WITNESS:  Pardon me?

22

23          MS. ZELDIN:  There's no question pending on

24   the record.

25

                                                      97

1           THE WITNESS:  Yes, ma'am.

2

3           MS. ZELDIN:  All right.  We have a pdf as part

4    of this document  which is actually the part that

5    we want to look at.  So let's just pull that up for

6    now and we'll make that Exhibit 14.  It's Number

7    60.

8

```
 9              (Document Marked for Identification as

10              Deposition Exhibit Number 14)

11

12         MS. ZELDIN:  I'm just going to note for the

13    record that Ms. Jones appears to be writing.

14

15         THE WITNESS:  There was -- you said that there

16    was no pending question, so we established in the

17    beginning that I would be taking notes for the

18    record.

19

20  BY MS. ZELDIN:

21

22  Q    All right.  Let's look at this which we've marked

23    Exhibit 14.

24

25         THE WITNESS:  If you -- if I'm going to ask
```

```
                                          98

 1    for a break please, for a five-minute break so I

 2    can finish writing my notes that I'm not using as a

 3    refresher to any questions, but we established that

 4    I would be taking notes, so if we could just do a

 5    couple of minute break, please.   I'm taking notes
```

6        for my disabilities and I'm a pro se litigant in

7        this case.  So we don't have to go off the record,

8        but if you could -- like we've given you all time,

9        I'm asking if you could just give me about two

10       minutes, please.

11

12           MS. ZELDIN:  We're going to go off the record

13       and we can take a break and again, I'm just going

14       to caution you to retain those notes in full.  Off

15       the record, please.

16

17           THE WITNESS:  Oh, no we can -- I'm finished

18       taking the notes now.

19

20   BY MS. ZELDIN:

21

22   Q   Okay.  Let's look at Exhibit 14.  So, Ms. Jones,

23       this is an excerpt from the 2004 Spring Bid and

24       that's the wide document we were looking at.  This

25       is an expert of part of that that includes your

99

1        there at the top.  And do you see over there

2        effective date April 15, 2024?

3   A   I'm not able to confirm that this was a part of

4       what you all just had off the record, so all I can

5       confirm is that this new record that you're showing

6       says Summer, 2024 Shift Bid -- well, Benefitted

7       Seniority List, Summer, 2024 Shift Bid, Effective

8       Monday, April 15th, 2024.

9   Q   Okay.  And do you recall bidding on a shift as part

10      of this bid?

11  A   I successfully bidded for over twenty-five times,

12      so to recall this particular bid I can't say that

13      I do, but I see that it states my information

14      there.

15  Q   And if we look on there it says Bid Date.  Does

16      that March 20th, 2024.  So that's the date

17      according to this document you bid on your shift,

18      is that right?

19  A   According to this document, yes.

20  Q   And it looks like you selected a shift from seven

21      a.m. to twelve p.m., is that right?

22  A   Yes.

23  Q   And it looks like you selected RDO, which is

24      regular days off as Sunday and Monday, is that

25      correct?

100

1   A   Yes.

2   Q   So why did you -- why did you select Sunday and

3       Monday off instead of days that would have covered

4       your Sabbath.

5   A   Because Delta had given me a religious

6       accommodation in the beginning.  Also stating that

7       I can shift swap, which I held successfully for

8       almost thirteen years before they revoked it due to

9       discrimination and retaliation and also if you

10      notice that in this bid, particular one, the area

11      is different.  It's B-R-A-B-M, which I believe

12      stands for Bag Room and to continue answering the

13      question, Delta I believe Main Station Delta

14      leaders create the bids every time we bid.  They

15      changed the bids around, the times.  They reduced

16      the lines and it doesn't say how many hours, just

17      for the record that this is.

18  Q   I believe it does if we scroll over.

19  A   Okay.  It doesn't say it.  So you see here it says

20      twenty-five, twenty, twenty.  I'm reading down the

21      list of what different people have bidded.  Twenty-

22      five hours, twenty, twenty, twenty-two point five.

23      So there were -- twenty-two hours, twenty-four

24      hours.  So there were variations and I believe

25      there were even more times and hours available.  So⤊

                                                            101

1       one of the benefits of being able to bid on

2       seniority is that you can get one of the shifts

3       that best meets your needs.  Whether that be for

4       some people work other jobs, whether it's taking

5       care of your children, taking care of your elder

6       care, whatever your needs are and that's why Delta

7       offers flexibility and in my case they offered this

8       as an accommodation so that I can bid accordingly.

9       Maybe that time, I don't know I had talked to shift

10      partners and we discussed -- because Delta sends

11      out the bid to us months in advance or weeks at

12      least in advance and so people discuss what they

13      have going on, because everyone's needs may change

14      and you can partner with somebody or say hey, if I

15      -- I have this seniority, so if I get this, you try

16      to get this and you never know what you going to

17      get or what's going to be available to you because

18      -- until the day you bid.  So what you may have

19      wanted to get, it may have been gone.  Somebody

20      with more seniority may have taken that away from

21      your ability to take it.  And you only have like I

```
22      think three minutes.  It doesn't have the times on

23      here, but everybody has a time when they have to

24      come in and bid and they only give you three

25      minutes to bid.  So you go in -- pardon me?↑
```

                                                            102

```
 1  Q   Ms. Jones, all these names under you have lower

 2      seniority than you do.

 3  A   I wasn't -- I wasn't -- I wasn't able to finish he

 4      question.  I'm sorry.  Like you said, you're in

 5      control.

 6  Q   Your answer was not responsive to my question.

 7  A   It is.  You said -- well, could you repeat the

 8      question, please.

 9  Q   I'm going to ask a different --

10  A   No, I want to -- can the court reporter, because I

11      did not --

12  Q   No.

13  Q   -- finish answering the question, okay.

14  Q   No.  I'm in charge of the questions.

15  A   Yes, you are.

16  Q   I'm going to ask questions that I need you to

17      answer, please.

18  A   Could you just for my -- may I ask a disability
```

19      request?  Could you share with me in which way,

20      just for clarification, that I did not answer that

21      question, just so I can be better.

22   Q  This is all the names under you on this spreadsheet

23      have lower seniority than you.  Do you see that?

24      They have hire dates after yours.

25   A  Yes.

                                                        103

1    Q  So you're there at the top.  You were able to bid

2       before all these people under you, correct?

3    A  Yes.

4    Q  So what I want to ask you is if you look through

5       this schedule, you can see Erica Bowman, do you see

6       her down there?

7    A  Yes.

8    Q  Okay.  And you see that her regular -- she bid six

9       a.m. to eleven a.m.  Her days off were Thursday,

10      Friday, Saturday and she's in the same area as you.

11      And so my question to you is knowing that your

12      swaps were at risk of being suspended, you had been

13      warned repeatedly at this time, why didn't you not

14      take the shift that Erica Bowman ended up picking

15      up.

16  A    Wait.  You said that my shift had been suspended?

17       That's not true.  My shifts were suspended -- or

18       revoked in June.

19  Q    Right.

20  A    So this was April.  Management, as I've previously

21       testified, have been telling me different things

22       and furthermore if you look at that, it says she's

23       scheduled at twenty hours a week.  The hours -- if

24       they were telling me I needed to increase my hours,

25       I did it on a shift that was twenty-five hours a

                                                    104

1        week, which gives more credits to my testimony that

2        your client, Delta Air Lines, made the schedule, so

3        there are different variables that go into why

4        people may bid.

5

6               But the thing that's  clear is that that

7        should not be Delta's decision unless they make it

8        a policy.  There's no policy that says I have to

9        bid on a Friday -- Littiece Jones must bid on this.

10       They say you bid based on your seniority and for me

11       they gave me a religious accommodation to shift

12       swap.

13

14  Q    Ms. Jones, you could have chosen to be off on your

15       Sabbath and made sure that you had those days off,

16       correct?

17  A    I made sure that I had those days off by shift

18       swapping with partners who said that they will pick

19       them up.

20  Q    Just answer my question that I asked, please.  At

21       this bid with these lines available and we're going

22       to highlight just a few more, you could have chosen

23       a line that guaranteed you to have Friday evening

24       and Saturday off, correct?

25  A    Yes.

                                                        105

1  Q    And you did not do so, correct?

2  A    I did bid a line because I had a partnership with

3       someone who would pick up my Saturdays.

4  Q    You bid a line that had you able to be scheduled

5       Friday and Saturday, correct?

6  A    But with the shift swapping, which management was

7       working with me, I was able to find people to pick

8       up that Saturday shift so I would be covered.

9  Q    Okay.  Ms. Jones, I'm just going to try again.

```
10        When you made -- placed this bid, selected this

11        line for your 2024 summer shift bid, you chose a

12        schedule to have your days off as Sunday and

13        Monday, correct?

14   A    Yes.

15   Q    You could have chosen a schedule that had Friday

16        and Saturday off, correct?

17   A    Yes.

18   Q    And you did not choose that, correct?

19   A    Yes.

20   Q    I'm correct.

21   A    I did not choose a Friday, Saturday schedule, but I

22        supplemented that by making sure that my Saturdays

23        would be covered.  And I was picking up -- and I

24        wanted to make sure I had more hours, where I chose

25        the twenty-five hour.
```

106

```
1    Q    So just to clarify as of this shift, this bid, by

2         the schedule that you chose, you created a conflict

3         between your Sabbath and your schedule, correct?

4    A    No.

5

6              MS. ZELDIN:  Let's take that off, please.
```

```
7          Let's go off the record for one second.  Five-

8     minute break.  Thank you.

9

10          VIDEO TECHNICIAN:  Off the record 2:05.

11

12          THE WITNESS:  Oh, 2:05, so 2:10.  Thank you.

13

14             (Whereupon a short break was taken)

15

16          VIDEO TECHNICIAN:  Back on the record 2:16.

17

18          THE WITNESS:  I want to make a disability

19     accommodation request, please.  Counsel asked that

20     they -- they requested a five-minute break.  We

21     were supposed to be back at 2:05.  I was present

22     and accounted for and we're back on the record at

23     2:16.  This is affecting my disabilities because

24     you all seem to be continuing to take breaks and I

25     haven't taken a disability break and I don't need
```

107

```
1     one, but I'm concerned how it's negatively

2     affecting my disabilities and the time of me having

3     to be here.  So I just ask that you all please keep
```

```
4       that into consideration, please.

5

6            MS. ZELDIN:  Thank you, Ms. Jones, we will

7       proceed.

8

9            THE WITNESS:  You're welcome.

10

11           MS. ZELDIN:  I'm now showing you what we've

12      marked as Exhibit 15.

13

14                (Document Marked for Identification as

15                Deposition Exhibit Number 15)

16

17  BY MS. ZELDIN:

18

19  Q    And this is an email from Accommodations@Delta.com,

20       sent on April 4th -- I'm sorry, April 8th, 2024 to

21       you.  Do you see that?

22  A    Yes.

23  Q    Okay.  And it says Religious Request.  Do you see

24       that in the subject line?

25  A    It says employee -- I'm sorry.  It says Employee
```

```
 1      Religious Accommodation Request IP-Littiece Jones.
 2  Q   And you see there's a couple of attachments as
 3      well, correct?
 4  A   A couple -- yes.
 5  A   Okay.  And so, Ms. Jones, this email states youxx
 6      referred to the Accommodation Department by your
 7      operational leaders for potential job
 8      accommodations due to your religious beliefs or
 9      practices.  And this email states there's a form
10      attached for you to complete, as well as the
11      Guidelines outlining the Accommodation Program and
12      Review Process.  Do you see that?
13  A   Could you repeat.  You said there was a Guideline
14      and then you said something about shared document
15      for the process.  Could you repeat that.
16  Q   Let's look at the attachments.  That's what I was
17      referring to.  So if we scroll down do you see that
18      there's a form attached called Religious
19      Accommodation Request Form?
20  A   Yes.
21  Q   And the next document, if we keep scrolling, is
22      entitled Delta Accommodation Program.  Do you see
23      that?
24  A   No.
25  Q   Do you see a document entitled Delta Accommodation↟
```

109

1    Program?

2  A  Oh, you all scrolled back to it, so yes, I see it

3     now.

4  Q  Okay.  So what I first want to ask you is if we go

5     back to the form, the Religious Accommodation

6     Request Form, did you ever complete this form and

7     return it to the Accommodations Department?

8  A  I think that -- not to my knowledge.  I believe she

9     -- I believe Henrietta Archie filled that out.

10 Q  You did not fill it out yourself, correct?

11 A  I was in the process of doing so, yes, but they

12    came in and harassed me, Ron Cook and Shane Bowman.

13 Q  But you never did fill it out, correct, Ms. Jones?

14 A  No, that's incorrect.  I was in the process of --

15    and I want to make sure that I'm answering it

16    correctly because you're asking me to explain if I

17    filled it out.  So I was in the process of filling

18    it out, but Ron Cook and Shane Bowman came in and

19    harassed me about me not working on the Sabbath

20    because I had to come in on Saturday my first time

21    ever at Delta because they revoked my religious

22    accommodation.

23

24  Q    And that was Saturday, July 27, 2024, correct?

25  A    I don't know this particular time, but I do have a↑

110

1         recording of that as well.

2   Q    And have you -- have you provided that to us?

3   A    It's in the process under my medical treatment plan

4         to do so.  And these dates are -- if you all can

5         send me the dates since you seem to have those

6         dates, that will help with the medical -- the

7         medical treatment because I don't have anything

8         labeled in my phone.  We're going through that.  So

9         that would be helpful if you all have that

10        information to send that to me of when the

11        retaliation occurred.

12  Q    Ms. Jones, I'm going to strike that as a

13        nonresponsive response to the question that I had

14        asked.

15  A    May I be given the opportunity please to respond?

16  Q    No.

17  A    Okay.

18  Q    Let's go to the next document, please.

19  A    I'm going to ask for as a disability accommodation

20      because I didn't understand, I'm going to ask and

21      request for my disabilities that you allow me to

22      answer the question that you struck.

23   Q  So let me go back to a question.  The Religious

24      Accommodation Form that we looked at --

25   A  And just for the record -- just for the record, my

111

1       disability accommodation is I can process things,

2       is when you recall events that were trauma and

3       harassment where it triggers me.  But you don't

4       have to necessarily break it down per se.  It's

5       when we're talking about those topics, which we

6       just discussed that topic, so that's why I was

7       triggering.  Just for you to understand better

8       hopefully.

9    Q  Okay.  Thank you.  So if we look at this form --

10   A  You're welcome.

11   Q  -- Religious Accommodation Request Form, you

12      testified, Ms. Jones, that you did not finish

13      completing this and you never submitted it to

14      Accommodations, correct?

15   A  I don't think that was my testimony.  I think what

16      I shared, if I may explain or no.

17  Q    Well, let me ask you this.  Did you ever finish

18       filling out this form?

19  A    If I recall, Henrietta Archie, we were on a phone

20       conversation and she filled it out.  It was an

21       oral, I was sharing with her and she was writing it

22       out.  So by proxy of for disability accommodation,

23       she filled it out and I was in the process of

24       correcting what she had filled out or adding to

25       it.

                                                      112

1            MS. ZELDIN:  Let's go to Document 44, please.

2        I'm going to mark another document as an Exhibit.

3        This document is going to be marked as Exhibit 16,

4        please.

5

6                    (Document Marked for Identification as

7                    Deposition Exhibit Number 16)

8

9  BY MS. ZELDIN:

10

11  Q    Ms. Jones, I'll direct your attention to Exhibit

12       16.  It's an email from Henrietta Archie to you and

13       it went to both your Delta email and your home

14      email.  It's dated July 26, 2024 and I'm wondering

15      if this is the communication you were referring to.

16      It says Hello Littiece.  I am sending the completed

17      Accommodation Request Form.  Hopefully I've

18      captured your responses correctly.  And I'm just

19      going -- skipping around, but it says please review

20      the information and let me know if this is accurate

21      and if any changes are needed.  And I'm -- she said

22      I'm attaching the forms and FYI for you also.  Do

23      you see this email?

24   A   The -- from it does not have an email attached to

25      it.  It just says the name Archie, Henrietta and

113

1       then the other stuff you didn't want me to put on

2       the record, which I understand, but there's no

3       email showing that that was sent from Archie,

4       Henrietta.

5    Q   Well, it shows that this email was sent to you at

6       your Delta email and your home email and if you go

7       onto the next document -- the next page, it looks

8       like Henrietta has tried to complete this form.  Do

9       you see that?

10   A   I wouldn't be able to answer the question because

11      it does not show that this is sent from Henrietta

12      Archie's email.  But if you clarify the question,

13      then I may be able to answer it.

14  Q   Ms. Jones --

15  A   Yes.

16  Q   -- you testified that you recall Henrietta filling

17      out this form for you, right?

18  A   I recall us having a conversation in which as I was

19      speaking she share she would fill it out, yes.

20  Q   And can you scroll down, A.J.  Is this the form

21      that Henrietta filled out following that

22      conversation that you guys had?

23  A   I don't know for sure because it was over the

24      phone, so I'm not sure what form she had in front

25      of her.♠

                                                    114

1           MS. ZELDIN:  And let's go to 45, please.

2       We're going to put up what we're marking as Exhibit

3       17.

4

5               (Document Marked for Identification as

6               Deposition Exhibit Number 17)

7

```
 8  BY MS. ZELDIN:

 9

10  Q    Ms. Jones, this email if you look at Exhibit 17, it

11       was sent on July 27, 2024 and if you scroll -- if

12       we scroll down to the very first email in the

13       chain, you can see that this is another copy of

14       that email that we were just looking at from

15       Henrietta.  Do you see that?

16  A    No, I'm sorry.  And again, the first email it just

17       says my name.  It doesn't show an email address.

18  Q    Okay.  Let's look at this email the part of the

19       chain that's on the screen in front of us that says

20       from Henrietta Archie, Friday, July 26.

21  A    When you say a chain, could you clarify what you

22       mean by chain?

23  Q    Let's look at what's on the screen in front of us.

24       Do you see an email from Henrietta Archie to you on

25       Friday, July 26, 2024?
```

                                                        115

```
 1  A    Could you -- do I see an email from Henrietta

 2       Archie to me?

 3  Q    Um-hum.

 4  A    Yes.  Yes.
```

5  Q   Okay.  And you see in here that this is the email

6      where Henrietta says I'm sending the completed

7      Accommodation Request Form.  Do you see that?

8  A   Could you point to it, please.  Right.  It was good

9      speaking with you on yesterday.  As indicated, I am

10     sending the completed Accommodation Request Form.

11     Yes.

12 Q   Okay.  And so then if we go up above to the next

13     email, this is where you respond.  Do you see that?

14 A   Well, just for the record, it doesn't show the

15     attachment that she sent it.  It just shows an

16     email.  So I don't know if she attached anything or

17     not.

18 Q   Okay.  Ms. Jones, do you see this email here?

19 A   Yes.

20 Q   Okay.  And this is -- you state I'm having a

21     wonderful Sabbath day and am thankful for the

22     opportunity and time during my shift, July 27, 2024

23     at work to continue in the religious accommodations

24     process under duress, yet always happy to share my

25     faith and beliefs.  Do you see that?▲

116

1  A   Well, you skipped a part.  It said during my shift

2        seven a.m. to twelve p.m., but yes, everything else

3        is correct, yes.

4    Q   Okay.  And this is a Saturday that you were talking

5        about that you had to come to work, correct?

6    A   This was after Delta illegally revoked my

7        accommodations and has scheduled me for this date,

8        yes.

9    Q   Well, just to clarify, during this time you had bid

10       on a shift that had you able to be scheduled on

11       Saturday, correct?

12   A   Could you repeat the question.

13   Q   Yes.  As of this time period you had bid on a shift

14       that had you able to be scheduled on Saturdays.

15   A   Was that referring back to the -- I don't know

16       because, you know, I don't know when the bid

17       started and when it ended.  It just says winter

18       bid, summer bid.  I don't know what that means.  It

19       doesn't have any dates when the bid will start,

20       when the bid will end, so I don't know.

21   Q   Ms. Jones, do you recall that on this date you

22       actually didn't have to do any work in your job,

23       you were allowed to sit and work on your

24       accommodation request while at work and get paid.

25       Do you recall that?

117

```
 1   A   Oh, no.  I recall this incident where it's

 2       triggering, but I will testify.  This is when Ron

 3       Cook and Shane Bowman came in and harassed me

 4       saying when you come to work -- and I'm not

 5       speaking verbatim, but I have the recording of that

 6       incident and I immediately reported that as Delta

 7       policy says when there is workplace violence or

 8       employees acting appropriately.  This is when they

 9       harassed me, telling me that I was supposed to be

10       on the pier, so your question would be I wasn't

11       allowed to -- or they came in and harassed me

12       because it was a lot of different things going on.

13   Q   And this is a recording that you're going to

14       provide to us when you medical condition allows, is

15       that right?

16   A   Not necessarily when my medical condition allows,

17       but when I'm able to -- when I'm able to provide it

18       because I just -- I have to sort through it and

19       organize things and that's part of my medical plan.

20       And then if you all -- because maybe you all can --

21       hopefully this is the pro se part.  If you all

22       could share with me how I can get it to you because

23       I've sent things in the past to you and you all
```

24    didn't take it in that time, so I don't know, that

25    may gave me some additional harm because you all⬆

                                                        118

1     said you never received it, so I want to make sure

2     that we have that clear how I'm supposed to get it

3     to you all and that you received it so I won't have

4     to revisit these triggering incidents over and over

5     again unnecessarily.

6

7            MS. ZELDIN:  Let's take that Exhibit down off

8     the screen.

9

10  BY MS. ZELDIN:

11

12  Q    Ms. Jones, do you recall Henrietta Archie reaching

13       out to you on multiple occasions to try to schedule

14       a call regarding your religious accommodation?

15  A    I remember that we had multiple conversations.  I

16       don't know about her reaching out.  I believe there

17       was an email or so communication where she said

18       something along the lines of we were playing phone

19       tag, so she may have called me, I called her back

20       and these were all during hours where I was not at

21      work.  Mostly.  So she interacted with me during

22      unpaid hours while I was going through everything

23      at home or personal stuff.

24

25          MS. ZELDIN:  Let's go to Document 85.  ↑


119

1          THE WITNESS:  May I have permission please to

2      look at the time or could the videographer, Mr. Dlo

3      -- I shouldn't say that on the record, I'm sorry.

4      Could he please share with us what the time -- how

5      much time we've spent so far, if possible.

6

7          VIDEO TECHNICIAN:  Five hours and fifty-nine

8      minutes.

9

10          THE WITNESS:  Okay.  Thank you so much.  I'm

11      going to be writing that down if that's okay as a

12      note because there's no pending question.

13

14          MS. ZELDIN:  Ms. Jones, we're going to -- can

15      you look at this email, please.

16

17          THE WITNESS:  Yes, ma'am.

18

19          MS. ZELDIN:  We're marking this as Exhibit

20     what?

21

22          MR. SIMONTON:  18.

23

24               (Document Marked for Identification as

25               Deposition Exhibit Number 18)⌃


                                                        120

1  BY MS. ZELDIN:

2

3  Q    Ms. Jones, do you see this is a June 4th email from

4       Henrietta?

5  A    I can barely see it.  The writing -- if possible,

6       may I request that you all make it bigger, zoom in.

7       Yes, I can see it better now.  Thank you.

8  Q    Okay.  And in this email she is letting you know

9       that you have not responded to the request for

10      accommodation, that you didn't complete that form

11      and I think you testified that after this is when

12      she filled out the form herself during a

13      conversation and sent it to you, is that right?

14  A   No, that's not right.  First I would have to read

15     what is shown and the reason number one why I'm

16     saying it's not right is because there is no email

17     address.  It just says Archie, Henrietta.  There's

18     no email -- I don't know who this is coming from.

19     It has no email address to it.  It does say to

20     Jones, comma, Littiece R. and then semi-colon and

21     then it provides my personal email, but who it was

22     from, I do not -- there's no email address stating

23     that.

24  Q   Well it says Henrietta Archie, correct, on the

25     document?

121

1  A   Yes, but it's no email address.  It doesn't say a

2     dot com for or dot net or whatever to show that

3     it's an actual email account or where it's coming

4     from.

5  Q   Do you have any reason to dispute that this email

6     came from Henrietta Archie?

7  A   I haven't had the opportunity to read it because

8     you were questioning me and I was answering, but I

9     do know that Delta has changed things and I've

10    shared with the Judge that I believe you all --

11    Delta's obstructing, so I -- and they're a billion

12      dollar company, so I don't know what they can do.

13      And I do have a time in an email was sent, there

14      was some question about that that I reported to my

15      therapist in real time, so I don't know what

16      mechanisms Delta has under their belt to distort or

17      change things.

18   Q   Okay.  So we're going to give you the ability to

19      scroll, if you can do that A.J., and we just want

20      you to look at this email and tell us if you have

21      any basis to dispute that it came from Henrietta

22      Archie at Delta.

23   A   Oh, this is -- I don't have to scroll.  I have the

24      basis is that Delta has done things and made

25      accusations that are not correct.  Delta employees. ⬆

                                                        122

1       Not all -- the whole company, I love Delta and I

2       believe they have great employees, but I think that

3       they need to fix the ones who don't do right by the

4       law and intimidate.  So that is my basis.  I don't

5       need to scroll per se, but I will if that's what

6       you require of me.

7

8          MS. ZELDIN:  We're taking this off and we're

```
 9        going to put another Exhibit up.  One second,

10        please.  Let's put up 53.  Ms. Jones, I'm going to

11        direct your attention that this document -- one

12        second please.  This is Exhibit 19 please.

13

14                  (Document Marked for Identification as

15                  Deposition Exhibit Number 19)

16

17   BY MS. ZELDIN:

18

19   Q    And we can scroll through it or we can let you

20        scroll through it and what I want to ask you about

21        is do you agree that this document reflects that

22        Henrietta Archie reached out to you on June 4th,

23        June 6th, June 10th, June 18th, June 24th,

24        July 18th, July 19th and July 25th in efforts to

25        schedule time to speak with you about your
```

                                                         123

```
 1        accommodation request?

 2   A    This document that I see shows that one date that

 3        you just said.  You all are scrolling now, but the

 4        question --

 5   Q    Let me scroll through it.
```

6   A   The question -- the question was related to the

7       document that I saw.  And the document that you all

8       have only show one date, so I believe that

9       questioning is aggressive and intimidating because

10      it did not say all of those dates that you just

11      asked about.  It says -- and furthermore, again,

12      the email did not have an email.  It just said

13      Henrietta Archie with the brackets.  I did not say

14      a dot com or what the email address that it was

15      sent from.

16

17          MS. ZELDIN:  Can you help give Ms. Jones

18      scroll rights, please.

19

20          MR. SIMONTON:  I just gave her.

21

22  BY MS. ZELDIN:

23

24   Q   Ms. Jones, you should be able to scroll through the

25      document yourself.  See if you can see.

                                                        124

1   A   I'm not -- I'm not scrolling now, somebody else is

2       scrolling, but let me see if I can.  Okay.  Is that

3       me scrolling?

4

5               MR. SIMONTON:  Yes.

6

7               MS. ZELDIN:  It's not us.

8

9               THE WITNESS:  Okay.  So wait.  Where do you

10      want me to go to?

11

12  BY MS. ZELDIN:

13

14  Q    So I want you to look through -- okay.  Let's go --

15       let's go to the end of the document, the last

16       email.

17  A    If possible for my disabilities, can you give me

18       Bates -- it has the Bates numbering.  Could you

19       give me the Bates numbering that you would like or

20       the page number you would like for me to scroll to

21       and for accuracy of the record.

22

23  Q    Yes.  The very last page that says 1798 at the

24       bottom.

25  A    1798?

125

1  Q   Um-hum.

2  A   That's the Bates number?

3  Q   Yes.  Go all the way down to the end and you should

4      see it.

5  A   Yes, ma'am.  17 --

6  Q   Keep going down.

7  A   Okay.  Yes.

8  Q   Okay.  So if you look at that email, Ms. Jones,

9      that's page, do you see on there that Henrietta has

10      reached out to you and she's asking you to return

11      the attached form by June 11th and to include to

12      her the times that you're available to schedule a

13      call?

14  A   So you said to go down to 1798?

15  Q   Um-hum.

16  A   Okay.  It says on Tuesday, June 4, 2024, 4:11 p.m.

17      Archie, Henrietta and it does list the email,

18      Henrietta.Archie -- I don't know if I can put that

19      on the record, but it does list the Delta.com email

20      wrote.  It doesn't say that she sent this to anyone

21      or who -- it doesn't say who it was sent to or

22      from.  It just says she wrote, so I can't --

23  Q   Yeah.  Just take a minute and look through this

24      line of email chain and tell me if you have any

25      basis to dispute that these are emails between you⌃

126

1       and Henrietta Archie.

2    A  Yes, I do have basis to dispute.

3    Q  And what is that.

4    A  One, I believe it was -- the very first page which

5       it says from Archie, Henrietta and it does not list

6       an email address and it says sent July 19th, 2024

7       and it has at least two lines of letters, brackets,

8       numbers and like equal signs and all of that, but

9       it does not list the actual email that it was

10      coming from and I believe this is Page 1.  Where

11      also -- let me scroll down.  Yeah, it says 1 of 13,

12      but it's Bates Number 0 -- Jones001786 or Delta-

13      Jones, so it doesn't say who this started from.

14      What email address.

15   Q  Any other basis to dispute that these are emails

16      that were exchanged between you and Henrietta

17      Archie?

18   A  I haven't been able to read the full list, it's

19      thirteen pages.  So I previously gave testimony --

20      I'm not sure if you would like for me to repeat

21      that reason.

22  Q    You can take time to scroll through and let us know

23       if there is any other basis you have to dispute

24       that these were emails exchanged between you and

25       Henrietta Archie.

                                                           127

1   A    You want me to read through all of these?

2   Q    If that's what you need to do to answer my

3        question.

4   A    I answered it.  For the record, I just want to be

5        clear.  That I have answered the question of the

6        basis and I answered it previously, but I just want

7        to make sure I don't get in any trouble and that

8        I'm doing things correctly.  So I want to make sure

9        that it's acceptable to you or would you like me to

10       repeat -- humbly, I'm asking humbly, if you would

11       like me to repeat what I previously said for the

12       basis.  Because I don't want to take -- I don't

13       want you all to say that I took up time reading

14       this thirteen pages of emails.  I want to be able

15       to make sure you all can answer the questions you

16       want to ask me.  I'm just doing the best I can.

17       If you could -- I know time is elapsing.  If you

18       could let me know as soon as you get an answer,

19      please.

20  Q   Yeah.  Ms. Jones, your answers -- that answer was

21      not responsive, but we're going to move on.

22

23          MS. ZELDIN:  So we're going to pull up the

24      next Exhibit, please.

25↟

                                                    128

1           MR. SIMONTON:  Um-hum.  It will be Exhibit 20.

2

3           MS. ZELDIN:  Okay.  Ms. Jones --

4

5           THE WITNESS:  Yes.

6

7           MS. ZELDIN:  I'm showing you what we're

8       marking as Exhibit 20.

9

10          THE WITNESS:  Okay.  Yes.

11

12              (Document Marked for Identification as

13              Deposition Exhibit Number 20)

14

15  BY MS. ZELDIN:

```
16

17  Q    And this is an email from Henrietta Archie to you,

18       dated August 12, 2024 and looking at the body of

19       the mail it says Hello Littiece.  I wanted to

20       remind you I still have not received the

21       accommodation form that you were asked to complete

22       on July 26.  I would appreciate you providing that

23       to me by Wednesday, August 14, 2024.  I also wanted

24       to make you aware I recently learned your swap

25       privileges have been suspended due to your not↟
```

129

```
1   meeting ACS' minimum hours worked requirement.

2

3           She goes on to say that she wants to

4   schedule an interactive discussion and then she

5   says and this is the part that I'm going to read.

6   She says I wanted to make you aware that in

7   response to your accommodation request Delta is

8   prepared to temporarily reinstate your swap

9   privileges for Saturdays only and allow you to swap

10  mutual trade of hours to obtain -- with other

11  employees to obtain Saturdays off as needed.  We

12  can discuss this in more detail when we meet, but
```

13    your swapping privileges be reinstated for

14    Saturdays only and this accommodation would remain

15    in place until the next bidding cycle when you're

16    able to bid on a shift that your seniority will

17    hold that has Saturdays off.

18

19            So my question, Ms. Jones, is once you

20    received this email from Henrietta Archie, were you

21    satisfied that your request for accommodation had

22    been granted?

23

24  A  There was -- to answer the question, you said once

25    I received.  So I think that I have tho think back⌃

130

1    as to when I received this.  Management met with me

2    and told me, which I have a recording of as

3    evidence.  I'm not sure when, so that's why I'm

4    trying to answer your question so due to my

5    disabilities I'm trying to recall these triggering

6    harmful events.

7

8            They met with me and told me the opposite

9    of what Henrietta Archie, and this was leadership

10    and I'm not sure if it was that same day or the

11    following day because it shows in the email, which

12    does have an email address, her work email, it

13    shows that she sent it at 9:44 p.m.  9:44:29 p.m.,

14    and so I'm not sure when I actually reviewed this

15    because it was sent late at night.  And like you

16    said, my work hours were in the morning, so I

17    wasn't at work probably unless I had picked up, so

18    I don't know when this was reviewed, but I do know,

19    and I have a video recording, it should still be

20    there, that the -- that Delta employee leadership

21    met with me and disputed and said the opposite of

22    what she said in this email and that's what I'm

23    saying about the form of harassment, discrimination

24    because they keep changing things up knowing that I

25    had mental health disabilities, as well as physical

131

1    disabilities.  They -- it was constructive

2    confusion or whatever legal terminology.  That's

3    discriminatory.

4  Q    And, Ms. Jones, just to confirm, this video is

5    something that you have not given us yet, but you

6    intend to give us when your medical condition

7        allows, is that correct?

8   A    Not when my medical condition allows, but according

9        to my treatment plan in which like I shared -- I

10       think we've gone over a few videos just recently

11       that we've been able to identify for me that was

12       Delta-related for me to send as recent as this

13       week, so I have to -- and I want to -- that's why I

14       put the motion in because you all said you didn't

15       receive the one, so I want to make sure that it's

16       in a format that you can receive as well, so I'm

17       working all of that out under my medical plan.

18  Q    And, Ms. Jones, just to confirm, you don't have a

19       date that you're going to provide these videos, is

20       that right?

21  A    Oh, I never said that.  I'm sorry.  Did I say that

22       somewhere in this?  I apologize if I -- I don't

23       think I said that.

24  Q    When do you plan to provide them.

25  A    You would have to speak with my medical provider.  ↑

                                                           132

1        It's a part of my medical treatment plan.

2   Q    Okay.  Putting that aside for now and just looking

3        at this email from Henrietta, do you agree that

```
 4        this email -- this accommodation that Delta was

 5        agreeing to give you was sufficient to provide you

 6        with your Sabbath off?

 7   A    No.

 8   Q    Why not.

 9   A    Because it was a retaliatory thing.  Anything that

10        is illegal and retaliatory can't be sufficient.

11        It's illegal.

12   Q    Any other reason it wasn't sufficient?

13   A    Could you clarify what you mean by sufficient just

14        so I can have a good understanding, please.

15   Q    So Henrietta says that you would be allowed to do a

16        mutual swap to get Saturdays off as needed.  And

17        that's what you were asking for, right, was to get

18        Saturdays off.

19   A    I wasn't asking for a mutual swap, no.  And what

20        does mutual swap mean and where can I find that in

21        the so-called policies.  I don't even understand

22        what mutual.  Is that the one way, the two way, the

23        three way, the four -- what does that mean, mutual

24        swap.  Mutual trade of hours.  This is what I mean

25        by you all -- Delta should have clear policies that
```

1    everyone can follow and that's uniform company-wide

2    so that we can follow it.  I don't understand in

3    this email Delta is prepared to temporarily, how

4    long, didn't have any dates, reinstate your swap

5    privileges for Saturdays only.  What about the

6    Friday nights.  What about from Friday sunset.  And

7    so say -- I could work Saturday night once sunset

8    it over.  And allow you to swap mutual trade of

9    hours with other employees to obtain Saturdays off

10   as needed.  I can work Saturdays.  I can work

11   Saturday nights.  Like today the sun sets I think

12   around five something, so I could work after that

13   time period.  So again, this is retaliatory,

14   illegal discrimination retaliation and so no, it's

15   not -- to answer your question, no, it's not

16   sufficient.

17 Q So if you had questions about Henrietta's email,

18   like what mutual swap privileges meant, for

19   example, mutual swaps, why didn't you respond to

20   Henrietta and ask for more clarification.

21 A Well, first, I'm responding in this deposition I

22   did not indicate that I had questions at the time.

23   We were still trying to clarify when I received

24   this email and like I shared, I do have video of

25   Delta leadership coming and me trying to put in

134

1   shift swaps and them saying -- and I'm not saying

2   this verbatim, but basically denying my

3   accommodations.  So it's a lot going on here and

4   that's why it's discriminatory because of companies

5   such as Delta Air Lines should have clear policies

6   that are uniformly enforced company-wide.

7

8        MS. ZELDIN:  Let me direct your attention,

9   please, to Exhibit 21.

10

11          (Document Marked for Identification as

12       Deposition Exhibit Number 21)

13

14  BY MS. ZELDIN:

15

16  Q   And this is an email from Henrietta Archie to you

17      that's dated September 13, 2024 and I'll start

18      reading it.  It says Hello Littiece.  Reaching out

19      to follow up regarding my August 12, 2024 email.

20      I'll state for the record that that was Exhibit 20

21      that we just looked at.  And Henrietta says sent to

22      you and no response has been received.  As of today

23    I have not received the accommodation form I sent

24    you on July 26, 2024 and asked you to return by

25    August 14th, 2024.  I also did not receive a⚓

135

1    response to my request in that same email regarding

2    scheduling an interactive discussion with you and

3    your leaders to review your religious accommodation

4    request.  Did I read that correctly?

5  A   I wasn't following.  I was listening to you.

6      Because at the top it doesn't, again, have the

7      email address that it's coming from.  I was just

8      listening.

9  Q   And Henrietta goes on to again tell you that you

10     were granted a temporary accommodation by allowing

11     you to swap mutual trade of hours on Saturdays only

12     and she says while we had hoped to discuss the

13     details of this accommodation with you during the

14     interactive discussion, given your failure to

15     respond to the meeting request, I'm providing those

16     details as part of the accommodation request close

17     out process.

18

19            So then she says specifically you're

```
20      permitted to swap the hours you were scheduled to

21      work on Saturdays with another employee only if you

22      pick up the same number of hours on a different day

23      from that same employee.  Since your requested

24      appeared to be focused on your not having to work

25      on Saturdays, the accommodation did not address the
```

                                                               136
```
1       period after sundown on Fridays.  We assume your

2       current schedule does not conflict with that time

3       period.  However, if that is incorrect, please let

4       me know.

5

6               Then she goes on to say during the next

7       bidding cycle you will have the opportunity to bid

8       or be expected to bid on a shift that your

9       seniority will hold that includes Fridays after

10      sundown and Saturdays off.  According to ACS

11      leaders, your seniority should enable you to

12      successfully bid on a shift that does not require

13      you to work on Friday evenings or on Saturdays.

14      The next shift bid will take place on September

15      23rd through 27, 2024 with a scheduled start date

16      of October 14th, 2024.  As a result, this
```

17      accommodation is temporary and will expire after

18      the start of the next shift bid expected to begin

19      October 14, 2024.

20

21              And so my question to you, Ms. Jones, is

22      do you agree that this -- Henrietta's email what

23      she has stated in here that Delta agreed to do

24      accommodated your need to be off for your Sabbath?

25  A   No.

137

1   Q   Why not.

2   A   Why not.  Could you clarify.

3   Q   Why do you not feel that this was a sufficient

4       accommodation.

5   A   First because again, anything -- I was already

6       accommodated from the time that I first started in

7       2012 and this was done illegally.  So it's like if

8       somebody does a criminal or an illegal act, it

9       doesn't -- you can't say that that's justifiable or

10      sufficient if it's illegal, okay.  They revoked my

11      long-held accommodations as an illegal act.

12

13              Furthermore, this email was sent when

14    Delta forced me, and I have a recording of that, on

15    a leave because Delta employees, which we've known

16    that you -- that's how you all establish it as

17    Delta employees, but this was leadership, met with

18    me during that interactive process in which I'm

19    going to figure out the date once I'm allowed to

20    with the medical when that took place, and they

21    denied those shift trades that I tried to turn in

22    and did turn in that Henrietta Archie may be

23    referring to if this is really from her because the

24    email doesn't say an email.  It just says her

25    name.

138

1             So in addition, they -- I said listen.  I

2     have doctors appointments.  I need accommodation

3     for my disabilities and for my religion because

4     that's how they operate one-to-one, go to your

5     leader, you can talk to us, we're a family and in

6     those conversations Delta employees denied those

7     accommodations and said we will not allow you, and

8     I'm not saying verbatim, but basically they said we

9     will not allow you to shift trade after they were

10    supposed to have allowed me to and they said well,

11    if you need -- and I'm not saying this is verbatim

12    because I don't have that right in front of me, but

13    basically the gist was what they shared, if you

14    need time off, we're not going to accommodate you,

15    we're not going to let you, you can't shift trade,

16    you're going to have to go call Sedgwick and ask

17    for a leave, in which I did.  Because that's what

18    my employer told me to do and I have that on

19    recording.

20

21  Q   And just to clarify for the record, this is a

22    recording that we do not yet have, but that you

23    intend to provide in accordance with your medical

24    treatment plan, is that right?

25  A   Yes.  And just for the record as well, I think this⌃

139

1    is probably a numerous amount of recordings, so

2    just imagine someone going through all of this when

3    you come to work.  I was already preyed on, my

4    daughter through human trafficking.  I shouldn't

5    have to come to work and be preyed on by Delta

6    employees.  I should be able to come to work and do

7    my job and Delta not act illegally.

8

9          So all these recordings or whatever I

10   have is numerous in over thirteen years of me

11   working there.  All of these -- I don't have

12   recordings from in the beginning when Delta wasn't

13   being illegal, but I felt that I had to show and

14   also for my disabilities just to make sure because

15   there was some gas lighting, which is a form of

16   discrimination and them saying things weren't

17   happening, so for my disabilities as well, I felt

18   that I was being preyed on at work where I had to

19   make sure things were as they were and the

20   recordings will hopefully show that.  As well as

21   emails, text messages and all of this how Delta is

22   a timeline and that created great harm to my

23   ability to work and my mental health, my physical

24   health, everything.

25

                                                140

1        MS. ZELDIN:  Ms. Jones, we need to take a

2   quick break to run to the ladies room, so do you

3   want five minutes or would you rather have ten

4   minutes or --

5

6        THE WITNESS:  I think this is a part of the

7    gas lighting.  You share we need to take a break,

8    but you're asking me what would I like.  You're in

9    control.  You need to go to the restroom, so do --

10   I'm here ready to continue.

11

12       MS. ZELDIN:  We'll take a ten-minute break.

13

14       THE WITNESS:  Okay.  Thank you.

15

16       MS. ZELDIN:  Let's go off the record.

17

18       VIDEO TECHNICIAN:  Off the record 3:01.

19

20            (Whereupon a short break was taken)

21

22       VIDEO TECHNICIAN:  Back on the record 3:12.

23

24       MS. ZELDIN:  Mr. Videographer, can you please

25   tell us the amount of time used, please.

141

1        VIDEO TECHNICIAN:  Six hours and twenty-eight

```
 2    minutes.

 3

 4         MS. ZELDIN:  Ms. Jones, we are putting on the

 5    screen what we're marking as Exhibit 22.

 6

 7              (Document Marked for Identification as

 8               Deposition Exhibit Number 22)

 9

10         THE WITNESS:  For the record, a few minutes --

11    a few seconds have passed.  I do not see anything

12    on the screen as of yet.

13

14         MS. ZELDIN:  Yes.  Just wait one second, okay.

15

16         THE WITNESS:  No worries.

17

18  BY MS. ZELDIN:

19

20  Q    Ms. Jones, this is an email that was sent to you

21       from Ron Cook and for the record, who is Ron Cook.

22  A    I'm not -- he's a Delta employee at DTW.

23  Q    Was he one of your supervisors?

24  A    No.

25  Q    His title on the email says Department Manager.  ↖
```

142

```
 1      Does that -- is that what you remember?
 2  A   Yes.  My OSM I believe -- he wasn't a supervisor
 3      though, he was a department man -- he wasn't one of
 4      my supervisors.  They have OSM as your supervisor
 5      that you report to directly.  He was a Department
 6      Manager.
 7  Q   Okay.  And he was above you in the company
 8      hierarchy, is that fair to say?
 9  A   Yes.
10  Q   And Ron sends this email to you on July 31st, 2024
11      and it says Greetings Littiece.  Unfortunately your
12      swaps are still suspended due to noncompliance with
13      the minimum work hours.  And before we went off the
14      record you were telling us that after Delta had
15      offered you a temporary accommodation some of your
16      swaps were still denied.  Do you recall that
17      testimony?
18  A   You said before we went off on break, so I mean
19      we've been here for a while.  I don't know at what
20      point before.  If we could run it back so I could
21      hear it, that would be great.  And also this does
22      not state that it's an email address.  It just says
23      Cook, Ronald and it has all those letters and
```

24    numbers.  It does not say that it has his Delta

25    email or any email.

143

1  Q    Ms. Jones, if you look down in the email, if you

2       scroll down, do you see an email from your Lovely

3       Lady home address?

4  A    I'm not scrolling just for the record.  I'm not

5       scrolling for the record.

6  Q    Okay.  If you look down as we scroll, do you see an

7       email from you on July 3st to -- that you sent to

8       Todd Cabanaw and copied Tenia Russ, Ron Cook and

9       Hussein Berry?

10 A    Yes.  And all emails are reflecting that.  And one

11      moment.  This door opened up.  I don't want to take

12      a break, if possible my request.  Let me just close

13      the door real quick.

14 Q    Okay.

15 A    Okay.  Thank you so much.  I appreciate you.

16 Q    Okay.  So what I want you to look at is in the

17      second paragraph do you se where it says as you are

18      aware I and my dependents.  Do you see that?

19 A    Yes.

20 Q    Okay.  And do you see on here that it appears that

21      you're asking Todd to allow you to swap your shift

22      on August 1st?

23   A   Did we share that this was an Exhibit?  I'm sorry.

24   Q   Yes.

25   A   What Exhibit is this?  Pardon me?↟

                                                    144

1    Q   It's Exhibit 22.

2    A   Okay.  The whole thing is Exhibit 22 or what part.

3    Q   Yes.

4    A   How many pages is it?  I don't have scroll -- I'm

5        not scrolling, so I don't know when it refers to

6        this Exhibit.

7

8            MS. ZELDIN:  Give her the right to scroll.

9        A.J. can you give that to her, please.

10

11           MR. SIMONTON:  Okay.

12

13           THE WITNESS:  I do see where it says 00148B or

14       88.

15

16   BY MS. ZELDIN:

17

18  Q   Okay.  So Ms. Jones, scroll through and it's a

19      three-page document that you can look at.

20  A   Okay.  Is that me scrolling?

21  Q   Um-hum.

22  A   It says one of five pages just for the record, not

23      three.  It says 1 of 5, so I'm not sure if that was

24      an error.  Even on the side here it says five, not

25      three.

                                                    145

1  Q   Okay.  Just scroll down, please.

2  A   Okay.  Just for the record, the first page does not

3      have an email address.  It just says the names

4      Cook, Ronald and it has two lines of letters,

5      digits, numbers, dashes, so forth, but it does say

6      sent July 31st, 2024.  It says from with no

7      address, sent July 31st, 2024, 4:41:24 p.m. and

8      then to and it does have lrbj_99@yahoo and Todd

9      Cabanaw.  Todd, his Delta and cc's.  But the from

10      does not have an email address.

11  Q   Ms. Jones, you're not answering any pending

12      question.

13  A   I'm sorry.  Was there -- was there a question

14      pending?

15  Q    No, there's not.

16  A    Oh.

17  Q    I asked you to scroll through the document and now

18       we'll ask you a question.

19  A    So is it -- I'm just asking for clarification.  Was

20       it wrong for me to say that while scrolling?

21  Q    Ms. Jones --

22  A    Because there was -- there was no question pending.

23       I just want to clar -- I want to make sure I'm

24       doing the right thing.  I don't -- I don't want to

25       be in trouble.⬆

146

1   Q    Please complete your scrolling and then I will ask

2        you a question.

3   A    Am I -- is it okay for me -- I want to get

4        permission while I scroll to read what I see while

5        scrolling.  May I ask that permission of Counsel,

6        please?

7   Q    Just read to yourself.

8   A    Okay.

9   Q    And just let me know when you're ready.

10  A    It's five pages.  I'm still on Page Number 1

11       because there was some scrolling difficulties.

12  Q    Okay.

13  A    Somebody -- somebody's scrolling for me, I think.

14       For the record, I'm entering into Page 2 of the

15       five-page document.  I'm entering into Page 3.  For

16       the record, these seem to be repeat emails.  I'm

17       entering into Page 4.  They seem to be duplicates.

18       Even though it says five pages, I think a couple of

19       them may have been duplicates.  I'm entering into -

20       - so I don't know if -- I'm skipping over it,

21       because it seems to be duplicates.  So I'm on the

22       last page, which has a letter -- oh, you told me to

23       read to myself.  Sorry.  Okay.  I scrolled through.

24  Q    Thank you.  So, Ms. Jones, Exhibit 22 appears to be

25       a request by you to have off August 1st to be able

147

1        to swap off that shift.  Do you agree with me?

2   A    No.  It says -- I believe your question was to

3        shift swap that shift and I would have to say no.

4        It says that I -- if this is an email, that I be

5        allowed to shift trade, comma, adjust my shift,

6        comma, or have the time off for my shift tomorrow,

7        August 1st, 2024 and it was -- this email -- or

8        document says good afternoon Todd, so it wasn't

9     addressed -- who probably was my OSM, my direct

10    leader and it does have an email above it.  So it

11    does say that -- it does have an email, my email to

12    my direct leader OSM, Todd Cabanaw and it does have

13    his email on July 31st, 2024.  So it asks for

14    multiple ways to be able to work.  I could have --

15    as a twenty-four hour operation, I could have came

16    in at any time.

17  Q   So are you claiming that -- and it says on here Ron

18    Cook responds, it says your swaps are still

19    suspended due to non-compliance.  It says that

20    right there at the top?

21  A   I don't -- I can't verify that because there's no

22    email again attached to it.  I don't know where it

23    was sent.  I don't know if I received it or

24    anything because it does not have an email.

25  Q   I'm just asking you to look at what's on the screen

148

1    where it unfortunately your swaps are still

2    suspended due to non-compliance with minimum work

3    hours.  And then Ron says your options are to work

4    your scheduled shift or call out if you're unable

5    to make it.  And what I want to ask you about this

```
 6        whole thing is are you claiming that you should

 7        have been allowed to swap off for August 1st as

 8        part of your religious accommodation?

 9   A    When you say am I claiming, could you clarify

10        please.

11   Q    Well, let me ask you this.  Is this issue part of

12        your claims?  Do you believe that not being able to

13        get off August 1st, is that part of your claims in

14        this case?

15   A    Was I not able to get off August 1st?  Could you

16        show the record as to whether -- what happened on

17        August 1st because I don't know.  It's not -- it's

18        not depicted here.  I don't know what happened on

19        August 1st.

20   Q    Let's -- let's look at the calendars, which are

21        Exhibit -- Document 11.

22

23              MR. SIMONTON:  We're at 23.

24

25              MS. ZELDIN:  Okay.  And this will be Exhibit
```

149

```
 1        23.

 2
```

```
 3                   (Document Marked for Identification as

 4                   Deposition Exhibit Number 23)

 5

 6          THE WITNESS:  I don't see the Exhibit on the

 7     screen.  I'm sorry.  I'm sorry, could -- did anyone

 8     hear me just to check?  Oh, okay.  I see it now.

 9     Thank you.

10

11  BY MS. ZELDIN:

12

13  Q    Okay.  Ms. Jones, this is a calendar for August,

14       2024 -- I mean a calendar for the year 2024.  Can

15       you look at August 1st, please.

16  A    Yes.

17  Q    And what day of the week is that.

18  A    Thursday according to the calendar.

19  Q    So your request for August 1st, Thursday off, was

20       not part of your request for religious

21       accommodation, correct?

22  A    As I've stated, I don't understand what the

23       requests were because the email chain shows that I

24       sent an email to Todd Cabanaw, my direct leader.  My

25       director supervisor.  And then what you're
```

150

1   referring to is a document that does not have an

2   email address attached to it.  I cannot answer the

3   question and speculate what you're referring to

4   without the correct knowledge of the documentation

5   being sent from that email.

6  Q   Ms. Jones.

7  A   Yes.

8  Q   Was there ever a time you needed Thursday off as a

9      religious accommodation?

10 A   Was there ever a time I needed Thursday off as a

11     religious accommodation?

12 Q   That's my question.

13 A   I'm not sure.

14 Q   Well, what religious beliefs that you have that are

15     sincerely held that require you to be off on a

16     Thursday.

17 A   That's -- I'm not sure how to answer the question

18     honestly.

19

20         MS. ZELDIN:  Let's look at Document 51,

21     please.

22

23         THE WITNESS:  Document 51?

24

25          MS. ZELDIN:  We're going to put it up on the↑

                                                    151

1    screen.  Give us one second.

2

3          THE WITNESS:  There have been a few seconds

4    that passed -- or minutes.  Can I ask the recorder

5    what --

6

7          MS. ZELDIN:  Ms. Jones --

8

9          THE WITNESS:  -- the time how we've had?

10

11         MS. ZELDIN:  Ms. Jones, can you hear me?

12

13         THE WITNESS:  Yes, I can hear you.

14

15         MS. ZELDIN:  We're marking this as Exhibit 24.

16    Exhibit 24.

17

18              (Document Marked for Identification as

19              Deposition Exhibit Number 24)

20

21  BY MS. ZELDIN:

22

23   Q   And what I want to ask you about this document is

24       this document, it's an email to you from Tenia Russ

25       on October 15, 2024 and you can see the second↑


                                                         152

1        paragraph it says please submit your medical

2        documents to Sedgwick as they assist with any

3        workplace restrictions and return to work notes.

4        And what I want to ask you now is is it -- are you

5        claiming that you requested medical accommodations

6        from Delta during this time period, 2024?

7    A   Could you please clarify because you shared that

8        this is an email and it has -- it depicts that

9        there is no email address attached to from Russ,

10       Tenia.  It just has those two lines of letters,

11       numbers and things as I've shared before.  They may

12       be different, but there's no email attached.

13   Q   Let's put this document aside.  You can take it

14       down.  Do you claim that you made any request to

15       Delta in 2023 or 2024 for medical accommodations?

16   A   That I made any requests?  There was no

17       Accommodation Department.   I wasn't sure of the

18       terminology accommodation per se, perhaps, but I

19     did have that one-to-one relationship with my

20     leaders and employees, Delta employees where they

21     were aware of medical needs that I had shared with

22     them and requested for me to have time off or

23     whatever the case may be, yes.

24   Q   Are you claiming that your leaders granted you

25     accommodations for some type of medical disability?↑

153

1   A   I'm claiming that -- I'm not sure if it was -- the

2     title was accommodations, but -- because that was

3     -- I knew of religious accommodations.  That is

4     what they told me.  When it came to medical I was

5     unaware, per se, until a certain point in time that

6     the word accommodations was there.  So through the

7     one-to-one relationship I have shared things with

8     my leaders medically-wise if they've asked.  Like

9     Rob O'Leary would repeatedly text me and call me

10    about COVID and things of that nature and my

11    daughter, all different types of stuff, as well as

12    other people not -- they didn't really call and

13    text me like that, but we've had those discussions.

14    That's what the pattern was.  And they have

15    accommodated me by the action was there, by giving

16  me the time off, giving me a PPT or whatever they -

17  - whatever they did to accommodate me, yes, for

18  medical, yes.

19 Q  Okay.  Regardless of what it may have been called,

20  you're saying that what you needed for a medical

21  related disability was given to you by your

22  leaders.

23 A  Not always given, but they accommodated me

24  accordingly.  Whatever they said, I would -- I

25  would relay the information to them and they said▲


               154

1  different things, whether it was yes, no or

2  indifferent.

3 Q  But whatever it was that they did was sufficient to

4  accommodate you for medically-related disabilities.

5 A  Could we replay if possible what I -- how I just

6  answered that?  And you can share with me if I need

7  to clarify the answer or not, if possible.

8

9    MS. ZELDIN:  Can we have the court reporter

10  read it back?

11

12    COURT REPORTER:  It's going to take me a

13        minute.

14

15            MS. ZELDIN:  Okay.  Well, let's move on for

16        now.

17

18            THE WITNESS:  Okay.

19

20  BY MS. ZELDIN:

21

22  Q    So, Ms. Jones, is there any medical-related

23        accommodation that you're claiming that you've

24        asked for that you didn't receive?

25  A    Perhaps, but I don't have anything in front of me. ✦

                                                    155

1         But medical, yeah.  On the date that they met with

2         me.  That was one that I can recall right off the

3         top of my head.

4   Q     What date are you talking about.

5   A     That was in August.  You shared a document -- I'm

6         not sure if it was an email or not of where

7         Henrietta Archie sent saying they would have an

8         interactive discussion with me and I think as far

9         as I can recall, and I'm not looking at any notes,

10     this is just from my recollection, I believe that

11     date was possibly August 12th that she sent at 9:44

12     p.m. or whatever time at night. Around that time,

13     whether it was August 12th, August 13th or

14     somewhere around there they denied my medical

15     accommodations. I specifically requested medical

16     or I may have said disability. But they're

17     intertwined. Medical and my -- medical and

18     disability.

19  Q   What accommodation did you ask for.

20  A   I wanted to -- I have found somebody to pick up my

21     days because I had a medical appointment for my

22     disability and it was -- the shift swap rules you

23     have to put in to trade within a certain amount of

24     time or you have to ask for a leader to sign off,

25     so I had done that process. I found people to work

156

1     it. I -- management asked to meet with me. I

2     didn't go to management -- excuse me -- because

3     this is a trauma incident so of discrimination,

4     retaliation that I'm alleging, so let me -- I'm

5     starting to feel my eyes start to twitch and my

6     chest starting to tighten up.

7

8          So Shane Bowman, who was not my direct

9     OSM, but he's an OSM at the time, he came to me

10    while I was working on the pier in the back room

11    and he said basically -- this is not verbatim, but

12    he said that management wanted to meet with me.  I

13    think this was August 13th and so I went to the

14    ESC, he told me to go to the ESC and I recall me

15    having symptoms because I don't know what -- they

16    -- it was ongoing harassment, so I'm like what are

17    they going to say now.  They're switching things up

18    always.  What are they calling me for now.  I just

19    want to be able to do my job at work.  And they're

20    calling me, they're taking me off the pier to meet

21    with management yet again.

22

23          So I remember seeing Jeff Simonen and --

24    who's a leader at Delta.  He's -- I think he's

25    above Ron Cook, if I'm not mistaken.  And the other

157

1     -- another Delta employee who's a leader on

2     management.  Kitty or Kate -- Kitty, so they told

3     me they wanted to talk to me.  So they brought me

```
 4        in the room and told me basically that they would
 5        not be -- allow me to shift trade.  They said we
 6        saw you turned in some shifts -- when I say said,
 7        I'm going off of recollection.  It's not verbatim.
 8        They said we say that -- they had that interactive
 9        discussion in which Henrietta Archie, that email
10        she said where they will be meeting with me.  They
11        called me in to meet with me and said opposite of
12        what they -- she had described in that document
13        because I don't know if that's an email, but in
14        that document.  I can't recall whether it had the
15        email address or not.
16
17             And to answer your question, the medical
18        disability I requested, I told them, I begged them,
19        I'm like listen, please, I'm requesting an
20        accommodation.  I met separately with -- Jeff
21        Simonen left and then I met with the other manager,
22        I can't think of her name.  Kitty, Katelyn -- not
23        Kitty.  Kathryn Koster, I believe, but I could be
24        wrong.  And I met with her --
25   Q    Let me stop you right there, please.  I just want
```

158

1    to ask you.  Do you have recordings of those

2    conversations --

3  A  Yes.

4  Q  -- that you're talking about?

5  A  Yes.  And I want to make for the record, I have

6    these in -- I don't know how if they -- I'm not

7    going to destroy them, but I don't know -- I have

8    concerns that Delta or something and I've shared

9    this with you all, they may try to go in and find a

10   way to erase them off my device and this is not

11   being paranoid, but Delta is very tech savvy,

12   they're a billionaire company, so as of the last

13   time I met with my -- well, I can't say that, but

14   at the time I did have them.  I haven't -- I

15   haven't verified whether they're still with me as

16   of now.  This has been two years or so -- a year

17   and a half ago now, but I did at the time record

18   that conversation.  Those conversations.

19  Q  And did you do that with your personnel cell phone?

20  A  It was either cell phone or another device.

21  Q  That you owned?

22  A  Yes.

23  Q  So, Ms. Jones, if I can summarize what I think you

24   just testified to.  Your request for a medical

25   accommodation that you described was related to

159

```
 1       wanting to shift swap in 2024, is that right?

 2   A   Or for them to provide some type of accommodation.

 3       Whatever the case may be.  Because they -- they

 4       have the ability to say it was -- I needed to get

 5       to a medical disability provider appointment.  If

 6       they told me -- if they told me hey, Littiece,

 7       okay, which they have in the past.  We're going to

 8       shift adjust your shift.  We see that you have to

 9       be there at your appointment at nine o'clock and

10       you have to work seven to twelve, so we're going to

11       shift adjust you to five to ten or whatever the

12       case may be.  They have the ability and they've

13       done it before, not only for me, but for other

14       employees, to do so.  That's the one-to-one direct

15       relationship that they claim is what makes Delta be

16       the company that they are and the flexibility that

17       they give and how they have open door policy and

18       they don't need a union because of that one-to-one

19       direct relationship.

20   Q   Ms. Jones, did you end up being able to get to that

21       medical appointment?

22   A   I don't remember.  I don't recall.  I'd have to
```

23      look at my medical records to see.

24      What provider was that that you were going to.

25  A   I don't recall at this time.

                                        160

1           MS. ZELDIN:  Document 32, please.

2

3           THE WITNESS:  Could we please take record of

4       what time that we've had so I can know what time we

5       have left.  I don't want to waive any of my rights.

6

7           VIDEO TECHNICIAN:  Six hours and fifty-eight

8       minutes.

9

10          THE WITNESS:  So we have two minutes.

11

12          MS. ZELDIN:  Can you --

13

14          THE WITNESS:  Thank you, Mr. Videographer.

15

16          MS. ZELDIN:  Okay.  Ms. Jones, please look at

17      this document that I've marked Exhibit 25.  A.J.,

18      can you scroll down quickly so she can see what it

19      is.

20

21          (Document Marked for Identification as

22          Deposition Exhibit Number 25)

23

24  BY MS. ZELDIN:

25↟

161

1  Q     And, Ms. Jones, if you look at this document and I

2        would like you to confirm that this is an email

3        that you sent -- go back.  That you sent to Antonio

4        Bush and you copied some other people and you were

5        forwarding a complaint that you made to OSHA and an

6        EOC Charge.

7  A     Could you scroll back up to the top document if

8        possible, please.  Thank you.  Yes.  It says my

9        email address, it's attached there, and it does

10       have the other email addresses, yes.  I can confirm

11       this is an email.  Could you scroll down and I can

12       see what -- the second part I believe of your

13       question.  I see what's a complaint, OSHA, and now

14       this -- if you could scroll back up, please just a

15       little bit.  Now this does -- begin forwarded

16       message.  So believe that that would be a part of

17       the forwarding.  And it does say Equal Charge of

18       Discrimination Against Delta Air Lines.  So those

19       leaders -- Delta employees were aware of my

20       complaint.  So on February 7th, 2024.  And my

21       protected activity.

22  Q    And, Ms. Jones, this OSHA Complaint that was

23       attached to your email, that's the first OSHA

24       Complaint that you made at Delta Air Lines,

25       correct?♠

                                                        162

1  A    I apologize, but I believe time is up.  Could

2       Mr. --

3  Q    No.  Ms. Jones, you need to answer my question

4       that's pending on the record.

5  A    Okay.  Could you ask it, please.  It's 3:44 and I

6       believe we've met the seven-hour requirement and

7       it's been way more than --

8  Q    The last few seconds are being wasted by your

9       making statements like that.

10  A    I apologize.

11  Q    So please answer my question.  This is the first

12       form -- this is the first complaint that you made

13       to OSHA while you were at Delta Air lines, correct?

14  A    I o not know.

15

16          MS. ZELDIN:  Okay.  At this point we are going

17     to suspend Ms. Jones' deposition.

18

19          THE WITNESS:  May I ask what that means,

20     suspend the deposition?

21

22          MS. ZELDIN:  The deposition is suspended.

23     We're off the record.

24

25          THE WITNESS:  Okay.  Thank you.

163

1           VIDEO TECHNICIAN:  We are off the record at

2      3:45.

3

4               (Deposition concluded at 3:45 p.m.)

5

6

7