

**State Court Administrative Office
Trial Court Services**

# A Handbook for Michigan Courts on Accessibility and Accommodation for Individuals with Disabilities

**March 2018**
*Updated September 2022*



Table of Contents

Acknowledgements................................................................................................ 1
Overview............................................................................................................... 1
Introduction........................................................................................................... 3
PART I  An Overview of the Americans with Disabilities Act of 1990 (ADA)
and the ADA Amendments Act of 2008................................................................ 6
   The Americans with Disabilities Act (ADA) ................................................. 6
   The ADA Amendments Act of 2008 (ADAAA) ........................................... 6
   Equal Opportunity......................................................................................... 6
   Defining Disability Pursuant to the ADA...................................................... 7
   Qualified Individual with a Disability .......................................................... 8
   Activities Covered by the ADA..................................................................... 9
   Integrated Settings ........................................................................................ 9
PART II Interacting With Persons With Disabilities.......................................... 11
   General Considerations................................................................................ 11
   Special Considerations for Judges in the Courtroom.................................... 12
   Using Person-First Language....................................................................... 12
   Interacting with People Who Are Deaf or Hard of Hearing ......................... 13
   Interacting with People Who Have Speech or Language Disorders.............. 15
   Interacting with People Who Are Blind or Visually Impaired ..................... 17
   Interacting With People Who Have Mobility Limitations............................ 18
   Interacting With People Who Have Cognitive Disabilities ......................... 18
   Service Animals .......................................................................................... 20
   Developing the Accommodation Protocol.................................................... 21
PART IV Removing Common Barriers to Access - Communication ............... 24
   Equally Effective Communication............................................................... 24
   Auxiliary Aids and Services ....................................................................... 25
   Public Service Announcements ................................................................... 30
   Alternate Document Formats....................................................................... 30
   Accessible Websites ................................................................................... 31
PART V Removing Common Barriers to Access - Facilities............................ 33
   Facility Access............................................................................................ 33
   Setting Priorities ........................................................................................ 33
   Historic Preservation................................................................................... 35
   New Construction and Alterations............................................................... 35
Appendix A - Resources
Appendix B: MC 70 - Request for Reasonable Accommodation....................... 44
Appendix C: Model Local Administrative Order and Grievance Procedure...... 45
Appendix D: Sign Language Interpreters in the Courtroom............................... 46
Appendix E - Law Supplement......................................................................... 52

# Acknowledgements

This handbook has been modified, with permission, from one developed by the State of Georgia's Commission on Access and Fairness in the Courts in December 2004.  The Michigan State Court Administrative Office (SCAO) sincerely thanks the state of Georgia's Administrative Office of the Courts for their willingness to permit the use and modification of this material.

# Overview

The Americans with Disabilities Act of 1990 and the ADA Amendments Act of 2008 clearly identify the responsibilities of courts under Title II to provide access for citizens with disabilities to programs and services offered by public entities, including courts.  This handbook serves as a guide for judges and court staff for being fully compliant with these two federal statutes.  Review the technical assistance manual for further information.

This handbook is organized into five sections:

   I.     An Overview of the Americans with Disabilities Act of 1990 (ADA) and the ADA Amendments Act of 2008

   II.    Interacting With Persons With Disabilities

   III.   Establishing a Disability/Accommodation Protocol

   IV.    Removing Common Barriers to Access - Communication

   V.     Removing Common Barriers to Access - Facilities

Within the context of these five sections, the following requirements have been mandated by the Michigan Supreme Court:

   ▪   Under Administrative Order No. 2015-5, chief judges and ADA coordinators must receive ADA training provided by the State Court Administrative Office.

   ▪   Each court must have a local administrative order (LAO 35) to ensure that qualified individuals with disabilities have equal and full access to the judicial system. Further, chief judges and court administrators should develop policies and procedures for responding to requests for accommodation and communicate them to all court staff.  Requests for accommodation may be made verbally or in writing. Whenever possible, the court should document the request for accommodation in writing, which may be accomplished on the SCAO-approved form MC 70, also attached as Appendix B.

1

2

In addition, we recommend that:

- Judges, administrators, and court staff should receive training on interacting with persons with disabilities.

- Each court should have a comprehensive resource guide for providing effective communication to persons with disabilities.  This resource guide should outline all local resources, as well as state and federal resources that are available.

- Court staff should receive training on responding to the needs of persons with mental or cognitive disabilities.

Implementing these recommendations will provide benefits that exceed any cost associated with their implementation.  They will preserve our commitment to access to Michigan's justice system for all citizens.

# Introduction

**Michigan's courts are obligated to take proactive steps to remove barriers to accessibility for people with disabilities.  This handbook is designed to help Michigan courts identify and remove barriers to access Michigan's courts for people with disabilities.**

Disability is a natural part of life.  Nearly two million[1] people in Michigan have some kind of disability.  Some of them acquired disabilities at birth, such as cerebral palsy, while others acquired them later in life, such as a spinal cord injury.  Some people have obvious disabilities, such as blindness, while others experience disabilities coined as hidden, such as diabetes, deafness, HIV infection, and epilepsy.  Some individuals experience disability on a temporary basis, such as individuals undergoing cancer treatment, while others have permanently disabling conditions that may be progressive in nature, such as multiple sclerosis.  As a result of disabilities, many citizens are significantly restricted in their ability to hear, see, think, breathe, walk, or conduct many other major life activities.

At any given time, citizens with disabilities may come into contact with the court system.  Citizens with disabilities may serve as jurors, appear as parties or witnesses in a trial, or choose to attend hearings as observers.  Currently, individuals with disabilities serve as judges, referees, magistrates, clerks, and lawyers in Michigan's courts.

While some individuals with disabilities are able to take part in various court processes and activities without difficulty, for many others their disabilities, combined with environmental obstacles, impose significant barriers to an equal opportunity to participate.  Therefore, Michigan courts are obligated to identify and remove barriers for people with disabilities so they can access court programs and services, including judicial proceedings, jury service, and courthouse meetings.

Common barriers to access include:

- Lack of awareness of or unintended insensitivity to disability-related concerns.

- Lack of effective auxiliary aids and services for individuals with communication disabilities.

- Inaccessible court facilities for individuals with mobility impairments.

- Inflexible court policies, practices, and procedures.

**The Challenge**

Disability presents two related, yet distinct, challenges for Michigan's courts.  The first challenge involves developing and implementing a comprehensive plan to address general accessibility concerns for Michigan's citizens with disabilities, including but not limited to removing architectural barriers in courthouses, installing assistive listening systems in courtrooms,

---

[1] http://www.michigan.gov/disabilityresources

3

providing materials in alternative formats, and making court websites accessible for people who use assistive technology. These actions improve access to the courts for many people.[2]

The second challenge involves interacting with people with disabilities as individuals, and not just as members of a group. No two people with disabilities are alike; each individual has unique skills, aptitudes, and capacities. Under certain circumstances, it may be necessary to provide an individualized accommodation to ensure an equal opportunity to be heard in the administration of justice, such as a sign language interpreter for a person who is deaf and a Text Telephone (TTY)[3] device for a person who is deaf but does not know sign language. An accommodation that works well for one individual may not work as well for someone else with a similar disability. Thus, courts must[4] evaluate on a case-by-case basis each request for a reasonable accommodation by a person with a disability.

**The Approach**

This handbook is designed to provide accurate, up-to-date information about the rights of people with disabilities and to build the capacity of judges, courtroom staff, clerks, and other courthouse personnel to effectively identify and remove barriers to ensure that individuals with disabilities are able to fully participate in Michigan's courts.

To address these challenges, this handbook follows the framework established in the Americans with Disabilities Act of 1990 (ADA) and the ADA Amendments Act of 2008. With these broader standards, courts must recognize that the ADA was designed to protect the civil rights of people with disabilities. When courts are asked to take steps to ensure that people with disabilities have equal access to court programs, services, and activities, it is important to view such requests in the context of the civil rights of an individual with a disability, rather than seeing ADA compliance as an unwanted mandate.

This handbook is not intended as a complete ADA compliance manual; it is a resource for Michigan's courts. The U.S. Department of Justice (DOJ) provides abundant information, including an ADA technical assistance manual for Title II entities and additional Title II materials.

**The Benefits**

The benefits of providing disability-related accommodations include:

- Ensuring due process, equal protection, and civil rights of individuals with disabilities;

- Empowering Michigan's citizens with disabilities to fully participate in the judicial system by exercising the rights and responsibilities expected of all citizens, such as jury service;

---

[2] A form for assessing your court's facility may be found at
http://courts.mi.gov/Administration/SCAO/OfficesPrograms/Documents/access/ADA-SelfEvaluationChecklist.pdf.
[3] Text Telephone (TTY) is also sometimes called a TDD, or Telecommunication Device for the Deaf.
[4] Whenever the word "must" is used in connection with the responsibilities of the court, it is a requirement of the Americans with Disabilities Act and the ADA Amendments Act of 2008.

- Increasing the capacity of Michigan's courts to respond to accommodation requests and the specific needs of individuals with disabilities; and

- Enhancing the usability and accessibility of Michigan's courts for a broad range of people with and without disabilities.

# PART I:  An Overview of the Americans with Disabilities Act of 1990 (ADA) and the ADA Amendments Act of 2008.

**Courts must provide equal access to all Michigan citizens with disabilities in an integrated setting, and must make reasonable accommodations when necessary, unless doing so constitutes an undue administrative or financial burden, or fundamentally alters the nature of the court's programs, services, and activities.  Michigan's courts must be aware of the basic minimum requirements for accessibility under the ADA, which include many different courtroom activities.**

### The Americans with Disabilities Act (ADA)

Congress passed the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  The ADA is the world's first comprehensive, national law protecting the civil rights of individuals with disabilities.  At the time the ADA was passed, Congress estimated that more than 43 million Americans experienced some form of disability.  In its lengthy findings about the necessity of the ADA, Congress stated that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."  *Williams v Wasserman*, 164 F. Supp. 2d 591 (2001).

### The ADA Amendments Act of 2008 (ADAAA)

The primary purpose of the ADA Amendments Act of 2008, as stated in the Findings and Purposes section of the act is "… to carry out the ADA's objectives of providing a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination by reinstating a broad scope of protection to be available under the ADA."  This broad scope of protection extends coverage under the ADAAA to individuals who were denied coverage as a result of limiting Supreme Court decisions.[5]

### Equal Opportunity

The goal of the ADA is to provide equal opportunity for people with disabilities.  In the administration of justice, Michigan's courts must provide an equally effective opportunity for people with disabilities to participate in the programs the court offers to citizens.  The general principle underlying a court's obligations under the ADA is protecting the civil rights of people with disabilities to enjoy and benefit from the services, programs, and activities provided to all people by the court system.

---

[5]  Sutton v United Air Lines, Inc., 527 U.S. 471 (1999)
   Toyota Motor Manufacturing, Kentucky, Inc. v Williams, 534 U.S. 184 (2002)

**Defining Disability Pursuant to the ADA**

Under the ADA, an individual with a disability is a person who:

1.  Has a physical or mental impairment that substantially limits one or more major life activities. A physical impairment is defined as any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine. A mental impairment is defined as any mental or psychological disorder, such as a developmental disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

2.  Has a record of such impairment. For example, an individual with cancer may have taken significant time off from work for chemotherapy. Years later, a potential employer, noting the gap in employment, may not hire that individual even though the individual is currently not impaired in any way. The individual would be covered by the ADA because of the past record of a disability.

3.  Has been regarded as having such an impairment. An individual meets the requirement of being regarded as having such an impairment if the individual establishes that he or she has been subjected to an action prohibited under this chapter[6] because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity.

Not all physical or mental impairments constitute disabilities under the ADA, however in the ADAAA, the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." For a physical or mental impairment to be defined as a disability, the impairment or a combination of impairments must substantially limit one or more major life activities. Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. Whether an individual has a disabling impairment depends on the particular facts of each individual case.

To determine if an impairment substantially limits a major life activity, the following factors should be considered:

1.  The nature and severity of the impairment;

2.  The permanent or long-term impact of the impairment; and

3.  The duration of the impairment.[7]

Thus, temporary, nonchronic impairments that have little or no long-term impact, such as broken limbs, sprained joints, concussions, appendicitis, and influenza, usually are not viewed as

---

[6] Title 42, Chapter 126
[7] https://www.ada.gov/qandaeng.htm

7

disabilities.  For example, a broken leg, which is an impairment of relatively brief duration, would not be considered a disability.

However, the residual impact of an improperly healed broken leg might be considered a disability.  Likewise, a temporary psychological impairment is not considered a disability under the ADA, while a long-term or permanent impairment may be a disability.

ADAAA states that the determination of whether an impairment substantially limits a major life activity shall be made *without regard* to the ameliorative effects of mitigating measures such as:

1. Medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

2. Use of assistive technology;

3. Reasonable accommodations or auxiliary aids or services; or

4. Learned behavioral or adaptive neurological modifications.

The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

**Qualified Individual with a Disability**

Under the ADA, qualified individuals with disabilities must have equal access to court programs, services, and activities.  An individual is qualified when he or she meets the essential eligibility requirements for participation.  For example, if an individual who is hard of hearing and meets the essential eligibility requirements as well as the statutory requirements to serve as a juror, the court must make an accommodation to allow participation as a juror.

When determining whether someone is qualified, courts must (1) make reasonable modifications to their policies, practices, and procedures and/or (2) furnish aids or services when necessary to ensure an equally effective opportunity to participate.  However, a court is not required to take any action that would constitute an undue financial or administrative burden or fundamentally alter the nature of the program, service, or activity.  On the other hand, a court may wish to work with the individual on alternative accommodations that would meet his or her needs.

For example, a court may have a policy that prohibits food or drink in the courtroom.  However, if an individual has diabetes and requires eating something every hour, the court may adjust its policy to provide this accommodation and allow the individual to bring food with them into the courtroom.  However, a potential juror who requests to be present outside the courtroom during trial due to extreme anxiety may be denied this request as it would fundamentally alter the nature of the proceedings due to the requirement that jurors be physically present to evaluate testimony.

Eligibility criteria for access to court programs, services, and activities, which tend to exclude persons with disabilities, must not be arbitrary or based on stereotype or speculation.  Instead, this determination must be made on a case-by-case basis.  For example, a potential juror who is blind may not be qualified to serve on a jury requiring visual perception, such as at a trial for

forgery, but may be qualified to serve as a juror in other cases if given reasonable accommodations (e.g. written evidence could be provided in alternate format or by the provision of a reader).

A court may reject an accommodation request for which the individual with a disability is not otherwise qualified.  For example, a court would not be required to provide a sign language interpreter for a potential juror if that juror did not meet the essential eligibility requirement of residency.

## Activities Covered by the ADA

Almost every activity conducted by a Michigan court is covered by the Title II mandate that courts ensure that qualified individuals with physical or mental disabilities are afforded an equal opportunity to participate in court programs, services, or activities.  Title II covers the juror selection system, trials, hearings, courthouse security procedures, and access to libraries, publications, Internet sites, dispute resolution programs, and seminars offered by the court.  Even if a trial or hearing is closed to the public, Title II applies if one of the participants has a disability.  Title II also applies to the physical accessibility of courtrooms and courthouse structures.  The court, under Title II, must ensure that all programs with which it contracts are ADA compliant.  However, the court has no obligation to pay for the contracted program's ADA compliance.

The U.S. Supreme Court has broadly applied the program access requirement of Title II.  In *Pennsylvania v Yeskey*, 524 U.S. 206 (1998), the U.S. Supreme Court applied the ADA's use of the terms *services*, *programs*, and *activities* liberally to include a motivational boot camp offered for state prisoners.  The Court held that state prisons were clearly subject to the ADA and that the boot camp was an ADA-protected voluntary program by virtue of its definition in a Pennsylvania statute.

Certain internal administrative functions of the court that are not open to the public, such as regular staff meetings for courthouse personnel, are not covered under Title II.  However, a court may have to provide reasonable accommodations for court employees with disabilities under the employment provisions of the ADA.[8]

## Integrated Settings

Court programs, services, and activities must be provided to people with disabilities in the most integrated setting to the maximum extent feasible.  The ADA's integration mandate provides that segregation and isolation are forms of discrimination and should be avoided to achieve equal opportunity.  Sometimes, it may be necessary to provide access in an alternative manner.  For example, a court may construct a fully accessible courtroom in a courthouse to accommodate people with disabilities.  However, the court must ensure that this effort does not result in unnecessary segregation, i.e. the court must not reserve the accessible courtroom solely for cases involving people with disabilities.  A possible solution when planning renovations is to use an ADA architect to ensure ADA compliance without resulting in mistaken segregation and isolation.

---

[8] https://www.ada.gov/ada_title_I.htm

With the widespread use of videoconferencing that began with the COVID-19 pandemic, the need for accommodations under the ADA continues with remote hearings, although many accommodations may look different in a remote world.

# PART II:  Interacting With Persons With Disabilities

**General Considerations**

The most important thing Michigan court officials can do in their day-to-day interactions with people with disabilities is to treat them with the same courtesy, dignity, and respect that they afford everyone else.  The local ADA coordinator should provide training to all court staff to familiarize them with the various types of disabilities they may encounter.  There is no need to be nervous or apprehensive when speaking to and working with people with disabilities.

A person with a disability may be able to access every feature in a courtroom but may be left out of court activities if court personnel exhibit negative or unhelpful attitudes to simple accommodation requests or requests for information.  Eliminating these attitudinal barriers can help ensure that people with disabilities have full access to Michigan's courts.

Some general tips[9] for communicating with people with disabilities are:

- Always direct communication to the individual with the disability.  If the individual is accompanied, do not direct your comments to the companion.

- Use the same level of formality with everyone present.

- Relax.  Do not be embarrassed if you happen to use common expressions like "See you later" or "Got to be running along" that seem to relate to the person's disability.

- It is appropriate to shake hands when introduced to a person with a disability.  People who have limited use of their hand or who wear an artificial limb can usually shake hands.  Shaking with the left hand is acceptable.  For people who cannot shake hands, touch them on the shoulder or arm to welcome and acknowledge their presence.

- Focus on the individual and the issue at hand, not the disability.

- People with disabilities are interested in the same topics of conversation in which people without disabilities are interested.

- A person who needs you to speak in a louder voice will ask.

- People with disabilities, like all people, are experts on themselves.  They know what they like, what they do not like, and what they can and cannot do.  If you are uncertain what to do, ask.  Most people would rather answer a question about protocol than be in an uncomfortable situation.

- Offer assistance in a dignified manner, with sensitivity and respect.  Be prepared to have the offer declined.  If the offer is accepted, listen to and accept instructions.

---

[9]  Developed by the Georgia Commission on Access and Fairness in the Courts

- When mistakes are made apologize, correct the problem, learn from the mistake, and move on.

- Let people provide information about their disability on their own initiative.  They are not responsible for educating the public by sharing their story.

- Offer assistance but do not insist or be offended if your offer is not accepted.

**Special Considerations for Judges in the Courtroom**

Judges are the embodiment of justice.  Everyone looks to the court to ensure full and effective participation for people with disabilities.  Top-level leadership and commitment are essential in developing an environment where access is not only a requirement but an expectation for all citizens.

- Judges and ADA coordinators should carefully evaluate requests for accommodation made by people with disabilities appearing in the courtroom or the courthouse.  Although the court makes the final decision regarding the most appropriate accommodation for each particular situation, it is important to be educated by people about their disabilities.  The individuals have experience and information regarding their disabilities and are usually able to suggest the best way to accommodate their needs.

- Use person-first language.  Put the person ahead of the disability in order to communicate your recognition that the person's disability is not the most important part of their identity.  For example, it is more polite to say "the juror with a disability" than "the disabled juror" or "the handicapped juror."

- Train your staff, including the court officers, to be sensitive to the needs of people with disabilities.  Patience and flexibility are important because, just as with most other citizens, many people with disabilities will not be familiar with the procedures and practices of the court.

- The need for accommodations under the ADA continues with remote hearings,[10] although many accommodations may look different in a remote world.  Requests for accommodations are decided on a case-by-case basis, with the court and the requestor engaging in a dialogue to determine the best reasonable accommodation for the person.  The Virtual Courtroom Task Force issued guidance[11] on ADA accommodations and remote hearings in July 2020; the document contains information that is relevant today. It is important to note that some accommodations cannot be made through Zoom and it may be necessary to hold in-person hearings to ensure that persons with disabilities can participate fully.

**Using Person-First Language**

---

[10] ADM File No 2020-08 included amendments to MCR 2.002, 2.107, 2.305, 2.407, 2.506, 2.621, 3.904, 6.006, 6.106, 6.425, 8.110, 9.112, 9.115, and 9.221. These amendments facilitate the use of videoconferencing in Michigan courts.
[11] https://www.courts.michigan.gov/4a1e13/siteassets/covid/covid-19/ada-remotehearingsinfo.pdf

When communicating, use person-first language consistently. Person-first language recognizes that a person's disability is not the most important part of that person's identity.

- Using person-first language is an effort to be polite and sensitive and not an attempt to restrict the use of language.

- Put the person ahead of the identifier of the disability in a given sentence. For example, saying "people with disabilities" is more appropriate, thoughtful, and sensitive than saying "disabled people."

- Avoid language that is insulting or dehumanizing. Words like crippled, deaf-mute, retarded, and deformed, while once commonly used, are now considered offensive when applied to individuals with disabilities.

- To avoid repetitive usage in long documents, switch around the order of words that appear frequently on one page. For example, consider using "Michigan's citizens with disabilities" or "juror with a disability," but keep the person-first pattern consistent.

## Interacting with People Who Are Deaf or Hard of Hearing

Hearing loss among the citizens of Michigan ranges from mild to profound. Many of Michigan's citizens with hearing loss can be accommodated in court when assistive listening devices are available. However, in certain situations, more individualized accommodations, such as Communication Access Realtime Translations (CART)[12] or sign language interpreters are necessary to facilitate effective communication with the court. The Michigan Deaf Interpreters Act (1982 PA 204), in addition to the federal requirements under the Americans with Disabilities Act, provides for and regulates the use of interpreters for administrative and judicial proceedings. It also establishes standards and compensation for interpreters.

Guidelines to follow when interacting with people who are deaf or hard of hearing:

- There is a wide range of hearing losses and communication preferences. If you do not know the individual's preferred communication method, ask.

- Make direct eye contact. Natural facial expressions and gestures will provide important information to your conversation. Keep your face and mouth visible when speaking.

- Before speaking to a person who is deaf or hard of hearing, get the person's attention. To get a person's attention, call his or her name. If there is no response, lightly touch the person's arm or shoulder.

- If you are asked to repeat yourself several times, try rephrasing your sentence.

- Writing information down may facilitate communication.

---

[12] Closed captioning for nonbroadcast settings, such as classrooms, churches, meetings, and conferences.

13

- When speaking to a person who reads lips or is hard of hearing, speak clearly. Do not exaggerate your speech. Shouting does not help communication.

- The role of a sign language interpreter is to facilitate communication between people who do not share a common language. Therefore, interpreters should not participate or be included in the communication outside of that role and function.

- Good lighting is important to facilitate clear communication.

Range of deafness and hard of hearing:

- Individuals who are hard of hearing or late deafened (those who became deaf after acquiring speech and language skills) may use hearing aids, cochlear implants, and/or assistive listening devices to support their residual hearing or they may not use any augmentative devices at all. They may use lip-reading skills to facilitate one-on-one communication and may use sign language or oral interpreters in group settings. Individuals who are hard of hearing or late-deafened commonly use spoken English as a method of communicating verbally and may or may not know how to communicate with sign language.

- Individuals who are prelingually or culturally deaf are those who were born deaf or became deaf before acquiring speech and language skills. They most likely will use American Sign Language (ASL) or a form of English sign language to communicate and may or may not have lip-reading skills. Some individuals may use hearing aids or cochlear implants to augment residual hearing.

- Individuals who are deaf-blind are those who are deaf or hard of hearing and are also blind or have low vision (also called partial sight) that cannot be satisfactorily corrected with glasses, contacts, or surgery. They aren't necessarily profoundly deaf and totally blind; they may have tunnel vision and be hard of hearing. To communicate, they may use tactile sign language,[13] finger spelling,[14] or print-on-palm.[15] They may also require either close or far proximity for clarity of visual field or they may need an interpreter to sign in a small space. While courts are holding many proceedings remotely, it may be necessary to hold in-person hearings instead of remote hearings because of the nature of these accommodations, which require physical touch and proximity. For written communication, individuals who are deaf-blind may rely extensively on braille, a system of raised dots to represent letters. Depending on the type of vision loss they have and if they communicate using sign language, these individuals may or may not have special requirements to accommodate their visual field and language needs.

- Some individuals who are deaf may have had only limited exposure to formal language (spoken or signed) and consequently are not fluent in ASL or English.

---

[13] Tactile signing is a common means of communication used by people with both a sight and hearing impairment, which is based on a standard system of deaf manual signs.

[14] Finger spelling (or dactylology) is the representation of the letters of a writing system, and sometimes numeral systems, using only the hands.

[15] Print-on-Palm (POP) is a simple method of communicating with a person who is deaf-blind and familiar with printed English.

They may or may not have an effective gestural communication form that can be used to give or receive information.  Therefore, providing communication access for individuals who have minimal linguistic competency will be most challenging.  The Michigan Department of Civil Rights - Division of Deaf, Deaf-Blind, and Hard of Hearing can provide resources to assist in facilitation.

- If a person requests an ASL interpreter for an ADA accommodation during a remote proceeding, the interpreter will appear as a participant, just like a party to the case.  In Zoom, their name should include "Interpreter" so that participants can easily identify the interpreter.  The party who requested the interpreter may wish to "pin" the interpreter's video feed.  Pinning a specific user's video won't affect the view of other participants and will not affect cloud recordings.  Instructions may be found here.  If a party who has an ASL interpreter is moved into a breakout room, the ASL interpreter will need to be assigned to the breakout room as well.  If the person who is deaf has issues communicating with the interpreter, it may be necessary to hold the proceeding in person.

**Interacting with People Who Have Speech or Language Disorders**

A speech or language disorder is an inability to understand and/or appropriately use the speech and language systems of society.  Such disorders may range from simple sound repetitions and occasional misarticulations to the complete absence ability to use speech and language for communication.  Speech and language problems can exist together or independently.  Some causes of speech and language disorders include hearing loss, stroke, brain injury, developmental disability, drug abuse, cleft lip or palate, and vocal abuse or misuse.  Frequently, however, the cause is unknown.

Speech problems affect how the communication sounds.  There is a speech problem when so many speech sounds are distorted that the speaker cannot be understood, when there is no source of sound because the vocal cords have been surgically removed, or when stuttering disrupts the natural rhythm of the oral message.  Speech disorders include fluency disorders, motor speech disorders, and voice disorders:

- A fluency disorder is an interruption in the flow of speaking characterized by atypical rate, rhythm, and repetitions in sounds, syllables, words, and phrases.  This interruption may be accompanied by excessive tension, struggle behavior, and secondary mannerisms.  Stuttering is a type of fluency disorder.

- A motor speech disorder is an impairment of speech arising from damage to the central or peripheral nervous system that can affect a person's speech, voice, and breath support for communication and swallowing.  Often, Parkinson's Disease, Huntington's Disease, and Amyotrophic Lateral Sclerosis (ALS) lead to motor speech disorders.

- A voice disorder is characterized by the abnormal production and/or absence of vocal quality, pitch, loudness, resonance, and/or duration, given an individual's age and/or sex.  Vocal abuse and misuse are the most prevalent causes and preventable types of voice disorders.

15

Language disorders are the impaired comprehension and/or use of spoken, written, and/or other symbol systems. Language refers to a code made up of a group of rules that cover what words mean, how to make new words, how to combine words, and what word combinations are best in what situations. A person who cannot understand the language code has a receptive language problem. A person who is not using enough language rules to share thoughts, ideas, and feelings completely and appropriately has an expressive language problem. One type of problem can exist without the other, but often they occur together in both children and adults.

When interacting with people who have speech or language disorders, consider the following tips:

- Give the person your full attention. Don't interrupt or finish the person's sentences. Listen patiently and carefully.

- Do not assume that a person with speech impairment doesn't understand you.

- If you have trouble understanding, ask the person to repeat the statement. If you still cannot understand, ask the person to write it down or suggest another way of facilitating communication.

- If necessary, repeat your understanding of the message in order to clarify or confirm what the person said.

- Provide a quiet environment to make communication easier.

**Interacting with People Who Are Blind or Visually Impaired**

Blindness is the total or partial inability to see because of a disease or disorder of the eye, optic nerve, or brain. Legal blindness is defined as a visual acuity of 20/200 or worse with the best possible correction. Someone with a visual acuity of 20/200 can see at 20 feet what someone with normal sight can see at 200 feet.

Vision impairment means that a person's eyesight cannot be corrected to a normal level. It is a loss of vision that makes it hard or impossible to do daily tasks without specialized adaptations. Vision impairment may be caused by a loss of visual acuity where the eye does not see objects as clearly as usual. It may also be caused by a loss of visual field where the person cannot see as wide an area as usual without moving their eyes or turning their head. Visual acuity alone cannot tell you how much a person's life will be affected by vision loss. It is important to also assess how well a person uses the vision he or she has. Two people may have the same visual acuity, but one may be able to use their vision better to do everyday tasks. Many people who are blind may have some usable vision that can help them move around in their environment and do things in their daily lives.

When interacting with people who are blind or visually impaired, consider the following tips:

- Identify yourself and address the individual by name so they will know you are speaking to him or her.

- It is appropriate to ask, "Would you like me to guide you?" If your offer is accepted, let the person take your arm just above the elbow.

- Offer to read written information.

- Provide all standard printed information available to the public concerning court policies, practices, and procedures in an alternate format such as braille, audio tape, electronic format, or large print. Efforts should also be made to provide information at kiosks or as posted signage in an audible format.

- If the individual has a guide dog, walk on the side opposite the dog. As you are walking describe the setting, noting any obstacles such as stairs ("up" or "down") and objects protruding from the wall.

- Never pet a guide dog (or any other service animal) before getting permission from its handler to do so. The dog is working and must concentrate.

- If you need to leave a person alone, inform them first and make sure there is a rail, wall, or something else he or she can touch.

- A person's cane is part of the individual's personal space, so avoid touching it. If they put the cane down, do not move it. Let the person know if it is in the way.

- If the court is conducting a remote hearing with a person who is blind or visually impaired, the court should verbalize what is being displayed on screen or in the chat. The court may consider reading any chat comments aloud, saving the entire chat for later reference and to share with participants, and sending links or

17

documents shared through the chat to participants via e-mail.  Documents or videos shared through the share screen feature would be shared ahead of any proceedings.  If it is not, then it should be shared with all parties after the hearing.

### Interacting With People Who Have Mobility Limitations

Mobility impairment involves the partial or complete loss of use of any of an individual's limbs.  Mobility impairment refers to a broad range of disabilities that include orthopedic, neuromuscular, cardiovascular, and pulmonary disorders.  Many things can cause mobility impairment including disease (polio), spinal cord trauma (a motor vehicle accident), and disorders occurring at or before birth (cerebral palsy).

Many disabilities that cause mobility impairment are visible because individuals may rely upon assistive devices such as wheelchairs, scooters, crutches, and canes.  Other disabilities that cause mobility impairments, such as arthritis, are invisible but must be taken equally seriously.

When interacting with people who have mobility limitations, consider the following tips:

- Avoid touching or leaning on a person's wheelchair, scooter, or walking aid without permission.  People with disabilities consider their mobility devices as part of their personal space.

- Be aware of an individual's reach limits.  Place as many items as possible within the grasp of a wheelchair user.  If a service counter is too high for a wheelchair user to see over, step around it to provide service.  Also, have a clipboard available if filling in forms or providing signatures is expected.

- Sit down and/or position yourself at the same eye contact level when speaking with a wheelchair user for more than a few moments.

- Provide a chair for someone who has difficulty standing for an extended time.

- People who are not visibly mobility-impaired may have medical needs that impact their ability to get around the courthouse.  For example, a person with a heart condition may have trouble walking quickly or long distances and may need chairs or benches to sit and rest on.

- With the widespread use of remote proceedings, the court may find it necessary to conduct a remote proceeding in a case to accommodate the person with mobility issues.

### Interacting With People Who Have Cognitive Disabilities

One of the most difficult areas of accommodation that Michigan's courts face is that of mental illness or cognitive disability.  Cognition refers to understanding; the ability to comprehend what you see and hear and the ability to infer information from social cues and body language.  People with these impairments may have trouble learning new things, making generalizations from one situation to another snd expressing themselves through spoken or written language.  Cognitive limitations of varying degrees can often be found in people who have been diagnosed with Attention Deficit Disorder (ADD), a developmental disability, autism, or a closed head injury.

18

Because the issues facing individuals with mental illness or cognitive disability often touch on basic rights, especially for criminal defendants, it is difficult to address them effectively in the scope of this handbook. What follows are three basic steps Michigan's courts can take to ensure that people with mental or cognitive disabilities have equal access to justice.

In many cases, courts must first determine whether an individual is a qualified individual with a disability under the ADA. For a criminal defendant, this will usually be a determination of whether the individual is competent to stand trial. In other situations involving a person with a mental disability appearing as a witness or as a potential juror, the court must determine whether that individual can carry out his or her duties in a courtroom. For example, if an individual is unable to understand testimony as a juror because of a developmental disability, or if an individual disrupts the courtroom frequently as a spectator because of behavioral problems or delusions, those individuals are not qualified and can be excluded from the courtroom. However, it is important to remember that a developmental disability or a traumatic brain injury will not always leave individuals unqualified to serve as witnesses, spectators, or jurors. Courts should conduct an individualized inquiry to determine whether an individual is qualified.

Courts must next determine whether it can provide reasonable accommodations for an individual with mental or cognitive disabilities without a fundamental alteration of court programs and services. Keep in mind that many people with mental or cognitive impairments may not be able to request accommodations effectively and may need assistance in constructing appropriate accommodation requests, whether from the court or from their legal representatives.

The third step is determining whether an individual with a mental or cognitive disability poses a direct threat to him- or herself or others in the courtroom. The ADA requires Michigan's courts to make a knowing, individualized determination - not based on myth, fear, or stereotype - of whether an individual poses a threat, and to consider any possible, available accommodations for this threat. Courts may choose to exclude individuals who pose a threat, but only in a manner consistent with their civil rights and other protections.

The wide variance among the mental capabilities of those with cognitive disabilities (any disability affecting mental processes) complicates matters in the courthouse because a person with a developmental disability will not have the same needs as a person who has attention deficit disorder or autism. A person with profound cognitive disabilities will need assistance with nearly every aspect of daily living. Someone with a minor learning disorder, however, may be able to function adequately despite the disorder, perhaps even to the extent that the disorder is never discovered or diagnosed. It is important, however, not to approach an individual with any preconceived notions as to his or her specific capabilities. Not everyone who is slow speaking is cognitively impaired.

Many legal or courtroom-related terms and concepts are complex and may be difficult to understand. People with some form of cognitive disability, however, may be reluctant to disclose their disability or to disclose that they do not understand the information being presented. If you suspect that someone may be struggling to understand, ask, "This is very complicated. May I explain this in a different way that may make it easier to understand?" The use of simple, easily understood language will benefit all participants - not only people with disabilities.

When interacting with people who have cognitive disabilities, consider the following tips:

19

- Speak clearly and slowly and keep sentences short.

- Break complicated information or instructions down into shorter, distinct parts and avoid complex terms.

- If possible, use symbols, pictures, or actions to help convey meaning.

- Ask concrete, open-ended questions.  Avoid yes/no answers.

- Allow for additional time to speak with participants and for them to respond.

- When necessary, repeat information using different wording or a different communication approach.  Allow time for the information to be fully understood.

- Provide material on audiotape rather than in written form.

**Service Animals**

In addition to people who are blind and may use guide dogs, other people with disabilities may use animals to assist them.  For example, some individuals with limited manual dexterity may have a service animal retrieve or pick up objects for them.

When interacting with people who use service animals, consider the following tips:

- Avoid petting or touching a service animal while the animal is working.

- Do not feed a service animal or distract a service animal in any way.

- Do not separate an individual with a disability from his or her service animal.

- If the service animal misbehaves, or becomes out of the control of the person with the disability, that person is obligated to control the animal.

- The U.S. Department of Justice authored a brochure about service animals that may be helpful in answering questions regarding service animals in Michigan's courts.

# PART III: Establishing a Disability/Accommodation Protocol

**Having a protocol to handle disability accommodation requests is necessary to ensure that all Michigan citizens have an equal opportunity to participate in court activities. A disability protocol in each court should establish a single point of contact for requests, as well as guidance for providing accommodations in a timely manner.**

To ensure that all individuals with disabilities have a truly equal opportunity to participate in court proceedings, it is necessary to provide a means for these individuals to access the courts despite the particular barriers they often face.

Courts can address this responsibility in various ways. One means is to preemptively modify court facilities or services in a way that is intended to provide access to individuals with certain disabilities. Consider blind individuals who want to visit a court system's website for case information. If the website is designed to interface with commonly available assistive technology, those individuals consistently have a meaningful opportunity to utilize that court service without having to make a request for accommodation. Likewise, a court's installation of a commonly used assistive listening system will provide deaf individuals with a means to effectively communicate during court proceedings. Similarly, structural building alterations can provide accessibility to many people with varying disabilities. And, once accomplished, these types of actions generally require only periodic maintenance to facilitate use.

Another means by which courts may address their responsibility to provide access to individuals with disabilities is through individualized accommodation requests that trigger case-by-case assessments to determine the appropriate course of action. Under the ADA, qualified individuals are eligible for individualized accommodations when necessary to ensure an equal opportunity to participate. And, if a particular accommodation is determined to be necessary, the court cannot pass any associated cost on to the individual.

To manage its responsibilities, each court should develop and implement a local protocol for addressing individualized requests. A protocol enables the court to:

- Utilize resource information for addressing common accommodation requests;

- Demonstrate to individuals with disabilities that their requests are being considered; and

- Methodically evaluate accommodation requests, without creating unnecessary administrative demands on busy court personnel that often result from unexpected requests.

**Developing the Accommodation Protocol**

A protocol should include the following steps:

21

**Step 1: Identify and train an ADA coordinator for disability-related matters.**

Designating a knowledgeable ADA coordinator is perhaps the most important step toward achieving compliance with the law. According to the ADA, if a public entity has 50 or more employees it is required to designate at least one responsible employee to coordinate ADA compliance. In Michigan, however, Administrative Order 2015-5 requires every court to have an ADA coordinator regardless of the number of employees and an ADA contact for each court location. A court's ADA coordinator should be prepared to perform four important roles:

- **Serve as Single Point of Contact:** The ADA coordinator provides a single point of contact for people with disabilities who need accommodations to access court services. Identifying the ADA coordinator in public notices and publications allows individuals with disabilities to contact one person with the knowledge and responsibility to handle accommodation requests.

- **Disseminate Information to Public and Within Court:** The ADA coordinator serves as a central resource on disability issues for judges, administrators, court officers, clerks, other courtroom personnel, and citizens with disabilities. The ADA coordinator should be familiar with the court's responsibilities under the law and should have access to the resources needed to respond to inquiries and accommodation requests.

- **Promote Effective Communication About Accessibility and Requests for Accommodation:** The ADA coordinator should have the authority and willingness to promote effective communication among court judges and staff and members of the public about accessibility and requests for accommodation.

- **Provide Training and Support for Court Staff:** The ADA coordinator provides or arranges for disability awareness training and technical assistance for court employees whose positions require that they respond to accessibility issues and requests for accommodation.

**Step 2: Involve people with disabilities and disability-related organizations in proactively identifying potential and existing access barriers.**

Effective outreach will help educate the disability community on court programs, services, and activities, as well as provide feedback to court personnel on ways to improve their customer service.

**Step 3: Establish a procedure for evaluating accommodation requests in a timely manner.**

A well-drafted accommodation procedure should:

- Evaluate cases and circumstances on an individualized, case-by-case basis as expeditiously as possible;

- Eliminate unnecessary levels of review where possible. Court employees may receive impromptu requests, such as a request to escort a person who is blind to the appropriate courtroom, and the employees should be empowered to handle these requests;

22

- Maintain the confidentiality of medical information;

- Track all accommodation requests, including those requests that cannot be fulfilled, and document the process used to resolve each request. Whenever possible, the accommodation request should be documented on SCAO-approved form MC 70 as attached in Appendix B.  If a review of request for reasonable accommodations is requested, SCAO-approved form MC 70a should be utilized for the individual requesting accommodation to complete and for the response to be documented. SCAO-approved form MC 70a is also attached in Appendix B.

The ADA coordinator should maintain a resource and technical support database regarding disability issues to support implementation of the accommodation procedure.

**Step 4: Educate all court personnel on the court's accessibility features and its accommodation protocol.**

The ADA coordinator should be responsible for arranging training of all court personnel on accessibility features of all facilities, as well as the court's accommodation protocol.  The Human Resources or Personnel Office may assist the ADA coordinator in tracking the completion of training modules by court personnel.

Court staff may be referred to the [SCAO training video about ADA](), along with the accompanying training materials.

**Step 5: Notify the public regarding the court's accommodation process.**

Each court is required to provide information about its ADA-related responsibilities to all interested persons.  A court can disseminate information about its disability accommodation protocol, including the name of its ADA coordinator, in several ways:  on its website, in its local court rules, in juror summonses, and in publicly available information pamphlets.  Notice to the public should reference the ADA's prohibition against discrimination and address the rights of individuals with disabilities under applicable laws.  A court may also reference its local administrative order.

**Step 6: Implement a Grievance Procedure**

Courts must adopt and publish a grievance procedure for the prompt and equitable resolution of ADA-related complaints.  The grievance procedure may be included in existing grievance procedures adopted by the court for any other purpose.  The ADA provides sufficient latitude in this area that courts may choose to adopt alternative dispute resolution processes, such as third-party mediation, in their grievance procedures.

Appendix C contains a sample grievance procedure.  This is also located in the court's local administrative order.

# PART IV:  Removing Common Barriers to Access - Communication

**Equally Effective Communication**

**Because so much of court business involves conveying information, effective communication is one of the most important and challenging responsibilities for Michigan's courts.  When courts do not communicate effectively with people with disabilities, it can have a serious detrimental effect on the administration of justice.**

Communication includes the exchange of information in all forms, including voice, sound, print, and electronic and information technology.  Michigan's courts should be aware of the types of disabilities that impact effective communication, as well as the auxiliary aids and services that are often necessary to ensure effective communication.

To ensure an equal opportunity for individuals with disabilities to participate in the courtroom, it is necessary to acknowledge and remove the communication barriers people with disabilities often face.  Disabilities that may affect an individual's ability to effectively communicate with the court may include, but are not limited to:

- Hearing

- Speech

- Vision

- Cognition

The court should assess each situation on an individual, case-by-case basis to determine if it needs to provide auxiliary aids and services to ensure effective communication with people with disabilities.  Examples of auxiliary aids and services used to accommodate people with disabilities are:

- Assistive listening devices

- Communication Access Realtime Translation (CART)

- Qualified sign language interpreters

- Telecommunications relay services (also known as TRS, relay service, IP-relay, or Web-based relay service)

- Electronic mail

- Alternate formats for printed materials

- Accessible Internet sites

24

In selecting an auxiliary aid or service, courts should:

- Give primary consideration to the aid or service preferred by the individual because that individual is usually best able to identify the communication barriers that hamper participation.

- Allow people the opportunity to use their own assistive technology products to achieve effective communication. Denying persons the opportunity to use such devices would deny effective communication. For example, a person with cerebral palsy who has difficulty with speech may use their own augmentative communication device and decide to use their device during the court proceeding. However, if the individual does not own an augmentative communication device, a court is not required to purchase such a device for a person with a disability.

- Consider the context in which the communication is taking place and its importance:

  o If a plaintiff who is deaf requests a sign language interpreter for a scheduling hearing, it may be possible to provide effective communication through written notes, provided the plaintiff understands written English, the hearing is brief, the plaintiff is represented by counsel and can communicate with his or her counsel, and the plaintiff is able to participate effectively in the hearing.

  o However, when the information being communicated is complex or lengthy (for example a hearing to determine child custody) and the plaintiff who is deaf uses sign language to communicate, a qualified sign language interpreter is necessary for effective communication.

A court is not required to provide the requested aid or service if there is another equally effective means of communication available; if the requested aid or service would result in a fundamental alteration in the service, program, or activity; or if it would create undue financial or administrative burdens.

A court shall not pass along to a person with a disability the cost of the aid or service in the form of a surcharge.

**Auxiliary Aids and Services**

**Assistive Listening Systems**

Assistive Listening Systems (ALS) are like binoculars for the ears. They increase the loudness of specific sounds and bring sounds directly into the ear. In addition, they stretch hearing aids and cochlear implants by improving their effectiveness in noisy environments, places having poor acoustics, and when the the speaker is distant. ALS can utilize FM, infrared, or inductive loop technologies. All three technologies are considered good, and each one has advantages and disadvantages. Infrared systems guarantee privacy and are the appropriate choice for situations such as court proceedings that require confidentiality. Infrared systems work by transmitting sound via light waves in a 60-degree cone to receivers worn by users. Thus, the system is

restricted to the room in which the equipment is installed.  With the exception of high frequency lights and bright sunlight, there are few sources of interference with infrared systems.

Like all ALS, each infrared system has at least three components: a microphone, a transmission technology, and a device for receiving the signal and bringing the sound to the ear.  New Access Board ADA standards require receivers to have a jack to plug in a neck loop or a cochlear implant patch cord.

If a courtroom already has a microphone and a public address system for people who hear, it should be simple to patch in an infrared system.  If a courtroom does not have a public address system, consideration should be given to the number of microphones to provide and who will use them.  Wireless microphones can be used with any system, thereby eliminating running cables around the courtroom.  However, if security is an issue, wireless microphones are not secure.

ALS should also be considered for the jury room.  Small, portable infrared systems are available with multiple microphones in addition to a table-mounted conference microphone.

Some microphones should have a mute switch, such as those used on the bench when a judge calls up attorneys for a private conversation.

**Communication Access Realtime Translation (CART) Services**

Communication Access Realtime Translation (CART) is a word-for-word speech-to-text service for people who require communication access.  People who are deaf, late deafened, hard of hearing, or who have cochlear implants benefit from CART because it provides a text display of speech that occurs in the courtroom.  A CART provider uses a steno machine, notebook computer, and Realtime software to render instant speech-to-text translation on a computer monitor or other display media for an individual or group.

In remote proceedings, Zoom has the capacity to allow closed captioning for participants. If closed captioning is being provided as an accommodation under the ADA, the court must use a Communication Access RealTime Transcriber (CART). Many Court Stenographic Reporters (CSRs) are also CART-certified and may be utilized to provide this service. If the court does not have a CART-certified CSR, then the court must contact a third-party CART provider for the service. You may find instructions on setting up closed captioning for a proceeding in Zoom here.

Further information about CART may be found on the National Association of the Deaf website. If an assistive device is needed, contact the Michigan Coalition for Deaf and Hard of Hearing or the Michigan Division of Civil Rights – Department of Deaf, DeafBlind, and Hard of Hearing.

**Sign Language Interpreters**

When it is necessary to utilize a sign language interpreter to facilitate effective communication, the ADA requires that the interpreter must be qualified.  Being able to sign does not equate to being able to interpret.  To provide effective communication, the interpreter must be able to process spoken language into equivalent sign language and to process sign language into equivalent spoken language.  Therefore, a state or local court employee who can "sign pretty well" is not qualified to provide effective communication.

26

There are a number of sign language systems (signed English and American Sign Language are the most prevalent) used by individuals who are deaf or hard of hearing, and individuals who use a particular system may not communicate effectively through an interpreter using a different system.  Therefore, when an interpreter is required, courts should provide a qualified interpreter who is able to equivalently interpret using the same sign system as the individual who is deaf.

A qualified interpreter must be able to interpret both receptively and expressively in sign language and in spoken English and must do so effectively, accurately, and impartially, using any specialized vocabulary necessary.  Additionally, Michigan law requires that a sign language interpreter be certified by the Registry of Interpreters for the Deaf in particular proceedings.[16] See Appendix D for the Sign Language Interpreter's Code of Ethics from the Registry of Interpreters for the Deaf, Inc.

Under the ADA, courts must provide a qualified interpreter; courts may not require individuals who are deaf or hard of hearing to provide their own interpreters.  The obligation to provide impartial interpreting services requires that, upon request, courts provide an interpreter who does not have a personal relationship to the individual who is deaf or hard of hearing.  In most situations, allowing friends or family members to interpret is inappropriate because their presence may violate the right to confidentiality or because a friend or family member may have an interest in the proceeding that is different from that of the individual who is deaf or hard of hearing.

In remote proceedings, if a person requests an ASL interpreter for an ADA accommodation, the interpreter will appear as a participant, just like a party to the case. In Zoom, their name should include "Interpreter" so that participants can easily identify the interpreter. The party who requested the interpreter may wish to "pin" the interpreter's video feed. Pinning a specific user's video will not affect the view of other participants and will not affect cloud recordings[17]. Instructions may be found here. If a party who has an ASL interpreter is moved into a breakout room, the ASL interpreter will need to be assigned to the breakout room as well.

It is often necessary to employ more than one interpreter during proceedings that are lengthy or complex.  See Appendix D, Sign Language Interpreters in the Courtroom, for additional information.

### Text Telephone (TTY)

Text telephone is a generic term for devices that provide access to real-time telephone communications for persons with hearing or speech impairments.  Text telephones are also known as TTYs and TDDs (telecommunications devices for deaf persons).  Like computers with modems, text telephones provide keyboards for typing conversations and visual displays for callers and receiving parties who are connected over standard telephone lines.

A call from one text telephone can only be received by another compatible-text telephone.  The devices, however, can be used by and between both hearing and non-hearing persons.  Two-way communications between individuals who use text telephones and those who do not is accomplished through 24-hour operator-assisted telecommunications relay services.

---

[16] MCL 393.508c

[17] Zoom Help Center "Pin or Spotlight Video"

A court utilizing a TTY should include the dedicated TTY phone number on all publications where the court's main telephone number is listed.  If a court provides public telephone service, it should consider purchasing a TTY device for public use.  If the court does not provide a public TTY, it should provide people with disabilities access to the court's TTY device on request.

The U.S. Access Board has a helpful guide on using a TTY.

**Telecommunications Relay Services (TRS)**

Michigan's courts can communicate with people who have difficulty using a telephone by using Telecommunications Relay Services (TRS), which enables standard voice telephone users to talk to people who have difficulty hearing or speaking on the telephone.  TRS uses operators, called communications assistants, to facilitate the making of telephone calls by people who have difficulty hearing or speaking and who use assistive technology devices such as text telephones (TTY).  Relay services are managed by the Michigan Relay program, administered under the Public Service Commission.

There are several types of TRS available.  Any of these may be initiated by an individual with a hearing or speech disability, or by a conventional telephone user:

- **Text-to-Voice TRS.**  A person using a TTY dials 7-1-1 to access an operator who places the call.  The operator then relays the conversation by transmitting the text from the TTY display to the recipient through speech, and by transmitting the voice of the recipient to the TTY caller through text.  Relay callers are not limited in the type, length, or nature of their calls.  The TRS operator is bound by a confidentiality requirement not to disclose the content of any TRS call.  Courts should train employees who are responsible for making and answering phone calls about the TRS system so they can communicate effectively with people using the system.  When employees answer the phone and hear, "Hello, this is the relay service.  Have you received a relay call before?" the employee should not hang up.  They are about to talk to a person who is deaf, hard of hearing or has a speech disability.

- **Voice Carry Over (VCO) TRS.**  VCO TRS enables a person who is hard of hearing but who wants to use his or her own voice, to speak directly to the receiving party and to receive responses in text form through the operator.  No typing is required by the calling or the called party.  This service is particularly useful to people who have lost their hearing but who can still speak.

- **Hearing Carry Over (HCO) TRS.**  HCO TRS enables a person with a speech disability to type his or her part of the conversation on a TTY.  The operator reads these words to the called party and the caller hears responses directly from the called party.

- **Speech-to-Speech Relay (STS).**  With STS, a person with a speech disability uses an operator specially trained in understanding a variety of speech disorders.  The operator repeats what the caller says in a manner that makes the caller's words clear and understandable.  No special telephone is needed for this option.

- **Video Relay Services (VRS).**  VRS enables individuals who use sign language to make relay calls through operators who can interpret their calls.  The caller signs to

28

the operator with the use of video equipment and the operator voices what is signed to the called party and signs back to the caller.  This type of relay service is offered on a voluntary basis by certain TRS programs.  This option is helpful for people who use American Sign Language (ASL), and for people who cannot type on a TTY easily.  The Michigan Relay Center also provides for people to make relay calls over the Internet through its website.

- **Electronic mail (e-mail).**  Electronic mail and text messaging have replaced telephone calls for many types of information exchange.  Michigan's courts should be encouraged to communicate with persons who have difficulty using a telephone by printing an e-mail address on court forms as an alternative to TTY or TRS services.  Court employees should be willing to use office e-mail to answer questions or supply information to persons who have a hearing disability.

29

**Public Service Announcements**

Courts may choose televised public service announcements to transmit messages to local residents. For example, the court may fund a message for broadcast on television stations about the local specialty court programs or may show a short orientation videotape to prospective jurors. In any multimedia production, courts should consider providing captions for any spoken content so that people who are deaf or hard of hearing can access the content.

There are two different types of captioning available. Open captioning displays the captions directly on the screen where all viewers can readily see the captions. The subtitles on foreign language movies are a form of open captioning. While open captions can be effective for people who are deaf and hard of hearing, the hearing population also relies on the captions in noisy venues such as airports, health clubs, and restaurants. However, open captioning can also be distracting for some viewers. Thus, closed captioning provides coded captions that are embedded in the video. Televisions manufactured after 1993 have a caption decoder chip that decodes the captioned video.

If courts work with a production company to create a video, it should be captioned. Most production companies have the capability to provide either open or closed captions on request. If the video is to be displayed in the courtroom, the court should be sure that the television where the video is to be displayed is equipped with closed captioning and that courtroom personnel have the training to set closed captioning options on request.

Another possible solution for courts without the funding to provide closed captioning is to present the video on a split-screen. The content of the video would be shown on one half of the screen, while a sign-language interpreter would interpret the spoken words on the other half of the screen. While this is a low-cost approach, it may not be as effective as captioning for long videos, or for persons who are hard of hearing and do not understand sign language.

**Alternate Document Formats**

People with disabilities that affect their ability to read print may request print materials in alternate formats. Common examples of alternate formats include:

- **Audiotape.** Courts should make sure that any audiotape versions of documents are recorded in a way that is clear and understandable.

- **Braille.** Braille uses a system of raised dots to represent letters. Documents in braille are embossed onto heavy paper and read by touch. A court may choose to purchase a braille embosser and the necessary software to translate electronic documents into braille, but it may be more convenient to contract this work out to an expert in braille printing. Because the majority of people who are blind do not use braille, however, it should not be the only type of alternate format provided.

- **Electronic Files.** Courts can use either a floppy disk or a CD-ROM to deliver electronic copies of documents depending on the technology needs of the person making the request. Documents should be saved on disk either in text format (.txt extension) or in Microsoft Rich Text Format (.rtf) format unless the person requests a specific file format.

30

- **Large Print.** The minimum size for creating large-print documents is 18-point font, which can be easily produced on most word processors. However, a person with low vision may request a larger font. If the document is not available electronically, use the enlarging features on a copier to provide large print.

**Accessible Websites**

Increasingly, electronic and information technology is the medium for the exchange of information. Many people with disabilities use assistive technology to enable them to use computers and access the Internet. People who are blind and cannot see computer monitors may use screen readers - devices that speak the text that would normally appear on a monitor. People who have mobility impairments and experience difficulty using a computer mouse can use voice recognition software to control their computers with verbal commands. People with other disabilities may use still other kinds of assistive technology.

As it becomes more common to provide public services over the Internet, courts should be aware of potential barriers that people with disabilities face in accessing their Internet sites. Many researchers draw a parallel to the design of accessible buildings and the design of accessible websites. In both instances, making just a few changes can make the building or the website more accessible to people with disabilities. However, the changes that need to be made to an Internet site are less expensive and more easily implemented than installing a ramp or widening a door. Designers may not realize how simple features built into a web page will assist someone who, for instance, cannot see a computer monitor or use a mouse. Creating accessible Internet sites only appears more complicated because most people are not familiar with the computer code used to create websites.

An example of a barrier is a photograph of a courthouse on a court's website with no text identifying it. Because screen readers cannot interpret images unless there is text associated with it, a blind person would have no way of knowing whether the image is an unidentified photo or logo, artwork, link to another page, or something else. Simply adding a line of hidden computer code to label the photograph "Photograph of County Courthouse" will allow the blind user to make sense of the image.

Technology offers tremendous potential for Michigan's courts to provide effective services. The U.S. Department of Justice suggests the following voluntary action plan for providing accessible websites:

- Establish a policy that your web pages will be accessible and create a process for implementation.

- Ensure that all new and modified web pages and content are accessible:

  - Check the HTML of all new web pages. Make sure that accessible elements are used, including alt tags, long descriptions, and captions, as needed.

  - If images are used, including photos, graphics, scanned images, or image maps, make sure to include alt tags and/or long descriptions for each.

  - If you use online forms and tables, make those elements accessible.

31

- ○ When posting documents on the website, always provide them in HTML or a text-based format (even if you are also providing them in another format, such as Portable Document Format (PDF)).

- ▪ Develop a plan for making your existing web content more accessible.  Describe your plan on an accessible web page.  Encourage input on improvements, including which pages should be given high priority for change.  Let citizens know about the standards or guidelines that are being used.  Consider making the more popular web pages a priority.

- ▪ Ensure that in-house staff and contractors responsible for web page and content development are properly trained.

- ▪ Provide a way for visitors to request accessible information or services by posting a telephone number or e-mail address on your home page.  Establish procedures to ensure a quick response to users with disabilities who are trying to obtain information or services in this way.

- ▪ Periodically enlist disability groups to test your pages for ease of use; use this information to increase accessibility.

A U.S. Department of Justice publication, Accessibility of State and Local Government Websites to People with Disabilities, explains many of the issues involved in creating accessible websites.

32

# PART V:  Removing Common Barriers to Access - Facilities

**Facility Access**

**Existing Facilities**

If a courthouse is inaccessible because doorways are too narrow, restroom facilities are inaccessible, or steps are the only way to get to all or portions of a facility, people with mobility, visual, and hearing impairments may not be able to fully participate in jury duty, attend hearings, or gain access to other services.  Title II of the ADA calls on courts to ensure that their programs, services, and activities are accessible to people with disabilities, even if located in older buildings, unless to do so would fundamentally alter a program, service, or activity or result in undue financial or administrative burdens.  This requirement is called *program access*.

Program access may be achieved by a number of methods.  While in many situations providing access to facilities through structural methods, such as alteration of existing facilities and acquisition or construction of additional facilities, may be the most efficient method, a court system may pursue alternatives to structural changes in order to achieve the necessary access.  The court can:

- Relocate the program or activity to an accessible facility;

- Provide the activity or service in another manner that meets ADA requirements; or

- Make modifications to the building or facility itself to provide accessibility.

However, when choosing among available methods of providing program accessibility, the court must give priority to those methods that offer services, programs, and activities in the most integrated setting appropriate.  The Department of Justice ADA Title II Technical Assistance Manual includes the following illustration:

*D, a defendant in a civil suit, has a respiratory condition that prevents her from climbing steps. Civil suits are routinely heard in a courtroom on the second floor of the courthouse.  The courthouse has no elevator or other means of access to the second floor. The public entity must relocate the proceedings to an accessible ground floor courtroom or take alternative steps, including moving the proceedings to another building, in order to allow D to participate in the civil suit.*

See the U.S. Department of Justice's ADA Title II Technical Assistance Manual.

Program access is a workable requirement because it is reasonable.  SCAO's ADA coordinators stand ready to assist courts in examining options and determining the most appropriate method(s) for achieving program access in a particular court setting.

**Setting Priorities**

When accessibility-related architectural and structural improvements are planned, court systems must ensure that they meet applicable state and federal requirements, briefly outlined below.

If a court system cannot renovate or remove all inaccessible barriers, priority should be considered as follows:

- **Parking, Approach, and Entrance.** Access must be provided to the courthouse from parking areas, public sidewalks, and public transportation stops that abut or are located on court property. This can include installing accessible parking spaces, widening entrances, constructing ramps, or repairing sidewalks. If the main entrance to a courthouse cannot be made accessible, signage should be posted to direct visitors to the accessible entrance.

- **Public and Program Access.** Access must be provided to and within the rooms and spaces where court programs and activities are conducted, including:

  - Courtrooms, which may include jury selection and juror assembly rooms, deliberation rooms, judges' benches, jury boxes, witness stands, and stations used by clerks, court officers, deputy clerks, court reporters, litigants, and counsel;

    - This access can include installing assistive listening systems, braille signage, or fire alarms with visual alerts in one or more courtrooms, or installing an elevator in an inaccessible building.

    - Supporting facilities include holding cells, restrooms, court floor holding cells, visitation rooms, cubicles, and communication devices;

  - Security systems include metal detectors; and

    - If metal detectors have been installed, provide an alternate means for people with disabilities who use mobility aids such as wheelchairs to pass through these systems, such as the use of wands to conduct searches.

  - Ancillary areas, to which a court must provide access for public use, including cafeteria/snack bars and restrooms.

    - Restroom access includes installing accessible stalls, providing insulation for exposed pipes carrying hot water, adjusting the location of coat hooks, or installing grab bars and raised toilets.

A court must take other necessary measures to remove barriers to accessibility. These measures may include installing accessible drinking fountains, installing no-slip surfaces where appropriate, allowing access to offices not generally used by the public, and installing public telephones with volume control mounted at an accessible height.

When existing space and cost constraints hamper efforts to ensure full accessibility, courts should take the following simple steps to reduce or eliminate situations that may pose unnecessary barriers:

- Utilize the court's disability/accommodation protocol to better anticipate when alternative arrangements or relocation may be necessary to ensure that an individual with a disability has the opportunity to fully participate; and

34

- Regularly maintain the court's existing architectural, mechanical, and physical accessibility features.  If accessibility must be disrupted to perform required maintenance, the work should be scheduled during off hours if possible.

## Historic Preservation

Michigan has many historic county courthouses that represent the importance of justice in the state's rich history.  Courts may face significant challenges in making historic courthouses accessible for people with disabilities, while preserving the historic character of these structures.  The ADA does not exempt historically significant facilities from coverage.  If any alterations are made to a historic courthouse - for example, installing an accessible bathroom or water fountain - the court must follow either the ADA accessibility standards or the Uniform Federal Accessibility Standards to the maximum extent feasible.  If following these standards would result in damage to the historic significance of the courthouse, alternative standards that provide a minimal level of access may be used.  The ADA provides that public entities are not required to make structural changes to historic facilities if doing so would threaten or destroy the historical significance of the property.  This provision applies only to properties that are listed or eligible for listing in the National Register of Historic Places or properties designated as historic under state or local law.

Courts should consult their local historic district office or the Michigan State Historic Preservation Office regarding such modifications.  Members of the community, including people with disabilities, should be invited to participate in whatever process the court uses to make decisions.

Under the program access requirement, if court services cannot be offered to citizens with disabilities in historically significant structures, then the programs or services conducted in the facility must be offered in an alternative accessible manner or location when needed.  For example, a rural county court that holds hearings in an inaccessible county courthouse may move proceedings to an accessible courtroom in a city-owned building.

## New Construction and Alterations

Newly constructed or structurally altered court buildings must be designed and constructed in compliance with federal and state accessibility requirements.  Courts should be aware that there can be differences between state and federal requirements in their source, content, and legal effect.

## Standards and Guidelines

- Michigan Law: Utilization of Public Facilities by the Physically Limited Act of 1966 governs the accessibility of newly constructed or remodeled buildings in Michigan. http://legislature.mi.gov/doc.aspx?mcl-Act-1-of-1966

- Federal Law: The U.S. Architectural and Transportation Barriers Compliance Board (Access Board) develops and maintains accessibility guidelines for buildings and facilities.  When the Access Board's guidelines are adopted in the U.S. Department of Justice (DOJ) regulations implementing the ADA, they become enforceable ADA standards.

35

The DOJ has adopted standards for generic spaces and elements, such as entrances, hallways, doorways, toilet facilities, and parking spaces.  These standards are enforceable for courts.  However, the DOJ has not yet adopted standards for elements and spaces that are unique to judicial facilities, such as jury boxes, witness stands, and holding cells.

The Access Board has developed a new set of guidelines that address generic spaces and elements, as well as those that are unique to different types of facilities.  These supersede the previous Access Board guidelines.  The DOJ intends to consider adoption of the new guidelines as a package, including both the generic and the unique elements.  In the interim, courts must follow the DOJ's standards for generic spaces and may adapt these standards in designing unique element/spaces.

**Guidelines for Courtroom Accessibility**

The new ADA-ABA guidelines address access to both public and restricted or secured areas of courthouses and judicial facilities, including:

- **Entrances.**  The guidelines cover access to public entrances and to entrances that are restricted for use by courthouse personnel and detainees.  Features that control use, such as intercommunication devices for controlled entry, are addressed so that they are accessible to people with hearing or vision impairments.  These devices, where provided, are required to have audible and visual signals.  Certain exemptions are provided for entrances and doors used only by security personnel.  In addition, access through or around security screening systems, such as metal detectors, is addressed for people who use mobility aids.

- **Courtrooms.**

  - Jury Boxes and Witness Stands.  Jury boxes and witness stands in each courtroom must be accessible.  When such spaces are elevated, a ramp or platform lift is necessary to provide an accessible route for people unable to use steps.  Sufficient space as detailed in the guidelines is required for people who use wheelchairs or other mobility devices.  Such space is to be located within the defined area of jury boxes and witness stands.

  - Judges' Benches and Courtroom Stations.  The guidelines also cover access to judges' benches and courtroom stations used by court personnel or litigants, such as clerk and court officer stations.  Since these spaces are used mainly by employees, the guidelines allow access to be provided on an as-needed basis, provided that certain conditions are met to facilitate post-construction adaptations.  For example, steps to a judge's bench are permitted if wiring and other features to support later installation of a platform lift are included in the design.

  - Spectator Areas.  Spectator seating in courtrooms is subject to criteria covering assembly areas generally.  These provisions specify a minimum number of wheelchair spaces according to the seating capacity.  Technical criteria for wheelchair spaces address the minimum size and connection by an accessible route.

○ *Assistive Listening Systems.* Assistive listening systems provide access for people who are hard of hearing by enhancing the sound signal of audio amplification systems through a receiver. These systems are required in each courtroom to ensure access for people with hearing impairments to court proceedings, whether they are participants or observers. Assistive listening systems are generally categorized by their mode of transmission. There are hard-wired systems and there are three types of wireless systems: induction loop, infrared, and FM radio transmission. Not all technologies may be suitable for courtrooms. For example, infrared technology is typically a better choice than an FM system where confidential transmission is important.

- **Jury Rooms and Assembly Areas.** The guidelines cover access to rooms and spaces used for jury selection and for deliberations by empaneled jurors. An accessible route must serve these spaces and certain elements, where provided, such as drinking fountains and refreshment counters, must comply with applicable access criteria.

- **Holding Cells.** Holding cells or rooms within courthouses must be accessible. The new ADA guidelines are written to cover cells individually serving courtrooms as well as central holding facilities within a courthouse. Design criteria are provided for elements that may be provided within cells, such as toilets and benches.

# Appendix A

## Disability Resources

Local disability resources can be found easily using the following link to the Michigan Disability Resource Directory.  In this appendix, only national and state resources are listed.

## Building Capacity Resources

### General

**The National Center for State Courts**
ADA Resource Center for State Courts
300 Newport Avenue
Williamsburg, VA 23185
757-259-7590 Phone
757-564-2075 Fax
Web: http://www.ncsc.org/Topics/Access-and-Fairness/Americans-with-Disabilities-Act-ADA/Resource-Guide.aspx

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Civil Rights Division
Disability Rights Section - NYAV
Washington, D.C. 20530
800-514-0301 Phone
202-307-1198 Fax
Web: http://www.usdoj.gov/crt/ada/

**American Bar Association**
Commission on Mental and Physical Disability Law
740 15th Street, N.W.
Washington, DC 20005-1019
202-662-1000 Phone
Web: http://www.americanbar.org/groups/disabilityrights.html

## Deaf and Hard of Hearing Resources

**Self Help for Hard of Hearing People, Inc.**
7910 Woodmont Avenue, Suite 1200
Bethesda, Maryland 20814
301-657-2248 (Voice)
301-657-2249 (TTY)
Web: http://www.shhh.org/


## Interpreting Services

**Interpreter Referral Agencies**
**Michigan Department of Civil Rights**
**Division on Deaf, DeafBlind, and Hard of Hearing**
110 W. Michigan Avenue, Suite 800
Lansing, MI 48913
517-241-1965 V/TTY
517-241-0546 FAX
VP 866-939-3853 or IP: DODHH.net
doddbhh@michigan.gov
http://www.michigan.gov/mdcr/0,4613,7-138-28545---,00.html
Michigan Online Interpreter System

39

## Blind Community Resources

**MCB Office Locations & Staff Directory: Michigan Commission for the Blind**

The Michigan Commission for the Blind (MCB) Central Administrative Office and the Library Service for the Blind and Physically Handicapped are both in Lansing.  The residential MCB Training Center is in Kalamazoo.  MCB Regional Offices are located in Detroit, Escanaba, Flint, Gaylord, Grand Rapids, Kalamazoo, Lansing, and Saginaw. Office contact information is listed below:

**CENTRAL ADMINISTRATIVE OFFICE**
Michigan Commission for the Blind
201 N. Washington, 2nd Floor
P.O. Box 30652
Lansing, MI 48909
517-373-2062 Voice
517-335-5140 Fax
888-864-1212 TDD/TTY

**DETROIT REGIONAL OFFICE**
Michigan Commission for the Blind
Cadillac Place
3038 W. Grand Blvd.
Suite 4-450
Detroit, MI 48202-6038
313-456-1646 Phone
313-456-1645 Fax

**ESCANABA REGIONAL OFFICE**
Michigan Commission for the Blind
State Office Building, 1st Floor
305 Ludington
Escanaba, MI 49829
906-786-8602 Phone
906-786-4638 Fax

**FLINT REGIONAL OFFICE**
Michigan Commission for the Blind
Flint State Office Building
125 E. Union, 7th Floor
Flint, MI 48502
810-760-2030 Phone
810-760-2032 Fax

40

**GAYLORD REGIONAL OFFICE**

Michigan Commission for the Blind
209 W. First Street, Suite 102
Gaylord, MI 49735
989-732-2448 Phone
989-731-3587 Fax

**GRAND RAPIDS REGIONAL OFFICE**

Michigan Commission for the Blind
State Office Building, 4th Floor
350 Ottawa Ave., N.W.
Grand Rapids, MI 49503
616-356-0180 Phone
616-356-0199 Fax

**KALAMAZOO REGIONAL OFFICE**

Michigan Commission for the Blind
1541 Oakland Drive
Kalamazoo, MI 49008
269-337-3875 Phone
269-337-3872 Fax

**LANSING REGIONAL OFFICE**

Michigan Commission for the Blind
201 N. Washington, 2nd Floor
P.O. Box 30652
Lansing, MI 48909
517-373-6425 Phone
517-335-0254 Fax

**SAGINAW REGIONAL OFFICE**

Michigan Commission for the Blind
Jerome T. Hart Building
411 E. Genesee
Saginaw, MI 48607
989-758-1765 Phone
989-758-1405 Fax

**LIBRARY SERVICE FOR THE BLIND AND PHYSICALLY HANDICAPPED**

Michigan Library & Historical Center Building
First Floor
702 West Kalamazoo St.
P.O. Box 30007
Lansing, MI 48909-7507
517-373-5614 Phone                               800-992-9012 Toll-free phone
800-726-7323 In State Fax                        517- 373-5865 Out of State Fax

41

## Mental Health and Cognitive Disabilities Resources

**The Bazelon Center for Mental Health Law**
1101 15th Street, NW Suite 1212
Washington, DC 20005
202-467-5730 Phone
202-223-0409 Fax
Web: http://www.bazelon.org/

## Facility-Related Resources

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Civil Rights Division
Disability Rights Section - NYAV
Washington, D.C. 20530
800-514 -0301 Phone
202-307-1198 Fax
Web: http://www.usdoj.gov/crt/ada/

**U.S. Architectural and Transportation Barriers Compliance Board (Access Board)**
331 F Street, NW, Suite 1000
Washington, DC 20004-1111
800-872-2253 (v)
800-993-2822 (TTY)
202-272-0081 (fax)
E-mail: info@access-board.gov
Web: http://www.access-board.gov/

## Advocacy Services

**Michigan Protection and Advocacy Services - Web:** http://www.mpas.org/
Michigan Protection and Advocacy Service -- Lansing Office
4095 Legacy Parkway, Suite 500
Lansing, MI 48911-4263
1-800-288-5923 Phone (Toll Free)
517-487-1755 Alternate phone
517-487-0827 Fax

**Michigan Protection and Advocacy Service -- Livonia Office**
29200 Vassar Blvd., Suite 200
Livonia, MI 48152-2116
800-414-3956 Phone (Toll Free)
248-473-2990 Alternate Phone
248-473-4104 Fax

**Michigan Protection and Advocacy Service -- Marquette Office**
129 West Baraga Ave., Suite A
Marquette, MI 49855-4644
866-928-5910 Phone (Toll Free)
906-228-5910 Alternate Phone
906-228-9148 Fax

**Appendix B**

# MC 70 - Request for Reasonable Accommodations and Response

http://courts.mi.gov/Administration/SCAO/Forms/courtforms/mc70.pdf

# MC 70a – Review of Request for Reasonable Accommodations and Response

http://courts.mi.gov/Administration/SCAO/Forms/courtforms/mc70a.pdf

44

**Appendix C**

## Model Local Administrative Order and Grievance Procedure

http://courts.mi.gov/Administration/SCAO/Resources/LAOs/LAO35-Model.rtf

45

# Appendix D: Sign Language Interpreters in the Courtroom

Americans with Disabilities Act:  ASL Interpreter Policies

*Are there credentialing and ethics considerations for sign language interpreters?*
Yes. According to current Michigan law,[18] the designated sign language interpreter in legal settings must be certified through the national registry of interpreters for the deaf (RID) or certified through the state by the Division on Deaf and Hard of Hearing of the department of Labor and Economic Growth.  RID-certified interpreters are bound by the RID Code of Ethics and the Michigan Code of Professional Responsibility for Court Interpreters.  Additionally, The National Center for State Courts' Model Code of Professional Responsibility for Interpreters in the Judiciary can be used as a guide for interpreter conduct and responsibilities.

To be a sign language interpreter for any legal proceeding, the interpreter must be credentialed as a level 3 interpreter with a legal endorsement.  If the individual is deaf-blind, the interpreter must also possess a deaf-blind endorsement.

*What is the duty of a certified interpreter?*
Sign language interpreters are officers of the court who are appointed to provide interpreting services for court proceedings.  The duty of the interpreter is to interpret the spoken and signed proceedings accurately while maintaining the integrity of the communication.  The interpreter must execute this role with total absence of bias and must maintain strict confidentiality.

*How do I locate a certified interpreter?*
This technical handbook contains a list of some of the interpreting services brokers/agencies in Michigan.  You can also contact the State Court Administrative Office (SCAO) for additional information.  The Michigan Registry of Interpreters lists level 3 interpreters for the Deaf, which may be found at https://w2.lara.state.mi.us/interpreter/.

*How much lead time do I need to locate a level 3 certified interpreter?*
The shortage of sign language interpreters for any setting is problematic nationally and the scarcity of those who are actually qualified to work in legal and judicial settings is even more severe.  Hence, the more lead time a court has to secure a certified legal interpreter, the better the chance of finding one.  Given the unpredictability of need in legal and judicial settings, it is imperative that attorneys, clerks, law enforcement, etc. inform the Court of the need for an interpreter as soon as possible.  Outside of the mandated Court appearances that must be done within a specific time frame, flexibility in scheduling Court appearances, trials, hearings, etc., will increase the chances that a qualified interpreter or team of interpreters will be found.

*Why do I need more than one interpreter?*
Because of the length or complexity of most legal assignments, a team of two or more interpreters will be necessary in order to ensure the integrity of the court's record.

---

[18] MCL 393.502, MCL 393.503a

*How will a team of interpreters work in court?*
When working as a team for the proceedings, interpreters will work in teams of two or more. Interpreting is more mentally and physically demanding than most people realize and the first thing to suffer as a result of interpreter fatigue is accuracy. Therefore, when working as a team, the interpreters will engage in a system of monitoring to ensure the quality of the process. This process requires the support interpreter to provide the working interpreter with small bits of information that may have been missed. However, if a substantive point has been missed, the interpreters will immediately inform the court of the omission. During the proceedings, the interpreters will utilize written notes to ensure consistency in the process and to provide feedback to one another. At the end of the proceedings, the interpreters will make these notes available to the court. The interpreters infrequently may also need clarification or repetition from the court or may need to confer with one another regarding the process and will inform the court if the need arises.

*Should the Sign Language Interpreters be administered an Oath?*
Yes. Sign Language Interpreters should be administered an Interpreter's Oath prior to the start of the proceedings and before counsel make their appearance for the record:

> **Suggested Interpreter's Oath**
> "Do you solemnly swear or affirm that you will interpret accurately, completely, and impartially, using your best skill and judgment in accordance with the standards prescribed by law and the Code of Professional Conduct for Interpreters in Michigan's courts, follow all official guidelines established by this court for legal interpreting, and discharge all of the solemn duties and obligations of legal interpretation?"

The provision of an interpreter by an agency does not absolve the court from determining whether an interpreter is qualified. Therefore, qualifying the interpreter at the time of the hearing and before the oath is administered to the interpreter will ensure the interpreter's credentials, experience and skills are satisfactory to all parties. Lastly, interpreters should disclose for the record any prior professional and/or social contacts with the person who is deaf.

*What is American Sign Language (ASL)?*
ASL is a naturally occurring language with its own distinct syntax, grammar, and sentential structure. ASL is comparable in complexity and expressiveness to spoken languages. It is not a form of English. Most culturally deaf people regard ASL as their natural language, which reflects their cultural values and keeps their traditions and heritage alive. It is used mainly in North America.

*How does the sign language interpreting process work?*
Proceedings interpreters are on duty throughout the proceedings to interpret the proceedings and will function as officers of the court.

Counsel table interpreters may also be present during the proceedings. Seated between the attorney and client, the counsel table interpreter will interpret all communications between the attorney and client during the proceedings and will interpret as needed for other non-proceeding

47

interchanges.  Counsel table interpreters may or may not serve as monitors of the proceedings interpreters.

Proceedings interpreters are occasionally requested by the court to also serve as interpreters for a deaf defendant and attorney or a deaf plaintiff/victim and prosecuting attorney.  While this is not an ideal situation, interpreters, as officers of the court, serve at the court's discretion and will make every effort to accommodate the court.  However, there may be situations where serving in a dual capacity would be inappropriate or would pose a potential conflict of interest.  If this is the case, the interpreters will inform the court of the potential conflict.

When the interpreter addresses the court, the interpreter will speak in third person in order to indicate for the record that it is the interpreter speaking.  When a person who is deaf addresses the court in sign language, the interpreter will interpret in spoken English and will use first person to indicate for the record that it is the person who is deaf speaking.

It is impossible to sign and speak at the same time when addressing the court because American Sign Language (ASL) and English are grammatically dissimilar languages. Therefore, if working with a team interpreter, one interpreter will address the court while the other interpreter will continue interpreting.  Depending on the setting, bench conferences may be more appropriate and will be requested as necessary.  Courts should hold all bench conferences on the record.  If working alone, the interpreter will address the court without signing.  The person who is deaf will have been informed that this situation could occur.

The proceedings interpreters must maintain an appearance of neutrality at all times and avoid unnecessary discussions with counsel, parties, witnesses, and interested parties both inside and outside the courtroom.  If others make this problematic for the interpreters, the interpreters will request assistance from the court regarding possible instructions from the court to the parties involved.  In light of this requirement, the interpreters may need to have a room or place reserved to retire to during breaks to avoid unnecessary interaction with others.

At times, there will be information that is not interpreted such as the swearing in of the interpreters, sidebar conversations, and attorney-client discussions.

***What are some of the logistical considerations?***
Depending on the individual who is deaf and the specific situation, there may be particular linguistic and procedural issues, logistics, positioning, etc. that will need to be addressed with the court during a brief, pretrial conference.

Sign language interpreters are positioned in the courtroom differently from spoken language interpreters.  Because ASL is a visual language, the interpreter must be placed in front of the person for whom they are interpreting.  If a team of two interpreters has been appointed, the second interpreter will need to take a position in the sightline of the first interpreter, preferably behind and slightly to the side of the deaf individual.  The interpreters request that they be allowed some time prior to the commencement of the proceedings for appropriate positioning to be determined.  In doing so, the interpreters will make every effort to ensure that all sightlines in the well of the court are preserved.

48

When two interpreters are working as a team, the support interpreter will relieve the working interpreter every twenty minutes or so.  The interpreters will make every effort to do this during a natural pause and will do so as inconspicuously as possible.  As happens when working between spoken languages, occasionally there will be a lack of direct equivalence between English and ASL.  Consequently, the interpreter may require a longer period of time to provide an equivalent spoken or signed interpretation. Therefore, if the interpreter is still working after someone has stopped signing or speaking, it is usually a function of this linguistic process. Because of the visual nature of the interpreting process, the interpreters respectfully request that care be given when positioning exhibits or moving about the well of the courtroom to avoid impeding the sightlines.

*What are the logistical considerations for interpreters in remote proceedings?*
If a person requests an ASL interpreter for an ADA accommodation, the interpreter will appear as a participant, just like a party to the case. In Zoom, their name should include "Interpreter" so that participants can easily identify the interpreter. The party who requested the interpreter may wish to "pin" the interpreter's video feed. Pinning a specific user's video won't affect the view of other participants and will not affect cloud recordings[19].  You may find instructions here. If a party who has an ASL interpreter is moved into a breakout room, the ASL interpreter will need to be assigned to the breakout room as well. Zoom has the capacity to allow closed captioning for participants.

*What are the special considerations when interpreting for jury duty?*
Interpreters for jury duty are present only to provide interpreting services during preliminary instructions, voir dire, and, upon empanelment, judicial proceedings, instructions, and deliberations.  The interpreters are not a party in the case, have no interest in the case, and will remain completely neutral.

Interpreters are prohibited from being involved in any manner other than to provide interpreting services as noted above.  Interpreters are not allowed to converse with any member of the jury panel outside of the interpreting process.  Interpreters are prohibited from engaging in discussions about or commenting on the judicial process or proceedings.  All questions will be referred to the appropriate court official.

During deliberations, interpreters are present to carry out their responsibilities and duties as court interpreters and officers of the court.  Consequently, they are only permitted to interpret the conversations and discussions among jurors.  They are not permitted to interject their opinions, thoughts, or questions.  They are not permitted to speak with any of the jurors on their own behalf.  Their sole purpose in being present is to interpret.

---

[19] Zoom Help Center "Pin or Spotlight Video"

**Sign Language Interpreter's Code of Ethics**
The Registry of Interpreters for the Deaf, Inc. has set forth the following tenets of ethical behavior to protect and guide interpreters and hearing and deaf consumers.  Underlying these principles is the desire to ensure for all the right to communicate.  This Code of Professional Conduct applies to all members of the Registry of Interpreters for the Deaf, Inc. and to all certified non-members.

1. Interpreters adhere to standards of confidential communication.
2. Interpreters possess the professional skills and knowledge required for the specific interpreting situation.
3. Interpreters conduct themselves in a manner appropriate to the specific interpreting situation.
4. Interpreters demonstrate respect for consumers.
5. Interpreters demonstrate respect for colleagues, interns, and students of the profession.
6. Interpreters maintain ethical business practices.
7. Interpreters engage in professional development.

**Resources for Sign Language Interpreters**

**Michigan Department of Civil Rights**
**Division on Deaf, Deaf-Blind, and Hard of Hearing**
Cadillac Place, 3054 W. Grand Boulevard, Suite 3-600
Detroit, MI 48202
VP: 313-437-7035
Toll-Free Voice/TTY: 877-499-6232
Fax: 517-241-3963
Email: DODDBHH@Michigan.gov

**Michigan Registry of Interpreters for the Deaf**
Web: http://www.mirid.org

**Registry of Interpreters for the Deaf, Inc**.
333 Commerce Street Alexandria, VA 22314
(703) 838-0030 Phone
Web: http://rid.org/

**The National Center for State Courts**
ADA Resource Center for State Courts
300 Newport Avenue
Williamsburg, VA 23185
(757) 259-7590 Fax: (757) 564-2075
Web: http://www.ncsc.org/

**U.S. Department of Justice**
950 Pennsylvania Avenue, NW
Civil Rights Division
Disability Rights Section - NYAV
Washington, D.C. 20530
(800) 514-0301 Phone
(202) 307-1198 Fax
Web: http://www.usdoj.gov/crt/ada/

**American Bar Association**
Commission on Mental and Physical Disability Law
740 15th Street, N.W.
Washington, DC 20005-1019
(202) 662-1000 Phone
Web: http://www.americanbar.org/aba.html

51

# Appendix E - Law Supplement

Federal Statutes Affecting People with Disabilities

1. ADA and ADA Amendments Act

   http://www.ada.gov/pubs/adastatute08.pdf

2. A Guide to Disability Rights Laws

   http://www.ada.gov/cguide.pdf

Michigan Statutes Affecting People with Disabilities

1. 1982 PA 204 of: Deaf Persons' Interpreters Act

   http://www.michigan.gov/documents/dleg/PA_204_Amended_2007_242542_7.pdf

2. 1937 PA 72 of: Division on Deafness Act

   http://www.legislature.mi.gov/(S(u1zzfsferzdftl2ft2ws2j55))/documents/mcl/pdf/mcl-Act-72-of-1937.pdf

3. 1976 PA 220 of: Persons with Disabilities Civil Rights Act

   https://www.michigan.gov/documents/PWDCRA10-05_115444_7.pdf

4. MCL 750.502c Person with disabilities or trainer led by guide, leader, hearing, or service dog; refusing entry to or use of public or private accommodations as misdemeanor; conditions; identification card; list; definitions.

   http://www.legislature.mi.gov/(S(jasmifznb4pdaa55rwhwxkyv))/documents/mcl/pdf/mcl-750-502c.pdf